UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:14-cv-292 |
| ITT EDUCATIONAL SERVICES, INC. | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

The Consumer Financial Protection Bureau (the "Bureau") alleges the following, upon information and belief, having occurred between 2009 and the present, unless otherwise specified, against ITT Educational Services, Inc. ("ITT" or "Defendant"):

### INTRODUCTION

1. The Bureau brings this action under sections 1031(a), 1036(a), 1054(a), and 1055 of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531(a), 5536(a), 5564(a), and 5565, based on Defendant's violations of section 1036(a)(1) of the CFPA, which prohibits unfair, deceptive, and abusive acts and practices, and the Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq.*, and Regulation Z thereunder, 12 C.F.R. Part 1026.

2. ITT, a publicly traded, for-profit corporation, assures consumers who enroll in classes at one of its 149 locations throughout the country, or in its online programs, that it will help them obtain more desirable jobs and higher income to better their lives.

3. This offer comes with a high price tag, however, and the low-income consumers whom ITT targets can rarely afford to pay its high tuition out-of-pocket. Therefore, ITT's business model relies on convincing these consumers to obtain federal aid, mostly loans, to pay ITT.

4. Federal aid, mostly loans, taken out by consumers comprises the overwhelming majority of ITT's revenue.

5. Federal aid, including federal loans, does not typically provide an ITT student with enough money to cover ITT's entire tuition, however.  Few of ITT's students can afford to cover this tuition gap with their own money.

6. To close this tuition gap, when ITT recruited new students, it offered them zero-interest, short-term loans payable in a single payment nominally due nine months later, at the end of that academic year.  ITT referred to these loans as "Temporary Credit."

7. Through December 2011, ITT's Temporary Credit operated merely as an entry point to private student loans that ITT students would be pushed into in order to repay their Temporary Credit and pay for any tuition gap in subsequent years of study.

8. Students who were given Temporary Credit received no warning of what ITT ultimately planned to do.  If students were not able to pay off the Temporary Credit at the end of the academic year—something ITT knew few students would be able to do—ITT coerced them into paying off their Temporary Credit amounts with high-interest, high-fee private loans payable over ten years.  At the same time, to cover the tuition gaps for the upcoming year, students were coerced into taking out additional private student loans.  If students were unable to pay off the Temporary Credit and pay the second-year tuition gap, and they refused the private loans, they were threatened with expulsion.

9. The ITT staff of campus financial aid offices (the "Financial Aid staff")—who were compensated based in part on how many students they were able to force into these private loans— engaged in a variety of aggressive tactics, such as pulling students from class or withholding course materials or transcripts, to get those students to sign up for these private loans.

10. While students were left unaware that the zero-interest Temporary Credit was just an entry point for these expensive private loans, ITT did consistently tell its investors, from the time the loan programs were put in place, that it was ITT's "plan all along" that students' Temporary Credit would be paid off through private lending programs. ITT had established the lending programs to ensure that income and free cash flow would improve, which in turn improved the appearance of ITT's financial statements.

11. Indeed, ITT designed these private loan programs—ostensibly run by third parties, but in reality controlled by ITT and backed by an ITT guarantee that protected those third parties from loss—to ensure that students with Temporary Credit balances could repay those balances and finance future tuition gaps no matter what their credit profile; ITT required in the lending criteria for those loan programs that they accept virtually any second-year ITT student who had been given a Temporary Credit by ITT.

12. Default rates for ITT students on all loans have been high, but ITT itself projected, as far back as May 2011, that more than 60% of the students who had received the private loans would default. Simply to enhance its financial statements and appearance to investors, ITT sacrificed its students' futures by saddling them with debt on which it knew they would likely default.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action because it concerns federal consumer financial law, 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

14. Venue is proper in this district because Defendant maintains its headquarters and does business in the Southern District of Indiana. 28 U.S.C. § 1391(b); 12 U.S.C. § 5564(f).

## PARTIES

**Plaintiff**

15. The Bureau is an independent agency of the United States charged with regulating the offering and provision of consumer financial products and services under federal consumer financial laws.  12 U.S.C. § 5491(a).  It has independent litigating authority.  12 U.S.C. §§ 5564(a) and (b).

**Defendant**

16. ITT is a Delaware corporation headquartered in Carmel, Indiana that is publicly traded on the New York Stock Exchange under the ticker symbol "ESI."  ITT is a for-profit post-secondary educational institution that operates 149 locations in 38 states, in addition to offering online programs.

17. At least from July 21, 2011 through December 2011, ITT engaged in offering or providing "consumer financial products or services" pursuant to the CFPA, 12 U.S.C. §§ 5481(5) and (15)(A)(i), by offering or providing loans, through certain private loan programs, to its students to pay for a portion of ITT's tuition.

18.  At least from July 21, 2011 through December 2011, ITT engaged in offering or providing "consumer financial products or services" pursuant to the CFPA, 12 U.S.C. §§ 5481(5) and (15)(A)(i), by brokering loans to its students by, among other things, serving as, and holding itself out as, an intermediary between lenders offering student loans and ITT's students, and in arranging the loans for the students.  ITT received a benefit in arranging such loans, which were exclusively provided to ITT students.

19. At least from July 21, 2011 through December 2011, ITT engaged in offering or providing "consumer financial products or services" pursuant to the CFPA, 12 U.S.C. §§ 5481(5) and (15)(A)(viii), by providing, or purporting to provide, through its Financial Aid staff, substantial advice and assistance to students enrolling in ITT programs regarding loans or other available

4

financial aid to cover their ITT tuition, including advising them on what aid programs they could use to pay for ITT, completing much of the necessary applications and paperwork on behalf of students for such loans and aid, and ensuring that such applications and paperwork were completed so that students would obtain the financial aid to pay ITT's tuition.

20. At least from July 21, 2011 through December 2011, ITT provided a material service to a "covered person," pursuant to the CFPA, 12 U.S.C. § 5481(26), in connection with the offering or provision by such covered person of a "consumer financial product or service" pursuant to the CFPA, by participating in "designing, operating, and maintaining" the private loan programs.

21. Accordingly, at least from July 21, 2011 through December 2011, ITT was a "covered person" and a "service provider" under the CFPA, 12 U.S.C. §§ 5481(6) and (26).

## FACTUAL ALLEGATIONS

### ITT's Business Model Is Based on Convincing Consumers to Take out Student Loans to Pay Its High Cost

22. ITT is a publicly-held company, and its primary duty is to maximize profit for its shareholders.

23. ITT's revenues come from student tuition and fees. ITT's tuition is higher than most other for-profit post-secondary institutions. Since 2009, ITT's two-year Associate's degree programs—which are the programs in which approximately 85% of ITT students are enrolled—have cost approximately $44,000, based on a charge of $493 per credit hour. By the same measure, Bachelor's degree programs have cost approximately $88,000.

24. ITT students generally have poor credit profiles and low earnings; according to ITT's Chief Financial Officer ("CFO"), the average ITT student is earning around $18,000 per year and has a credit score under 600 at the time he or she enrolls. Such students can very rarely pay for ITT's tuition out-of-pocket.

25. The primary method by which students pay their ITT tuition, and the main source of ITT's cash receipts, is financial aid provided by the federal government under Title IV of the Higher Education Act of 1965, 20 U.S.C. §§ 1070 *et seq.* ("Title IV Aid").  In its Form 10-K for the year 2012, filed with United States Securities and Exchange Commission ("SEC"), ITT reported that it obtained approximately 80% of its cash receipts from Title IV Aid programs, most of which came from student loans.  ITT also disclosed that approximately 16% of its cash receipts came either from federal benefits for servicemembers and veterans or from state aid programs.  Therefore, in 2012, about 96% of ITT's cash receipts came from the government.

26. In 2011, about 89% of ITT's cash receipts came from the government, and around 7% came from private loans.

27. The only way ITT can access these funds is by getting consumers in the door to apply for these forms of aid.  These students are ITT's sole source of revenue.

28. ITT is aware of the financial struggles of its students.  The average ITT student who is single with no dependents earns only a few thousand dollars above the poverty line and has a deeply sub-prime credit profile, and the average student with a family is living below the poverty line.

**To Convince Consumers to Take out Loans to Pay ITT's High Tuition, ITT Represented That It Would Work in Their Interest to Place Them in Desirable Jobs With Good Salaries**

29. In order to convince consumers to attend and remain at ITT, ITT represented, through a variety of means, that it would work in the interests of its students to better their lives.

30. ITT represented through television and Internet advertising, as well as in oral and written marketing materials, that ITT and the education it provided would help students obtain better jobs. For example, ITT broadcast advertisements on television and on the Internet that stated, "We are educators helping people build a foundation for their lives."

31. ITT made representations regarding the success of its graduates in job placement through a variety of means.  These representations were meant to attract and retain students at ITT and to induce them to take out aid, including loans, to pay ITT's tuition.

32. On its website and in written materials provided to students, ITT told its students about its "placement rates" for "positions that required the direct or indirect use of skills taught in their programs of study."  In addition, ITT provided this information in its Forms 10-K filed with the SEC for the years 2010 through 2012, representing that ITT placed approximately 70% of its "Employable Graduates" in such positions.

33. These figures were based on selective data and incomplete information and did not represent realistic outcomes for most ITT students.  For example, the placement rates do not include former students who did not graduate (which is the most common outcome for students who begin at ITT), may include jobs that do not require the degrees students paid for (such as retail jobs), and may include positions that were merely seasonal.  These job placement rates were designed to mislead consumers about the value of an ITT education.

34. ITT recruiters made a practice of representing that ITT would help to 'place' students in order to convince potential students that ITT would help them obtain desirable jobs.  ITT maintained only one career counselor per approximately 207 students.

35. As a part of a mystery shopping program conducted for ITT, a mystery shopper reported that although the recruiter would not "guarantee anything about placement," the recruiter "told me after the interview that I was highly place able [sic]."

36. Another mystery shopper wrote, "I asked if there were programs upon graduation for job placement.  She said that they do not use the word guarantee, but that placement is highly successful."  [Punctuation added.]

37. Despite making representations to students that ITT would help them find a job in their field of study, ITT provided either no help or only minimal assistance in this regard.  Numerous students have complained that ITT failed to provide them the career support they expected and that they have been unable to obtain positions utilizing their degrees.

38. In order to convince potential students that attending ITT would better their lives, ITT represented through oral and written marketing materials that attending ITT would increase their future salaries.

39. ITT made a practice of instructing its representatives to show prospective students presentations that purported to reflect substantially improved earnings and job prospects resulting from attending ITT.  For example, ITT provided its recruiting staff with a chart to show prospective students entitled "Projected Future Earnings," which showed that earnings over time would increase into the six figures, even with only an Associate's degree.  The chart said in large letters, "25% Annual Return on Investment."  ITT representatives were instructed to "[r]ecite from memory the following statement and interest check word for word:"

> The potential average return on investment for employed graduates is presented in the Value Proposition for Employed Graduates disclosure.  Based on the reported salary information of the 2006 employed graduates of the ITT Technical Institutes across the country, the *potential annual return to a 2006 employed graduate over his or her working life from his or her monetary investment in an ITT Tech education is, on average, 25%.* [Emphasis added.]

40. ITT staff made a practice of orally providing prospective students with assurances of large salaries or selective local graduate salary information.

41. One mystery shopper hired by ITT reported that an ITT recruiter told her that graduates of ITT's Programs Management program "usually make six figures."

42. Another mystery shopper wrote that a phone representative "quoted the Department Director as saying that some of their IT Security graduates are earning six figures after one year of work."

43. Another mystery shopper wrote that a Financial Aid Coordinator told her "about salaries at 90 thousand a year."

44. In addition to the foregoing, ITT representatives also provided vague answers, general numbers, and misleading salary charts, calculated to give a misimpression of what an ITT education would offer.

45. For example, one mystery shopper who asked about the salaries for graduates of the paralegal program reported that, "after the long drawn out application enrollment process, I began to get the impression that this school might be a bit of a scam because I talked to so many different people who all seemed so intent on being my friend while at the same time avoiding my direct questions."  [Punctuation added.]

46. In contrast to claims by ITT representatives about large salaries, in its Form 10-K for the year 2012, ITT claimed that the "reported annualized salaries initially following graduation averaged approximately $32,061 for the Employable Graduates in 2011."  In its Forms 10-K for the years 2011 and 2010, ITT disclosed average "annualized salaries" for Employable Graduates as approximately $31,300 and $31,600, respectively.

47. Even those Form 10-K numbers appear to be exaggerated because they were based on a flawed survey.  In addition, the numbers were "annualized," which suggests that they included jobs that were temporary, rather than permanent, salaried positions.

48. In any event, since most ITT students drop out without obtaining a degree, disclosing salary numbers only for graduates is inherently misleading.

49. Numerous students have complained that ITT promised better salary outcomes than they have been able to achieve.

**To Convince Consumers to Take out Loans to Pay ITT's High Tuition, ITT Made Misleading Representations About ITT's Accreditation and Transferability of Credits**

50. In convincing students that it would help them better their lives and was worth incurring a significant debt burden, ITT trumpeted its "national accreditation," which to a consumer not knowledgeable about accreditation sounds better than "regional accreditation." In fact, regional accreditation is preferable for purposes of allowing credits to easily transfer among schools.

51. Regionally accredited schools, such as community colleges and state universities, will not automatically accept credits from institutions accredited by the Accrediting Council for Independent Colleges and Schools ("ACICS"), a national accreditation organization that accredits many for-profit schools, including ITT. Rather, regionally accredited schools will accept transfer credits from ACICS-accredited institutions only on a case-by-case basis.

52. ITT exploited a lack of understanding by consumers regarding the distinction between types of accreditation and transferability of credits.

53. For example, ITT falsely told prospective nursing students that the nursing programs either were accredited, or would be accredited, by the appropriate bodies to allow them to use their ITT degree to obtain a nursing position. Many students only learned this was untrue after they started at ITT.

54. Mystery shoppers hired by ITT reported that some ITT recruiters lied about accreditation. For example, one mystery shopper wrote that a recruiter falsely "explained that ITT was accredited by ACICS just like all other schools, noting it is the same system for everyone." [Punctuation added.] Another mystery shopper reported that an ITT "representative said that the accreditation was the same as any traditional college or university." A third said that a recruiter "said that the ACICS was the same for ITT as well as other Colleges" and "that all colleges had to be accredited by the ACICS." A fourth said the recruiter "told me that ITT Tech is accredited by the Department of Defense." These statements are all false.

**ITT Used Aggressive and Controlling Tactics to Recruit and Enroll Students, and to Convince Them to Take Out Loans to Pay Its Tuition**

55. ITT used high-pressure, strong-arm recruiting tactics to get consumers to enroll in ITT programs and take out student loans to pay for them.

56. ITT instructed its recruiters to make 140 calls a day to consumers if they had no appointments scheduled, or 100 per day if they had an appointment. ITT recruiters at times contacted consumers several times in the same day.

57. ITT provided its recruiters with scripted responses intended to get prospective students to come to campus. For example, ITT instructed its recruiters to counter a consumer's concerns like "Was only looking for info to be mailed," with a series of responses until the recruiter could get the student to "give up" and come in. ITT instructed its recruiters to counter a consumer's concerns about cost with an evasion, such as: "I cannot tell you what your exact cost will be . . . it varies student to student, our Financial Aid Administrators are the experts. You can meet with them when you come in for the tour." ITT instructed its recruiters to counter a consumer's concerns about cost with a response such as, "Do you want a discount education, or a valuable one that will give you a return in the future?"

58. ITT trained its recruiters to entice potential students to visit a campus in person because consumers have a harder time fending off ITT's high-pressure sales tactics when they are present in person.

59. ITT instructed its staff to engage in a long, hard sell, including the use of many videos and presentations designed to wear down prospective students into agreeing to enroll at ITT. One mystery shopper reported, "Too much time was taken on the . . . presentation and not enough on financial aid and making a decision."

60. Another mystery shopper wrote, "I was there for over 3 hours and they still were not through with the presentation and financial aid process."

61. Part of that long process was an admission test that was virtually impossible to fail and was used to give prospective students the impression that ITT had admissions standards and that the students had achieved something by being admitted to the school. Despite the test, ITT would enroll virtually any student who had access to funding.

62. For example, a mystery shopper that ITT hired wrote that she "made a point to fail the 12 minute exam and she came back and said I passed just fine, which made no sense to me. I think I only answered one or two of the math questions, so I don't see how that was possible . . . ." [Punctuation added.] Another mystery shopper reported that a recruiter "explained even though the test has 50 questions and your [sic] only allowed 12 minutes to take it, you only need 13 correct." [Punctuation added.]

**ITT Recruiters and Financial Aid Staff Rushed Students Through the Complex Process of Enrollment and Financial Aid, Forcing Students to Rely on ITT to Act in Their Interests**

63. After an aggressive sales pitch about how ITT would help students better their lives, ITT encouraged consumers to rely on ITT's staff to get them signed up for the school and for financial aid funds. The enrollment and financial aid processes were inexorably linked, efficiently automated, and run by ITT staff so that ITT could be sure students enrolled and obtained funding, bringing in revenues.

64. In contrast to the lengthy sales pitch, the enrollment and financial aid processes were much faster, so that many consumers did not know or did not understand what they signed up for.

65. Recruiters induced prospective students to sign forms without giving them sufficient information about what they were signing.

66. ITT required potential students to sign an Enrollment Agreement before they could receive information about their financial aid options or meet with Financial Aid Staff. This tactic was aimed

at getting the students to commit to enrollment before they were in a position to make an informed decision about how they would pay for their program, further encouraging students to rely on ITT Financial Aid staff to help them with the process.

67. Mystery shoppers hired by ITT reported being rushed through e-signing documents such as credit check approvals and authorizations to request transcripts, among other documents, without understanding what they were agreeing to.  One mystery shopper said of these tactics, "they try to trap you into enrollment by going through these steps so soon."

68. Another wrote that the ITT representative "wanted me to start classes tonight.  I told her I could not  . . .  I told her I needed to know how my financial aid turned out before I committed, so she said if I came to classes and then finances did not work out I would not have to pay for anything. . . . I never owe anything until I graduate."  [Punctuation added.]

69. The financial aid process is complicated and difficult to understand.  Rather than helping students better understand the borrowing process and make informed decisions in their best financial interests, ITT made a practice of having its Financial Aid staff take control of the students' loan applications and rush them through the process of signing up for loans.

70. A mystery shopper reported that the financial aid coordinator:

> had me complete some forms explaining briefly what the forms were as I signed off of them. *She began the financial application without really explaining to me fully what I was about to sign.*  I told her that I was not ready to give my SSN for the credit check.  It was at this point she told me that I may not be able to take the test If I did not provide my SSN and that she wanted to get me enrolled and set up for classes today. [Emphasis and punctuation added.]

71. Another mystery shopper wrote, "For example, had I not been aware that a soft check of my credit was being performed ahead of time, as indicated in the material for this shop, I would not have known that such is taking place.  *The option to allow or disallow a credit check was never explained or provided.*" [Emphasis and punctuation added.]

72. Another mystery shopper reported that an ITT representative "forged" her paperwork and further noted:

> I saw briefly on the computer screen and asked her to wait because I wanted to see what it said. I said again, 'let me see.' She reluctantly slid the mouse to me. I asked her why it said I unknowingly signed forms electronically because I stated multiple times that I had not decided . . . . She said she was trying to help and it was the only way she could give me the test to help push me through. I found the page she skipped over and it stated that I electronically signed High School GED certification, Transcript Authorization, School Catalog Handbook, Graduation Information Agreement . . . . I told her I feel like they are being deceptive . . . my electronic signature was fraudulently placed . . . I am absolutely astonished how they are attempting to cheat, lie, and fraudulently mislead individuals. [Punctuation added.]

73. As part of their sales tactics, ITT recruiters pressured prospective students to schedule follow-up appointments to complete their financial aid applications either before they had even made the decision to enroll, or quickly after enrollment so they would be less likely to change their minds.

74. A mystery shopper wrote that an ITT recruiter indicated that her application "could not move on in the computer system unless we filled in an appointment date for the Financial Aid." When the mystery shopper objected, saying he wanted to check his calendar, the recruiter "told me that I HAD to pick a date . . . so I picked a date to meet with him."

75. Another mystery shopper wrote, the Financial Aid representative "insisted on scheduling an appointment with me, telling me that she was required to enter something on her calendar, even if I had to change or cancel it. I told her I could not commit to anything but she insisted anyway." [Punctuation added.]

76. Another mystery shopper wrote, "I was strongly pressured to attend a meeting on Saturday for a grants seminar, and an appointment was made to finish my enrolling and financial aid paperwork, despite my declining. I was told to make it and then I could cancel it later." [Punctuation added.]

77. Another mystery shopper wrote that the Financial Aid Coordinator "said she would call me Saturday to set up a meeting, and I said that would not be good because I was moving but she seemed insistent to do so. *This seemed a bit invasive and suffocating for me* since I said I would be in contact with them." [Emphasis and punctuation added.]

78. ITT Financial Aid staff, like the recruiters, made a practice of rushing new students through the financial aid process, leaving many unsure what they were signing and further encouraging reliance by the students on what the Financial Aid staff was doing on their behalf.

79. One mystery shopper reported that, during the financial aid process, the Financial Aid Coordinator only explained some of the documents and even signed two of them for the shopper, who reported, "The whole meeting went so fast (the [Financial Aid Coordinator] talked very quickly) that it was hard to understand what was going on."

80. Another mystery shopper wrote, "It was a challenge to keep up with [the Financial Aid Coordinator's] pace, as she was very quick explaining things, and very fast on the computer. There were a few times where I just stopped her and asked her to please explain what she had just said."

81. Another mystery shopper reported that the Financial Aid Coordinator discouraged her from reading the material on the screen, "telling me it was not necessary to read all the way through. The same for areas needing my signature. She summarized the paragraphs and told me to put my initials and that I could read over it later." [Punctuation added.]

82. Another mystery shopper wrote, "I did not like how quickly [the Financial Aid Coordinator] had me e-sign papers on the screen. *Honestly, I really did not want to sign anything, but she was controlling the mouse and, as soon as I said everything on the screen was correct, she clicked that I signed it* and moved onto the next one. That was off putting." [Emphasis and punctuation added.]

83. Another mystery shopper reported that it was "a bit overwhelming with how quickly we went through everything, and I wasn't exactly clear on everything [the Financial Aid Coordinator] was having me sign up for."  [Punctuation added.]

84. Another mystery shopper wrote that, "the Financial Aid aspect of the interview . . . was conducted quite rapidly and very little information was provided as to what my personal information was being used for."

**ITT Also Pressured and Rushed Continuing Students Through Their Financial Aid Appointments, Requiring Them to Rely on ITT to Work in Their Interests**

85. The financial aid appointments for continuing students, called "repackaging" or "repack" appointments, were similarly rushed and controlled by the Financial Aid staff.

86. This required continuing students to keep relying on Financial Aid staff to act in their interests.

87. In order to ensure that continuing students (including graduating students) came to the Financial Aid staff and signed up for additional financial aid, ITT instructed and incentivized the Financial Aid staff to use certain tactics (the "repackaging tactics") such as emailing students, calling them at home, finding them in the bookstore or the library or the student lounge, pulling them from class, barring them from class, enlisting the aid of other ITT staff (including professors), and withholding course materials, diplomas, and transcripts.  A former Vice President of Finance indicated that withholding materials was "leverage" that ITT used to pressure the students to meet with Financial Aid staff for repackaging.

**ITT Made a Practice of Encouraging Students to Rely on Financial Aid Staff to Work in Students' Interests**

88. ITT instructed its Financial Aid staff to gain students' trust and appear to work in students' interests.

89. ITT Financial Aid staff, through their words and actions, encouraged students to rely on them, including in putting together financial aid applications on the students' behalf.  Indeed, Financial Aid staff assisted students in filling out their Free Application for Federal Student Aid, commonly called the "FAFSA" form, and required students to provide tax returns.

90. A former Vice President of Finance at ITT testified that Financial Aid staff were "essentially holding [the students'] hands" through the financial aid process, including federal aid and private loans.

91. Part of the way that Financial Aid staff did this 'hand holding' was through the automated process for financial aid set up by ITT.  ITT provided its Financial Aid staff with software called "SmartForms," which automatically populated and submitted financial aid applications for its students to the federal government or other lenders, requiring only e-signatures from students.

92. Most ITT students obtained their financial aid this way, being encouraged by ITT Financial Aid staff to rely on the staff to do all the work for the students and simply tell them where to sign.

93. One mystery shopper reported that a Financial Aid Coordinator "stated I would get more free money that I don't have to pay back if I let them take care of my paperwork."  [Punctuation added.]

94. Another mystery shopper wrote that a representative "said that they want what was best for me and said that they do not pressure students and they are not on commission."

95. Despite words and actions to the contrary, ITT staff was not trained, nor was the staff instructed, to safeguard students' financial interests.

96. Most of ITT's metrics for evaluating the performance of Financial Aid staff were related to how many students had completed financial aid packages, and to the amount of accounts receivable owed to the campus, much of which was related to outstanding Temporary Credit.

**ITT Coerced Students to Take out Private Student Loans, for ITT's own Financial Gain, Through a Private Student Loan Financing Scheme Involving "Temporary Credit"**

97. Using the tactics described above and others, ITT Financial Aid staff coerced students into taking out loans that they did not want, did not understand, or did not even realize they were getting. ITT Financial Aid staff coerced students into taking out private student loans to cover the tuition gap between what federal loans and grants would cover and the high cost of attending ITT.

98. Through December 2011, ITT sought to have its students pay for the tuition gap with ostensible third-party loans because outside sources of payment could be booked as income to the company, improving its free cash flow and the appearance of its financial statements, and because outside sources of revenue helped ITT meet a requirement by the Department of Education that at least 10% of its revenue be derived from sources outside Title IV loans and grants.

*The Temporary Credit*

99. Prior to February 2008, ITT relied on a large third-party lender to provide private loans to its students to cover their tuition gap.  In or about 2008, after the third-party funding source dried up, to cover tuition beyond what would be covered by Title IV Aid, ITT began offering its students loans that it called Temporary Credit.  ITT's Temporary Credit was a no-interest loan payable in a single lump sum payment, with a due date typically nine months after enrollment, the end of the academic year for which it was offered.

100. ITT had minimal credit criteria that students had to meet to be eligible for Temporary Credit.  Even if a student did not meet these minimal criteria, staff at ITT headquarters could—and, when asked, often did—grant exceptions.

101. Before ITT provided Temporary Credit to students, it performed credit checks to determine if they met the limited credit criteria.  Thus, at the time ITT provided Temporary Credit to students, it knew their credit scores.

102. Each student who enrolled at ITT and received Temporary Credit was given a "Cost Summary Payment Addendum" ("CSPA"), to be signed along with the Enrollment Agreement.

103. The CSPA gave limited disclosures about Temporary Credit, disclosing little except that the credit was nominally due in 9 months, the length of the academic year, and carried no interest charge.

104. Some students who had a Temporary Credit loan obligation did not even know they had received Temporary Credit or did not know that it was a loan that would have to be repaid.

105. ITT also led some students to believe that Temporary Credit would be available to cover their tuition gaps for their entire educational program, and that it would only be due to be repaid after the students graduated from ITT.

106. Although the CSPA does not provide any information about having to repay Temporary Credit with other private loans, it does refer to "New Temporary Credit" and "Renewal of Carryforward Temporary Credit," which could lead consumers to believe that each year they would be provided with Temporary Credit to cover the tuition gap.

107. An ITT mystery shopper reported that Financial Aid staff told her that any costs above those covered by federal aid "would be covered under a new temporary credit and that I would owe no money out of pocket."  Another reported that the ITT staff told her that any costs beyond those covered by grants and federal loans "would be picked up by ITT."

108. At least one Director of Finance at an ITT campus directed her staff to use the word "funding" to describe Temporary Credit, in order to hide the fact that it was a loan and would have to be repaid.

109. ITT knew that the vast majority of students who received Temporary Credit did not, and would not, have the resources to make the entire lump sum payment within nine months.

110. ITT did not intend to continue offering Temporary Credit to students throughout their entire ITT education.  As provided more fully below, in or about 2008, ITT actively solicited, created, and guaranteed ostensibly-third-party lending programs to repay Temporary Credit.  In 2009, those programs began offering private loans, and Financial Aid staff began coercing students into repaying their Temporary Credit with those loans.

111. In some circumstances, students received Temporary Credit more than once, were required to pay it off only just before graduation, or were not required to pay it off until after graduation.

112. From 2009 through 2011, ITT was lending students approximately $100 million to $150 million per year in Temporary Credit.

113. ITT believed most students were unlikely to repay the Temporary Credit loans and deeply discounted them on its balance sheet, calling them "doubtful accounts."  However, after putting the private loan programs described below into place, ITT no longer had to maintain those deep discounts on its balance sheet because it expected students to be forced to repay the Temporary Credit with private loans.

### The ITT Private Loan Programs

114. In 2008, ITT began to build two private loan programs from scratch, later to be called Student CU Connect and PEAKS (together, the "ITT Private Loan Programs" or the "ITT Private Loans").  The ITT Private Loan Programs were intended to be the vehicle for students to pay off their Temporary Credit, enabling ITT to convert Temporary Credit into immediate income and cash-on-hand.  The private loans also financed students' second year tuition gap.

115. ITT disclosed to its auditors and its investors that the ITT Private Loan Programs were specifically intended, and would be used, to reduce the amount of Temporary Credit outstanding and to help ITT avoid lending students any further amounts from its own books after their first year.

116. Indeed, ITT's Temporary Credit program operated as a tool to pre-qualify students for the ITT Private Loan Programs regardless of their credit profile.  Pursuant to the written underwriting criteria for the ITT Private Loans, a continuing ITT student who had received Temporary Credit was automatically eligible for an ITT Private Loan so long as he or she had not declared bankruptcy within 24 months ("Temporary Credit Exception").

117. These underwriting guidelines were established by ITT.

118. The Temporary Credit Exception meant that the true credit decisions for ITT Private Loan Programs were made by ITT at the point when it provided Temporary Credit to its students.

119. ITT students did not know this, nor were they made aware that ITT would coerce them into using the ITT Private Loans to repay Temporary Credit, until the point that Financial Aid staff gave them no choice other than to take the ITT Private Loans or be expelled from ITT.

### The Student CU Connect Loan Program

120. The Student CU Connect private loan program ("SCUC") originated approximately $189 million in student loans to ITT students from March 2009 until December 2011, and in particular, approximately $60 million from July 21, 2011 through December 2011.  SCUC was available only to ITT students.

121. SCUC was the brainchild of ITT or its paid consultants, and ITT was actively involved in the creation and support of SCUC by developing the underwriting criteria, providing a credit facility, and paying the credit union membership fees in the lead credit union on behalf of the students who took out SCUC loans.  ITT was also actively involved in the servicing and collection activities of SCUC.  In addition, ITT provided a stop-loss guarantee to the program participants: if defaults exceeded 35%, ITT would make the credit unions whole for any further defaults.

122. ITT served as the sole intermediary between SCUC and ITT students in introducing the students to the loans.  ITT Financial Aid staff did most of the work in completing the paperwork for

the SCUC loans, and students were encouraged to rely on the Financial Aid staff for this assistance. The SCUC loans were disbursed directly to ITT; proceeds were required to be used only to pay ITT and could not be used by students for any other purposes.

123. The interest rate for the SCUC loan, which carried a ten-year term, was based on a student's credit score.  For borrowers with credit scores under 600, the interest rate initially went as high as the prime rate plus 10.5%, with an origination fee as high as 10%.  Starting in or around April 2011, borrowers with credit scores under 600 were charged an interest rate of prime plus 13%, in addition to the 10% origination fee.

124. The prime rate, since 2009, has been 3.25%; thus the effective interest rate for SCUC loans has been 13.75% for some borrowers with credit scores under 600; for borrowers taking out loans after April 2011 with credit scores under 600, the SCUC interest rate has been 16.25%. Approximately 46% of the SCUC borrowers had credit scores under 600, and thus were subject to interest rates of 13.75% or 16.25% and origination fees of 10%.

125. Since 2009, federal Stafford loans available under Title IV offered interest rates for all borrowers that were 3.4% for subsidized loans and 6.8% for unsubsidized loans.  Such loans did not have origination fees.

126. Approximately $149 million, or 79%, of the entire SCUC program went to students who had Temporary Credit and who were pushed into SCUC loans to pay it off and to finance their tuition gaps for later years at ITT.

127. As early as May 2011, ITT's consultant for loan default analysis projected a gross default rate of 61.3% for the existing SCUC loans.

128. As private student loans, SCUC loans are difficult to discharge in bankruptcy, requiring the debtor to make a special showing of "undue hardship."

*The PEAKS Loan Program*

129. On or around September 24, 2009, ITT solicited other loan originators to provide a private loan program, ultimately called PEAKS, which had terms similar to SCUC.

130. The result of that initial solicitation was a complicated structure comprising a trust created in December 2009, finalized in January 2010, and funded by selling student loan asset-backed securities to institutional investors.  The originating bank made the loans and then sold them to the trust.  ITT served as a guarantor to the trust and the investors, but it maintained the program as an off-balance sheet vehicle.

131.  PEAKS, although structured differently, served the same purpose as SCUC.  It offered similar rates and now uses the same servicer as the SCUC program.  Its borrowers had credit profiles similar to those of SCUC.  As it did for the SCUC loans, ITT developed the PEAKS lending criteria, introduced students to the program, and served as the sole intermediary between students and the originating bank.  ITT was also actively involved in the servicing and collection activities of PEAKS.  As with the SCUC loans, PEAKS loans were exclusively available to ITT students and were disbursed directly to ITT; proceeds were required to be used only to pay ITT and could not be used by students for any other purposes.

132. PEAKS ran out of origination funds in 2011, and it appears that it made no loans after July 21, 2011.

*The Plan Behind the ITT Private Loan Programs*

133. While failing to disclose to students that the ITT Private Loans were intended from the start to be vehicles to pay off its students' Temporary Credit, ITT did share this fact with investors.

134. From 2009 through 2011, ITT's CEO and CFO participated in quarterly earnings calls with analysts and investors.  In these calls, the ITT executives repeatedly discussed the ITT Private Loan Programs as vehicles for taking Temporary Credit off of ITT's balance sheet.

135.  In the January 21, 2010 earnings call for Fourth Quarter 2009, ITT talked about the PEAKS program, which had just begun.  In response to a question from analysts, ITT's CFO said: "the way the program works is, that it is eligible for second year students.  So therefore, those students who have had some internal borrowings in year one, would have effectively refinanced through the PEAKS program in year two."  The CEO reinforced this point:

> We still anticipate offering internal financing to first-year students . . . .  Second year students then would be eligible for financing through the PEAKS program, to have financing for their forward-looking studies, as well as refinancing any institutional funding provided to them during the first year. . . .  But it works that way, second-year students are in the PEAKS program, and first year will continue to be on the balance sheet.

136. Later in that same call, the CFO clarified further:

> Basically the way the program is set up, if you think about the balance sheet aspects of this, obviously positive cash flow elements there.  And some of that will come from AR [accounts receivable, including Temporary Credit] that is going to be converted into the PEAKS program, *which was our plan all along.* [Emphasis added.]

137. This "plan all along" applied to both ITT Private Loan programs, which served the same purpose for ITT.  Even as ITT discussed the expiration of the PEAKS program in a July 21, 2011 earnings call, ITT's CEO reminded investors that "we actually have other third party lending programs, typically I think referred to as the credit union programs," that is, SCUC.  The CEO went on to say that SCUC was "substantially similar for us relative to the PEAKS program so that it's structurally similar and the economics are very, very similar."

### *"Repackaging" Students into ITT Private Loans*

138. ITT instructed its Financial Aid staff to identify students to repackage into the ITT Private Loans as soon as the students had obtained sufficient academic credits to qualify.

139. Financial Aid staff used all of the "repackaging tactics" described above to get students to repackage.

140.   Some students objected to the ITT Private Loans, but they were told that if they refused to use them, they either had to pay any outstanding Temporary Credit and the next year's tuition gap—which most could not do—or leave the school in the middle of their program and forfeit the investment they had made so far.

141. Some ITT students accepted the ITT Private Loans because they believed ITT Financial Aid staff was acting in their interests in signing them up for such loans, and they believed, based on ITT's representations, that ITT in general was acting in their interests to better their lives.

142. Some ITT students did not even realize they took out the ITT Private Loans because of the rushed and automated manner in which ITT Financial Aid staff processed ITT students' paperwork.

**ITT Failed to Disclose the Finance Charges Associated with Temporary Credit Installment Plans**

143. Some students who obtained Temporary Credit did not get repackaged into the ITT Private Loans, so they had remaining Temporary Credit balances at the time they were due to graduate.

144. On or about March 2009, ITT began offering students who still had outstanding Temporary Credit at graduation a discount of up to 25% on their Temporary Credit balance if they agreed to pay off all or a portion of the balance in a lump sum.

145. Prior to December 2011, if the students who received this offer could not pay off all of their loan balance in a lump sum, Financial Aid staff was instructed to push the students into a SCUC or PEAKS loan.

146. If the students could not or would not pay either a lump sum or through an ITT Private Loan, ITT offered those students an installment plan of monthly payments ranging, depending on the total amount owed, from 6 months to 6½ years ("Temporary Credit Installment Plan").

147. After December 2011, ITT continued to offer students a discount of up to 25% for paying their Temporary Credit balances in a lump sum upon graduation.  ITT offered Temporary Credit

Installment Plans to students who could not, or would not, pay those entire balances in a lump sum. It appears this practice continues.

148. For those students in a Temporary Credit Installment Plan, the foregone discount they would have received had they paid off their Temporary Credit balances in a lump sum constitutes a finance charge.

149. Thus, through the Temporary Credit Installment Plan, ITT regularly extends or offers to extend credit in the form of loans payable in more than four installments and subject to a finance charge.

150. Upon agreeing to the Temporary Credit Installment Plan, students have been asked to sign an acknowledgment of the debt owed to ITT.

151. That acknowledgment letter contains information regarding "Current Temporary Credit Balance," "Total Payments Required," "Monthly Payment," and "Payment Begin Date," but it does not contain a disclosure of a finance charge.

**ITT Students, Left With Unaffordable Loan Payments, Default in Large Numbers**

152. While ITT remains profitable—it reaped approximately $59 million in net income during 2013—former ITT students, having been coerced by ITT into the ITT Private Loans, face a high likelihood of defaulting.

153. The ITT Private Loans carry a high monthly payment, with higher interest rates, more rigid conditions, and fewer options to reduce monthly payments than federal loans offer. For most former ITT students, this monthly payment, on top of all other loan obligations, is unaffordable.

154. ITT is presently projecting a gross cumulative default rate of 64% for the ITT Private Loans. ITT's projected gross cumulative default rate for the SCUC pool of loans from 2009, the oldest and most seasoned pool of loans, is higher than 70%.

155. The ITT Private Loans are unlikely to be discharged in bankruptcy without a special showing of "undue hardship."

## COUNTS

## COUNT ONE

**ITT UNFAIRLY SUBJECTED CONSUMERS TO UNDUE INFLUENCE OR COERCED THEM INTO TAKING OUT PRIVATE STUDENT LOANS IN VIOLATION OF THE CFPA**

156. The allegations in paragraphs 1-155 are incorporated here by reference.

157. An act or practice is unfair under the CFPA where "(A) the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and (B) such substantial injury is not outweighed by countervailing benefits to consumers or competition." 12 U.S.C. § 5531(c)(1).

158. ITT is a covered person and a service provider under the CFPA.  12 U.S.C. §§ 5481(6) and (26).

159. The ITT Private Loans are consumer financial products.  Offering, providing, and brokering the ITT Private Loans and offering and providing financial advisory services are consumer financial services.  12 U.S.C. §§ 5481(5), (15)(A)(i), and (15)(A)(viii).

160. From July 21, 2011 through December 2011, ITT subjected consumers to undue influence or coerced them into taking out ITT Private Loans through a variety of unfair acts and practices designed to interfere with the consumers' ability to make informed, uncoerced choices.  These unfair acts and practices included the following, at or around the time the students signed the ITT Private Loan contracts:

      a.   ITT used the Financial Aid staff's control of the financial aid process, which was rushed and automated according to ITT policies and practices, along with high-pressure repackaging tactics, including pulling students from class, barring students

from class, refusing to provide necessary materials for class, emailing and calling

students at home, refusing to provide transcripts and diplomas, and threatening

students with expulsion, to persuade, entice, and coerce students to sign the ITT

Private Loan contracts;

b.   ITT leveraged the students' existing Temporary Credit debt, their limited ability to

pay that debt or any tuition gap, the virtual non-transferability of ITT's credits, and

students' fear of losing their entire investment under the threat of expulsion, to

persuade, entice, and coerce the students to sign the ITT Private Loan contracts; and

c.   ITT exploited the students' expectations, which ITT's representations created, that,

upon completion of a given ITT program, students were likely to have job

opportunities and sufficient earnings capacity to enable them to repay the ITT

Private Loans, to persuade, entice, and coerce the students to sign the ITT Private

Loan contracts.

161. From July 21, 2011 through December 2011, ITT engaged in these unfair acts and practices in order to increase its income.  ITT benefited from the use of ITT Private Loans to repay Temporary Credit, since those payments improved ITT's financial statements by reducing accounts receivable, assuring payment for doubtful accounts, and increasing cash on hand.  ITT also benefited from the use of ITT Private Loans to pay tuition gaps, since those payments improved ITT's financial statements by increasing income and cash on hand.

162. Since July 21, 2011, these acts and practices have caused substantial injury to consumers. As a result of being pressured into doing so by ITT, approximately 8,600 consumers entered into loans that they could not afford, did not want, did not understand, or did not even know they had. ITT Private Loans were high-fee, high-interest rate, ten-year loans, which have more rigid conditions and fewer options to reduce monthly payments than federal loans offer, and which are not

dischargeable in bankruptcy without a special showing of undue hardship.  A majority of ITT students who took out the ITT Private Loans since July 21, 2011 have defaulted on or are expected to default on those loans.

163. Since July 21, 2011, the injury caused by ITT's unfair practices was not reasonably avoidable by consumers because:

      a.  Due to ITT's handling of the financial aid process, many students either did not understand the loan obligations or were not even aware they had signed the ITT Private Loan contracts;

      b.  ITT credits were typically not transferable to other post-secondary institutions, putting students at risk of losing their credits for coursework they had completed and had incurred substantial debt to pay for, if they did not agree to the ITT Private Loan contract;

      c.  The vast majority of ITT students had insufficient income to pay off their Temporary Credit or their tuition gap other than through the ITT Private Loans; and

      d.  For students without sufficient income, there was an expectation that completing ITT would allow them to earn enough money to avoid defaulting on the loans they had already incurred.

164. The injury to the ITT students who took out ITT Private Loans was not outweighed by countervailing benefits to consumers or to competition.

165. Therefore, from July 21, 2011 through December 2011, ITT violated the CFPA by engaging in unfair practices, 12 U.S.C. § 5536(a)(1)(B), as defined in 12 U.S.C. § 5531(c)(1).

## COUNT TWO

## ITT TOOK UNREASONABLE ADVANTAGE OF THE INABILITY OF ITT STUDENTS TO PROTECT THEIR INTERESTS IN SELECTING OR USING THE ITT PRIVATE LOANS IN VIOLATION OF THE CFPA'S PROHIBITION AGAINST ABUSIVE PRACTICES

166. The allegations in paragraphs 1-155 are incorporated here by reference.

167. An "abusive" act or practice includes, *inter alia*, one that "takes unreasonable advantage of . . . the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service . . . ."  12 U.S.C. § 5531(d)(2)(B).

168. ITT is a covered person and a service provider under the CFPA.  12 U.S.C. §§ 5481(6) and (26).

169. The ITT Private Loans are consumer financial products.  Offering, providing, and brokering the ITT Private Loans and offering and providing financial advisory services are consumer financial services.  12 U.S.C. §§ 5481(5), (15)(A)(i), and (15)(A)(viii).

170. From July 21, 2011 through December 2011, ITT took unreasonable advantage of consumers' inability to protect their interests in selecting or using the ITT Private Loans.

171. Students were not able to protect their interests in selecting or using ITT Private Loans because few students had the resources, particularly in the time permitted, to repay the Temporary Credit or pay the tuition gap out of pocket, or to obtain private loans elsewhere.  Given the virtual non-transferability of ITT credits, most students were forced to either take the ITT Private Loans or forfeit their entire investment.

172. ITT took unreasonable advantage of ITT students' inability to protect their interests in selecting or using the ITT Private Loans.  ITT knew about these vulnerabilities and exploited them by:

      a.   Taking control of the complex financial aid process;

      b.   Using aggressive repackaging tactics, including the threat of expulsion;

    c.  Pushing students into expensive, high-risk loans that ITT knew were likely to default; and

    d.  Pushing students into expensive, high-risk loans for the purpose of window-dressing ITT's financial statements and increasing its stock price.

173. Therefore, from July 21, 2011 through December 2011, ITT violated the CFPA by engaging in abusive practices, 12 U.S.C. § 5536(a)(1)(B), as defined in 12 U.S.C. § 5531(d)(2)(B).

## COUNT THREE

### ITT TOOK UNREASONABLE ADVANTAGE OF ITT STUDENTS' REASONABLE RELIANCE ON ITT TO ACT IN THEIR INTERESTS IN VIOLATION OF THE CFPA'S PROHIBITION AGAINST ABUSIVE PRACTICES

174. The allegations in paragraphs 1-155 are incorporated here by reference.

175. An "abusive" act or practice is defined, *inter alia*, as one that "takes unreasonable advantage of . . . the reasonable reliance by the consumer on a covered person to act in the interests of the consumer." 12 U.S.C. § 5531(d)(2)(C).

176. ITT is a covered person under the CFPA. 12 U.S.C. § 5481(6).

177. The ITT Private Loans are consumer financial products. Offering, providing, and brokering the ITT Private Loans and offering and providing financial advisory services are consumer financial services. 12 U.S.C. §§ 5481(5), (15)(A)(i), and (15)(A)(viii).

178. From July 21, 2011 through December 2011, ITT took unreasonable advantage of consumers' reasonable reliance on ITT to act in their interests.

179. ITT students relied on ITT and its Financial Aid staff to act in their interests when they signed up for their financial aid packages, including the ITT Private Loans.

180. The reliance by the students on ITT to act in their interests was reasonable because:

    a.  ITT held itself out as a school that would help students better their lives;

      b.   The Financial Aid staff held themselves out as subject matter experts who could advise the students about financial aid;

      c.   Students did not know that the Financial Aid staff was paid like a sales staff; and

      d.   The Financial Aid staff solicited students' reliance and trust, as they were trained to do.

181. ITT did not act in the students' interests.  Instead, it took unreasonable advantage of the students' reasonable reliance to act in their interests by:

      a.   Taking control of the complex financial aid process;

      b.   Using aggressive repackaging tactics, including the threat of expulsion;

      c.   Pushing students into expensive, high-risk loans that ITT knew were likely to default; and

      d.   Pushing students into expensive, high-risk loans, for the purpose of window-dressing ITT's financial statements and increasing its stock price.

182. Therefore, from July 21, 2011 through December 2011, ITT violated the CFPA by engaging in abusive practices, 12 U.S.C. § 5536(a)(1)(B), as defined in 12 U.S.C. § 5531(d)(2)(C).

## COUNT FOUR

## ITT'S FAILURE TO DISCLOSE FINANCE CHARGES VIOLATED TILA

183. The allegations in paragraphs 1-155 are incorporated here by reference.

184. The Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq.* ("TILA"), and Regulation Z, 12 C.F.R. Part 1026, require certain disclosures to be made clearly and conspicuously in writing, in a form that the consumer may keep, in connection with the extension of consumer credit.  12 C.F.R. § 1026.17(a).

185. The "finance charge" is one item that must be disclosed by a creditor in a closed-end transaction pursuant to TILA and Regulation Z, 12 C.F.R. § 1026.18(d).

186. Under Regulation Z, a "finance charge" includes any discounts offered as an incentive to pay by a means other than credit. 12 C.F.R. § 1026.4(b)(9).

187. ITT is a creditor within the meaning of the TILA and Regulation Z, 12 C.F.R. § 1026.2(a)(17), because it regularly extends closed-end consumer credit that is both subject to a finance charge and payable by written agreement to ITT in more than four installments, that is, Temporary Credit Installment Plans.

188. From approximately March 2009 through the present, ITT has typically offered a discount plan to students at graduation with outstanding Temporary Credit balances.  They are offered a discount on their Temporary Credit balance if they pay in a lump sum rather than through the Temporary Credit Installment Plans.

189. To the extent that such discounts are not applied to the Temporary Credit Installment Plans, ITT is charging students a finance charge in connection with those extensions of credit.  12 C.F.R. § 1026.4(b)(9).

190. From approximately March 2009 through the present, ITT has not disclosed that finance charge clearly and conspicuously in writing in the documents provided to students in connection with Temporary Credit Installment Plans.

191. Therefore, from approximately March 2009 through the present, ITT has violated TILA and Regulation Z.  15 U.S.C. §§ 1631(b) and 1638, 12 C.F.R. §§ 1026.17 and 1026.18.

### DEMAND FOR RELIEF

The Bureau requests that the Court award:

1. Equitable relief against ITT;

2. Restitution to affected consumers against ITT;

3. Injunctive relief against ITT;

4. Disgorgement against ITT;

5.  Rescission against ITT;

6.  Civil Money Penalties against ITT;

7.  Plaintiff's costs against ITT; and

8.  Additional relief as the Court may determine to be just and proper.


Respectfully submitted,


Anthony Alexis (DC Bar #384545)
*Acting Enforcement Director*

Ori Lev (DC Bar #452565)
*Deputy Enforcement Director*

Laurel Loomis Rimon (CA Bar #166148)
*Assistant Litigation Deputy*

s/ Cynthia Gooen Lesser
Cynthia Gooen Lesser (NY Bar #2578045)
Ethan Haim Levisohn (DC Bar #982702)
Nicholas F. B. Smyth  (PA Bar #307972)
Maureen Elin McOwen (DC Bar #976749)
*Enforcement Attorneys*

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: (202) 435-9594
Facsimile: (202) 435-7722
e-mail: Cynthia.Lesser@cfpb.gov

*Attorneys for Consumer Financial Protection Bureau*