UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **Consumer Financial Protection Bureau,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:14-cv-00292-SEB-TAB** |
| | ) | |
| **ITT Educational Services, Inc.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

ICE MILLER, LLP
Philip A. Whistler (#1205-49)
Thomas E. Mixdorf (#16812-49)
One American Square, Suite 2900
Indianapolis, IN  46282-0200
Telephone: (317) 236-2100
Facsimile: (317) 236-2219
Philip.Whistler@icemiller.com
Thomas.Mixdorf@icemiller.com

GIBSON, DUNN & CRUTCHER LLP
Timothy J. Hatch (*pro hac vice* pending)
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile:  (213) 229-7520
THatch@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
Douglas R. Cox (*pro hac vice* pending)
Jason J. Mendro (*pro hac vice* pending)
Lucas C. Townsend (*pro hac vice* pending)
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: (202) 955-8500
ut relevant terms.  To the contrary, the Bureau
admits that all students signed an Enrollment

April 28, 2014

*Attorneys for Defendant*
*ITT Educational Services, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

ALLEGATIONS OF THE COMPLAINT ............................................................. 1

LEGAL STANDARDS ......................................................................................... 7

ARGUMENT ......................................................................................................... 8

I.      THIS ACTION VIOLATES THE CONSTITUTION ......................................... 8

      A.    The Bureau Is An Unconstitutional Entity ................................................ 8

      B.    This Enforcement Action Violates Due Process Because
Regulated Parties Lack Fair Notice Of What Conduct Is
Prohibited. ............................................................................................ 10

II.    ITT IS NOT PROPERLY SUBJECT TO THIS ENFORCEMENT
ACTION ............................................................................................... 13

      A.    ITT Is Not A "Covered Person." ............................................................ 13

      B.    ITT Is Not A "Service Provider." ........................................................... 17

      C.    ITT Is Excluded From The Bureau's Authority As A Seller
Of Nonfinancial Goods And Services ..................................................... 18

III.   THE BUREAU HAS NOT ADEQUATELY ALLEGED A
VIOLATION OF THE CONSUMER FINANCIAL
PROTECTION ACT .............................................................................. 19

      A.    Count 1:  The Complaint Fails To Allege Adequately That
ITT Engaged In Unfair Acts Or Practices ............................................... 19

            1.    The Complaint Fails To Allege That Students
Suffered "Substantial Injury." ..................................................... 20

            2.    The Complaint Fails To Allege That ITT Caused
The Asserted Injury ..................................................................... 21

            3.    The Complaint Fails To Allege That Any Injuries
Were Not "Reasonably Avoidable." ............................................. 23

            4.    The Complaint Fails To Allege That Any Harm
Was Not Outweighed By Benefits To Consumers. ....................... 25

**TABLE OF CONTENTS**
(continued)

Page

B.    The Complaint Fails To Allege Adequately That ITT
        Engaged In Any Abusive Acts Or Practices. ........................................... 25

        1.    Counts 2 and 3:  The Complaint Fails To Allege
                That ITT Took "Unreasonable Advantage" Of
                Students. .................................................................................. 25

        2.    Count 2:  The Complaint Fails To Allege Students'
                Inability To Protect Their Interests. ............................................ 27

        3.    Count 3:  The Complaint Fails To Allege That ITT
                Took "Unreasonable Advantage" Of Students'
                "Reasonable Reliance" On ITT To Act In Their
                Interests. .................................................................................. 29

IV.    THE CLAIM THAT ITT VIOLATED REGULATION Z IS
        SUBSTANTIALLY TIME-BARRED AND ENTIRELY
        MERITLESS .......................................................................................... 33

CONCLUSION ..................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### Cases

*A.L.A. Schechter Poultry Corp. v. United States,*
    295 U.S. 495 (1935) .......................................................................................... 12

*Adams v. City of Indianapolis,*
    742 F.3d 720 (7th Cir. 2014) ............................................. 7, 19, 20, 22, 26, 28

*Am. Bar Ass'n v. FTC,*
    430 F.3d 457 (D.C. Cir. 2005) ......................................................................... 16

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ......................................................... 7, 19, 25, 26, 29, 31

*Ass'n of Am. Railroads v. U.S. Dept. of Transp.,*
    721 F.3d 666 (D.C. Cir. 2013) ......................................................................... 10

*Bank of Am., N.A. v. Knight,*
    725 F.3d 815 (7th Cir. 2013) ........................................................................... 19

*Basham v. Fin. Am. Corp.,*
    583 F.2d 918 (7th Cir. 1978) ........................................................................... 34

*Beler v. Blatt, Hasenmiller, Liebsker & Moore, LLC,*
    480 F.3d 470 (7th Cir. 2007) ........................................................................... 10

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................ 5, 7, 15, 19, 32

*Bissessur v. Ind. Univ. Bd. of Trs.,*
    581 F.3d 599 (7th Cir. 2009) ........................................................................... 26

*Bowen v. Georgetown Univ. Hosp.,*
    488 U.S. 204 (1988) ........................................................................................ 17

*Brownmark Films, LLC v. Comedy Partners,*
    682 F.3d 687 (7th Cir. 2012) ............................................................................. 4

*Buckley v. Valeo,*
    424 U.S. 1 (1976) .............................................................................................. 9

*Cemar, Inc. v. Nissan Motor Corp.,*
    713 F. Supp. 725 (D. Del. 1989) ..................................................................... 31

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Chadbourne & Parke LLP v. Troice*,
    134 S. Ct. 1058 (2014) ............................................................................... 17-18

*In re Chambers*,
    348 F.3d 650 (7th Cir. 2003) ............................................................. 22, 25, 27

*Cohen v. Am. Sec. Ins. Co.*,
    735 F.3d 601 (7th Cir. 2013) ........................................................................ 22

*Connally v. Gen. Constr. Co.*,
    269 U.S. 385 (1926) ...................................................................................... 12

*Consumer Fin. Prot. Bureau v. Morgan Drexen Inc.*,
    No. 13-1267 (C.D. Cal. Jan. 10, 2014), *appeal dismissed on jurisdictional*
    *grounds*, No. 14-55333 (9th Cir. Apr. 11, 2014) ......................................... 10

*Davis v. HSBC Bank Nev., N.A.*,
    691 F.3d 1152 (9th Cir. 2012) ................................................................. 23, 24

*Diamond v. One W. Bank*,
    2010 WL 1742536 (D. Ariz. Apr. 29, 2010) ........................................... 34-35

*DiLeo v. Ernst & Young*,
    901 F.2d 624 (7th Cir. 1990) ........................................................................ 19

*Dugan v. R.J. Corman R.R. Co.*,
    344 F.3d 662 (7th Cir. 2003) ........................................................................ 24

*FCC v. Fox Television Stations, Inc.*,
    132 S. Ct. 2307 (2012) ...................................................................... 10, 12, 21

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
    130 S. Ct. 3138 (2010) ............................................................................... 8, 9

*FTC v. Cantkier*,
    767 F. Supp. 2d 147 (D.D.C. 2011) .............................................................. 22

*FTC v. IFC Credit Corp.*,
    543 F. Supp. 2d 925 (N. D. Ill. 2008) ...................................................... 22, 24

*FTC v. World Travel Vacation Brokers, Inc.*,
    861 F.2d 1020 (7th Cir. 1988) ...................................................................... 23

*Gates & Fox Co. v. OSHRC*,
    790 F.2d 154 (D.C. Cir. 1986) ...................................................................... 12

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Harris v. Forklift Sys., Inc.,*
    510 U.S. 17 (1993)............................................................................. 12

*Humphrey's Ex'r v. United States,*
    295 U.S. 602 (1935)............................................................................ 9

*Jackson v. Bank of Am. Corp.,*
    711 F.3d 788 (7th Cir. 2013) ............................................................ 27

*Joseph v. Sasafrasnet, LLC,*
    689 F.3d 683 (7th Cir. 2012) .............................................................. 5

*Karam v. Corinthian Colls., Inc.,*
    2012 WL 8499135 (C.D. Cal. Aug. 20, 2012) .............................28-29

*Kelley v. Univ. of Richmond,*
    2006 WL 1555933 (E.D. Va. June 2, 2006),
    *aff'd,* 211 F. App'x 173 (4th Cir. 2006) ........................................... 22

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    134 S. Ct. 1377 (2014).......................................................................27

*Logan v. Denny's, Inc.,*
    259 F.3d 558 (6th Cir. 2001) .............................................................. 5

*Molosky v. Wash. Mut., Inc.,*
    664 F.3d 109 (6th Cir. 2011) ............................................................ 17

*Moor v. Travelers Ins. Co.,*
    784 F.2d 632 (5th Cir. 1986) ............................................................ 34

*Morrison v. Olson,*
    487 U.S. 654 (1988)............................................................................ 9

*Myers v. United States,*
    272 U.S. 52 (1926).............................................................................. 8

*Odier v. Hoffman Sch. of Martial Arts, Inc.,*
    619 F. Supp. 2d 571 (N.D. Ind. 2008) ............................................. 35

*In re Oliver,*
    499 B.R. 617 (Bankr. S.D. Ind. 2013) .............................................. 28

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.,*
    631 F.3d 436 (7th Cir. 2011) ............................................................ 19

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Roberson*,
　999 F.2d 1132 (7th Cir. 1993) .................................................................. 27

*Schorsch v. Reliance Standard Life Ins. Co.*,
　693 F.3d 734 (7th Cir. 2012) ................................................................... 31

*SEC v. George*,
　426 F.3d 786 (6th Cir. 2005) ................................................................... 15

*Siegel v. Shell Oil Co.*,
　612 F.3d 932 (7th Cir. 2010) ................................................................... 22

*State Nat'l Bank v. Lew*,
　958 F. Supp. 2d 127 (D.D.C. 2013), *appeal pending*, No. 13-5247 (D.C. Cir.) .................. 10

*Taylor v. Bob O'Connor Ford, Inc.*,
　1998 WL 177689 (N.D. Ill. Apr. 13, 1998) ............................................. 35

*Todd v. Collecto, Inc.*,
　731 F.3d 734 (7th Cir. 2013) ................................................................... 28

*United States ex rel. Hall v. Tribal Dev. Corp.*,
　100 F.3d 476 (7th Cir. 1996) ................................................................... 14

*United States v. Williams*,
　553 U.S. 285 (2008) ................................................................................. 10

*Ustrak v. Fairman*,
　781 F.2d 573 (7th Cir. 1986) ................................................................... 11

*Van Gunten v. Cent. States, Se. & Sw. Areas Pension Fund*,
　672 F.2d 586 (6th Cir. 1982) ................................................................... 31

*Virachack v. Univ. Ford*,
　410 F.3d 579 (9th Cir. 2005) ................................................................... 35

*Wells Fargo Bus. Credit v. Hindman*,
　734 F.3d 657 (7th Cir. 2013) ................................................................... 14

*Whitman v. Am. Trucking Ass'ns, Inc.*,
　531 U.S. 457 (2001) ................................................................................. 12

*Yeftich v. Navistar, Inc.*,
　722 F.3d 911 (7th Cir. 2013) .......................................................... 27, 29

<u>**TABLE OF AUTHORITIES**</u>
(continued)

<u>Page(s)</u>

**Constitutional Provisions**

U.S. Const. art. I, § 7, cl. 1 .................................................................. 10

U.S. Const. art. II, § 2, cl. 2 ................................................................. 9

U.S. Const. art. II, § 3 .......................................................................... 8

**Statutes**

12 U.S.C. § 244 ..................................................................................... 10

12 U.S.C. § 5301(15) ............................................................................ 15

12 U.S.C. §§ 5481 *et seq.* ................................................................... 6

12 U.S.C. § 5481(4) .............................................................................. 30

12 U.S.C. § 5481(6)(A) ........................................................................ 13

12 U.S.C. § 5481(15)(A)(i) .............................................................. 13, 14

12 U.S.C. § 5481(15)(A)(viii) ........................................................ 13, 14, 16

12 U.S.C. § 5481(26)(A)(i) .................................................................. 17

12 U.S.C. § 5491(a) .............................................................................. 9

12 U.S.C. § 5491(b)(5) ........................................................................ 9

12 U.S.C. § 5491(c)(3) ......................................................................... 9

12 U.S.C. § 5492(b) ............................................................................. 9

12 U.S.C. § 5497(a) .............................................................................. 9

12 U.S.C. § 5497(a)(2)(C) .................................................................... 9

12 U.S.C. § 5512(b)(4)(B) .................................................................... 10

12 U.S.C. § 5513(a) .............................................................................. 10

12 U.S.C. § 5513(c)(3)(B)(ii) ............................................................... 10

12 U.S.C. § 5517(a) .............................................................................. 13

12 U.S.C. § 5517(a)(2)(A)(i) ................................................................ 18

**TABLE OF AUTHORITIES**
(continued)

Page(s)

12 U.S.C. § 5517(*o*) ..................................................................................... 29

12 U.S.C. § 5531(a) ..................................................................................... 19

12 U.S.C. § 5531(c) ..................................................................................... 21

12 U.S.C. § 5531(c)(1) ......................................................................... 11, 19

12 U.S.C. § 5531(d) ..................................................................................... 12

12 U.S.C. § 5531(d)(2) ................................................................................. 25

12 U.S.C. § 5531(d)(2)(B) ..................................................................... 26, 28

12 U.S.C. § 5531(d)(2)(C) ............................................................. 26, 30, 33

12 U.S.C. § 5536(a)(1) .......................................................................... 13, 17

12 U.S.C. § 5536(a)(1)(B) ................................................................. 10, 19, 22

12 U.S.C. § 5564 ............................................................................................ 9

12 U.S.C. § 5565(a)(2)(A) ............................................................................ 14

12 U.S.C. § 5581(d) ..................................................................................... 17

15 U.S.C. § 78c ............................................................................................ 15

15 U.S.C. §§ 1601 *et seq.* ............................................................................. 6

15 U.S.C. § 1605(a) ................................................................................ 33, 34

15 U.S.C. § 1640(e) ..................................................................................... 34

15 U.S.C. § 1692a(6)(A) ............................................................................. 35

20 U.S.C. § 1001 ............................................................................................ 2

20 U.S.C. § 1002(b) ....................................................................................... 2

20 U.S.C. § 1019a ......................................................................................... 15

20 U.S.C. § 1085(a) ....................................................................................... 2

20 U.S.C. § 1087c(d) ..................................................................................... 2

20 U.S.C. § 1087tt(c) ................................................................................... 20

**<u>TABLE OF AUTHORITIES</u>**
**(continued)**

<u>Page(s)</u>

20 U.S.C. § 1094(a)(5) ............................................................................................. 2

20 U.S.C. § 1094(a)(17) ........................................................................................... 2

20 U.S.C. § 1094(a)(24) ........................................................................................... 2

20 U.S.C. § 1097a ................................................................................................... 2

44 U.S.C. § 3502(5) ................................................................................................. 9

**Regulations**

12 C.F.R. § 225.28(a) ............................................................................................. 16

12 C.F.R. § 226.4 ................................................................................................... 34

12 C.F.R. § 226.20(a)(4) ........................................................................................ 34

12 C.F.R. Part 1026 ................................................................................................. 6

12 C.F.R. § 1026.4(a) ............................................................................................ 35

12 C.F.R. § 1026.4(b)(9) ................................................................................... 33, 35

12 C.F.R. § 1026.17(a) ........................................................................................... 33

12 C.F.R. § 1026.43(c) ........................................................................................... 21

34 C.F.R. § 668.71 ................................................................................................. 23

34 C.F.R. § 668.72 ................................................................................................. 23

34 C.F.R. § 668.73 ................................................................................................. 23

34 C.F.R. § 668.74 ................................................................................................. 23

34 C.F.R. § 668.75 ................................................................................................. 23

34 C.F.R. § 685.301(a)(3) ...................................................................................... 20

34 C.F.R. § 685.301(a)(8) ...................................................................................... 20

75 Fed. Reg. 57,252 (Sept. 20, 2010) ................................................................... 17

76 Fed. Reg. 34,386 (June 13, 2011) ..................................................................... 20

78 Fed. Reg. 6408 (Jan. 30, 2013) ......................................................................... 21

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**Rules**

Fed. R. Civ. P. 8(a)(2) ................................................................................ 7

Fed. R. Civ. P. 9(b) ................................................................................. 19

Fed. R. Civ. P. 12(b)(7) ........................................................................... 14

**Other Authorities**

69 Am. Jur. 2d *Securities Regulation—Federal* § 303 ............................... 15

*Black's Law Dictionary* (9th ed. 2009) ...................................................... 15

CFPB Bulletin 2012-03 ............................................................................. 18

CFPB Supervision and Examination Manual (Oct. 2012),
    http://files.consumerfinance.gov/f/ 201210_cfpb_supervision-and-examination-
    manual-v2.pdf .................................................................................... 11

CFPB Sues For-Profit College Chain ITT For Predatory Lending (Feb. 26, 2014),
    http://www.consumerfinance.gov/newsroom/cfpb-sues-for-profit-college-chain-
    itt-for-predatory-lending/ ...................................................................... 6

Brittany Hackett, "Why are community college students defaulting at such high
    rates?," Cmty. Coll. Daily (Mar. 24, 2014),
    http://www.ccdaily.com/Pages/Campus-Issues/Why-Are-Community-College-
    Students-Defaulting-at-Such-High-Rates.aspx ................................... 21, 27

*How Will the CFPB Function Under Richard Cordray: Hearing Before the Subcomm.
    on TARP, Financial Services and Bailouts of Public and Private Programs,*
    112th Cong. 112-107 (2012) ................................................................ 12

ITT, Transferability of Credits Disclosure,
    http://www.itt-tech.edu/credits.pdf ...................................................... 24

S. Rep. No. 111-176 ................................................................................. 16

White House, Higher Education Webpage,
    http://www.whitehouse.gov/issues/education/higher-education ............. 32

## **INDEX OF EXHIBITS**

**A.**     ITT's Enrollment Agreement Form (Indianapolis, IN rev. Oct. 5, 2011)

**B.**     Cost Summary and Payment Addendum to Enrollment Agreement Form (rev. Dec. 14, 2011)

**C.**     Excerpts From ITT's Catalog and Handbook (Indianapolis, IN 2011)

**D.**     Mystery Shopper Report (Owings Mills, MD July 21, 2011)

**E.**     Mystery Shopper Report (Oak Brook, IL Feb. 7, 2012)

## INTRODUCTION

This unprecedented and unfounded lawsuit should be dismissed.  Plaintiff, the Consumer Financial Protection Bureau (the "Bureau"), has limited authority to regulate consumer finance, but wants to override the boundaries set by Congress and extend its power.  Defendant ITT Educational Services, Inc. ("ITT") does not provide consumer financial products, and its conduct as described in the Bureau's complaint falls outside the Bureau's jurisdiction.  The complaint recognizes that the loans at issue in this case were made by third parties—not ITT—and those third parties set the terms, signed the contracts, and received the fees and interest.  The Bureau's theory that somehow it can still pursue ITT relies on fatally vague concepts of "unfairness" and "abusiveness" that violate the constitutional guarantee of Due Process.  The complaint also invokes facially implausible conclusions and bare recitals of statutory elements that lack factual support.  More significantly, the Bureau is an unconstitutional entity that lacks legitimate authority to pursue this lawsuit.

## ALLEGATIONS OF THE COMPLAINT

The Bureau does not claim that ITT engaged in fraudulent or deceptive conduct.  The complaint bases ITT's alleged liability primarily on a five-month period in late 2011, but never alleges relevant facts specific to that time period, and repeatedly conflates ITT's conduct with that of other, independent actors.  Nearly every allegation in the complaint—including the misleading and out-of-context "mystery shopper" allegations—is window-dressing that has nothing to do with the third-party loans or the causes of action the Bureau has chosen to plead.

*1. About ITT.*  ITT is a leading private college system that provides undergraduate and graduate degree programs at more than 140 campuses in 38 states and online.  ¶ 16.[1]  Each ITT campus is accredited by an accrediting agency recognized by the federal Department of

---

[1]   References to "¶ __" refer to the Bureau's February 26, 2014 complaint.

Education.  ¶ 51.  Approximately 10,000 employees implement ITT's educational programs, which blend traditional academic content with applied learning concepts aimed at helping students develop the skills and technical knowledge necessary to pursue careers in the modern economy.  Since its founding in 1969, ITT has educated hundreds of thousands of students; more than 55,000 are currently enrolled in its programs.  These students are generally those who have been underserved by traditional higher education:  older students, low-income students, minority students, students working full-time, and single parents.  ¶ 28.

ITT is subject to extensive federal and state oversight.  As an "institution of higher education" under Title IV of the Higher Education Act, 20 U.S.C. §§ 1001, 1002(b), ITT must satisfy substantial monitoring, disclosure, and reporting requirements to participate in Title IV federal financial aid programs.  *E.g.*, 20 U.S.C. § 1094(a)(5), (a)(17); *id.* § 1097a; *see also* ¶ 25.  Among other things, ITT must receive at least 10% of its revenue from nonfederal sources, 20 U.S.C. § 1094(a)(24), and its students may not exceed a specified rate of default on federally guaranteed loans, *id.* §§ 1085(a), 1087c(d).  In addition, ITT is extensively regulated by the Department of Education, the Securities and Exchange Commission, state educational authorities, and accrediting agencies.

This matter involves private loans made years ago by third parties.  The private loans fell into two categories:  CUSO and PEAKS.  ITT did not originate or service these third-party loans, which were designed to help students have access to funding to pursue their educations after the financial crisis made it difficult for many students to obtain financial aid.  ¶ 99.

*2. CUSO.*  In 2008, representatives from a consulting firm met with ITT about a third-party loan program that would be operated by a credit union service organization ("CUSO").  Under the program, loans were made by the member credit unions from CUSO funds beginning

in March 2009; ITT provided certain guarantees to the CUSO; and no CUSO loans were made after the end of 2011.  ¶¶ 120-21.  The complaint does not allege that ITT originated or owned any CUSO loans, or that ITT had any right to interest or fees generated by the loans.

   *3. PEAKS.*  In 2009, another independent entity approached ITT with a proposal for a third-party private loan program called PEAKS.  Under the PEAKS program, a third-party lender issued loans to ITT students.  Those loans were in turn purchased by a trust.  ITT served as guarantor to the trust, but was not among its beneficiaries.  ¶¶ 129-30.  The PEAKS program disbursed its first loan in February 2010, and disbursed its final loan before July 21, 2011, the earliest date on which the Bureau claims a violation of the Consumer Financial Protection Act.  ¶¶ 130, 132, 165, 173, 182.  There is no allegation that ITT originated or owned any PEAKS loans, or that ITT had any right to interest or fees generated by those loans.

   *4. Temporary Credit.*  In early 2008, ITT began to extend Temporary Credit as a last resort to qualified students unable otherwise to cover the full cost of their upcoming academic year.  ¶ 99.  Temporary Credit was due and payable to ITT within 12 months and generally at the end of the academic year, which lasts nine months.  ¶¶ 6, 99.  ITT never charged interest or fees, including origination fees, on Temporary Credit balances.  *Id.*

   ITT fully disclosed the terms of Temporary Credit to students.  As the Bureau admits, the terms of Temporary Credit were set forth in a Cost Summary and Payment Addendum ("Cost Summary") attached to the Enrollment Agreement that all students were required to sign upon enrolling with ITT.  ¶¶ 66, 102-03; Ex. A (Enrollment Agreement); Ex. B (Cost Summary); Ex. C (Course Catalog, incorporated in Enrollment Agreement).  Each Cost Summary discloses that Temporary Credit carries an "Annual Percentage Rate" of 0% and a "Finance Charge" of $0.  Cost Summaries also disclose how many payments students must make and when they must

make them, and that there are no late charges for Temporary Credit, but that late payment constitutes "a default under the Agreement." Ex. B, at 3.[2]

    *5. Operation of CUSO and PEAKS Loans.* Each year, students at institutions of higher education across the country assemble a "package" of financial aid that covers their educational expenses. For new students at ITT, the financial aid process during the enrollment period involved signing an Enrollment Agreement and Cost Summary that disclosed the terms and conditions of any Temporary Credit awarded. ¶¶ 102-03.

    For *continuing* students, the "repackaging" process was different. Continuing students sometimes owed a balance to ITT due to their failure to satisfy their Temporary Credit balances. Consistent with ITT's policy, which is identical to that of most other colleges—and which every student signed as part of the Enrollment Agreement—these students could not continue in their educational program until they satisfied their account balances. Students could pay using their own savings, money borrowed from family and friends, a credit card, or a private third-party loan. Although the complaint alleges that many students elected to pay their balances with a CUSO or PEAKS loan (¶ 171), it does not allege that any student was required to do so by ITT, or that ITT received any benefit if they chose such a loan over any other option.

    Both CUSO and PEAKS loans were available only to students who had completed the first academic year of their program. ¶ 114 (private loans "financed students' second year tuition gap"). Although ITT reserved the right to prevent students from continuing their studies until any outstanding Temporary Credit balances were satisfied, ITT took steps to ensure that students who repackaged their financial aid could continue. For example, ITT would sometimes, in its discretion, extend additional Temporary Credit to cover any gap between students' financial aid

---

[2] "It is well settled that in deciding a Rule 12(b)(6) motion, a court may consider 'documents attached to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to his claim.'" *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (citation omitted; ellipsis in original).

4

packages and the cost of attending school if, for any reason, they could not otherwise satisfy their Temporary Credit balances.  ¶ 143.  ITT also allowed students with outstanding Temporary Credit balances upon graduation to enter into an interest-free installment plan to pay that debt over time; ITT also offered graduating students with Temporary Credit balances a discount on their Temporary Credit balance if they paid in a lump sum at the time of graduation.  ¶ 144.

The complaint does not allege that, in offering Temporary Credit and in helping students obtain tuition assistance from third-party providers, ITT originated, received interest from, or owned any private education loans.

6.  *"Mystery Shoppers."*  The complaint centers on a collection of excerpted, undated quotations from "mystery shoppers."  ¶¶ 35-36, 41-45, 54, 59-62, 67-84, 92-94, 107.  ITT voluntarily initiated the mystery shopper program to identify instances of noncompliance with company policies; ITT hired mystery shoppers to search for misconduct and provide ITT with the critical assessments that the Bureau now brandishes.  ¶¶ 35, 41, 54, 62, 67.  Such corporate self-evaluation programs are common.  *E.g.*, *Joseph v. Sasafrasnet, LLC*, 689 F.3d 683, 688 & n.20 (7th Cir. 2012); *Logan v. Denny's, Inc.*, 259 F.3d 558, 563-65 (6th Cir. 2001).  As is clear on their face, the partial quotations included in the complaint pertain only to the initial recruiting and financial aid process for new students.  Significantly, there are no mystery shopper quotations in the paragraphs directed to the repackaging stage, the only stage where PEAKS and CUSO loans were available.  ¶¶ 85-87, 138-42.

The complaint provides only out-of-context, edited quotations from select mystery shopper reports.  The full quotations reveal a starkly different picture.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 n.13 (2007) (district courts may take notice of full quotations "from which the truncated quotations were drawn").  For example, the complaint quotes one mystery

shopper as describing ITT's insistence on following up with the prospective student as "a bit invasive" (¶ 77 (emphasis omitted)), yet omitted the remainder of the shopper's report stating that she "was pleasantly overwhelmed at how willing and excited [ITT] was to help me in finding a career," and "ha[d] never encountered a career service office as nice and helpful as this one."  The shopper also praised ITT staff because "[t]hey truly seem to make it their goal to help their students succeed at making the leap from education to career, which is great!!"  Ex. D, at 3.[3]

*7. The Claims.*  The Bureau touts this as a "predatory lending" suit and hails it as the Bureau's "first public enforcement action against a company in the for-profit college industry."[4] The complaint asserts four counts—three counts under the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. §§ 5481 *et seq.*, and one count under Regulation Z implementing the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.* and 12 C.F.R. Part 1026.

Count 1 asserts that the third-party loans were "unfair" because ITT allegedly subjected students to undue influence or coercion "at or around the time the students signed the ITT Private Loan contracts"—that is, during the repackaging process for continuing students.  ¶ 160.[5]

Count 2 asserts that the third-party private loans were "abusive"—and that ITT, not the third-party lenders, is responsible for that "abuse"—because ITT allegedly took unreasonable advantage of continuing students' inability to protect their interests in selecting private loans during the repackaging process.  ¶¶ 167, 170.

Count 3, which overlaps with count 2, asserts that the third-party loans were "abusive"

---

[3]  The Bureau's attempt to tar ITT with ITT's own mystery shopper program would be objectionable even if context were provided.  ITT created the program in a good-faith effort to help ensure *compliance* with applicable law, and to check on its employees' conduct.  The Bureau's tactics here will dissuade other educational institutions from maintaining similar self-evaluation programs.

[4]  *See* CFPB Sues For-Profit College Chain ITT For Predatory Lending (Feb. 26, 2014), http://www.consumerfinance.gov/newsroom/cfpb-sues-for-profit-college-chain-itt-for-predatory-lending/.

[5]  The complaint's references to "ITT Private Loans" are curious and wrong, given that no such thing exists:  the complaint admits that ITT did not enter into a contract for the private loans at issue with any student.  ¶¶ 11, 98, 110, 130 (third parties, not ITT, originated the loans).  The "ITT Private Loans" phrase is misleading rhetoric.

because ITT allegedly took unreasonable advantage of continuing students' reliance on ITT to act in their interests.  ¶¶ 175, 178.

Each of counts 1–3 (the "CFPA counts") is limited to the period from "July 21, 2011 through December 2011" (¶¶ 165, 173, 182); none of these claims is based on Temporary Credit.

Count 4 asserts that ITT violated Regulation Z and TILA because the discount offered to graduating students who paid their Temporary Credit balances in a lump-sum supposedly constituted a "finance charge" for graduating students who declined the discount in favor of paying their Temporary Credit debt in installments, and ITT supposedly did not make the disclosures required when a finance charge is imposed.  ¶¶ 188-89.  The complaint claims that this purported violation occurred "from approximately March 2009 through the present."  ¶ 191.

## LEGAL STANDARDS

A well-pleaded complaint must state a claim that is "plausible on its face" and contain sufficient factual allegations to allow a court "to draw a reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 570; *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014).  Conclusory allegations are "not entitled to be assumed true."  *Iqbal*, 556 U.S. at 681.  The complaint must allege facts "showing" that the Bureau is entitled to relief.  Fed. R. Civ. P. 8(a)(2).

The CFPA counts are limited to the period from July 21, 2011 through December 2011. Thus, factual allegations concerning conduct outside that five-month period do not support the claims.  *E.g.*, ¶¶ 12, 25, 46, 99, 110, 114, 127, 129-32, 135-36, 152, 154.  Further, no PEAKS loans were disbursed after July 21, 2011 (¶ 132); thus, allegations concerning that program are not actionable at all (*e.g.*, ¶¶ 114, 129-32, 135-37).  In any event, inasmuch as the complaint alleges no substantive differences between PEAKS and CUSO loans, ITT's arguments apply equally to both types of third-party loan.

Counts 1 and 2 also are limited to acts and practices at the time students selected or entered into third-party loans, which were available only in the repackaging stage for continuing students.  ¶¶ 160, 170, 177, 179.  Therefore, only allegations concerning repackaging and third-party student loans are relevant to these counts (¶¶ 85-87, 97-98, 114-155); allegations concerning new student enrollment and the initial financial aid process are irrelevant (¶¶ 22-84, 88-96, 99-113).  Count 3 arguably can be read to include the initial financial aid process, and count 4 includes payments in connection with Temporary Credit.

## ARGUMENT

Each of the claims fails as a matter of law and should be dismissed with prejudice.

## I.     THIS ACTION VIOLATES THE CONSTITUTION

### A.     The Bureau Is An Unconstitutional Entity.

Title X of the Dodd-Frank Act insulates the Bureau from any significant checks by the Executive or Legislative Branches, in violation of the Constitution's separation of powers.

*1. No Presidential Oversight.*  The Constitution vests the Executive power in the President, who must "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.  "The President cannot 'take Care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them."  *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3147 (2010); *see also Myers v. United States*, 272 U.S. 52, 134 (1926).  When the President "loses confidence in the intelligence, ability, judgment, or loyalty" of a subordinate, the President "must have the power to remove [the subordinate] without delay." *Myers*, 272 U.S. at 134.

Even a limited ability to remove officers, such as a "good-cause" requirement, restricts the President's ability to control Executive officers.  *Free Enter. Fund*, 130 S. Ct. at 3147, 3152. The limitations on removal here are far more restrictive than a "good cause" provision.  The

Director, who serves a five-year term, may be removed by the President only "for inefficiency, neglect of duty, or malfeasance in office."  12 U.S.C. § 5491(c)(3).  Such restrictions have been upheld only where the organic statute limits the agency's responsibilities or otherwise checks its authority.  *See, e.g.*, *Morrison v. Olson*, 487 U.S. 654, 695-96 (1988); *Humphrey's Ex'r v. United States*, 295 U.S. 602, 628 (1935).

The Director, by contrast, has lengthy tenure and purports to have broad jurisdiction and significant power over numerous industries without any check on his authority by the Chief Executive.  Further, the Bureau is purportedly authorized to sue in the name of the United States, a core Executive power.  *Morrison*, 487 U.S. at 691; *see also* 12 U.S.C. § 5564.  Without meaningful Presidential control over the Director, the Director could initiate suits advancing his—and not the President's—views on the proper construction of federal laws.  Remarkably, the Director can delegate any or all of his significant powers to *any* "duly authorized employee, representative, or agent."  12 U.S.C. § 5492(b).  This further undermines the President's control over Executive officials.  *Buckley v. Valeo*, 424 U.S. 1, 136 (1976).[6]

*2.  No Congressional Control Of Funding.*  The Director may unilaterally claim up to 12% of the Federal Reserve's budget, currently about half a billion dollars, without Congress's approval.  12 U.S.C. § 5497(a).  The CFPA provides that "the funds derived from the Federal Reserve System . . . shall not be subject to review by the Committees on Appropriations" of the House and Senate.  *Id.* § 5497(a)(2)(C).  Congress cannot even derivatively influence the Bureau

---

[6]  The Director's ability to appoint the Deputy Director also violates the Appointments Clause.  The only Executive Branch officials, besides the President, who may appoint inferior officers such as the Deputy Director are the heads of Executive departments who are themselves accountable to the President.  U.S. Const. art. II, § 2, cl. 2; *Free Enter. Fund*, 130 S. Ct. at 3162.  The Deputy Director, however, is "appointed by the Director," 12 U.S.C. § 5491(b)(5), who is not the head of an Executive department.  Under the Appointments Clause, a department is "a freestanding component of the Executive Branch, not subordinate to or contained within any other such component."  *Free Enter. Fund*, 130 S. Ct. at 3163.  The Bureau is "established in the Federal Reserve System," 12 U.S.C. § 5491(a), which is led by the Board of Governors of the Federal Reserve System, an "independent regulatory agency," 44 U.S.C. § 3502(5).

by restricting the budget of the Federal Reserve, because its revenues also are exempt from the appropriations process.  *Id.* § 244.  The Director thus enjoys unprecedented power over the regulation of private sector activity and exclusive control of more than half a billion dollars, outside the appropriations process.  *See also* U.S. Const. art. I, § 7, cl. 1.[7]

\*   \*   \*

Each of these breaks in the constitutional order renders the Bureau's authority unconstitutional.  Thus, the Bureau lacks power to bring this action and its complaint must be dismissed.  *Ass'n of Am. Railroads v. U.S. Dept. of Transp.*, 721 F.3d 666, 673 (D.C. Cir. 2013).

### B.     This Enforcement Action Violates Due Process Because Regulated Parties Lack Fair Notice Of What Conduct Is Prohibited.

The Bureau asserts that ITT engaged in "unfair" and "abusive" acts or practices.  12 U.S.C. § 5536(a)(1)(B).  Both on their face and as applied, those terms fail to provide sufficient notice of what is proscribed and violate the Due Process Clause of the Fifth Amendment.

The requirement that laws "give fair notice of conduct that is forbidden or required" is fundamental to Due Process.  *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012).  The void for vagueness doctrine ensures that (1) "regulated parties . . . know what is required of them" and (2) there is sufficient "precision and guidance" such that "those enforcing the law do not act in an arbitrary or discriminatory way."  *Id.*; *see also United States v. Williams*, 553 U.S. 285, 304 (2008).  Both Due Process requirements are trampled by the complaint.

A standardless prohibition of "unfair" acts and practices is "as vague as they come."  *Beler v. Blatt, Hasenmiller, Liebsker & Moore, LLC*, 480 F.3d 470, 474 (7th Cir. 2007).  That

---

[7]   The CFPA also limits judicial oversight in ways that are relevant to separation of powers analysis.  12 U.S.C. §§ 5512(b)(4)(B), 5513(a) & (c)(3)(B)(ii).  Some constitutional flaws in the CFPA are being litigated in other courts, but have not resulted in a decision binding on this Court.  *Cf. State Nat'l Bank v. Lew*, 958 F. Supp. 2d 127 (D.D.C. 2013) (dismissing pre-enforcement challenge to Bureau's constitutionality on standing and ripeness grounds), *appeal pending*, No. 13-5247 (D.C. Cir.); Order, *Consumer Fin. Prot. Bureau v. Morgan Drexen Inc.*, No. 13-1267 (C.D. Cal. Jan. 10, 2014) (denying motion to dismiss Bureau enforcement action on constitutional grounds), *appeal dismissed on jurisdictional grounds*, No. 14-55333 (9th Cir. Apr. 11, 2014).

vagueness is compounded by the CFPA, which provides that the Bureau has no authority to declare an act or practice "unfair" unless there is a "reasonable basis to conclude" that "(A) the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and (B) such substantial injury is not outweighed by countervailing benefits to consumers or to competition."  12 U.S.C. § 5531(c)(1).  What constitutes "substantial injury" or is "reasonably avoidable" is as amorphous—and subjective—as the term "unfair." The Bureau's own Enforcement Guideline fails to define these terms with any precision, stating for example that "substantial injury" may take the form of "monetary harm," but also some "emotional impacts may amount to or contribute to substantial injury."[8]

Nor has the Bureau attempted to provide meaningful guidance through regulation, instead asserting that its interpretation of "unfair" practices "may" be informed by case law, enforcement actions, and *ad hoc* policy statements.  *See* CFPB Supervision and Examination Manual, at UDAAP 1 n.2.  This obviously is not fair notice.  Such a general reference—which is not even binding on the Bureau—provides no fair warning that third-party private loans, which are common in the already highly regulated field of educational institutions, could lead to an enforcement action against ITT by the Bureau.

The prohibition of "abusive" acts is even less defined.  The Seventh Circuit has described the term "abusive" as "vague," *Ustrak v. Fairman*, 781 F.2d 573, 580 (7th Cir. 1986), and the CFPA provides no meaningful guidance.  The CFPA states that an "abusive" act or practice, in relevant part, is one that "takes unreasonable advantage of . . . the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service, or . . . the reasonable reliance by the consumer on a covered person to act in the interests

---

[8]  CFPB Supervision and Examination Manual, at UDAAP 2 (Oct. 2012), http://files.consumerfinance.gov/f/ 201210_cfpb_supervision-and-examination-manual-v2.pdf.

of the consumer." 12 U.S.C. § 5531(d).  These conditions, apparently dependent on the

subjective experience of the consumer, add more uncertainty.  *See Harris v. Forklift Sys., Inc.*,

510 U.S. 17, 24 (1993) (Scalia, J., concurring) ("'Abusive' . . . does not seem to me a very clear

standard—and I do not think clarity is at all increased by adding the adverb 'objectively' or by

appealing to a 'reasonable person['s]' notion of what the vague word means").

 The Bureau's Director has acknowledged the vagueness.  In 2012, the Director testified

that the term "abusive" is "a little bit of a puzzle because it is a new term," and that the Bureau

> ha[s] been looking at it, trying to understand it, and we have determined that that
> is going to have to be a fact and circumstances issue. . . .  Probably not useful to
> try to define a term like that in the abstract; we are going to have to see what kind
> of situations may arise where that would seem to fit the bill under the prongs.

*How Will the CFPB Function Under Richard Cordray: Hearing Before the Subcomm. on TARP,*

*Financial Services and Bailouts of Public and Private Programs*, 112th Cong. 112-107, at 69

(2012).  This approach maximizes the Bureau's power at the expense of the Bureau's targets, and

is constitutionally impermissible.

 The Bureau's "know it when I see it" approach leaves regulated entities to "guess at its

meaning and . . . application[,] violat[ing] the first essential of due process of law."  *Connally v.*

*Gen. Constr. Co.*, 269 U.S. 385, 391 (1926); *see also Fox Television*, 132 S. Ct. at 2317.

Accordingly, the CFPA claims should be dismissed as contrary to the Due Process Clause.

*Gates & Fox Co. v. OSHRC*, 790 F.2d 154, 156 (D.C. Cir. 1986) (reversing agency's application

of unconstitutionally vague regulation).[9]

---

[9] Notions of "unfairness" and "abusiveness" also fail to lay down "'an intelligible principle to which the [Bureau] is directed to conform,'" resulting in an unconstitutional delegation of Legislative power.  *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472 (2001) (citation omitted).  For example, where Congress purported to confer on an agency "authority to regulate the entire economy on the basis of no more precise a standard than . . . assuring 'fair competition,'" the result was unconstitutional.  *Id.* at 474 (citing *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 531 (1935)).  The charge to counter "unfair" and "abusive" practices in consumer finance is no less standardless and sweeping.

## II.    ITT IS NOT PROPERLY SUBJECT TO THIS ENFORCEMENT ACTION

The complaint must also be dismissed for failure to state a claim because it has alleged no facts showing that ITT, an educational institution, falls within the Bureau's enforcement jurisdiction.  The Bureau's authority under the CFPA to prevent unfair or abusive acts or practices is limited to "covered person[s]" and "service provider[s]."  12 U.S.C. § 5536(a)(1).  ITT is neither.  The Act separately excludes "merchants, retailers, and other sellers of nonfinancial goods or services"—such as ITT—from the Bureau's authority.  *Id.* § 5517(a).  These statutory terms bar this suit.

### A.    ITT Is Not A "Covered Person."

The CFPA defines "covered persons" as "any person that engages in offering or providing a consumer financial product or service."  12 U.S.C. § 5481(6)(A).  A financial product or service means "extending credit and servicing loans, including . . . brokering . . . extensions of credit."  *Id.* § 5481(15)(A)(i).  It also means "providing financial advisory services," including "credit counseling" and "services to assist [with] debt management or debt settlement."  *Id.* § 5481(15)(A)(viii).  The complaint fails to allege that ITT offered, provided, or brokered any extension of credit or provided financial advisory services.

1. Apart from a single conclusory assertion that merely recites the statutory standard (¶ 17), the complaint does not allege that ITT "offer[ed]" or "provid[ed]" CUSO or PEAKS loans—the private student loans that are the basis for all of the Bureau's CFPA claims.  ¶¶ 159, 169, 177.  Bald assertions that ITT "designed" various "private loan *programs*" (*e.g.*, ¶ 11 (emphasis added)) obviously do not, even on their own terms, transform ITT into an offeror or provider of consumer *loans*.  That an educational institution may be deemed to create a "program" to accommodate student demand for a third-party lender's financial products or services does not mean that the educational institution itself is the lender.

13

The complaint admits that third parties, and not ITT, originated the private loans. ¶¶ 11, 18 ("lenders offering student loans"), 98, 110, 130 ("The originating bank made the loans . . . ."). The complaint's use of "ostensible" in describing these third-party lenders is wholly rhetorical.

The complaint fails to allege facts showing that ITT sought to enter into a bargain with any student regarding PEAKS or CUSO loans, that any student formed a PEAKS or CUSO contract with ITT, or that ITT had any right of action against a student who defaulted on a PEAKS or CUSO loan—all hallmarks of lending activity. *Wells Fargo Bus. Credit v. Hindman*, 734 F.3d 657, 666 (7th Cir. 2013). Moreover, absent any alleged contract between ITT and a student for a private loan, the Bureau's demand for "[r]escission against ITT" demonstrates the irrationality of this claim. Compl. at 34; *see also* 12 U.S.C. § 5565(a)(2)(A) (authorizing only "rescission or reformation *of contracts*") (emphasis added).[10]

Given that ITT received no fees or interest under the third-party private loan contracts, it is unclear on what basis the complaint seeks restitution, disgorgement, and rescission. To the extent the Bureau seeks to recover from ITT the payments made by students to third-party lenders pursuant to their lending contracts, the complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(7) for failure to join those third-party lenders as necessary parties. *United States ex rel. Hall v. Tribal Dev. Corp.*, 100 F.3d 476, 479-81 (7th Cir. 1996).

2. Because ITT did not offer the third-party loans, the Bureau's theory that it may regulate ITT as a "covered person" boils down to the contention that ITT engaged in "brokering . . . extensions of credit" or "providing financial advisory services." 12 U.S.C. § 5481(15)(A)(i), (15)(A)(viii). The CFPA defines a "broker" as "any person engaged in the business of effecting

---

[10]  Guaranteeing a loan also does not equate to offering or providing it. To read "guaranteeing" a loan as "providing" one would mean that the Bureau's jurisdiction could reach any person who makes loans possible or more likely. Similarly, underwriting a loan does not equate to offering or providing a loan. Regardless of the source of the underwriting criteria (¶ 121), the loans could not have been made without the actual provider—a third party, not ITT—giving up its own money.

transactions . . . for the account of others." *Id.* § 5301(15) (cross-referencing 15 U.S.C. § 78c); *see also Black's Law Dictionary* 219 (9th ed. 2009) (a "broker" is "employed to make bargains and contracts between other persons in matters of trade, commerce, or navigation"). The complaint fails to allege that ITT—an educational company—engaged in the *business* of effecting private student loans for others. Nor would such allegations be plausible. *Twombly*, 550 U.S. at 557. The complaint does not allege that ITT worked for private banks, actively recruited borrowers as a business, or received commissions or brokerage fees. *SEC v. George*, 426 F.3d 786, 797 (6th Cir. 2005). Indeed, the complaint concedes that private loans covered a small portion of continuing students' tuition ("the second-year tuition gap," ¶ 8); thus, brokering loans could not plausibly be deemed ITT's "business." 69 Am. Jur. 2d *Securities Regulation— Federal* § 303 (a broker "must conduct such defined activity as a business").

The Bureau nonetheless asserts that ITT engaged in brokering by "serving as, and holding itself out as, an intermediary" between students and third-party lenders, and "arranging the loans for the students." ¶ 18. These activities do not constitute "brokering" under the CFPA. The Bureau's overbroad construction of "brokering" would extend its enforcement authority to all persons who assist another in completing an administrative process. Institutions of higher education across the country, for example, are *required* to inform students of the availability of loans and assist them in the process of securing financial aid—and this function is already regulated by the Department of Education. 20 U.S.C. § 1019a. There is no indication that the Department has ever considered schools to be "brokering" loans when they offer students statutorily-required assistance navigating the financial aid process, or that Congress intended to convert financial-aid employees into "brokers" subject to the Bureau's jurisdiction.

In any event, the complaint fails to allege factual support for the Bureau's theory. As

noted, *all* of the mystery shopper allegations pertain to the initial financial aid stage.  The few

allegations that address the repackaging stage, where continuing students became eligible for

private loans, are vague and conclusory.  *E.g.*, ¶¶ 85-87 (asserting only that the repackaging

stage was "similarly rushed and controlled"); ¶ 97 (asserting that ITT conducted the repackaging

stage "[u]sing the tactics described above and others").  The Bureau pleads no factual support for

its assertion that ITT held itself out as the "sole intermediary" between third-party lenders and

students, or that it did "most of the work in completing the paperwork" for private loans.  ¶ 122.

That omission is telling, because the Bureau, using its subpoena power, has obtained extensive

discovery from ITT and others and would have alleged supporting facts had they existed.  In

short, there is no basis for the "brokering" theory.

3.  The complaint asserts that ITT was also a covered person because it supposedly

provided "financial advisory services" to students.  12 U.S.C. § 5481(15)(A)(viii).  Although the

CFPA does not define "financial advisory services," the legislative history makes clear that the

term "financial product or service," which includes financial advisory services, was meant to

cover only those non-banking services "so closely related to banking . . . as to be a proper

incident thereto."  12 C.F.R. § 225.28(a); S. Rep. No. 111-176, at 160.  Any attempt to stretch

"financial advisory services" to cover the normal assistance that all college financial aid

employees provide to students—clearly not banking—would be unlawful.  *See Am. Bar Ass'n v.*

*FTC*, 430 F.3d 457, 467-68 (D.C. Cir. 2005).

Further, the complaint asserts that ITT triggered the Bureau's enforcement authority by

providing "substantial advice and assistance to students enrolling in ITT programs regarding

loans or other available financial aid."  ¶ 19.  But assertions regarding assistance to students at

the *enrollment* stage, again, could be brought against employees of any university in the country;

and they have no bearing on those CFPA counts pleaded here which pertain only to the later repackaging stage for continuing students.  ¶¶ 159-60, 169-71, 177.

### B.     ITT Is Not A "Service Provider."

The Bureau also incorrectly asserts that it may sue ITT as a "service provider."  12 U.S.C. § 5536(a)(1).  A "service provider" is one who "provides a material service to a covered person in connection with" the covered person's offering of a "consumer financial product." Presumably, the Bureau views the covered persons in this context to be the third-party lenders, and the consumer financial products to be the third-party student loans.  A material service includes participating in the "designing, operating, or maintaining" of the consumer financial product—*i.e.*, the third-party loans.  *Id.* § 5481(26)(A)(i).

The complaint concedes that both the third-party loans programs were designed in 2008 and 2009—long before July 21, 2011, when the Bureau first asserts a violation of the CFPA. ¶¶ 114, 120.  The Bureau cannot exercise enforcement authority over ITT for "designing" a consumer financial product or service before the Bureau obtained enforcement power on July 21, 2011.  12 U.S.C. § 5581(d); 75 Fed. Reg. 57,252 (Sept. 20, 2010).  Nor do the relevant provisions of the CFPA apply retroactively to reach events in 2008, 2009, and 2010.  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *see also Molosky v. Wash. Mut., Inc.*, 664 F.3d 109, 113 n.1 (6th Cir. 2011) (provisions of Dodd-Frank not retroactive).

The complaint also fails to allege that ITT "operated" or "maintained" any extension of credit or loan servicing in connection with the third-party loans.  Providing financial aid assistance *to students* is not equivalent to providing a "material service" *to third-party lenders* in connection with operating or maintaining third-party loans.  The phrase "material service . . . in connection with" means a connection between the service and the offer or sale of a consumer loan that matters to the covered person.  *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058,

1066 (2014).  Thus, there is no basis for concluding that ITT was a "service provider" that materially assisted in "operating" or "maintaining" third-party student loans.[11]

### C.   ITT Is Excluded From The Bureau's Authority As A Seller Of Nonfinancial Goods And Services.

The CFPA expressly excludes entities like ITT—sellers of nonfinancial goods or services—from the Bureau's enforcement jurisdiction.  The statute excludes companies that "exten[d] credit directly to . . . consumer[s]," so long as the credit extended is used to "enabl[e] . . . consumer[s] to purchase . . . nonfinancial good[s] or service[s] directly from the merchant, retailer, or seller."  12 U.S.C. § 5517(a)(2)(A)(i).  Any extension of credit to students would be excluded from the Bureau's jurisdiction because such loans enabled students to purchase nonfinancial services—educational services—directly from ITT.  The Bureau admits that the purpose of the third-party private loans was "to pay for a portion" of students' tuition (¶ 17), and that the loans "financed students' second year tuition gap" (¶ 114)—concessions that exempt ITT from the Bureau's enforcement authority.  12 U.S.C. § 5517(a)(2)(A)(i).

It is no answer that CUSO and PEAKS loans supposedly were "intended" to allow students to pay Temporary Credit balances.  ¶ 114; *see also* ¶¶ 132, 135-36.  Like PEAKS and CUSO loans, Temporary Credit is also an extension of credit to allow students to purchase educational services directly from ITT.  A student's decision to replace one exempt form of debt with another does not move ITT out of the statutory exclusion.

*       *       *

The CFPA is not a vehicle for regulating higher education through the guise of consumer financial protection.  Public policy questions concerning whether particular college degrees are

---

[11]   The Bureau also has stated that "service providers" are entities to whom covered persons have "outsource[d]" functions that would otherwise fall within the Bureau's jurisdiction.  CFPB Bulletin 2012-03, at 1.  The complaint fails to allege that any covered person outsourced functions to ITT, or that the assistance ITT supposedly provided to students was an exercise of that delegated authority.

worth students' investments are widely debated.  The Bureau's attempt to impose liability on ITT for helping students pursue degrees that the Director, in his discretion, may deem not "worth it" would set a limitless precedent that could be applied against *all* institutions of higher education.  Consistent with the CFPA, the Court should reject the slippery slope that this action invites and dismiss the complaint.

## III.   THE BUREAU HAS NOT ADEQUATELY ALLEGED A VIOLATION OF THE CONSUMER FINANCIAL PROTECTION ACT

Wholly apart from these constitutional and statutory deficiencies, the complaint also fails to state a claim on which relief can be granted.  The complaint asserts that ITT violated the CFPA by engaging in "unfair" and "abusive" conduct, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B), but alleges only "[t]hreadbare recitals of the elements of a cause of action" that are "not entitled to be assumed true."  *Iqbal*, 556 U.S. at 678, 681.  Because no factual allegations allow the Court "to draw a reasonable inference that [ITT] is liable for the misconduct alleged," the CFPA counts must be dismissed.  *Adams*, 742 F.3d at 728; *see also Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.[12]

### A.   Count 1:  The Complaint Fails To Allege Adequately That ITT Engaged In Unfair Acts Or Practices.

Under the CFPA, an act or practice is "unfair" where "(A) the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and (B) such substantial injury is not outweighed by countervailing benefits to consumers or to competition."  12 U.S.C. § 5531(c)(1).  The complaint fails to satisfy these elements.

---

[12]   In paragraphs 33, 44-45, 48, 50-54, and 72 of the complaint, the Bureau accuses ITT of misleading students.  Deception, however, is not an element of any claim pleaded in the complaint, and thus should be ignored.  To the extent they are deemed relevant, such allegations sound in fraud and must be pleaded with specificity.  Fed. R. Civ. P. 9(b); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 446-47 (7th Cir. 2011).  Because the complaint fails to plead the "'the who, what, when, where, and how'" of any purported deception, these paragraphs should be disregarded for this additional reason.  *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)).

1.      **The Complaint Fails To Allege That Students Suffered "Substantial Injury."**

The Bureau asserts that since July 2011, ITT students suffered "substantial injury" when students supposedly were "pressured" into taking "loans that they could not afford, did not want, did not understand, or did not even know they had."  ¶ 162.  No factual allegation in the complaint supports such a conclusion.

The complaint fails to provide factual support for conclusory assertions regarding what "[s]ome students" wanted, understood, or knew when they "took out ITT Private Loans." ¶¶ 140-42; *Adams*, 742 F.3d at 728.  All the mystery shopper quotes involve individuals paid by ITT to root out instances of noncompliance at the initial financial aid stage; the complaint alleges no facts concerning the subsequent repackaging stage.  Even if the mystery shopper allegations were relevant to the repackaging stage, the complaint fails to tie those allegations to the five-month period that is the subject of count 1.  Notably, the complaint's reference to "8,600 students" is not tied to that period either, but floats free of any time period at all.

The complaint also erroneously assumes that students suffered "substantial injury" by taking loans that were "unaffordable."  ¶ 153.  "Unaffordable" is a vague and subjective concept found nowhere within the CFPA.  No authority holds that ITT had a legal duty to ensure that its students could "afford" loans that they took from third-party lenders.  To the contrary, the Department of Education *requires* schools to permit students to borrow up to the maximum amount of federal loans they can receive.  34 C.F.R. § 685.301(a)(3).  "[A] statutory change would be required to allow an institution to directly limit or control student borrowing."  76 Fed. Reg. 34,386, 34,416 (June 13, 2011); *see also* 20 U.S.C. § 1087tt(c); 34 C.F.R. § 685.301(a)(8). Nor is there a discernible standard against which ITT, or this Court, could determine whether a loan is "affordable," a term meaning wildly different things depending on context.  The Bureau

has a 213-page rule attempting to define the affordability of a mortgage, 12 C.F.R. § 1026.43(c); 78 Fed. Reg. 6408 (Jan. 30, 2013), but there are no standards for measuring the affordability of a student loan.

The Bureau attempts to equate unaffordability here with high projected or actual aggregate default rates (¶ 162), but never alleges what default rate the Bureau would deem acceptable, never states whether affordability should be associated with projected or actual default rates, and never explains how an individual student is harmed by the loan experience of others.  This ambiguity highlights the arbitrariness of the Bureau's regulation-by-litigation approach.  If the Bureau wants to develop an approach for regulating private student loans using a cut-off default rate, it should propose a rule, with public notice and comment, instead of attempting to establish one in this lawsuit.  The lack of fair notice of what constitutes an "unaffordable" student loan violates Due Process.  *Fox Television*, 132 S. Ct. at 2317.[13]

### 2.    The Complaint Fails To Allege That ITT Caused The Asserted Injury.

The complaint also fails to allege adequately that ITT's acts or practices "cause[d] or [were] likely to cause" substantial injury to students.  12 U.S.C. § 5531(c).  The Bureau asserts that the supposed injury arose "at or around the time the students signed the [private loan] contracts" (¶ 160)—not at the earlier financial aid stage—during five months in late 2011.  The complaint asserts only generalities and legal conclusions.  ¶¶ 85-87, 97-98.

The complaint asserts that the "financial aid process . . . was rushed and controlled" (¶ 160), but no facts tie the allegations in paragraphs 63–84, pertaining to the mystery shoppers and the initial financial aid process, to the relevant repackaging stage, or even to the relevant five

---

[13]    Many students default on student debt for reasons having nothing to do with the acts of lenders or educational institutions.  *See, e.g.*, Brittany Hackett, "Why are community college students defaulting at such high rates?" Cmty. Coll. Daily (Mar. 24, 2014), http://www.ccdaily.com/Pages/Campus-Issues/Why-Are-Community-College-Students-Defaulting-at-Such-High-Rates.aspx (citing economic conditions, cost of living, students not completing their degrees, and family and emotional factors as causes of rising student default rates).

months.  *Adams*, 742 F.3d at 733 (affirming dismissal where there is a "complete lack of factual content directed at" the relevant claim).  The complaint contains *no* allegation regarding the time spent by ITT employees discussing PEAKS or CUSO loans, the materials given to students regarding these loans, or how much time students had to consider those materials.[14]

The complaint also fails to allege that conduct by ITT financial aid staff amounted to "coercion," or that any students entered into a CUSO or PEAKS loan *because* of the asserted conduct.  *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 609 (7th Cir. 2013).[15]  Institutions of higher education of all types encourage students to satisfy their financial obligations—and students often satisfy those obligations by assuming debt.[16]  Moreover, although the complaint alleges that students took out private loans to pay Temporary Credit balances, it admits that ITT fully disclosed the terms of Temporary Credit, including how many payments students must make and when they must make them.  ¶¶ 66, 102-03.  It is not unfair or coercive to hold a contracting party to the terms of an agreement.  *Cohen*, 735 F.3d at 609 ("insisting that a contract partner fulfill his contractual duties or face the agreed-upon consequences—is not coercion").

Any allegation that ITT caused students to enter into private loans by misrepresenting the *value* of its educational programs similarly must fail.  First, misrepresentation is an element of a deceptive practices claim, and the complaint does not include a cause of action for deceptive practices.  12 U.S.C. § 5536(a)(1)(B); *see also FTC v. Cantkier*, 767 F. Supp. 2d 147, 153 (D.D.C. 2011); *FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 935 n.3 (N. D. Ill. 2008).  Second, the complaint does not allege facts sufficient to show that any supposed representation

---

[14]  Several of the "mystery shopper" reports directly contradict the notion that the initial financial aid process was "rushed."  *See, e.g.*, Ex. D-E (mystery shopper reports quoted in paragraphs 59, 77 and 83, discussing the scheduling of "follow-up" financial aid appointments and students taking time to consider studying at ITT).

[15]  For example, if a student chose to take a third-party private loan regardless of ITT's statements at the repackaging stage, ITT could not have proximately caused any subsequent injury arising from *that loan*.  *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934-35 (7th Cir. 2010).

[16]  *In re Chambers*, 348 F.3d 650, 657-58 (7th Cir. 2003); *see also, e.g., Kelley v. Univ. of Richmond*, 2006 WL 1555933, at *1, *3 (E.D. Va. June 2, 2006), *aff'd*, 211 F. App'x 173 (4th Cir. 2006).

was likely to mislead reasonable consumers. *FTC v. World Travel Vacation Brokers, Inc.*, 861

F.2d 1020, 1029 (7th Cir. 1988). By the Bureau's lights, if an entity misrepresents its product to

a consumer who then purchases that product using credit—without relying on the

misrepresentation—then the entity has caused substantial harm within the Bureau's enforcement

authority. Given the many other statutory and common law prohibitions on commercial

misrepresentation, that could not have been Congress's intent. Third, representations regarding

academic program quality are in any event beyond the Bureau's expertise and are regulated

directly by the Department of Education and others. *E.g.*, 34 C.F.R. §§ 668.71-75.

### 3. The Complaint Fails To Allege That Any Injuries Were Not "Reasonably Avoidable."

The complaint does not adequately plead that any alleged injury was not reasonably

avoidable. Whether an injury is reasonably avoidable depends on the degree to which

"consumers had a free and informed choice," or "have reason to anticipate the impending harm

and the means to avoid it." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012)

(internal quotations and citations omitted). An injury also is avoidable where a consumer is

"aware of, and [is] reasonably capable of pursuing, potential avenues toward mitigating the

injury after the fact." *Id.* at 1168-69.

The complaint's conclusory assertion of unavoidability hinges on students' debt at the

time they took out private loans. ¶ 163. As the complaint acknowledges, the reason students

entered into private loans is because they owed money to ITT, either to satisfy due and owing

Temporary Credit balances or to pay for the next phase of their education, because they generally

lacked other financial financing options, and because ITT—like all businesses—sought payment

for services rendered. ¶ 8.

First, the complaint does not allege that students were prohibited from satisfying

obligations from other sources.  Indeed, it notes that many students satisfied their obligations using, for example, veterans benefits, and others did not take third-party loans at all.  ¶¶ 25, 143.

Second, the complaint fails to show that students had no choice but to enter into a CUSO or PEAKS loan because their credits were only transferable under limited circumstances. ¶ 160b.  Limited transferability is not non-transferability, and the complaint fails to allege that students could not protect their interests and avoid private loans by attending ITT part-time, working between academic terms, or transferring to another institution.  Moreover, all relevant information about the transferability of ITT credits was fully disclosed.  *See* ITT, Transferability of Credits Disclosure, http://www.itt-tech.edu/credits.pdf.

Third, the complaint states that ITT fully disclosed the terms of Temporary Credit, including how many payments students must make and when they must make them (¶¶ 66, 102-03), so that students certainly would "have reason to anticipate" they would have to repay. *Davis*, 691 F.3d at 1168 (quotation marks omitted).  The complaint does not allege that any students agreed to assume Temporary Credit because they somehow reasonably believed that *Temporary* Credit would not have to be repaid.  *Cf.* ¶¶ 104-08.  "Long-standing principles of contract and sound public policy impose a duty on contracting parties to understand the obligations they are assuming, and if they do not, they cannot be heard to later complain about a lack of understanding."  *IFC Credit*, 543 F. Supp. 2d at 946.  Moreover, the Enrollment Agreements that ITT students signed (¶ 66) expressly incorporated ITT's course catalog, which set forth the third-party lenders' terms for PEAKS and CUSO loans, including interest rates.  Ex. A at 2; Ex. C at 44-46, 48-49.[17]

---

[17]   The complaint does not plead that students were prevented from reading and understanding the Cost Summaries or course catalogs at the repackaging stage.  *IFC Credit*, 543 F. Supp. 2d at 946 ("[T]here is no 'I didn't read it' defense, unless there was some obstacle" to review of the materials) (citing *Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 667 (7th Cir. 2003)).

### 4. The Complaint Fails To Allege That Any Harm Was Not Outweighed By Benefits To Consumers.

The complaint also fails to plead that harm to students "was not outweighed by countervailing benefits" to consumers. ¶ 164; *see also Iqbal*, 556 U.S. at 678.

It is a mistaken notion that a CUSO or PEAKS loan is without significant benefit to students or, at the very least, would cause more harm than good. The complaint never asserts that any student was in a worse position after obtaining an ITT degree *and* entering into a CUSO or PEAKS loan than they would have been without both—even if a private loan *were* their only finance option. Earning potential does not only refer to employment obtainable immediately upon attainment of a degree. Many graduates from various types of post-secondary educational institutions advance in their careers following the "entry-level" positions obtained upon graduation. In any event, absent private loans, students with Temporary Credit balances or otherwise in need of funds to cover an additional year of tuition would almost certainly have been worse off. ITT would have been within its rights to deny such students continued access to its programs. *In re Chambers*, 348 F.3d 650, 658 (7th Cir. 2003) ("When students fail to pay tuition bills on time, institutions can withhold educational services until payment . . . .").

### B. The Complaint Fails To Allege Adequately That ITT Engaged In Any Abusive Acts Or Practices.

The Bureau's novel theories of "abusiveness" must be rejected.

### 1. Counts 2 and 3: The Complaint Fails To Allege That ITT Took "Unreasonable Advantage" Of Students.

Counts 2 and 3 fail as a matter of law because the Bureau has not adequately alleged that ITT took unreasonable advantage of consumers—an essential element of the Bureau's novel theory that ITT engaged in "abusive" acts or practices. 12 U.S.C. § 5531(d)(2); ¶¶ 167, 173, 175, 182. The complaint asserts only legal conclusions that are "not entitled to be assumed

true." *Iqbal*, 556 U.S. at 681.

The complaint asserts that ITT took unreasonable advantage of students' inability to locate financing sources other than third-party private loans by "[t]aking control" of the financial aid process, using "aggressive" tactics and "pushing" students into "expensive, high-risk" loans for the purpose of "window-dressing ITT's financial statements and increasing its stock price." ¶ 172. These are clear examples of conclusory statements that must be ignored in judging the sufficiency of a complaint. *Iqbal*, 556 U.S. at 681. Moreover, these conclusory assertions are unsupported by any facts, and thus give no indication of the specific conduct that the Bureau is challenging. Count 2, for example, alleges that ITT took unreasonable advantage of consumers "selecting or using the ITT Private Loans" only during a five-month period (¶¶ 170-71)—but there is no hint that any fact alleged pertains either to the repackaging process or that five-month period. *Adams*, 742 F.3d 720 at 733.

Similarly, the complaint gives no indication as to what is meant here by "'advantage.'" ¶¶ 167, 175 (quoting 12 U.S.C. § 5531(d)(2)(B) & (C)). There is no allegation that ITT received any fees or interest from any private loan. To the contrary, the complaint alleges that ITT "guarantee[d]" the very same private loans for which it supposedly predicted a 60% default rate (¶¶ 11-12)—which undermines the Bureau's unlikely claim of "advantage." *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603-04 (7th Cir. 2009) (complaint lacking facially plausible claims must be dismissed).[18]

Stripped of its conclusory and irrelevant allegations, the complaint alleges only that ITT offered certain students Temporary Credit that was payable at the end of the academic year (¶ 6), that continuing students had the option of repackaging outstanding balances by taking third-party

---

[18]   The conclusory allegations that the third-party loans were "window-dressing [for] ITT's financial statements and increasing its stock price" (¶¶ 172, 181), are supported by no facts concerning ITT's stock price or financial statements during the relevant period—matters outside the Bureau's jurisdiction in any event.

private loans to supplement any federal aid they received (¶¶ 5, 8), and that ITT expected students to secure funding from some source (including family, friends, or savings, for example) to pay outstanding balances before continuing with their classes (¶ 8).  No authority holds that this course of conduct is taking "unreasonable advantage" of consumers; rather, this is how financial aid in higher education works.  There is no factual allegation that ITT failed to inform any student of his or her obligation to repay Temporary Credit, or the consequences of failing to pay outstanding tuition balances when due.  *Jackson v. Bank of Am. Corp.*, 711 F.3d 788, 793 (7th Cir. 2013) (challenge to home foreclosure was properly dismissed where no facts showed that plaintiffs did not understand the terms of their loan or the consequences of defaulting).[19]

If the Bureau's theory is that the third-party loans were "abusive" because students taking such loans allegedly defaulted at a "high" rate (¶ 12), that, too, fails to state a claim.  The Bureau fails to plead that the student default rate was *caused* by ITT—a necessary element of any theory of liability.  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014) (injuries must be proximately caused by defendant's violation of statute).  More plausible causes are the actions of third-party lenders, general economic conditions, socioeconomic factors, and even student choice.  *In re Roberson*, 999 F.2d 1132, 1136 (7th Cir. 1993); *see also* Hackett, *supra*.  ITT cannot be punished for conditions it did not cause, and the complaint fails to cross "the line from a 'possible' to a plausible claim of entitlement to relief."  *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 917 (7th Cir. 2013); *see also* Section III.A.2, *supra*.

### 2.     Count 2:  The Complaint Fails To Allege Students' Inability To Protect Their Interests.

Count 2 must also be dismissed because it fails to allege that students were unable to

---

[19]   The complaint alleges that ITT threatened "expulsion" for students who failed to pay their outstanding tuition balances.  ¶ 172b.  Even assuming *arguendo* that allegation were true, there is nothing that prohibits a university from refusing to educate a student who fails to pay tuition.  *Chambers*, 348 F.3d at 658.

protect their own interests in deciding whether or not to enter into a private loan.  An act or practice is not abusive if it does not take unreasonable advantage of "the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service."  12 U.S.C. § 5531(d)(2)(B); ¶ 167.  Count 2 is limited to a five-month window and alleges abusive conduct only in the repackaging process, not during the initial financial aid process.  ¶¶ 170, 173.  As noted above, the complaint does not specify that *any* of its allegations pertain to the repackaging process during the relevant period.  Thus, the complaint fails to state a facially plausible claim.  *Adams*, 742 F.3d 728.

The complaint posits that students were unable to protect their own interests in the repackaging process "because" they lacked the resources or time to repay any outstanding Temporary Credit or obtain private loans elsewhere.  ¶ 171.  But these allegations, too, are conclusory:  The complaint does not show that ITT limited the amount of time students had to arrange financing from any source, prevented students from paying with family funds, or prevented students from taking a period to work and then resuming their education when they had paid their Temporary Credit balance—or, indeed, did anything to cause the injury.

Even if the complaint is read to allege "coercion" in requiring students to pay their debts before transferring, count 2 would still fail to state a claim because educational institutions may—and do—withhold credits for transferring students with outstanding tuition balances.  *In re Oliver*, 499 B.R. 617, 620-21 (Bankr. S.D. Ind. 2013); *see also Todd v. Collecto, Inc.*, 731 F.3d 734, 739 (7th Cir. 2013) (It is "[not] unfair for a college to withhold a student's transcript until she has settled her debt to the school.").  A student's decision to leave an educational institution before completing a degree may have countless causes unrelated to the transferability of credits or an outstanding tuition balance.  *Karam v. Corinthian Colls., Inc.*, 2012 WL 8499135, at *8,

*11 (C.D. Cal. Aug. 20, 2012) ("students may withdraw for any number of reasons," including "decisions to pursue other career or educational opportunities, family and personal circumstances, or financial factors").  The complaint thus fails to allege "more than a sheer possibility" of actionable conduct.  *Iqbal*, 556 U.S. at 678; *accord Yeftich*, 722 F.3d at 917.[20]

Indeed, the allegation that students could not protect their own interests because no other financing options were available to them, and that ITT took advantage of this fact by providing a financing option, is nonsensical.  If private loans were students' only option, then ITT *helped* students—which obviously was ITT's intent.  Without those loans, students would not have been able to continue their educations.  With those loans, students had the *choice* of not continuing their educations or taking a private loan.

Under the Bureau's boundless theory of abusive conduct, any business that offers an interest-bearing loan to consumers who lack other financing options takes "advantage" of their "inability" to protect themselves.  It is no answer to characterize third-party private loans as "expensive" and "high-risk."  ¶ 172c-d.  The CFPA precludes the Bureau from regulating interest rates, 12 U.S.C. § 5517(*o*), and loans to consumers who lack other financing options are high-risk by definition, since it is the risk of default that limits their options.  The Bureau's legal theories thus would create a class of prospective students who are too dangerous to serve—and therefore cannot be educated.  Such a construction of the CFPA is contrary to the best interests of disadvantaged students, lacks any discernible limits, and should be rejected.

### 3.    Count 3:  The Complaint Fails To Allege That ITT Took "Unreasonable Advantage" Of Students' "Reasonable Reliance" On ITT To Act In Their Interests.

Count 3 also must be dismissed because it is internally inconsistent and fails to plead

---

[20]   The complaint implausibly suggests that because of limits on the transferability of ITT academic credits, "most students were forced" to take private loans or leave ITT.  ¶ 171.  Again, students were not "forced," and ITT disclosed all pertinent information about the transferability of its credits at all times.  *See* Part III.A.3, *supra*.

adequately that ITT took "unreasonable advantage" of its students' "reasonable reliance" on ITT staff "to act in the interests of the consumer."  12 U.S.C. § 5531(d)(2)(C).

     *a. Internally Inconsistent.*  As with counts 1 and 2, count 3 is limited to a five-month window in late 2011 and is premised on ITT's supposed "brokering" of third-party private loans. ¶¶ 177-78.  Unlike counts 1 and 2, however, count 3 can be read—barely—to cover actions at both the initial financial aid stage *and* in the repackaging process.  ¶ 179 (alleging students' reliance "when they signed up for their financial aid packages, including the [third-party private loans]").  This attempt to cobble together enough conduct to make out a claim for abusiveness only highlights count 3's fatal flaws.

     To be "abusive," the alleged "unreasonable advantage" and the alleged "reasonable reliance" must be experienced by the same "consumer," 12 U.S.C. § 5531(d)(2)(C)—defined as "an individual," *id.* § 5481(4)—within the period of the alleged violation.  If the complaint is asserting that individual students entering the initial *financial aid* stage between July 21, 2011 and December 2011 reasonably relied on ITT staff, then ITT cannot have taken unreasonable advantage of that reliance in making CUSO and PEAKS loans available to those students within that five-month period because those students would not have been eligible for such loans until 2012, when any Temporary Credit became due (¶ 6), and those third-party loans were not offered in 2012 in any event.  Thus, count 3 fails to state a claim insofar as it depends on supposed actions "when [students] signed up for their financial aid packages."  ¶ 179.

     If, on the other hand, the complaint is asserting that students entering the *repackaging* process in the five-month period reasonably relied on ITT staff "when they signed up for . . . the [private loans]" (¶ 179), then count 3 fails to state a claim because the Bureau asserts that students supposedly had "no choice" but to sign up for private loans.  ¶ 119.  If students were

"forced" to take private loans, as the Bureau contends, then they could not have relied on ITT's representations at the repackaging stage as a matter of law.  "Reliance naturally implies some choice between two or more possible decisions," whereas coercion "implies that the person who is coerced has no choice."  *Cemar, Inc. v. Nissan Motor Corp.*, 713 F. Supp. 725, 733-34 (D. Del. 1989).  The Bureau's theory that continuing students in the repackaging process had no choice but to enter into private loans necessarily means that those students took private loans for reasons *other* than representations purportedly made by ITT in the repackaging process—thus fatally undermining the notion that students were acting in reliance on ITT's representations. *See, e.g.*, *Schorsch v. Reliance Standard Life Ins. Co.*, 693 F.3d 734, 741 (7th Cir. 2012) (no reasonable reliance where party would not have acted differently); *Van Gunten v. Cent. States, Se. & Sw. Areas Pension Fund*, 672 F.2d 586, 589 (6th Cir. 1982) (per curiam) (similar).

      *b.  Failure To Show Reliance.*  Count 3 fails for the additional reason that it alleges no factual content concerning ITT's representations and assurances.  The complaint offers only bare conclusions that students were not given "sufficient information" and ITT employees did "all the work" for students, simply telling them where to sign (¶¶ 65, 92)—but no facts in the complaint support such conclusions.  Paragraphs 65 and 92 (like most other allegations in the complaint) relate to the initial financial aid process, whereas the Bureau principally seeks to hold ITT liable for allegedly taking advantage of students *later*, at the repackaging stage.  ¶ 181b-d.  The paragraphs that purport to relate to the repackaging process are "[t]hreadbare recitals of the elements of a cause of action" devoid of factual content—a telling failure.  *Iqbal*, 556 U.S. at 678; ¶¶ 85-87, 138-42.  Indeed, the complaint fails to allege that students were not given full information regarding Temporary Credit or private loans, or that ITT gave students false information about relevant terms.  To the contrary, the Bureau admits that all students signed an

Enrollment Agreement, which incorporated the third-party lenders' terms and interest rates for PEAKS and CUSO loans.  Ex. C at 44-46, 48-49.  The complaint also fails to allege any facts regarding students' decisions to enter into private loans.  Thus, the complaint fails to set forth "allegations plausibly suggesting (not merely consistent with)" students' reasonable reliance on ITT's statements.  *Twombly*, 550 U.S. at 557.

The complaint asserts that "[s]ome ITT students" relied on financial aid staff (¶ 141), but fails to show that *any* student actually relied on representations by ITT staff at any stage of the financial aid process.

Grasping at straws, the complaint asserts that ITT induced reliance by telling students that an ITT education would "help students better their lives."  ¶ 180a.  But telling students that an education will better their lives is not actionable; the President repeatedly has said the same thing.[21]  That statement is also not a representation that private loans are appropriate financial tools for any particular student—and the complaint never draws that necessary connection.  Similarly, employees representing that they are "experts" in financial aid (¶ 180b)—even assuming that occurred—is no reason for students to rely on those employees for *personal* finance counseling.  Such a representation says nothing about whether ITT employees have insight into a student's particular financial interests.[22]

The complaint's assertion that ITT trained its employees to "solicit[]" students' reliance (¶ 180d) is unsupported.  Allegations that ITT assisted students in the financial aid process or used "automated" software (¶¶ 90-91) do not support an inference that ITT trained its staff to

---

[21]   *See, e.g.*, White House, Higher Education Webpage ("Earning a post-secondary degree or credential is no longer just a pathway to opportunity for a talented few; rather, it is a prerequisite for the growing jobs of the new economy."), http://www.whitehouse.gov/issues/education/higher-education.

[22]   That students "did not know" how the financial aid staff was paid (¶ 180c) is irrelevant to whether ITT induced students' reliance.  In any event, financial aid employee compensation is heavily regulated by the Department of Education, and there is no allegation that ITT's compensation policies were not fully compliant.

induce student reliance.  In any event, these allegations do not relate to conduct of ITT staff at the repackaging stage, and, once again, could be brought against any university in the country.

     *c. Student Interests.*  Count 3 also rests on the assumption that ITT did not "act in the interests of" its students.  12 U.S.C. § 5531(d)(2)(C).  But there is no reason why assisting students with CUSO or PEAKS loans means that ITT was not acting in students' interests. There is simply no incompatibility between the normal activities of financial aid staff and students' overlapping interests in obtaining financing to pursue their degrees.  To hold otherwise would be to foreclose many beneficial transactions that are in the parties' *mutual* interests. Moreover, nothing in the CFPA requires that covered persons must act *solely* in the interests of the consumer; if it did, the statute would effectively prohibit loan counseling by any for-profit entity.  Nor does the statute limit the relevant inquiry to consumers' *financial* interest, as the complaint apparently assumes.  Rather, the statute refers to consumers' "interests" (plural), acknowledging that consumers have a wide range of interests—financial, educational, professional—that may be implicated in any given context.

## IV.   THE CLAIM THAT ITT VIOLATED REGULATION Z IS SUBSTANTIALLY TIME-BARRED AND ENTIRELY MERITLESS

     TILA and Regulation Z require creditors to disclose any "finance charge," defined to include all charges imposed by the creditor as an incident to the extension of credit.  15 U.S.C. § 1605(a); 12 C.F.R. § 1026.17(a).  For count 4, the Bureau asserts that a discount ITT offered to graduating students who paid their Temporary Credit balances in a lump-sum at the time of graduation constituted an undisclosed "finance charge" to students who declined the discount because it was an offer made "for the purpose of inducing payment by a means other than the use of credit."  12 C.F.R. § 1026.4(b)(9); ¶¶ 147, 188-89.  The Bureau is wrong.

**A**.  As an initial matter, Regulation Z's statute of limitations bars the Bureau from pursuing remedies against ITT for alleged violations occurring prior to February 26, 2013.  Any civil action alleging violations of TILA and Regulation Z must be brought "within one year from the date of the occurrence of the violation."  15 U.S.C. § 1640(e); *Moor v. Travelers Ins. Co.*, 784 F.2d 632, 633 n.1 (5th Cir. 1986); *Basham v. Fin. Am. Corp.*, 583 F.2d 918, 927 (7th Cir. 1978).  The clock begins to run from the date the transaction is consummated between a consumer and a lender.  *Moor*, 784 F.2d at 633.  Thus, only claims arising after February 26, 2013, one year before the date on which the complaint was filed, can be heard.  And the complaint says *nothing* specific about ITT's conduct after February 26, 2013.

**B.**  The Bureau does not adequately state a claim for a violation of Regulation Z.  TILA and Regulation Z require creditors to disclose any "finance charge," defined as "the sum of all charges, payable directly or indirectly" by the borrower, "and imposed directly or indirectly by the creditor *as an incident to the extension of credit*."  15 U.S.C. § 1605(a) (emphasis added); *see also* 12 C.F.R. § 226.4.  There is no allegation here of a discount, much less a finance charge, "incident to the extension of credit."  Rather, the repayment of Temporary Credit in installments was nothing more than an arrangement to settle credit that ITT had *previously* extended.  Although the Bureau asserts that allowing payment of Temporary Credit balances in installments was an additional extension of credit (¶ 149), that characterization is foreclosed by the Bureau's admission that, at the time ITT offered students the payment installment plan, students' Temporary Credit balances were due and payable.  ¶¶ 6, 99, 103, 188.  The zero-interest installment plans that ITT offered to students who opted not to pay their Temporary Credit balance when due were a standard settlement of existing debt that is expressly *excluded* from Regulation Z.  12 C.F.R. § 226.20(a)(4); *see also Diamond v. One W. Bank*, 2010 WL 1742536,

at *5 (D. Ariz. Apr. 29, 2010).  Disclosures required in debt settlements are governed by the Fair

Debt Collection Practices Act, which excludes disclosure requirements for creditors settling their

own debts.  15 U.S.C. § 1692a(6)(A).  Thus, count 4 fails as a matter of law.[23]

## CONCLUSION

The complaint should be dismissed with prejudice.

Dated:   April 28, 2014

Respectfully submitted,

ICE MILLER, LLP

By:   /s/ *Philip A. Whistler*
          Philip A. Whistler (#1205-49)

Thomas E. Mixdorf (#16812-49)
One American Square, Suite 2900
Indianapolis, IN  46282-0200
Telephone:  (317) 236-2100
Facsimile: (317) 236-2219
Philip.Whistler@icemiller.com
Thomas.Mixdorf@icemiller.com

GIBSON, DUNN & CRUTCHER LLP
Timothy J. Hatch (*pro hac vice* pending)
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
THatch@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
Douglas R. Cox (*pro hac vice* pending)
Jason J. Mendro (*pro hac vice* pending)
Lucas C. Townsend (*pro hac vice* pending)
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: (202) 955-8500
Facsimile:  (202) 467-0539
DCox@gibsondunn.com
JMendro@gibsondunn.com
LTownsend@gibsondunn.com

*Attorneys for Defendant*
*ITT Educational Services, Inc.*

---

[23]   ITT's discount offer does not resemble situations where discounts on a good or service for cash customers operate as finance charges for credit customers.  12 C.F.R. § 1026.4(a).  A discount operates as a finance charge where a business charges two prices for its goods or services, a higher price to customers who choose to pay over time and a lower price to customers who pay upfront.  *E.g.*, *Taylor v. Bob O'Connor Ford, Inc.*, 1998 WL 177689 (N.D. Ill. Apr. 13, 1998); *see also Virachack v. Univ. Ford*, 410 F.3d 579, 582 (9th Cir. 2005); *Odier v. Hoffman Sch. of Martial Arts, Inc.*, 619 F. Supp. 2d 571 (N.D. Ind. 2008).  ITT's offer did not create an incentive for students to pay for their educational services before receiving them rather than over time after receipt, the circumstance addressed by 12 C.F.R. § 1026.4(b)(9).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 28, 2014, a copy of the foregoing Brief In Support Of

Defendant's Motion To Dismiss, including the accompanying exhibits, was filed electronically.

Service of this filing will be made on all ECF-registered counsel by operation of the Court's

electronic filing system.  Parties may access this filing through the Court's system.


_/s/ *Philip A. Whistler*_____
Philip A. Whistler