# EXHIBIT 1

 Consumer Financial
Protection Bureau

1700 G Street NW, Washington, DC 20552

18 May 2012

Clark D. Elwood
Chief Legal Officer and Executive Vice President
Christine G. Long
Senior Vice President and General Counsel
ITT Educational Services, Inc.
13000 North Meridian Street
Carmel, Indiana  46032-1404

**Via U.S. Certified Mail and Fax: (317) 706-3041**

Dear Mr. Elwood and Ms. Long:

Enclosed please find a Civil Investigative Demand ("CID") issued by the Consumer Financial
Protection Bureau.  Also enclosed are the Bureau's CID Document Submission Standards, and a
copy of the Bureau's Rules Relating to Investigations, which are codified at 12 C.F.R. Part 1080.

To schedule a meet and confer regarding the CID and the production, or should you have any
questions, please contact Gregory Lisa at (202) 435-7615.  We look forward to speaking with
you soon.

Sincerely,

Lawrence Brown
Enforcement Attorney

Gregory C.J. Lisa
Enforcement Attorney

Enclosures



**cfpb** Consumer Financial Protection Bureau

United States of America
Consumer Financial Protection Bureau

# Civil Investigative Demand

**To**  ITT Educational Services, Inc.
c/o CT Corporation System
251 E. Ohio Street Suite 1100
Indianapolis, IN 46204

This demand is issued pursuant to Section 1052 of the Consumer Financial Protection Act of 2010 and 12 C.F.R. Part 1080 to determine whether there is or has been a violation of any laws enforced by the Bureau of Consumer Financial Protection.

---

**Action Required** (choose all that apply)

☐ **Appear and Provide Oral Testimony**

| Location of Investigational Hearing | Date and Time of Investigational Hearing |
|---|---|
| | |
| | Bureau Investigators |

☑ **Produce Documents and/or Tangible Things**, as set forth in the attached document, by the following date  06/18/2012

☑ **Provide Written Reports and/or Answers to Questions**, as set forth in the attached document, by the following date  06/18/2012

---

**Notification of Purpose Pursuant to 12 C.F.R. § 1080.5**

The purpose of this investigation is to determine whether for-profit post-secondary companies, student loan origination and servicing providers, or other unnamed persons have engaged or are engaging in unlawful acts or practices relating to the advertising, marketing, or origination of private student loans in violation of section 1036 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. § 5536, the Truth in Lending Act, 15 U.S.C. § 1601 et seq., Regulation Z, 12 C.F.R. part 226, the Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq., the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq., or the Telemarketing Sales Rule, 16 C.F.R. part 310, and whether Bureau action to obtain legal or equitable relief would be in the public interest.

---

| **Custodian / Deputy Custodian** | **Bureau Counsel** |
|---|---|
| Ori Lev, Custodian/Britney Lewis, Deputy Custodian<br>Consumer Financial Protection Bureau<br>Attention: Enforcement, 1750 Pennsylvania Avenue, 10th Floor<br>1700 G Street, NW<br>Washington, DC 20552 | Gregory Lisa, Enforcement Attorney<br>Email: Gregory.Lisa@cfpb.gov<br>Tel: (202) 435-7615 |

| **Date Issued**<br>05/18/2012 | **Signature** | |
|---|---|---|
| | **Name / Title**   Kent Markus, Chief of Enforcement | |

---

**Service**
The delivery of this demand to you by any method prescribed by Section 1052 of the Consumer Financial Protection Act of 2010, 12 U.S.C. § 5562, is legal service and may subject you to a penalty imposed by law for failure to comply.

**Travel Expenses**
Request a travel voucher to claim compensation to which you are entitled as a witness before the Bureau pursuant to Section 1052 of the Consumer Financial Protection Act of 2010, 12 U.S.C. § 5562.

**Right to Regulatory Enforcement Fairness**
The CFPB is committed to fair regulatory enforcement. If you are a small business under Small Business Administration standards, you have a right to contact the Small Business Administration's National Ombudsman at 1-888-REGFAIR (1-888-734-3247) or www.sba.gov/ombudsman regarding the fairness of the compliance and enforcement activities of the agency. You should understand, however, that the National Ombudsman cannot change, stop, or delay a federal agency enforcement action.

**Paperwork Reduction Act**
This demand does not require approval by OMB under the Paperwork Reduction Act of 1980.

## CIVIL INVESTIGATIVE DEMAND
## FOR PRODUCTION OF DOCUMENTS, ANSWERS TO
## INTERROGATORIES, AND WRITTEN REPORTS

I.     **Definitions.**  As used in this Civil Investigative Demand, the following definitions shall apply:

A.     **"And,"** as well as **"or,"** shall be construed both conjunctively and disjunctively, as necessary, in order to bring within the scope of any request in this Civil Investigative Demand all information that otherwise might be construed to be outside the scope of the request.

B.     **"Any"** shall be construed to include **"all,"** and **"all"** shall be construed to include the word **"any."**

C.     **"CID"** shall mean the Civil Investigative Demand, including the Definitions, Instructions, and Requests.

D.     **"CFPB"** or **"Bureau"** shall mean the Consumer Financial Protection Bureau.

E.     **"Chief of Enforcement"** refers to the Assistant Director of the Division of Enforcement.

F.     **"ITT"** or **"You"** or **"Your"** or **"Company"** shall mean ITT Educational Services, Inc. ("ITT"), also doing business as ITT Technical Institute and Daniel Webster College, its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates; any parent, predecessor, or successor; and all present or former principals, directors, officers, owners, employees, agents, representatives, consultants, attorneys, accountants, independent contractors, and other persons working for or on behalf of the foregoing.

G.     **"Document"** shall mean any written matter of every type and description, including any book, record, report, memorandum, paper, communication, tabulation, chart, log, electronic file, or other data or data compilation stored in any medium. "Document" shall also mean any non-identical copy (such as a draft or annotated copy) of the foregoing, however and by whomever prepared, produced, disseminated or made, regardless of origin or location. "Document" shall also include **Electronically Stored Information.**

H.     **"Each"** shall be construed to include **"every,"** and **"every"** shall be construed to include **"each."**

I.     **"Electronically Stored Information,"** or **"ESI,"** shall mean the complete original and any non-identical copy (whether different from the original because of notations, different metadata, or otherwise), regardless of origin or location, of any electronically created or stored information, including but not limited to electronic mail, instant messaging, videoconferencing, SMS, MMS, or other text messaging, and other electronic correspondence (whether active, archived, unsent, or in a deleted items folder), word processing files, spreadsheets, databases,

unorganized data, document metadata, presentation files, and sound recordings, whether stored on cards, magnetic or electronic tapes, disks, computer files, computer or other drives, cell phones, Blackberry, or other storage media, and such technical assistance or instructions as will enable conversion of such ESI into a reasonably usable form.

J.    **"Financial Interest"** shall mean anything of economic or monetary value, including salary, consulting fees, honoraria, equity interests (e.g., stocks, stock options or other ownership interests), interests in real or personal property, dividends, royalties, rent, capital gains, intellectual property, and forgiveness of debt.

K.    **"Identify"** or **"the identity of"** shall be construed to require identification of (a) natural persons by name, title or position, present business affiliation, present business address and telephone number, or if a present business affiliation or present business address is not known, the last known business and home addresses; (b) businesses or other organizations by name, address, identities of natural persons who are officers, directors or managers of the business or organization, and contact persons, where applicable and (c) documents by title, date, author(s), recipient(s), type of document or some other means of identifying the document, and its present or last known location or custodian.

L.    **"Loan"** shall mean a "private education loan" as defined under the Truth in Lending Act (15 U.S.C. § 1650(a)(7)) as well as any other extension of credit issued expressly for postsecondary educational expenses to a borrower that is not made, insured, or guaranteed under Title IV of the Higher Education Act of 1965.

M.    **"Person"** shall mean an individual, partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity.

N.    **"Preferred lender arrangement,"** has the same meaning as in section 151 of the Higher Education Act of 1965 (20 U.S.C. § 1019) and Regulation Z implementing the Truth in Lending Act (12 C.F.R. § 1026.46(b)(4)).

O.    **"Referring to"** or **"relating to"** shall mean discussing, describing, reflecting, containing, analyzing, studying, reporting, commenting, evidencing, constituting, comprising, showing, setting forth, considering, recommending, concerning, or pertaining to, in whole or in part.

P.    **"Specified Loan"** shall mean, individually and collectively, (1) loans relating to the College Advantage Loan Program, or any successor to such program; (2) PEAKS Program loans; (3) Student CU Connect Program loans; (4) any loan, credit, or obligation relating to ITT's internal student financing; (5) any private student loan insured, sponsored, or guaranteed by ITT; or (6) any loan or credit subject to a risk sharing agreement involving ITT, other agreement to guarantee repayment by ITT, or requirement by ITT to maintain collateral related to the loan.

Q.    **"Template"** shall mean an exemplar, copy, or form upon which a disclosure, agreement, advertisement, or other document was based.

R.     The "**90/10 Rule**" shall mean the requirement under Title IV of the Higher Education Act that a proprietary institution of higher education derive not less than ten percent of such institution's revenues from sources other than federal student aid as set forth in 20 U.S.C. § 1094(a)(24).

## II.     Instructions.

A.     **Sharing of Information:** This CID relates to an official, nonpublic, law enforcement investigation currently being conducted by the Consumer Financial Protection Bureau. The Bureau may make its files available to other civil and criminal federal, state, or local law enforcement agencies pursuant to 12 C.F.R. §§ 1070.43(b)(1) and 1070.45(a)(5). Information you provide may be used in any civil or criminal proceeding by the Bureau or other agencies. As stated in 12 C.F.R. § 1080.14, information you provide pursuant to this CID is subject to the requirements and procedures relating to the disclosure of records and information set forth in 12 C.F.R. part 1070.

B.     **Meet and Confer:** You must contact Enforcement Attorney Gregory Lisa at (202) 435-7615 as soon as possible to schedule a meeting (telephonic or in person) to be held within **10** calendar days after receipt of this CID in order to confer regarding your production of documents and/or information.

C.     **Applicable Time Period for Responsive Materials:** Unless otherwise specified, the applicable time period for the request shall be from January 1, 2008 until the date of full and complete compliance with this CID.

D.     **Claims of Privilege:** If any material called for by this CID is withheld based on a claim of privilege, the claim must be asserted no later than the date set for the production of the material. Any such claim must include a schedule of the items withheld that states, as to each such item, the:

1.     type, specific subject matter, and date of the withheld item;

2.     names, addresses, positions, and organizations of all authors and recipients;

3.     specific grounds for claiming that the item is privileged; and

4.     interrogatory or request to which the privileged document is responsive.

In addition, the person who submits the schedule and the attorney stating the grounds for a claim that any item is privileged must sign it. In accordance with 12 C.F.R. § 1080.8(b), a person withholding material solely based on a claim of privilege shall comply with these requirements (which are set forth in 12 C.F. R. § 1080.8) in lieu of filing a petition for an order modifying or setting aside a demand under 12 C.F.R. §

3

1080.6(d), as described below. If only portions of the responsive material are privileged, those portions may be redacted from the responsive material, which must be submitted in a way that makes clear where the redactions were made. If all of the content on a particular page is privileged, a blank, sequentially numbered page should be included in the production where the responsive material, had it not been privileged, would have been located.

E.     **Document Retention:** You are required to retain all documentary materials and other tangible things that were relied upon or used in the preparation of the responses to this CID. In addition, during the pendency of this investigation and any related enforcement action, the Bureau may require the submission of additional documentary material or tangible things. *Accordingly, during the pendency of this investigation and any related enforcement action you must suspend any routine or non-routine procedures that may result in the destruction of documentary material or tangible things that are in any way potentially relevant to this investigation,* as described in the CID's Notification of Purpose Pursuant to 12 C.F.R. § 1080.5. You are required to prevent the unlawful destruction of relevant material irrespective of whether you believe such material is protected from future disclosure or discovery by privilege or otherwise. *See* 18 U.S.C. §§ 1505, 1519.

F.     **Modification of Requests:** If you believe that the scope of the search or response required by this CID can be narrowed consistent with the Bureau's need for documents or information, you are encouraged to discuss such possible modifications, including modifications of the requirements of these instructions, with Gregory Lisa at (202) 435-7615. Modifications must be agreed to in writing by the Chief of Enforcement or a Bureau employee to whom the Chief of Enforcement has delegated the authority to act under 12 C.F.R. § 1080.6(c).

G.     **Petition for Order Modifying or Setting Aside Demand:** Pursuant to 12 U.S.C. § 5562(f) and 12 C.F.R. § 1080.6(d), you may petition the Bureau for an order modifying or setting aside this CID. The petition must be filed with the Executive Secretary of the Bureau and a copy must be provided to the Chief of Enforcement within twenty calendar days after service of the CID or, if the return date is less than twenty calendar days after service, prior to the return date. The Chief of Enforcement or any employee to whom he or she has delegated authority to act under 12 C.F.R. § 1080.6(d) may rule upon a request for extensions of time to file a petition, but such requests are disfavored.

The petition shall set forth all factual and legal objections to the CID, including all appropriate arguments, affidavits, and other supporting documentation. The petition must also be accompanied by a signed statement representing that you have conferred with Gregory Lisa at (202) 435-7615 in a good faith effort to resolve the issues raised by the petition and have been unable to do so. If some of the matters in controversy have been resolved by agreement, the statement shall specify the matters so resolved and the matters remaining unresolved. The statement shall recite the date, time, and place of each such conference, and the names of all parties participating in each such conference.

4

The Director of the Bureau or a person authorized to perform the functions of the Director of the Bureau in accordance with the law will rule upon the petition.

H.     **Certification:** The person to whom the CID is directed or, if not a natural person, any person having knowledge of the facts and circumstances relating to the production, shall certify that the response to this CID is complete. This certification shall be made on the form declaration included with this CID, or by a sworn affidavit.

I.     **Scope of Search:** This CID covers materials and information in your possession, actual or constructive custody, or control.

J.     **Document Production:** All responsive documents available in electronic format must be produced electronically in native file format, including all metadata. We encourage the electronic production of all materials responsive to this CID. Please follow the enclosed Document Submission Standards for further instructions about the production of documents. As stated in the Document Submission Standards, all produced documents shall be clearly marked with unique, sequential numbers on each page, if imaged documents, or as part of the file name, if native documents.

K.     **Document Identification:** Documents that may be responsive to more than one request of this CID need not be submitted more than once; however, your response should indicate, for each document submitted, each request to which the document is responsive.

L.     **Sensitive Personally Identifiable Information:** If any material called for by these requests contains sensitive personally identifiable information or sensitive health information of any individual please contact Gregory Lisa at (202) 435-7615 before sending those materials to discuss ways to protect such information during production. You must encrypt electronic copies of such material with BitLocker encryption software. When submitting encrypted material, you must clearly designate the type of encryption software used and provide the encryption key, certificate or passcode in a separate communication.

For purposes of this CID, sensitive personally identifiable information includes an individual's Social Security number alone or an individual's name, address or phone number *in combination with* one or more of the following: date of birth, Social Security number, driver's license number or other state identification number, or a foreign country equivalent, passport number, financial account number, credit card number, or debit card number. Sensitive health information includes medical records and other individually identifiable health information relating to the past, present, or future physical or mental health or conditions of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual.

M.     **Information Identification:** Each request for a written report or interrogatory in this CID shall be answered separately and fully in writing under oath. All information

5

submitted shall clearly and precisely identify the request(s) to which it is responsive.

N.     **Declaration Certifying Records of Regularly Conducted Business Activity:**
Attached is a Declaration Certifying Records of Regularly Conducted Business Activity, which may limit the need to subpoena you to testify at future proceedings in order to establish the admissibility of documents produced in response to this CID.  You are asked to execute this Declaration and provide it with your response.

## III.   Requests.

### Interrogatories

1.  Identify all persons who participated in responding to this CID and the specific tasks performed by each person.

2.  State ITT's correct legal name and principal place of business; the date and state of incorporation; all trade names under which ITT has done business; and the names, titles, and dates of employment of all officers, directors, and principal stockholders or owners.

3.  List each state where ITT does or has done business.  Give the time period during which ITT did business and the type of business performed at each location listed.

4.  Describe the complete organizational structure of ITT, identifying all parents, wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, and affiliates, and for each entity state the following:

    a.  The correct legal name and principal place of business;

    b.  The date and state where it is incorporated or organized;

    c.  The names and titles of all officers, directors, and principals;

    d.  The entity's parent, principal stockholders or owners;

    e.  Any person or entity with a direct or indirect financial interest in the entity (other than those whose sole financial interest constitutes the holding of less than 5% of stock in the entity);

    f.  All trade names under which it does, or has done, business;

    g.  The type of business in which it engages; and

    h.  The date, if any, that it closed or ceased operations and the reason why the entity closed or ceased operations.

5.  Identify all current or former employees, officers, directors, or principals of ITT who are or were responsible for managing or overseeing the design and implementation of policies, procedures, guidelines, or practices regarding the following:

    a.  Student recruitment;

    b.  Student enrollment and admissions;

7

    c.  Student financial aid services;

    d.  Student financial aid counseling;

    e.  Marketing of educational programs and services;

    f.  Marketing of educational programs and services to current or former members of the United States military or their families;

    g.  Employee compensation;

    h.  Reporting of student enrollment data to federal or state authorities, including the Department of Education, or to accrediting agencies;

    i.  Reporting of student loan or financial aid data to federal or state authorities, including the Department of Education, or to accrediting agencies;

    j.  Reporting of student completion and job placement outcomes to federal or state authorities, including the Department of Education, or to accrediting agencies;

    k.  Evaluating, resolving, or responding to complaints made by current or former students; and

    l.  The sale, purchase, transfer, or securitization of any Specified Loan.

6.  For each of ITT's campus locations, identify the current or former employees responsible for overseeing:

    a.  Student recruitment;

    b.  Student enrollment and admissions;

    c.  Student financial aid services;

    d.  Student financial aid counseling;

    e.  Marketing of educational programs and services;

    f.  Marketing of educational programs and services to current or former members of the United States military or their families;

    g.  Reporting of student enrollment data to federal or state authorities, including the Department of Education, or to accrediting agencies;

    h.  Reporting of student loan or financial aid data to federal or state authorities,

including the Department of Education, or to accrediting agencies;

i.  Reporting of student completion and job placement outcomes to federal or state authorities, including the Department of Education, or to accrediting agencies;

j.  Evaluating, resolving, or responding to complaints made by current or former students or applicants of ITT;

k.  The sale, purchase, transfer, or securitization of loans originated under any Specified Loan program; and

l.  Any compensation, bonus, remuneration, or any form of recognition, financial or otherwise, which is connected in whole or in part to student recruitment, applications for admission, or loan applications.

7.  For any former employees, officers, directors, or principals identified in response to Interrogatories Number 5 or Number 6 who left for any reason during the applicable time period, identify for each individual the last title or position held, the reason for termination of employment with ITT and the last known contact information (physical/mailing address, telephone numbers, and electronic mail addresses).

8.  Describe the processes, policies, or procedures that ITT uses or has used for receiving, collecting, maintaining, forwarding, cataloguing, recording, or responding to grievances and complaints made by students, former students, prospective students, applicants, or any other person or entity on behalf of such persons, related to ITT's handling of, or policies and practices related to, student loans or financial aid, recruiting practices, or financial aid counseling services. In addition, identify all complaint codes used for cataloguing such grievances and complaints.

9.  Identify all persons, including any marketing or advertisement agencies, ITT engaged in connection with marketing or advertising of:

a.  Educational programs and services offered at any of ITT's schools or online programs; or

b.  Financial aid, financial aid counseling, or loan services available to students enrolled at any of ITT's schools.

10. Identify any preferred lender arrangements into which ITT has entered. For each preferred lender arrangement, identify the parties to that arrangement.

11. State each type of information from or about students or co-signers with students (such as customer/student/co-signer names, street and email addresses, telephone numbers, Social Security numbers, bank and credit card account numbers, income, credit histories, payment histories, or reports of identity theft) that is collected or maintained by or for

9

ITT that is furnished to a consumer reporting agency.

12. Identify all Specified Loan programs. For each such loan program, identify all current and former:

   a. Entities providing origination services, including application capture, application decisioning, loan documentation and disbursement;

   b. Entities providing underwriting or loan approval services;

   c. Entities responsible for product or program design services, including developing underwriting criteria or guidelines or loan approval criteria or guidelines;

   d. Entities identified as the lender on loan notes and applications;

   e. Subsequent assignees or holders of loan notes;

   f. Entities providing loan servicing services, including billing, payment processing, and collecting timely principal and interest payments;

   g. Entities providing funding, including the commercial financing, for the loan program;

   h. Entities assisting with the sale or securitization of the loans, including those entities acting as a sponsor, depositor, underwriter, trust, trustee, trust administrator, and/or structural advisor;

   i. Entities to which any loans in delinquency or default were referred for collection; and

   j. Entities which notified consumer reporting agencies regarding any loans which were delinquent or in default.

13. For each entity identified in response to Interrogatory Number 12, identify all officers, directors, and principals, and any other person(s) primarily responsible for managing each person's relationship with ITT, or with whom ITT primarily communicated, relating to any Specified Loan programs.

14. Identify the persons at ITT primarily responsible for managing the relationship with each person identified in the response to Interrogatory Number 13 relating to any Specified Loan programs.

15. For each Specified Loan program, identify the persons at ITT primarily responsible for determining the amount by which loans originated through the program would be discounted or for setting reserves in connection with purchasing or repurchasing loans

pursuant to those programs.

16. For each entity identified in response to Interrogatory Number 12, identify all relationships or arrangements involving any direct or indirect financial interest between ITT and the entity.

17. For each entity identified in response to Interrogatory Number 12, identify all relationships or arrangements involving any direct or indirect financial interest, other than regular salary, between ITT and any member of the entity's board of directors.

18. For each entity identified in response to Interrogatory Number 12, identify all relationships or arrangements involving any direct or indirect financial interest between or among the entities.

19. For each entity identified in response to Interrogatory Number 12, identify all relationships or arrangements involving any direct or indirect financial interest, other than regular salary, between or among any member of the entity's board of directors.

20. Identify any default management, reduction, or prevention programs for any Specified Loan, and for each such program:

    a.  State the details of each default management, reduction, or prevention program;

    b.  Identify the dates in which the program operated;

    c.  Identify the persons at ITT primarily responsible for the design, implementation, oversight, auditing, or management of each program; and

    d.  Identify any other person outside of ITT responsible for the design, implementation, oversight, auditing, or management of each program.

21. Identify all contractual repayment relief programs for Specified Loan programs, including forbearance or deferment programs, loan modification or cancellation programs, and income-based repayment programs. For each such program, identify the terms of such programs and the qualifications required of students to enter into such programs.

22. For each contractual repayment relief program identified in response to Interrogatory Number 21, identify the dates during which the program operated and the person at ITT primarily responsible for the design, implementation, and management of each program.

23. Identify all instances in which ITT has been investigated, sued (including shareholder derivative litigation), prosecuted, involved in arbitration or other alternative resolution measures, or had action taken against it for alleged violations of the False Claims Act, 31 U.S.C. § 3729, *et seq.*, the Telemarketing Sales Rule, 16 C.F.R. part 310, the Fair Credit

11

Reporting Act, 15 U.S.C. § 1681, *et seq.*, the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.*, the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.*, all applicable regulations issued pursuant to such statutes, any state or federal laws prohibiting unfair, abusive, or deceptive acts or practices, or fraud, or for any alleged violations of consumer protection laws. For each matter identified, provide the following information:

    a.  A description of the nature of the dispute;

    b.  Identification of the parties and opposing counsel;

    c.  The claims asserted or investigated, and remedies sought;

    d.  Identification of the jurisdiction, forum, title or caption, and case number; and

    e.  A description of the outcome or current status.

24. Identify all litigation (including derivative shareholder litigation), internal or external investigation, arbitration, or other alternative dispute resolution processes relating to ITT's marketing, recruitment, enrollment, financial aid services practices, or any Specified Loan program. For each matter identified, provide the following information:

    a.  A description of the nature of the dispute;

    b.  Identification of the parties and opposing counsel;

    c.  The claims asserted or investigated, and remedies sought;

    d.  Identification of the jurisdiction, forum, title or caption, and case number; and

    e.  A description of the outcome or current status.

25. Identify all entities involved with ITT in the PEAKS Private Student Loan Program ("PEAKS Program") and/or the Student CU Connect Private Student Loan Program ("Student CU Connect Program"). For each entity:

    a.  State the nature of that entity's involvement; and

    b.  Identify any form and purpose of payment or other financial interest, direct or indirect, between ITT and that entity related to that entity's involvement with the PEAKS Program and/or the Student CU Connect Program.

26. Identify the individual(s) at the following institutions or entities responsible for managing the relationship with ITT relating to the PEAKS Program and the Student CU Connect Program:

    a.  Liberty Bank, N.A.;

    b.  Eli Lilly Federal Credit Union;

    c.  Access Group, Inc.;

    d.  Deutsche Bank; and

    e.  Any other entity identified in response to Interrogatory Number 12.

27. For each entity identified in response to Interrogatory Number 12, identify any formal or informal arrangement(s) or agreement(s) relating to a financial interest shared by ITT and members of the entity's board of directors.

28. Identify all money paid by ITT to any other entity, and the number and value of Specified Loans repurchased by ITT, based on any obligation to guarantee or repay any loans in which a student has defaulted between January 1, 2008 and December 31, 2011. Please provide the following information:

    a.  Name of the entity receiving the payment or repurchase;

    b.  Amount and date of the repayment or repurchase; and

    c.  A description of the agreement or obligation that was the basis for the payment or repurchase.

29. Identify any arrangement or agreement ITT entered into with any entity establishing an obligation to guarantee, repay, purchase, or repurchase any Specified Loan(s), or asset backed security based on any Specified Loan(s). For each such arrangement, provide the details of the arrangement, including the name of the entity, and the terms, purposes, or conditions of the obligation to guarantee, repay, purchase, or repurchase.

30. Identify all payments made under any obligation identified in Interrogatory Number 29. For each payment identified, identify the:

    a.  Date of the payment;

    b.  Obligation under which the payment was made;

    c.  Dollar amount and number of student loans relating to the obligation;

    d.  Entity making the payment;

    e.  Entity receiving the payment; and

    f.  Reason for the payment.

31. Identify all lead generators engaged by or on behalf of ITT in connection with identifying prospective students.

32. Identify any person or entity, including trusts, which purchase or securitize, or have purchased or securitized, directly or indirectly, loans originated under any Specified Loan program.

33. Identify any person or entity who acts or has acted as a debt collector with respect to any Specified Loan obtained by ITT's students that have gone into default or delinquency.

34. Identify all employees or former employees who received an award, bonus, promotion, financial interest or payment other than regular salary, or other form of recognition, whether monetary or otherwise, for efforts or accomplishments in recruiting, or for which such award, bonus, promotion, financial interest or payment, or other form of recognition was in any way affected by that employee's efforts or accomplishments in recruiting.

35. For the time period of January 1, 2008 to December 31, 2011, identify the ten campuses that achieved the highest conversion rate for prospective students that were scheduled for appointments with ITT representatives that actually applied for financial aid.

36. For each school year during the applicable time period and broken down by school year, state the number of borrowers who:

    a.  Obtained any Specified Loan while not having exhausted all funds available under financial aid programs under Title IV of the Higher Education Act;

    b.  Obtained any Specified Loan after having exhausted funds available under financial aid programs under Title IV of the Higher Education Act;

    c.  Obtained any Specified Loan while not having exhausted funds available under the Department of Defense tuition assistance program or Veterans Department G.I. Bill benefits assistance program;

    d.  Obtained any Specified Loan after having exhausted funds available under the Department of Defense tuition assistance program or Veterans Department G.I. Bill benefits assistance program; and

    e.  Went into default or delinquency regarding any loan made pursuant to any Specified Loan program.

37. Identify all current and former employees, officers, directors, or principals responsible for developing, implementing, enforcing, or ensuring compliance with policies and procedures relating to ITT's compliance with the Telemarketing Sales Rule, 16 C.F.R. part 310, the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*, the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.*, all applicable regulations issued pursuant to such statutes, and state and federal laws prohibiting unfair, deceptive, or abusive practices.

38. Identify all instances in which ITT has invoked or otherwise enforced (directly or through another party, including counsel) confidentiality agreements or confidentiality clauses, that were included in (but not necessarily limited to) enrollment agreements, settlement agreements, employment agreements, or any other legally binding document between ITT and any other party containing a confidentiality agreement or confidentiality clause. For each such instance, identify:

   a. The document or documents in which such agreement or clause was memorialized;
   b. The stated justification for such agreements or clauses;
   c. The individual or entity against which such clause or agreement was enforced or invoked;
   d. The forum in which such agreement or clause was enforced or invoked;
   e. The type of information sought to be kept confidential; and
   f. Any correspondence, litigation, arbitration, mediation, arbitration, or any threatened litigation, arbitration, mediation, or arbitration, used to enforce such confidentiality agreements or clauses.

39. If for any of the following requests for documents set forth below, there are documents that would have been responsive to this CID, but were destroyed, mislaid, transferred, deleted, altered, or over-written, or are otherwise unavailable for production, identify the documents and explain why they cannot be produced. In addition to the identification of such documents, identify the following:

   a. Each person with any copy of the document; and
   b. Each person with any knowledge or record of the circumstances of the document becoming destroyed, mislaid, transferred, deleted, altered, over-written, or otherwise made unavailable for production.

40. Identify all fees, compensation, or other financial interest ITT received or paid relating to any Specified Loan, any default management, reduction, or prevention program identified in response to Interrogatory Number 20, or any contractual repayment relief program identified in response to Interrogatory Number 21, by stating:

   a. The transferor and transferee;
   b. The value of the payment, financial interest or other transfer;
   c. The date the payment or transfer was made; and
   d. The reason for the payment or transfer.

41. Identify and describe any scoring systems or models used in underwriting and/or pricing, including risk-based pricing models, relating to any Specified Loan program. For each such system or model, including those that are proprietary, list all variables that in any way influence the score, price, or any other output, and indicate the weight of each variable in determining the score, price or other output.

42. Identify each automated underwriting system (AUS) used by ITT in underwriting any Specified Loans. Identify all variables that in any way influence the AUS decision or score and describe when and how each AUS was validated. For each year during the relevant time period, identify the number of student loan applications underwritten with the assistance of each AUS, and identify the number of student loans underwritten without using any AUS.

43. Explain the procedures followed when taking adverse action on a verbal or written credit application submitted by a consumer for a Specified Loan. Include an explanation of how ITT maps variables used in underwriting into adverse action reasons.

44. Identify all databases and database systems used to originate, maintain, record, document, and service any Specified Loan or to monitor compliance with the 90/10 Rule. For each database or database system you identify, provide the:

    a. Database name, data fields in the database, and approximate database volume (total data volume, total table, total customer records);

    b. Retention/disposition/destruction routine of records maintained, including details defining the rules for record and customer information to be deleted or archived from the database production application;

    c. Back-up and/or archiving routines of database and database elements (tables, objects, macros, queries, reports, etc.) including back-up storage media retention and disposition routines; and

    d. A data dictionary which describes the meaning of each data field within each database.

45. Identify the email, file systems and databases and/or recordkeeping systems used by or on behalf of ITT to manage and maintain documents and data relating to the documents requested in the "Request for Documents" section below. For each system or database, identify the database name, structure, data fields and their respective functions and meanings, approximate volume (total data volume, total table, and total number of records), data management and retention/disposition/destruction policies and routines.

16

### Requests for Documents

Please provide the following documents:

1. All documents referred to or used to complete any of the Interrogatories set forth above.

2. Organizational charts of ITT, including both Company headquarters and other Company locations, as well as wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates.

3. For each current or former officer or employee of ITT (identified in response to Interrogatory number 5(c) and (d), above) who was responsible for managing or overseeing student financial aid or financial aid counseling, at a headquarters level, please provide the following:

   a. The position description for the position held by each such person;

   b. All job postings or announcements used to solicit candidates for the position(s) held by such person;

   c. A resume, Curriculum Vitae, or other description of qualifications for the officer or employee; and

   d. All documents relating to any form of award, bonus, promotion, additional payment, or other form of recognition, whether monetary or otherwise, for efforts or accomplishments.

4. For each current or former employee at each ITT location (identified in response to Interrogatory number 6(c) and (d) above) responsible for overseeing student financial aid or financial aid counseling, please provide the following:

   a. The position description for the position held by each such person;

   b. All job postings or announcements used to solicit candidates for the position(s);

   c. A resume, Curriculum Vitae, or other description of qualifications for the employee; and

   d. All documents relating to any form of award, bonus, promotion, additional payment, financial interest (other than regular salary), or other form of recognition, whether monetary or otherwise, for efforts or accomplishments.

5. All guidance, policies, or procedures relating to any award, bonus, promotion, payment, financial interest (other than normal salary), or other form of recognition, whether

17

monetary or otherwise, paid to any current or former employee, officer, director, or other individual (whether employed by ITT or otherwise) for efforts or accomplishments related to recruiting.

6. All guidance, including but not limited to manuals, handbooks, policies, procedures, emails, correspondence, telephone scripts, and training materials, provided or made available to ITT employees or contractors related to:

   a. The recruitment or enrollment of students;

   b. Financial aid assistance for students;

   c. Any default management, reduction, or prevention program; or

   d. Any contractual repayment relief or loan forgiveness program.

7. All documents referring or relating to ITT's marketing strategies related to:

   a. The recruitment or enrollment of students;

   b. Financial aid assistance for students;

   c. Any default management, reduction, or prevention program; or

   d. Any contractual repayment relief or loan forgiveness program.

8. All documents describing or implementing ITT's marketing strategies related to recruiting or enrolling prospective students for ITT's schools.

9. All documents describing or implementing ITT's marketing strategies related to members of the United States military or their families.

10. All documents describing or implementing ITT's marketing strategies related to any Specified Loan program, any default management, reduction, or prevention program identified in response to Interrogatory Number 20, or any contractual repayment relief program identified in response to Interrogatory Number 21.

11. Templates of (1) all form agreements used to enroll applicants or students in any of ITT's classes, campuses, or programs (including online programs); and (2) form disclosures provided or made available to applicants or students in connection with enrolling students in any of ITT's classes, campuses, or programs (including online programs), including disclosures provided on the internet or through electronic means.

12. Templates of all materials provided or made available to prospective or enrolled students, or co-signers for such prospective or enrolled students, describing financial aid services

18

offered in connection with any of ITT's educational programs, including materials made available on the internet or through electronic means.

13. Templates of all materials provided or made available to prospective or enrolled students, or co-signers for such prospective or enrolled students, describing Specified Loan programs, including materials made available on the internet or through electronic means.

14. Templates of all form documents used to inform prospective or enrolled students, or co-signers for such prospective or enrolled students, of the cost of participating in any of ITT's educational courses or programs.

15. All guidance, including but not limited to manuals, handbooks, policies, procedures, emails, correspondence, telephone scripts, and training materials, provided or made available to ITT employees or contractors related to:

    a.  The recruitment or enrollment of students;

    b.  Providing financial aid assistance to students; and

    c.  Specified Loan programs.

16. The following advertising, marketing, and student recruitment materials used by ITT related to its educational services and programs, including the availability of financial assistance for those programs:

    a.  Written materials provided to prospective or enrolled students while on-campus;

    b.  Written materials provided to prospective students off-campus;

    c.  Direct mail advertisements;

    d.  Radio advertisements;

    e.  Television advertisements;

    f.  Print media advertisements;

    g.  Internet advertisements; and

    h.  Telemarketing scripts.

17. All guidelines, policies, and procedures relating to the target audience or market for any documents requested in Document Request 16.

18. All policies, standards, and guidelines related to determining the compensation or

19

payment, including salaries, bonuses, incentive payments, promotions, financial interest, or any form of remuneration or recognition, financial or otherwise, of ITT employees, officers, contractors, or third-party vendors relating to:

    a. Financial aid extended to students;

    b. Student recruitment;

    c. Student enrollment;

    d. Any program related to any Specified Loan;

    e. Any default management, reduction, or prevention program identified in response to Interrogatory Number 20; and

    f. Any contractual repayment relief program identified in response to Interrogatory Number 21.

19. Templates of all form worksheets or financial aid calculators provided or made available to prospective and enrolled students or co-signers for such students, or used on their behalf, to calculate the amount of financial aid a student may need to obtain, including worksheets or financial aid calculators provided on the internet or through electronic means.

20. All grievances or complaints from students, former students, prospective students, or applicants, or co-signers for such students or applicants, related to ITT's handling of, or policies and practices related to, student financial aid or financial aid counseling services, Specified Loans, recruiting and retention of students, all documents related to such grievances and complaints, and all of ITT's responses thereto.

21. All grievances or complaints from current or former employees, contractors, officers, directors, or principals related to ITT's handling of, or policies and practices related to, student financial aid or financial aid counseling services, Specified Loans, recruiting and retention of students, all documents related to such grievances and complaints, and all of ITT's responses thereto.

22. All guidelines, policies, procedures, and standards for ensuring that a student loan applicant has exhausted his or her eligibility for funds available under financial aid programs under Title IV of the Higher Education Act before obtaining a Specified Loan.

23. Templates of all form promissory notes or other agreements with borrowers or co-signers used in Specified Loan programs.

24. Templates of all form contracts for temporary credit, payment plans, or any other internal financing arrangement provided by ITT to its potential, enrolled, or former students.

25. All agreements, contracts, or memoranda of understanding between ITT and any other person or entity, or between or among third-party persons or entities, related to Specified Loan programs. Documents requested include, but are not limited to, those relating to:

      a. Liberty Bank, N.A.;

      b. Eli Lilly Credit Union;

      c. Deutsche Bank;

      d. First Associates, LLC; and

      e. Access Group, Inc.

26. All documents referring or relating to any guarantee, discount, purchase obligation, or other financial obligation owed by ITT to another entity in the event of a student's or co-signer's default on a Specified Loan.

27. All agreements, contracts, memoranda of understanding, term sheets, or proposals, other than agreements or contracts between ITT and a student or co-signer on an individual loan, relating to any Specified Loan program or any agreement identified in Interrogatory Number 29.

28. Documents showing, or otherwise referring or relating to, any underwriting criteria or guidelines, or loan approval criteria or guidelines, used to determine whether to approve Specified Loans.

29. For all Specified Loan programs, all underwriting guidelines, including manual underwriting guidelines, policies, procedures and standards. If the underwriting or funding guidelines, policies, or procedures differ by lines of business, channel, divisions or geography, produce all documents that describe and explain the differences.

30. All pricing guidelines, rate sheets, policies, procedures, and standards for each Specified Loan program offered during the review period. If the pricing guidelines, rate sheets, policies, or procedures differ by lines of business, channel, divisions or geography, produce all documents that describe and explain the differences.

31. For all Specified Loan programs, all guidelines, policies, procedures, and standards for exercising discretion, including overrides or exceptions, over student loan underwriting or pricing (including interest rates, fees, discount/rebate points, and any other pricing component), types of loans offered, or other loan terms and conditions.

32. All meeting minutes or other transcripts, descriptions, or summaries of meetings of ITT's Board of Directors, or of any committee of the Board of Directors, related to any Specified Loan program.

33. All reports, summaries, compilations, and presentations, including but not limited to such materials presented to the ITT's Board of Directors or any committee of the Board of Directors, related to the following:

      a. Federal student loans obtained by ITT's students;

      b. Specified Loans obtained by ITT's students;

      c.  GI Bill or Tuition Assistance funds obtained by ITT's students;

      d.  Demographic information relating to current, former, or prospective students;

      e.  Temporary credit or any other form of payment plan provided by ITT to its students;

      f.  The amount of money borrowed by ITT's students;

      g.  Demographic information relating to ITT's potential or enrolled students;

      h.  Defaults or delinquencies on student loans by ITT's students or co-signers;

      i.  Forbearances, deferments, or other relief on loans for current or former ITT students or co-signers;

      j.  The retention rates of ITT's students;

      k.  The length of time from enrollment to graduation for ITT's students; and

      l.  Employment rates or salaries of ITT's graduates.

34. All audits, investigations, surveys, examinations, mystery shopping, or other internal reviews conducted by ITT, or by a third party engaged by ITT, relating to:

      a.  Any Specified Loan program;

      b.  The provision of financial aid counseling services to prospective or enrolled students;

      c.  The performance of ITT's financial aid counselors and other employees working in the area of financial aid;

      d.  Any default management, reduction, or prevention program identified in response to Interrogatory Number 20; and

      e.  Any contractual repayment relief programs identified in response to Interrogatory Number 21.

35. All forecasting models used to assess credit quality in connection with loans originated under any Specified Loan program, including underlying assumptions used in such models, refinements made to the model, and all reports generated by the model, including, without limitation, reports relating to current and future loan default rates.

36. All policies and procedures relating to ITT's compliance with the Telemarketing Sales Rule, 16 C.F.R. part 310, the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*, the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, all regulations issued pursuant to such statutes, and laws prohibiting unfair, deceptive, or abusive practices.

37. All of ITT's former and current record retention and record destruction policies.

38. Any document produced to the Senate Committee on Health, Education, Labor, and Pensions, or any Member, investigator, or staff member of such committee, regardless of the date of the document.

39. Policies, procedures, and best practices for ensuring the accuracy and integrity of the information furnished to a consumer reporting agency, and investigation of disputes, including consideration of 16 C.F.R. part 660, all Appendices thereto, and all guidelines implementing section 623(e)(1)(B) of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.*

40. All documents referencing the 90/10 rule as a factor in setting the price of tuition for any programs at ITT.

41. All documents, including reports, summaries, presentations, emails, meeting minutes or meeting agendas prepared by or provided to ITT's Board of Directors, or any committee of the Board of the Directors, relating to:

   a. Any Specified Loan program;

   b. Any default management, reduction, or prevention program identified in response to Interrogatory Number 20;

   c. Any contractual repayment relief programs identified in response to Interrogatory Number 21; and

   d. Audits, or legal or regulatory compliance.

42. All final reports, summaries, or presentations received from or distributed to external parties, including origination and servicing providers or third-party debt collectors, regarding:

   a. Any Specified Loan program;

   b. Any default management, reduction, or prevention program identified in response to Interrogatory Number 20;

   c. Any contractual repayment relief programs identified in response to Interrogatory

23

Number 21; or

    d.  Audits, or legal or regulatory compliance.

43. All final reports, summaries, or presentations received from or distributed to institutional investors, shareholders, or ratings agencies regarding:

    a.  Any Specified Loan program;

    b.  Any default management, reduction, or prevention program identified in response to Interrogatory Number 20;

    c.  Any contractual repayment relief programs identified in response to Interrogatory Number 21; and

    d.  Audits, or legal or regulatory compliance.

44. All reports or presentations received from or distributed to any entities that purchase, sell, or securitize, or facilitate the purchase, sale, or securitization, of any loans originated under any Specified Loan program relating to any such loan program.

45. ITT's audited financial statements, including any audited financial statements submitted to the Department of Education.

46. Compliance audits or reviews conducted to assess the administration of any Specified Loan program or any program under Title IV of the Higher Education Act, including any compliance audits submitted to the Department of Education.

47. Operating budgets for the applicable time period as well as projected budgets going forward relating, in whole or in part, to educational programs, marketing and recruitment, or Specified Loan programs.

48. Any reports submitted to the Department of Education regarding any preferred lender arrangement pursuant to 34 C.F.R. § 601.20.

49. All agreements, contracts, memoranda of understanding, term sheets, or proposals between and among any persons or entities, relating to any preferred lender arrangement identified in response to Interrogatory Number 10.

50. Any code of conduct implemented by ITT relating to compliance with Department of Education requirements and regulations, including 34 C.F.R. § 601.21.

**Definitions and Instructions for
Requests for Written Reports**

I.     **Definitions.** As used in the Requests for Written Reports in this Civil Investigative Demand, the following definitions shall apply:

     A.     **"Applicable Time Period"** shall mean the years of 2008, 2009, 2010 and 2011, with the requested data broken down by year.

     B.     **"Completion Rate"** shall have the same meaning as in 34 C.F.R. § 668.6(c).

     C.     **"Job Placement Rate"** shall have the same meaning as in 34 C.F.R. § 668.6(b)(iv).

     D.     **"Specified Dates"** shall mean the dates of December 31, 2008, December 31, 2009, December 31, 2010, and December 31, 2011, with the requested data broken down by year.

II.     **Instructions.**

     A.     **Format:** Reports shall be in the format attached as set forth in the Appendices to this CID.

     B.     **Incorporation:** Unless specified otherwise in the definitions and instructions in this section, all definitions and instructions in the remainder of this Civil Investigative Demand apply.

25

## Requests for Written Reports

1. For each of the years 2008 to 2012, for each Specified Loan program, provide the total dollar amount of the loans, total number of loans, and total numbers of students with such loans, total dollar amount of loans held by military members and spouses, total number of loans held by military members and spouses, the program under which each Specified Loan was originated, and total number of military members and spouses with such loans.

   Please use the format set forth in Appendix R-1 to this CID.

2. For each of the years 2008 to 2012, report the following:

   a. The total number of applications submitted for PEAKS Program loans;

   b. The total number of applications submitted for PEAKS Program loans that were denied; and

   c. The total number of applications submitted for PEAKS Program loans that were approved for an amount that was less than the amount requested in the initial application.

   Please use the format set forth in Appendix R-2 to this CID.

3. For each of the Specified Dates, report the number of loans for each Specified Loan program that were:

   a. In forbearance;
   b. In deferment;
   c. 31 to 60 days delinquent;
   d. 61 to 90 days delinquent;
   e. 91 to 120 days delinquent;
   f. 121 days or more delinquent; and
   g. Charged off.

   Please use the format set forth in Appendix R-3 to this CID.

4. For the applicable time period, report the following:

   a. The total number of applications submitted for Student CU Connect Program loans;

   b. The total number of applications submitted for Student CU Connect Program loans that were denied; and

26

    c. The total number of applications submitted for Student CU Connect Program loans that were approved for an amount that was less than the amount requested in the initial application.

Please use the format set forth in Appendix R-4 to this CID.

5. For each of the years 2008 to 2012, report: (1) the total number of students enrolled at all ITT campuses or programs (including online programs); (2) the completion rates for all campuses or programs (including online programs); and (3) the job placement rates for all campuses or programs (including online programs).

Please use the format set forth in Appendix R-5 to this CID.

6. For each of the years 2008 to 2012, report the total numbers of ITT's students who:

    a. Sought loan relief;

    b. Received loan relief;

    c. Received forbearances or deferments;

    d. Received changes to the amortization terms, e.g., five year amortization period to ten years;

    e. Received reductions to the principal amounts;

    f. Received interest rate reductions;

    g. Received changes to a balloon payment term;

    h. Received an adjustment in the terms of their interest rate, e.g., changes from adjustable rates to fixed rates;

    i. Received adjustments to the type of amortization method, e.g., removal of negative amortization terms; and

    j. Received loan relief not identified in a through i.

Please use the format set forth in Appendix R-6 to this CID.

7. For the period of January 1, 2011 through December 31, 2011, identify and provide contact information (home address; telephone numbers; and email addresses) for: (1) the five employees (or former employees if not currently employed by ITT), responsible for recruiting prospective students, who scheduled the highest number of appointments with prospective students at each of the campuses located in the cities in the list below; (2) the five employees (or former employees if not currently employed by ITT), responsible for

27

recruiting prospective students, who scheduled the lowest number of appointments with prospective students at each of the campuses located in the cities in the list below; and (3) identify the individuals that served as a Director of Recruitment or equivalent position at campuses located in the following cities:

- Albany, New York
- Atlanta, Georgia
- Austin, Texas
- Bessemer, Alabama
- Canton, Michigan
- Norfolk, Virginia
- Concord, California
- Cordova, Tennessee
- Indianapolis, Indiana
- Knoxville, Tennessee
- Little Rock, Arkansas
- Norwood, Ohio
- Portland, Oregon
- Tucson, Arizona
- Westminster, Colorado
- Greenfield, Wisconsin

Please use the format set forth in Appendix R-7 to this CID.

8. Report the radio, television, direct mail, telemarketing, print media, internet, and other advertising related to ITT's educational services and programs, including the availability of financial assistance for those programs. For each such item, report the title of the advertisement or marketing materials; the type of material (e.g., television advertisement, telemarketing script, direct mail, etc.); the date(s) published; the station or frequency; the publication in which the material was published, if applicable; the internet website, if applicable; the geographic area published or disseminated; the area code, if applicable; the zip code, if applicable, and the target audience or market of the advertising or marketing material.

Please use the format set forth in Appendix R-8 to this CID.

Appendix R-1

| | PEAKS Program Loans | | | | | Student CU Connect Program | | | | | Other Specified Loan Programs (Identify separately and add additional sheets as necessary.) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2008 | 2009 | 2010 | 2011 | 2012 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Total Dollar Amount | | | | | | | | | | | | | | | |
| Total Number of Loans | | | | | | | | | | | | | | | |
| Total Number of Students with such Loans | | | | | | | | | | | | | | | |
| Total Dollar Amount by Military Members/Military Spouses | | | | | | | | | | | | | | | |
| Total Number of Loans by Military Members/Spouses | | | | | | | | | | | | | | | |
| Originating Specified Loan Program | | | | | | | | | | | | | | | |
| Total Number of Military Members/Spouses with such Loans | | | | | | | | | | | | | | | |

Appendix R-2

| | PEAKS Program Loans | | | | |
|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 |
| Total Number of Applications Submitted for PEAKS | | | | | |
| Total Number of PEAKS Denials | | | | | |
| Total Number of PEAKS Approvals for Less than the Amount Requested | | | | | |

Appendix R-3

|  | PEAKS Program Loans | | | | Student CU Connect Program | | | | Other Specified Loan Programs (Identify separately and add additional sheets as necessary.) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | 31-Dec-08 | 31-Dec-09 | 31-Dec-10 | 31-Dec-11 | 31-Dec-08 | 31-Dec-09 | 31-Dec-10 | 31-Dec-11 | 31-Dec-08 | 31-Dec-09 | 31-Dec-10 | 31-Dec-11 |
| All Loans in forbearance |  |  |  |  |  |  |  |  |  |  |  |  |
| All Loans in deferment |  |  |  |  |  |  |  |  |  |  |  |  |
| All Loans 31 to 60 days delinquent |  |  |  |  |  |  |  |  |  |  |  |  |
| All Loans 61 to 90 days delinquent |  |  |  |  |  |  |  |  |  |  |  |  |
| All Loans 91-120 days delinquent |  |  |  |  |  |  |  |  |  |  |  |  |
| All Loans 121 or more days delinquent |  |  |  |  |  |  |  |  |  |  |  |  |
| All Loans that were charged off |  |  |  |  |  |  |  |  |  |  |  |  |

Appendix R-4

| | Student CU Connect Program | | | | |
|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 |
| Total Number of Applications Submitted for Student CU Connect | | | | | |
| Total Number of Student CU Connect Denials | | | | | |
| Total Number of Student CU Connect Approvals for Less than the Amount Requested | | | | | |

Appendix R-5

| | ITT | | | | |
|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 |
| Total Number of Students Enrolled | | | | | |
| Total Completion Rates | | | | | |
| Total Job Placement Rates | | | | | |

Appendix R-6

| | ITT Students | | | | |
|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 |
| Sought Loan Relief | | | | | |
| Received Loan Relief | | | | | |
| Forbearances/Deferments | | | | | |
| Changed Amortization Terms | | | | | |
| Reductions to Principal | | | | | |
| Reductions to Interest Rate | | | | | |
| Balloon Payment Changes | | | | | |
| Adjustment in terms of Interest Rate | | | | | |
| Adjustment to type of Amortization | | | | | |
| Other Loan Relief | | | | | |

Appendix R-7

For the period of January 1, 2011 through December 31, 2011, identify the five employees (or former employees if not currently employed by ITT), responsible for recruiting prospective students, who scheduled the highest number of appointments with prospective students at each of the campuses located in the cities in the list below. List as follows: a)Employee Name, b)Employment Status within the Company i.e. Former or Current, and c)Employee Contact Information (Telephone Number and Email Addresses).

| | Highest #1 | Highest #2 | Highest #3 | Highest #4 | Highest#5 |
|---|---|---|---|---|---|
| Albany, New York | | | | | |
| Atlanta, Georgia | | | | | |
| Austin, Texas | | | | | |
| Bessemer, Alabama | | | | | |
| Canton, Michigan | | | | | |
| Norfolk, Virginia | | | | | |
| Concord, California | | | | | |
| Cordova, Tennessee | | | | | |
| Indianapolis, Indiana | | | | | |
| Knoxville, Tennessee | | | | | |
| Little Rock, Arkansas | | | | | |
| Norwood, Ohio | | | | | |
| Portland, Oregon | | | | | |
| Tucson, Arizona | | | | | |
| Westminster, Colorado | | | | | |
| Greenfield, Wisconsin | | | | | |

Appendix R-7

For the period of January 1, 2011 through December 31, 2011, identify the five employees (or former employees if not currently employed by ITT), responsible for recruiting prospective students, who scheduled the lowest number of appointments with prospective students at each of the campuses located in the cities in the list below. List as follows: a)Employee Name, b)Employment Status within the Company i.e. Former or Current, and c)Employee Contact Information (Telephone Number and Email Addresses).

| | Lowest #1 | Lowest #2 | Lowest #3 | Lowest #4 | Lowest #5 |
|---|---|---|---|---|---|
| Albany, New York | | | | | |
| Atlanta, Georgia | | | | | |
| Austin, Texas | | | | | |
| Bessemer, Alabama | | | | | |
| Canton, Michigan | | | | | |
| Norfolk, Virginia | | | | | |
| Concord, California | | | | | |
| Cordova, Tennessee | | | | | |
| Indianapolis, Indiana | | | | | |
| Knoxville, Tennessee | | | | | |
| Little Rock, Arkansas | | | | | |
| Norwood, Ohio | | | | | |
| Portland, Oregon | | | | | |
| Tucson, Arizona | | | | | |
| Westminster, Colorado | | | | | |
| Greenfield, Wisconsin | | | | | |

Appendix R-7

For the period of January 1, 2011 through December 31, 2011, identify the individuals that served as a Director of Recruitment or equivalent positions at campuses located in the following cities.

| | Director of Recruitment or Equivalent Position |
|---|---|
| Albany, New York | |
| Atlanta, Georgia | |
| Austin, Texas | |
| Bessemer, Alabama | |
| Canton, Michigan | |
| Norfolk, Virginia | |
| Concord, California | |
| Cordova, Tennessee | |
| Indianapolis, Indiana | |
| Knoxville, Tennessee | |
| Little Rock, Arkansas | |
| Norwood, Ohio | |
| Portland, Oregon | |
| Tucson, Arizona | |
| Westminster, Colorado | |
| Greenfield, Wisconsin | |

Appendix R-8

| Unique ID | Title of Advertisement or Other Materials | Type of Material (TV, Radio, Internet Ad, Direct Mail, Print Ad, Telemarketing, Other (specify)) | Dates Published or Run | Station/Frequency | Publication | Website | Geographic Area | Area Code | Zip Code | Target Audience |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

## **CERTIFICATE OF COMPLIANCE**

I, _____, pursuant to 28 U.S.C. § 1746, declare that:

1.      All of the documents and information required by the enclosed Civil Investigative

Demand which are in the possession, custody, control and knowledge of the person to

whom the demand is directed have been submitted to Ori Lev and Britney Lewis.

2.      If a document or tangible item responsive to this Civil Investigative Demand has not been

submitted, a claim of privilege in compliance with 12 C.F.R. § 1080.8 has been

submitted.

3.      If an interrogatory or a portion of an interrogatory has not been fully answered or a report

or a portion of a report has not been completed, a claim of privilege in compliance with

12 C.F.R. § 1080.8 has been submitted.

I certify under penalty of perjury that the foregoing is true and correct.  Executed on

_____, 2012.


_____
Signature


_____
Title

29

## DECLARATION CERTIFYING RECORDS OF
## REGULARLY CONDUCTED BUSINESS ACTIVITY
### Pursuant to 28 U.S.C. § 1746

I, _____, pursuant to 28 U.S.C. § 1746, declare that:

1.    I am employed by _____ as _____ and by reason of

      my position am authorized and qualified to certify the authenticity of the records

      produced by ITT Educational Services, Inc. and submitted with this Declaration.

2.    The documents produced and submitted with this Declaration by ITT Educational

      Services, Inc. are true copies of records of regularly conducted activity that were:

      a.    made at or near the time of the occurrence of the matters set forth, by, or from

            information transmitted by, a person with knowledge of those matters;

      b.    kept in the course of the regularly conducted business activity; and

      c.    made by the regularly conducted business activity as a regular practice.

I certify under penalty of perjury that the foregoing is true and correct.  Executed on

_____, 2012.


                                        _____
                                        Signature


30

## PART 84—UNIFORM ADMINISTRATIVE REQUIREMENTS FOR GRANTS AND AGREEMENTS WITH INSTITUTIONS OF HIGHER EDUCATION, HOSPITALS, AND OTHER NON-PROFIT ORGANIZATIONS

The authority citation for part 84 continues to read as follows:

**Authority:** 42 U.S.C. 3535(d).

■ 7. Revise § 84.13(b) to read as follows:

### § 84.13  Debarment and suspension; Drug-Free Workplace.

\*　　\*　　\*　　\*　　\*

(b) Recipients and subrecipients shall comply with the requirements of the Drug-Free Workplace Act of 1988 (41 U.S.C. 701, *et seq.*), as set forth at 2 CFR part 2429.

## PART 1000—NATIVE AMERICAN HOUSING ACTIVITIES

The authority citation for part 1000 continues to read as follows:

**Authority:** 25 U.S.C. 4101 *et seq.*; 42 U.S.C. 3535(d).

■ 9. Revise § 1000.46 to read as follows:

### § 1000.46  Do drug-free workplace requirements apply?

Yes. In addition to any tribal requirements, the Drug-Free Workplace Act of 1988 (41 U.S.C. 701, *et seq.*) and HUD's implementing regulations in 2 CFR part 2429 apply.

Dated: July 15, 2011.

**Shaun Donovan,**

*Secretary.*

[FR Doc. 2011–19129 Filed 7–27–11; 8:45 am]

**BILLING CODE 4210–67–P**

## BUREAU OF CONSUMER FINANCIAL PROTECTION

### 12 CFR Part 1080

[Docket No. CFPB–2011–0007]

RIN 3170–AA03

### Rules Relating to Investigations

**AGENCY:** Bureau of Consumer Financial Protection.

**ACTION:** Interim final rule with request for public comment.

**SUMMARY:** The Bureau of Consumer Financial Protection ("CFPB" or "Bureau"), pursuant to the Consumer Financial Protection Act of 2010, is adopting its Rules Relating to Investigations in order to describe the Bureau's procedures for investigations pursuant to section 1052 of the Act. The Bureau invites interested members of the public to submit written comments to this interim final rule setting forth those rules.

**DATES:** This interim final rule is effective on July 28, 2011. Written comments must be received on or before September 26, 2011.

**ADDRESSES:** You may submit comments, identified by Docket No. CFPB–2011–0007, by any of the following methods:

• *Electronic: http:// www.regulations.gov.* Follow the instructions for submitting comments.

• *Mail or Hand Delivery/Courier in Lieu of Mail:* Monica Jackson, Office of the Executive Secretary, Consumer Financial Protection Bureau, 1801 L Street, NW., Washington, DC 20036.

All submissions must include the agency name and docket number or Regulatory Information Number (RIN) for this rulemaking. In general, all comments received will be posted without change to *http:// www.regulations.gov.* In addition, comments will be available for public inspection and copying at 1801 L Street, NW., Washington, DC 20036, on official business days between the hours of 10 a.m. and 5 p.m. Eastern Time. You can make an appointment to inspect the documents by telephoning (202) 435–7275.

All comments, including attachments and other supporting materials, will become part of the public record and subject to public disclosure. Sensitive personal information, such as account numbers or social security numbers, should not be included. Comments will not be edited to remove any identifying or contact information.

**FOR FURTHER INFORMATION CONTACT:** Monica Jackson, Office of the Executive Secretary, Consumer Financial Protection Bureau, 1801 L Street, NW., Washington, DC 20036, (202) 435–7275.

**SUPPLEMENTARY INFORMATION:** This discussion contains the following sections:

(a) Background
(b) Section-by-Section Summary
(c) Procedural Requirements

### (a) Background

The Bureau is adopting Rules Relating to Investigations ("Rules") that implement provisions of the Consumer Financial Protection Act of 2010 ("Act")[1] that relate to the Bureau's

---

[1] The Act is Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act, as amended, Public Law 111–203 (July 21, 2010), Title X, 12 U.S.C. 5481 *et seq.* Section 1066 of the Act grants the Secretary of the Treasury interim authority to perform certain functions of the CFPB. Pursuant to that authority, Treasury publishes these Rules on behalf of the CFPB.

investigations. Specifically, these Rules will govern investigations undertaken pursuant to section 1052 of the Act, 12 U.S.C. 5562, which authorizes the Bureau to investigate whether persons have engaged in conduct that violates any provision of Federal consumer financial law.

In developing these Rules, the Bureau considered the investigative procedures of other law enforcement agencies. Specifically, the Bureau reviewed the procedures currently used by the Federal Trade Commission ("FTC"), the Securities and Exchange Commission ("SEC"), and the prudential regulators for guidance. In light of the similarities between section 1052 of the Act and section 20 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. 41 *et seq.*, the Bureau drew most heavily from the FTC's nonadjudicative procedures in constructing the Rules.

The Rules describe a number of Bureau policies and procedures that apply in a nonadjudicative setting. Among other things, these Rules set forth (1) the Bureau's authority to conduct investigations, and (2) the rights of persons from whom the Bureau seeks to compel information in investigations.

In particular, the Rules lay out the Bureau's authority to conduct investigations before instituting judicial or administrative adjudicatory proceedings under Federal consumer financial law. The Rules authorize the Assistant Director of the Division of Enforcement to issue civil investigative demands for documentary material, tangible things, written reports or answers to questions, and oral testimony, which may be enforced in district court by either the General Counsel or the Assistant Director of the Division of Enforcement. The Rules also detail the authority of the Bureau's investigators to conduct investigations and hold investigational hearings pursuant to civil investigative demands for oral testimony.

Furthermore, the Rules set forth the rights of persons from whom the Bureau seeks to compel information in an investigation. Specifically, the Rules describe how such persons should be notified of the purpose of the Bureau's investigation. The Rules detail the procedures for filing a petition for an order modifying or setting aside a civil investigative demand, which will be ruled upon by the Bureau Director. They also describe the process for obtaining copies of or access to documents or testimony provided to the Bureau. In addition, the Rules describe a person's right to counsel at investigational hearings.

**(b) Section-by-Section Summary**

*Section 1080.1   Scope*

This section describes the scope of the Rules. It makes clear that these Rules only apply to investigations under section 1052 of the Act.

*Section 1080.2   Definitions*

This section defines several terms used throughout the Rules. Many of these definitions also may be found in section 1051 of the Act.

*Section 1080.3   Policy as to Private Controversies*

This section states the Bureau's policy of pursuing investigations that are in the public interest. Section 1080.3 is consistent with the Bureau's mission to protect consumers by investigating potential violations of Federal consumer financial law.

*Section 1080.4   By Whom Conducted*

This section explains that Bureau investigators are authorized to conduct investigations pursuant to section 1052 of the Act.

*Section 1080.5   Notification of Purpose*

This section provides that a person compelled to provide information to the Bureau or testify in an investigational hearing must be advised of the nature of the conduct constituting the alleged violation under investigation and the applicable provisions of law. This section implements the requirements for civil investigative demands described in section 1052(c)(2) of the Act.

*Section 1080.6   Civil Investigative Demands*

This section lays out the Bureau's procedures for issuing civil investigative demands. It authorizes the Assistant Director of the Division of Enforcement to issue civil investigative demands for documentary material, tangible things, written reports or answers to questions, and oral testimony. This section details the information that must be included in civil investigative demands and the requirement that responses be made under a sworn certificate. Section 1080.6 also authorizes the Assistant Director of the Division of Enforcement to negotiate and approve the terms of compliance with civil investigative demands and grant extensions for good cause. Finally, this section describes the procedures for seeking an order to modify or set aside a civil investigative demand, which will be ruled upon by the Bureau Director.

*Section 1080.7   Investigational Hearings*

This section describes the procedures for investigational hearings initiated pursuant to a civil investigative demand for oral testimony. It also lays out the roles and responsibilities of the Bureau investigator conducting the investigational hearing, which include excluding unauthorized persons from the hearing room and ensuring that the investigational hearing is transcribed, the witness is duly sworn, the transcript is a true record of the testimony, and the transcript is provided to the designated custodian.

*Section 1080.8   Withholding Requested Material*

This section describes the procedures that apply when persons withhold material responsive to a civil investigative demand. It requires that they assert a privilege by the production date and, if so directed in the civil investigative demand, also submit a detailed schedule of the items withheld. Section 1080.8 also sets forth the procedures for handling the disclosure of privileged or protected information or communications.

*Section 1080.9   Rights of Witnesses in Investigations*

This section describes the rights of persons compelled to submit information or provide testimony in an investigation. It details the procedures for obtaining a copy of submitted documents or a copy of or access to a transcript of the person's testimony. This section also describes a witness's right to make changes to his or her transcript and the rules for signing the transcript.

Section 1080.9 lays out a person's right to counsel at an investigational hearing and describes his or her counsel's right to advise the witness as to any question posed for which an objection may properly be made. It also describes the witness's or counsel's rights to object to questions or requests that the witness is privileged to refuse to answer. This section states that counsel for the witness may not otherwise object to questions or interrupt the examination to make statements on the record but may request that the witness have an opportunity to clarify any of his or her answers. Finally, this section authorizes the Bureau investigator to take all necessary action during the course of the hearing to avoid delay and to prevent or restrain disorderly, dilatory, obstructionist, or contumacious conduct, or contemptuous language.

*Section 1080.10   Noncompliance With Civil Investigative Demands*

This section authorizes the Assistant Director of the Division of Enforcement, the General Counsel, and their delegees, to initiate an action to enforce a civil investigative demand in connection with the failure or refusal of a person to comply with, or to obey, a civil investigative demand. In addition, they are authorized to seek civil contempt or other appropriate relief in cases where a court order enforcing a civil investigative demand has been violated.

*Section 1080.11   Disposition*

This section explains that an enforcement action may be instituted in federal or state court or through administrative proceedings when warranted by the facts disclosed by an investigation. This section further provides that the Bureau may refer investigations to appropriate federal, state, or foreign government agencies as appropriate. It also authorizes the Assistant Director of the Division of Enforcement to close the investigation when the facts of an investigation indicate an enforcement action is not necessary or warranted in the public interest.

*Section 1080.12   Orders Requiring Witnesses To Testify or Provide Other Information and Granting Immunity*

This section authorizes the Assistant Director of the Division of Enforcement to request approval from the Attorney General for the issuance of an order requiring a witness to testify or provide other information and granting immunity under 18 U.S.C. 6004. It also sets forth the Bureau's right to review the exercise of these functions, and states that the Bureau will entertain an appeal from an order requiring a witness to testify or provide other information only upon a showing that a substantial question is involved, the determination of which is essential to serve the interests of justice. Finally, this section describes the applicable rules and time limits for such appeals.

*Section 1080.13   Custodians*

This section describes the procedures for designating a custodian and deputy custodian for material produced pursuant to a civil investigative demand in an investigation. It also states that these materials are for the official use of the Bureau, but, upon notice to the custodian, must be made available for examination during regular office hours by the person who produced them.

**45170** **Federal Register** / Vol. 76, No. 145 / Thursday, July 28, 2011 / Rules and Regulations

*Section 1080.14 Confidential Treatment of Demand Material and Non-Public Nature of Investigations*

Section 1080.14 explains that documentary materials and tangible things obtained by the Bureau pursuant to a civil investigative demand are subject to the requirements and procedures relating to disclosure of records and information in part 1070 of this title. This section also states that investigations generally are non-public. A Bureau investigator may disclose the existence of an investigation to the extent necessary to advance the investigation.

**(c) Procedural Requirements**

*(1) Regulatory Requirements*

The Rules relate solely to agency procedure and practice and, thus, are not subject to the notice and comment requirements of the Administrative Procedure Act, 5 U.S.C. 551 *et seq.* Although these requirements, the Bureau invites comment on them. Because no notice of proposed rulemaking is required, the requirements of the Regulatory Flexibility Act, 5 U.S.C. 601(2) do not apply.

*(2) Section 1022(b)(2) Provisions*

The CFPB has conducted an analysis of benefits, costs, and impacts [2] and consulted with the prudential regulators, the Department of Housing and Urban Development, the Securities and Exchange Commission, the Department of Justice, and the Federal Trade Commission, including with respect to whether the Rules are consistent with any relevant prudential, market, and systemic objectives administered by such agencies.[3]

The Bureau concludes that, on balance, the Rules are beneficial to consumers and covered persons alike. The Rules do not impose any obligations on consumers or have any direct impact on their access to credit. Conversely, they provide a clear,

---

[2] Section 1022(b)(2)(A) addresses the consideration of the potential benefits and costs of regulation to consumers and industry, including the potential reduction of access by consumers to consumer financial products or services; the impact of proposed rules on depository institutions and credit unions with $10 billion or less in total assets as described in Section 1026 of the Dodd-Frank Act; and the impact on consumers in rural areas.

[3] The President's July 11, 2011, Executive Order 13579 entitled "Regulation and Independent Regulatory Agencies," asks the independent agencies to follow the cost-saving, burden-reducing principles in Executive Order 13563; harmonization and simplification of rules; flexible approaches that reduce costs; and scientific integrity. In the spirit of Executive Order 13563, the CFPB has consulted with the Office of Management and Budget regarding this interim final rule.

efficient mechanism for investigating compliance with the Federal consumer financial laws, which benefits consumers because the Rules offer a systematic process for protecting them from unlawful behavior.

The Rules impose certain obligations on covered persons who receive civil investigative demands in Bureau investigations. Specifically, as described above, the Rules set forth the process for complying with or objecting to civil investigative demands for documentary material, tangible things, written reports or answers to questions, and oral testimony. The obligations in the Rules stem from express language in the Act. As such, the Rules do not impose additional burdens on covered persons beyond those Congress imposed in the Act. In fact, the Rules implement the statutory requirements and provide clear guidelines to recipients of civil investigative demands, providing a level of clarity and certainty that is beneficial to those obligated under the Act to comply with such demands. Moreover, ensuring compliance with Federal consumer financial law ultimately benefits covered persons by ensuring that scrupulous actors are not competitively disadvantaged in the marketplace.

Furthermore, because section 1052 of the Act and the Rules are largely based on section 20 of the FTC Act and its corresponding regulations, they present an existing, stable model of investigatory procedures that should not impose new compliance costs. The entities subject to the Bureau's jurisdiction are accustomed to complying with these or similar procedures for responding to demands for information or testimony from regulators. Thus, they do not face a significant cost of adjusting to a new procedural landscape for investigations; rather, they benefit from the Bureau's adoption of an existing model.

The Rules contemplate that the Bureau will exercise its discretion to modify demands or extend the time for compliance for good cause. The Bureau can assess the cost of compliance with a civil investigative demand in a particular circumstance and take appropriate steps to mitigate any unreasonable compliance burden, a process providing flexibility that benefits covered persons.

Further, the Rules have no unique impact on insured depository institutions or insured credit unions with less than $10 billion in assets described in section 1026(a) of the Act, and do not have a unique impact on rural consumers.

**List of Subjects in 12 CFR Part 1080**

Administrative practice and procedure, Banks, Banking, Consumer protection, Credit, Credit unions, Federal Reserve System, Investigations, Law enforcement, National banks, Savings associations, Trade practices.

For the reasons set forth above, the Bureau of Consumer Financial Protection adds part 1080 to Chapter X in Title 12 of the Code of Federal Regulations to read as set forth below.

**TITLE 12—BANKS AND BANKING**

**CHAPTER X—BUREAU OF CONSUMER FINANCIAL PROTECTION**

**PART 1080—RULES RELATING TO INVESTIGATIONS**

Sec.
1080.1   Scope.
1080.2   Definitions.
1080.3   Policy as to private controversies.
1080.4   By whom conducted.
1080.5   Notification of purpose.
1080.6   Civil investigative demands.
1080.7   Investigational hearings.
1080.8   Withholding requested material.
1080.9   Rights of witnesses in investigations.
1080.10  Noncompliance with civil investigative demands.
1080.11  Disposition.
1080.12  Orders requiring witnesses to testify or provide other information and granting immunity.
1080.13  Custodians.
1080.14  Confidential treatment of demand material and non-public nature of investigations.

**Authority:** Pub. L. 111–203, Title X.

**§ 1080.1  Scope.**

The rules of this part apply to Bureau investigations conducted pursuant to section 1052 of the Act, 12 U.S.C. 5562.

**§ 1080.2  Definitions.**

For the purposes of this part, unless explicitly stated to the contrary:

*Act* means the Consumer Financial Protection Act of 2010, as amended, Public Law 111–203 (July 21, 2010), Title X, 12 U.S.C. 5481 *et seq.*

*Assistant Director of the Division of Enforcement* means the head of the Division of Enforcement or any Bureau employee to whom the Assistant Director of the Division of Enforcement has delegated authority to act under this part.

*Bureau* means the Bureau of Consumer Financial Protection.

*Bureau investigation* means any inquiry conducted by a Bureau investigator for the purpose of ascertaining whether any person is or has been engaged in any conduct that is a violation.

*Bureau investigator* means any attorney or investigator employed by the

Bureau who is charged with the duty of enforcing or carrying into effect any Federal consumer financial law.

*Custodian* means the custodian or any deputy custodian designated by the Bureau for the purpose of maintaining custody of information produced pursuant to this part.

*Director* means the Director of the Bureau or a person authorized to perform the functions of the Director in accordance with the law.

*Division of Enforcement* means the division of the Bureau responsible for enforcement of Federal consumer financial law.

*Documentary material* means the original or any copy of any book, document, record, report, memorandum, paper, communication, tabulation, chart, logs, electronic files, or other data or data compilations stored in any medium, including electronically-stored information.

*Electronically stored information (ESI)* means any information stored in any electronic medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form.

*General Counsel* means the General Counsel of the Bureau or any Bureau employee to whom the General Counsel has delegated authority to act under this part.

*Person* means an individual, partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity.

*Violation* means any act or omission that, if proved, would constitute a violation of any provision of Federal consumer financial law.

## § 1080.3   Policy as to private controversies.

The Bureau shall act only in the public interest and will not initiate an investigation or take other enforcement action when the alleged violation is merely a matter of private controversy and does not tend to affect adversely the public interest.

## § 1080.4   By whom conducted.

Bureau investigations are conducted by Bureau investigators designated and duly authorized under section 1052 of the Act, 12 U.S.C. 5562, to conduct such investigations.

## § 1080.5   Notification of purpose.

Any person compelled to furnish documentary material, tangible things, written reports or answers to questions, oral testimony, or any combination of such material, answers, or testimony to the Bureau shall be advised of the nature of the conduct constituting the alleged violation that is under investigation and the provisions of law applicable to such violation.

## § 1080.6   Civil investigative demands.

(a) *In general.* In accordance with section 1052(c) of the Act, the Assistant Director of the Division of Enforcement may issue a civil investigative demand in any Bureau investigation directing the person named therein to produce documentary material for inspection and copying or reproduction in the form or medium requested by the Bureau; to submit tangible things; to provide a written report or answers to questions; to appear before a designated representative at a designated time and place to testify about documentary material, tangible things, or other information; and to furnish any combination of such material, things, answers, or testimony.

(1) *Documentary material.*

(i) Civil investigative demands for the production of documentary material shall describe each class of material to be produced with such definiteness and certainty as to permit such material to be fairly identified, prescribe a return date or dates that will provide a reasonable period of time within which the material so demanded may be assembled and made available for inspection and copying or reproduction, and identify the custodian to whom such material shall be made available. Documentary material for which a civil investigative demand has been issued shall be made available as prescribed in the civil investigative demand.

(ii) Production of documentary material in response to a civil investigative demand shall be made under a sworn certificate, in such form as the demand designates, by the person to whom the demand is directed or, if not a natural person, by any person having knowledge of the facts and circumstances relating to such production, to the effect that all of the documentary material required by the demand and in the possession, custody, or control of the person to whom the demand is directed has been produced and made available to the custodian.

(2) *Tangible things.*

(i) Civil investigative demands for tangible things shall describe each class of tangible things to be produced with such definiteness and certainty as to permit such things to be fairly identified, prescribe a return date or dates which will provide a reasonable period of time within which the things so demanded may be assembled and submitted, and identify the custodian to whom such things shall be submitted.

(ii) Submissions of tangible things in response to a civil investigative demand shall be made under a sworn certificate, in such form as the demand designates, by the person to whom the demand is directed or, if not a natural person, by any person having knowledge of the facts and circumstances relating to such production, to the effect that all of the tangible things required by the demand and in the possession, custody, or control of the person to whom the demand is directed have been submitted to the custodian.

(3) *Written reports or answers to questions.*

(i) Civil investigative demands for written reports or answers to questions shall propound with definiteness and certainty the reports to be produced or the questions to be answered, prescribe a date or dates at which time written reports or answers to questions shall be submitted, and identify the custodian to whom such reports or answers shall be submitted.

(ii) Each reporting requirement or question in a civil investigative demand shall be answered separately and fully in writing under oath. Responses to a civil investigative demand for a written report or answers to questions shall be made under a sworn certificate, in such form as the demand designates, by the person to whom the demand is directed or, if not a natural person, by any person responsible for answering each reporting requirement or question, to the effect that all of the information required by the demand and in the possession, custody, control, or knowledge of the person to whom the demand is directed has been submitted to the custodian.

(4) *Oral testimony.*

(i) Civil investigative demands for the giving of oral testimony shall prescribe a date, time, and place at which oral testimony shall be commenced, and identify a Bureau investigator who shall conduct the investigation and the custodian to whom the transcript of such investigation shall be submitted. Oral testimony in response to a civil investigative demand shall be taken in accordance with the procedures for investigational hearings prescribed by §§ 1080.7 and 1080.9 of this part.

(ii) Where a civil investigative demand requires oral testimony from an entity, the civil investigative demand shall describe with reasonable particularity the matters for examination and the entity must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf. Unless

a single individual is designated by the entity, the entity must designate the matters on which each designee will testify. The individuals designated must testify about information known or reasonably available to the entity and their testimony shall be binding on the entity.

(b) *Manner and form of production of ESI.* When a civil investigative demand requires the production of ESI, it shall be produced in accordance with the instructions provided by the Bureau regarding the manner and form of production. Absent any instructions as to the form for producing ESI, ESI must be produced in the form in which it is ordinarily maintained or in a reasonably usable form.

(c) *Compliance.* The Assistant Director of the Division of Enforcement is authorized to negotiate and approve the terms of satisfactory compliance with civil investigative demands and, for good cause shown, may extend the time prescribed for compliance.

(d) *Petition for order modifying or setting aside demand—in general.* Any petition for an order modifying or setting aside a civil investigative demand shall be filed with the Executive Secretary of the Bureau with a copy to the Assistant Director of the Division of Enforcement within twenty (20) days after service of the civil investigative demand, or, if the return date is less than twenty (20) days after service, prior to the return date. Such petition shall set forth all assertions of privilege or other factual and legal objections to the civil investigative demand, including all appropriate arguments, affidavits, and other supporting documentation. The attorney who objects to a demand must sign any objections.

(1) *Statement.* Each petition shall be accompanied by a signed statement representing that counsel for the petitioner has conferred with counsel for the Bureau in a good-faith effort to resolve by agreement the issues raised by the petition and has been unable to reach such an agreement. If some of the matters in controversy have been resolved by agreement, the statement shall specify the matters so resolved and the matters remaining unresolved. The statement shall recite the date, time, and place of each such conference between counsel, and the names of all parties participating in each such conference.

(2) *Extensions of time.* The Assistant Director of the Division of Enforcement is authorized to rule upon requests for extensions of time within which to file such petitions. Requests for extension of time are disfavored.

(3) *Disposition.* The Director has the authority to rule upon a petition for an order modifying or setting aside a civil investigative demand.

(e) *Stay of compliance period.* The timely filing of a petition for an order modifying or setting aside a civil investigative demand shall stay the time permitted for compliance with the portion challenged. If the petition is denied in whole or in part, the ruling will specify a new return date.

(f) *Public disclosure.* All such petitions and the responses thereto are part of the public records of the Bureau unless the Bureau determines otherwise for good cause shown.

### § 1080.7  Investigational hearings.

(a) Investigational hearings, as distinguished from hearings in adjudicative proceedings, may be conducted pursuant to a civil investigative demand for the giving of oral testimony in the course of any Bureau investigation, including inquiries initiated for the purpose of determining whether or not a respondent is complying with an order of the Bureau.

(b) Investigational hearings shall be conducted by any Bureau investigator for the purpose of hearing the testimony of witnesses and receiving documentary material, tangible things, or other information relating to any subject under investigation. Such hearings shall be under oath or affirmation and stenographically reported, and a transcript thereof shall be made a part of the record of the investigation. The Bureau investigator conducting the investigational hearing also may direct that the testimony be recorded by audio, audiovisual, or other means, in which case the recording shall be made a part of the record of the investigation as well.

(c) In investigational hearings, the Bureau investigators shall exclude from the hearing room all persons except the person being examined, his or her counsel, the officer before whom the testimony is to be taken, any investigator or representative of an agency with which the Bureau is engaged in a joint investigation, and any individual transcribing or recording such testimony. At the discretion of the Bureau investigator, and with the consent of the person being examined, persons other than those listed in this paragraph may be present in the hearing room. The Bureau investigator shall certify or direct the individual transcribing the testimony to certify on the transcript that the witness was duly sworn and that the transcript is a true record of the testimony given by the witness. A copy of the transcript shall be forwarded promptly by the Bureau investigator to the custodian designated in § 1080.13.

### § 1080.8  Withholding requested material.

(a) Any person withholding material responsive to a civil investigative demand or any other request for production of material shall assert a claim of privilege not later than the date set for the production of material. Such person shall, if so directed in the civil investigative demand or other request for production, submit, together with such claim, a schedule of the items withheld which states, as to each such item, the type, specific subject matter, and date of the item; the names, addresses, positions, and organizations of all authors and recipients of the item; and the specific grounds for claiming that the item is privileged. The person who submits the schedule and the attorney stating the grounds for a claim that any item is privileged must sign it.

(b) A person withholding material solely for reasons described in this subsection shall comply with the requirements of this subsection in lieu of filing a petition for an order modifying or setting aside a civil investigative demand pursuant to § 1080.6(d).

(c) Disclosure of privileged or protected information or communications produced pursuant to a civil investigative demand shall be handled as follows:

(1) The disclosure of privileged or protected information or communications shall not operate as a waiver if:

(i) The disclosure was inadvertent;

(ii) The holder of the privilege or protection took reasonable steps to prevent disclosure; and

(iii) The holder promptly took reasonable steps to rectify the error, including notifying a Bureau investigator of the claim and the basis for it.

(2) After being notified, the Bureau investigator must promptly return, sequester, or destroy the specified information and any copies; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if he or she disclosed it before being notified; and, if appropriate, may sequester such material until such time as a hearing officer or court rules on the merits of the claim of privilege or protection. The producing party must preserve the information until the claim is resolved.

(3) The disclosure of privileged or protected information or communications shall waive the

privilege or protection as to undisclosed information or communications only if:

(i) The waiver is intentional;

(ii) The disclosed and undisclosed information or communications concern the same subject matter; and

(iii) They ought in fairness to be considered together.

### § 1080.9  Rights of witnesses in investigations.

(a) Any person compelled to submit documentary material, tangible things, or written reports or answers to questions to the Bureau, or to testify in an investigational hearing, shall be entitled to retain a copy or, on payment of lawfully prescribed costs, request a copy of the materials, things, reports, or written answers submitted, or a transcript of his or her testimony. The Bureau, however, may for good cause deny such a request and limit the witness to inspection of the official transcript of the testimony. Upon completion of transcription of the testimony of the witness, the witness shall be offered an opportunity to read the transcript of his or her testimony. Any changes in form or substance that the witness desires to make shall be entered and identified upon the transcript by the Bureau investigator with a statement of the reasons given by the witness for making such changes. The transcript shall then be signed by the witness unless the witness cannot be found, is ill, waives in writing his or her right to signature, or refuses to sign. If the transcript is not signed by the witness within thirty (30) days of being afforded a reasonable opportunity to review it, the Bureau investigator, or the individual transcribing the testimony acting at the Bureau investigator's direction, shall sign the transcript and state on the record the fact of the waiver, illness, absence of the witness, or the refusal to sign, together with any reasons given for the failure to sign.

(b) Any witness compelled to appear in person at an investigational hearing may be accompanied, represented, and advised by counsel as follows:

(1) Counsel for a witness may advise the witness, in confidence and upon the initiative of either counsel or the witness, with respect to any question asked of the witness for which an objection pursuant to paragraph (b)(2) of this section may properly be made. If the witness refuses to answer a question, counsel may briefly state on the record if he or she has advised the witness not to answer the question and the legal grounds for such refusal.

(2) Where it is claimed that a witness is privileged to refuse to answer a question or to produce other evidence,

the witness or counsel for the witness shall object on the record to the question or requirement and may state briefly and precisely the ground therefor. The witness and his or her counsel shall not otherwise object to or refuse to answer any question, and they shall not otherwise interrupt the oral examination.

(3) Any objections made under the rules in this part will be treated as continuing objections and preserved throughout the further course of the hearing without the necessity for repeating them as to any similar line of inquiry. Cumulative objections are unnecessary. Repetition of the grounds for any objection will not be allowed.

(4) Counsel for a witness may not, for any purpose or to any extent not allowed by paragraphs (b)(1) and (2) of this section, interrupt the examination of the witness by making any objections or statements on the record. Petitions challenging the Bureau's authority to conduct the investigation or the sufficiency or legality of the civil investigative demand shall be addressed to the Bureau in advance of the hearing. Copies of such petitions may be filed as part of the record of the investigation with the Bureau investigator conducting the investigational hearing, but no arguments in support thereof will be allowed at the hearing.

(5) Following completion of the examination of a witness, counsel for the witness may, on the record, request that the Bureau investigator conducting the investigational hearing permit the witness to clarify any of his or her answers. The grant or denial of such request shall be within the sole discretion of the Bureau investigator conducting the hearing.

(6) The Bureau investigator conducting the hearing shall take all necessary action to regulate the course of the hearing to avoid delay and to prevent or restrain disorderly, dilatory, obstructionist, or contumacious conduct, or contemptuous language. Such Bureau investigator shall, for reasons stated on the record, immediately report to the Bureau any instances where an attorney has allegedly refused to comply with his or her obligations under the rules in this part, or has allegedly engaged in disorderly, dilatory, obstructionist, or contumacious conduct, or contemptuous language in the course of the hearing. The Bureau will thereupon take such further action, if any, as the circumstances warrant, including suspension or disbarment of the attorney from further practice before the Bureau or exclusion from further

participation in the particular investigation.

### § 1080.10  Noncompliance with civil investigative demands.

(a) In cases of failure to comply in whole or in part with Bureau civil investigative demands, appropriate action may be initiated by the Bureau, including actions for enforcement.

(b) The Assistant Director of the Division of Enforcement and the General Counsel are authorized to:

(1) Institute, on behalf of the Bureau, an enforcement proceeding in the district court of the United States for any judicial district in which a person resides, is found, or transacts business, in connection with the failure or refusal of such person to comply with, or to obey, a civil investigative demand in whole or in part if the return date or any extension thereof has passed; and

(2) Seek civil contempt or other appropriate relief in cases where a court order enforcing a civil investigative demand has been violated.

### § 1080.11  Disposition.

(a) When the facts disclosed by an investigation indicate that an enforcement action is warranted, further proceedings may be instituted in federal or state court or pursuant to the Bureau's administrative adjudicatory process. Where appropriate, the Bureau also may refer investigations to appropriate federal, state, or foreign governmental agencies.

(b) When the facts disclosed by an investigation indicate that an enforcement action is not necessary or would not be in the public interest, the investigational file will be closed. The matter may be further investigated, at any time, if circumstances so warrant.

(c) The Assistant Director of the Division of Enforcement is authorized to close Bureau investigations.

### § 1080.12  Orders requiring witnesses to testify or provide other information and granting immunity.

(a) The Assistant Director of the Division of Enforcement is hereby authorized to request approval from the Attorney General of the United States for the issuance of an order requiring a witness to testify or provide other information granting immunity under 18 U.S.C. 6004.

(b) The Bureau retains the right to review the exercise of any of the functions delegated under paragraph (a) of this section. Appeals to the Bureau from an order requiring a witness to testify or provide other information will be entertained by the Bureau only upon a showing that a substantial question is involved, the determination of which is

**45174**   **Federal Register** / Vol. 76, No. 145 / Thursday, July 28, 2011 / Rules and Regulations

essential to serve the interests of justice. Such appeals shall be made on the record and shall be in the form of a brief not to exceed fifteen (15) pages in length and shall be filed within five (5) days after notice of the complained of action. The appeal shall not operate to suspend the hearing unless otherwise determined by the Bureau investigator conducting the hearing or ordered by the Bureau.

**§ 1080.13   Custodians.**

(a) The Bureau shall designate a custodian and one or more deputy custodians for material to be delivered pursuant to a civil investigative demand in an investigation. The custodian shall have the powers and duties prescribed by section 1052 of the Act, 12 U.S.C. 5562. Deputy custodians may perform all of the duties assigned to custodians.

(b) Material produced pursuant to a civil investigative demand, while in the custody of the custodian, shall be for the official use of the Bureau in accordance with the Act; but such material shall upon reasonable notice to the custodian be made available for examination by the person who produced such material, or his or her duly authorized representative, during regular office hours established for the Bureau.

**§ 1080.14   Confidential treatment of demand material and non-public nature of investigations.**

(a) Documentary materials and tangible things the Bureau receives pursuant to a civil investigative demand are subject to the requirements and procedures relating to the disclosure of records and information set forth in part 1070 of this chapter.

(b) Bureau investigations generally are non-public. Bureau investigators may disclose the existence of an investigation to potential witnesses or third parties to the extent necessary to advance the investigation.

Dated: July 22, 2011.

**Sam Valverde,**

*Deputy Executive Secretary, Department of the Treasury.*

[FR Doc. 2011–19035 Filed 7–25–11; 4:15 pm]

**BILLING CODE 4810–25–P**

---

**BUREAU OF CONSUMER FINANCIAL PROTECTION**

**12 CFR Part 1082**

**[Docket No. CFPB–2011–0005]**

**RIN 3170–AA02**

**State Official Notification Rules**

**AGENCY:** Bureau of Consumer Financial Protection.

**ACTION:** Interim final rule with request for public comment.

**SUMMARY:** Section 1042(c) of the Consumer Financial Protection Act of 2010 ("Act"), requires the Bureau of Consumer Financial Protection ("CFPB" or "Bureau") to prescribe rules establishing procedures that govern the process, described in section 1042(b) of the Act, by which state officials notify the CFPB of actions or proceedings undertaken pursuant to the authority granted in section 1042(a) to enforce the Act or regulations prescribed thereunder. This interim final rule with a request for public comment sets forth those rules.

**DATES:** This interim final rule is effective on July 28, 2011. Written comments are invited and must be received on or before September 26, 2011.

**ADDRESSES:** You may submit comments, identified by *Docket No. CFPB–2011–0005,* by any of the following methods:

• *Electronic: http:// www.regulations.gov.* Follow the instructions for submitting comments.

• *Mail or Hand Delivery/Courier in Lieu of Mail:* Monica Jackson, Office of the Executive Secretary, Consumer Financial Protection Bureau, 1801 L Street, NW., Washington, DC 20036.

All submissions must include the agency name and docket number or Regulatory Information Number (RIN) for this rulemaking. In general, all comments received will be posted without change to *http:// www.regulations.gov.* In addition, comments will be available for public inspection and copying at 1801 L Street, NW., Washington, DC 20036, on official business days between the hours of 10 a.m. and 5 p.m. Eastern Time. You can make an appointment to inspect the documents by telephoning (202) 435–7275.

All comments, including attachments and other supporting materials, will become part of the public record and subject to public disclosure. Sensitive personal information, such as account numbers or social security numbers, should not be included. Comments will not be edited to remove any identifying or contact information.

**FOR FURTHER INFORMATION CONTACT:** Monica Jackson, Office of the Executive Secretary, Consumer Financial Protection Bureau, 1801 L Street, NW., Washington, DC 20036, (202) 435–7275.

**SUPPLEMENTARY INFORMATION:** The CFPB issues these State Official Notification Rules ("Rules"), pursuant to sections 1042(b) and (c) of the Consumer Financial Protection Act of 2010

("Act"),[1] 12 U.S.C. 5552(b), (c). These Rules are promulgated as an interim final rule with a request for comment. The CFPB invites interested members of the public to submit written comments addressing the issues raised herein.

**A. Background**

These Rules will govern the process by which state officials notify the CFPB of actions or proceedings undertaken under section 1042(a) of the Act, 12 U.S.C. 5552(a), to enforce the Act, or regulations prescribed thereunder.

The Rules implement a procedure for the timing and content of the notice required to be given to the CFPB, set forth the responsibilities of CFPB employees and others who receive the notice, and specify the rights of the CFPB to participate in an action brought by a state official. In drafting these Rules, the CFPB endeavored to create a process that would both provide the CFPB and the relevant prudential regulators with timely notice of pending actions and account for the investigation and litigation needs of state law enforcement agencies. In keeping with this approach, the Rules provide for a default notice period of at least 10 days, with exceptions for emergencies and other extenuating circumstances, and require substantive notice that is both straightforward and comprehensive. The Rules further make clear that the CFPB can participate as appropriate in an action brought by state officials under the Act or a regulation prescribed thereunder, provide for confidential treatment of information disclosed to the CFPB and prudential regulators under these Rules, and establish that provision of notice shall not constitute a waiver of any applicable privilege. In addition, the Rules specify that the notice provisions do not create any procedural or substantive rights for parties in litigation against the United States or against a state which brings an action under the Act or a regulation prescribed thereunder.

**B. Section Summary**

The Rules are set forth in a single section, with several paragraphs, each of which is addressed below.

*Section 1082.1(a) Notice Requirement*

This paragraph sets out the timing and process for the provision of notice

---

[1] The Act is Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act, as amended, Public Law 111–203 (July 21, 2010), Title X, 12 U.S.C. 5481 *et seq.* Section 1066 of the Act grants the Secretary of the Treasury interim authority to perform certain functions of the CFPB. Pursuant to that authority, Treasury publishes these Rules on behalf of the CFPB.

## CID Document Submission Standards

**These standards must be followed for all documents you submit in response to the CID.**

### General Instructions

1. A cover letter should be included with each production.
   The following information should be included in the letter:
   a. List of each piece of media (hard drive, thumb drive, DVD or CD) included in the production by the unique number assigned to it, and readily apparent on the physical media.
   b. List of custodians, identifying:
      i. The Bates range (and any gaps therein) for each custodian, and
      ii. Total number of images for each custodian, and
      iii. Total number of native files for each custodian
   c. List of fields in the order in which they are listed in the metadata load file.
   d. Time zone in which emails were standardized during conversion (email collections only).
2. Documents created or stored electronically MUST be produced in their original electronic format, not printed to paper or PDF.
3. Data may be produced on CD, DVD, USB thumb drive, or hard drive; use the media requiring the least number of deliverables.
   a. Magnetic media shall be carefully packed to avoid damage and must be clearly marked on the outside of the shipping container:
      "MAGNETIC MEDIA – DO NOT X-RAY"
      "MAY BE OPENED FOR POSTAL INSPECTION"
   b. CD-R CD-ROMs formatted to ISO 9660 specifications;
   c. DVD-ROM for Windows-compatible personal computers; and
   d. USB 2.0 thumb drives for Windows-compatible personal computers;
   e. USB 3.0 or USB 3.0/eSATA external hard disk drives, formatted in a Microsoft Windows-compatible file system (FAT32 or NTFS), uncompressed data.
4. Label all media with the following:
   a. Case number
   b. Production date
   c. Bates range
   d. Disk number (1 of X), if applicable
   e. Name of producing party
5. Organize productions first by request number and second by custodian, unless otherwise instructed.
6. All productions must be produced free of computer viruses.
7. All produced media must be encrypted using Microsoft Bitlocker. No other third party encryption utilities are accepted without prior approval.
   a. Data deliveries should be encrypted at the disc level.
   b. Decryption keys should be provided separately from the data delivery via email or phone.

*Rev. 04.04.2012*

8. Passwords for documents, files, compressed archives and encrypted media should be provided separately either via email or in a separate cover letter from the data.

## Delivery Formats

Standards for Submission of Electronically Stored Information ("ESI") and Any Other Documents Submitted in Electronic Form

Before submitting any ESI that does not conform completely to the listed specifications, you must confirm with the Bureau that the proposed formats and media types that contain such ESI will be acceptable. You are encouraged to discuss your specific form of submission, and any related questions with the Bureau as soon as is practicable.

The Bureau's preference is to receive productions in native format based on specifications outlined below.

- De-duplication
  De-duplication of documents shall be discussed on a case by case basis. In the event de-duplication is agreed and applied across custodians, each custodian should be identified in the Custodian field in the meta-data load file.

1. Bates Numbering Documents
   The Bates number must be a unique, consistently formatted identifier, i.e., an alpha prefix unique to each producing party and each custodian along with a fixed length number, i.e., ABC-DEF0000001, where ABC indicates entity and DEF indicates custodian. This format must remain consistent across all productions for each custodian. The number of digits in the numeric portion of the format should not change in subsequent productions, nor should spaces, hyphens, or other separators be added or deleted.

2. Document Retention / Preservation of Metadata
   The recipient of this CID should use reasonable measures to maintain the original native source documents in a manner so as to preserve the metadata associated with these electronic materials as it existed at the time of the original creation.

*Rev. 04.04.2012*

1. **Native Production**

   a. **Data File**
      The data file (.DAT) contains all of the fielded information (metadata) that will be loaded.

      i. The first line of the .DAT file must be a header row identifying the field names.
      ii. The .DAT file must use the following default delimiters:

         | | | |
         |---|---|---|
         | Comma | | ASCII character (020) |
         | Quote | þ | ASCII character (254) |
         | Newline | ® | ASCII character (174) |

      iii. Date fields should be provided in the format:  mm/dd/yyyy
      iv. All attachments should sequentially follow the parent document/email.
      v. All metadata associated with email, audio files, and native electronic document collections must be produced and linked via the NATIVELINK field.
      vi. Produce extracted metadata for each document in the form of a .DAT file, and include these fields:

| Field Name | Description |
|---|---|
| BATES_BEGIN | First Bates number of native file document/email |
| BATES_END | Last Bates number of native file document/email<br>**The LASTBATES field should be populated for single page documents/emails. |
| ATTACH_BEGIN | First Bates number of attachment range |
| ATTACH_END | Last Bates number of attachment range |
| PARENT_BATES | First Bates number of parent document/Email<br><br>**This PARENT_BATES field should be populated in each record representing an attachment "child" document |
| CHILD_BATES | First Bates number of "child" attachment(s); can be more than one Bates number listed depending on the<br><br>number of attachments<br>**The CHILD_BATES field should be populated in each record representing a "parent" document |
| REQ_NUM | Responsive to Interrogatory number or Document Request number |
| CUSTODIAN | Email:  mailbox where the email resided |

*Rev. 04.04.2012*

|  | Native: Individual(s) from whom the document originated. The first custodian listed should be the author. |
| --- | --- |
| FROM | Email:  Sender<br>Native: Author(s) of document<br>**semi-colon should be used to separate multiple entries |
| TO | Recipient(s)<br>**semi-colon should be used to separate multiple entries |
| CC | Carbon copy recipient(s)<br>**semi-colon should be used to separate multiple entries |
| BCC | Blind carbon copy recipient(s)<br>**semi-colon should be used to separate multiple entries |
| SUBJECT | Email: Subject line of the email<br>Native: Title of document (if available) |
| DATE_SENT | Email:  Date the email was sent<br>Native: (empty) |
| TIME_SENT | Email: Time the email was sent<br>Native: (empty)<br>**This data must be a separate field and cannot be combined with the DATE_SENT field |
| DATE_RECVD | Email: Date the email was received.<br>Native: (empty) |
| TIME_RECVD | Email: Time the email was received.<br>Native: (empty) |
| NATIVELINK | Hyperlink to the email or native file document<br>**The linked file must be named per the BATES_BEGIN number |
| FILE_EXT | The file type extension representing the Email or native file document; will vary depending on the email format |
| AUTHOR | Email:  (empty)<br>Native: Author of the document |
| DATE_CREATED | Email:  (empty)<br>Native: Date the document was created |
| TIME_CREATED | Email:  (empty)<br>Native: Time the document was created<br>**This data must be a separate field and cannot be combined with the DATE_CREATED field |
| DATE_MOD | Email:  (empty)<br>Native: Date the document was last modified |
| TIME_MOD | Email:  (empty)<br>Native: Time the document was last modified |

*Rev. 04.04.2012*

| | **This data must be a separate field and cannot be combined with the DATE_MOD field |
|---|---|
| DATE_ACCESSD | Email: (empty)<br>Native: Date the document was last accessed |
| TIME_ACCESSD | Email: (empty)<br>Native: Time the document was last accessed<br>**This data must be a separate field and cannot be combined with the DATE_ACCESSD field |
| PRINTED_DATE | Email: (empty)<br>Native: Date the document was last printed |
| FILE_SIZE | Size of native file document/email in KB |
| PGCOUNT | Number of pages in native file document/email *if TIFs are |
| FILEPATH | Email: (empty)<br>Native: Path where native file document was stored including original file name. |
| FILENAME | Email: (empty)<br>Native: original file name. |
| INTFILEPATH | Email: original location of email including original file name.<br>Native: (empty) |

**b. Document Text**

Searchable text of the entire document must be provided for every record, at the document level.

    i. Extracted text must be provided for all documents that originated in electronic format.

        Note: Any document in which text cannot be extracted must be OCR'd.

    ii. For redacted documents, provide the OCR text for the redacted version

    iii. The text should be delivered in the following method:

As multi-page ASCII text files with the files named the same as the Bates_Begin field. Text files can be placed in a separate folder or included with the .TIF files. The number of files per folder should be limited to 500 files.

*Rev. 04.04.2012*

c. **Linked Native Files**
Copies of original email and native file documents/attachments must be included for all electronic productions.
  i. Native file documents must be named per the BATES_BEGIN number.
  ii. The full path of the native file must be provided in the .DAT file in the NATIVELINK field.
  iii. The number of native files per folder should not exceed 500 files.

d. **Images**
In the event that TIFs must be produced in the native production, an image cross reference file must be provided. Instructions are provided in the following Scanned Paper section for TIF productions.

2. **Scanned Paper**
The following describes the specifications for producing image-based productions to the Bureau and the load files required.

a. Metadata Load File. Paper or Scanned Image productions should contain at minimum the following metadata fields:

| Field Title | Description |
|---|---|
| Bates_Begin | The bates label of the first page of the document |
| Bates_End | The bates label of the last page of the document |
| Attach_begin | The bates label of the first page of a family of documents |
| Attach_begin | The bates label of the last page of a family of documents |
| Page_Count | Number of images per document. |
| Custodian | The custodian in whose file the document was found |

*If bibliographic coding is available, it may be requested.

b. **Images**
  i. Images should be single-page, Group IV TIF files, scanned at 300 dpi.
  ii. File names should be titled after endorsed bates number.
  iii. Bates numbers should be endorsed on the lower right corner of all images.
  iv. The number of TIF files per folder should not exceed 500 files.

c. **Image Cross Reference File**
The image cross-reference file is needed to link the images to the database. It is a comma-delimited file consisting of seven fields per line. There must be a line in the cross-reference file for every image in the database.

*Rev. 04.04.2012*

| Field Title | Description |
|---|---|
| ImageID | The unique designation use to identify an image. |
| | *Note: This imageID key **must** be a unique and fixed length number. This number will be used in the.DAT file as the ImageID field that links the database to the images. The format of this image key must be consistent across all productions. We recommend that the format be an eight digit number to allow for the possible increase in the size of a production.* |
| VolumeLabel | Optional |
| ImageFilePath | The full path to the image file. |
| DocumentBreak | The letter "Y" denotes the first page of a document.  If this field is blank, then the page is not the first page of a document. |
| FolderBreak | Leave empty |
| BoxBreak | Leave empty |
| PageCount | Optional |
| | *This file should not contain a header row.* |

SAMPLE:
IMG0000001,OPTIONALVOLUMENAME,E:\001\IMG0000001.TIF,Y,,,3
IMG0000002,OPTIONALVOLUMENAME,E:\001\IMG0000002.TIF,,,,
IMG0000003,OPTIONALVOLUMENAME,E:\001\IMG0000003.TIF,,,,
IMG0000004,OPTIONALVOLUMENAME,E:\001\IMG0000003.TIF,Y,,,1
IMG0000005,OPTIONALVOLUMENAME,E:\001\IMG0000003.TIF,Y,,,2
IMG0000006,OPTIONALVOLUMENAME,E:\001\IMG0000003.TIF,,,,

**d.  Document Text**
Searchable text of the entire document must be provided for every record, at the document level.
    i.  OCR text must be provided for all documents that originated in hard copy format.
    ii.  For redacted documents, provide OCR for the redacted version.
    iii.  The text should be delivered in the following method:
        As multi-page ASCII text files with the files named the same as the Bates_Begin field. Text files can be placed in a separate folder or included with the .TIF files. The number of files per folder should be limited to 500 files.

**e.  PDF File Production**
When approved, Adobe PDF files may be produced in lieu of TIF images for scanned paper productions:
    i.  PDF files should be produced in separate folders named by the Custodian.
    ii.  All PDFs must be unitized at the document level, i.e. each PDF should represent a discrete document; a single PDF cannot contain multiple documents.
    iii.  All attachments should sequentially follow the parent document.

*Rev. 04.04.2012*

iv. All PDF files must contain embedded text that includes all discernible words within the document, not selected text only. This requires all layers of the PDF to be flattened first.

v. If PDF files are Bates endorsed, the PDF files must be named by the Bates range.

vi. The meta-data load file listed in 2.a. should be included.

## 3. Audio Files

If audio files must be produced further discussion must be had to confirm compatible file format, preservation of quality, and any original metadata.

Additionally, the call information (metadata) related to each audio recording must be provided. The metadata file must be produced in a delimited text format. Field names must be included in the first row of the text file.

The metadata must include, at a minimum, the following fields:

- CALLER_NAME or CALLER_ID: Caller's name or identification number
- CALLING_NUMBER:  Caller's phone number
- DATE:  Date of call
- DURATION:  Duration of call
- TIME:  Time of call
- CALLED_PARTY:  Name of the party called
- CALLED_NUMBER:  Called party's phone number
- FILENAME:  Filename of audio file

## 4. Video Files

If video files must be produced further discussion must be had to confirm compatible file format, preservation of quality, and any original metadata.

## 5. Transactional Data

If transactional data must be produced further discussion must be had to ensure the intended export is properly composed. If available, a data dictionary should accompany the production, if unavailable; a description of fields should accompany transactional data productions.

- SQL Backup file
- MS Access
- XML
- CSV
- TSV
- Excel (with prior approval)

*Rev. 04.04.2012*

6. **Electronic Phone Records**

If electronic Phone Records must be produced further discussion must be had to confirm compatible file format. The Bureau requires the following format and metadata:

   a. Delimited text file with header information detailing the field structure.
   b. Comma Separated Value file (.csv) with header information detailing the field structure.
   c. MS Excel spreadsheet with header information detailing the field structure. The metadata must include, at a minimum, the following fields:

   - ACCT_NUMBER:                 Caller's telephone account number
   - CALLING_NUMBER:              Caller's phone number
   - CALLED_NUMBER:               Called party's phone number
   - DATE:                        Date of call
   - START_TIME:                  Start time of call
   - END_TIME:                    End time of call
   - DURATION:                    Duration in minutes of the call

7. **Hard Copy Submission**

The Bureau strongly encourages you to submit all documents in electronic form. All documents kept as ESI in the ordinary course of business, or otherwise currently held in electronic form, must be submitted in electronic form.

For any documents submitted in hard copy form:
   a. Original documents shall not be submitted;
   b. Documents shall be produced in the order in which they appear in your files, without being shuffled or otherwise rearranged;
   c. Documents shall have unique, sequential numbers clearly marked on each page; and
   d. If documents are removed from their original folders, binders, covers, or containers in order to be produced, the documents shall be identified in a manner so as clearly to specify the folder, binder, cover, or container from which such documents came.

*Rev. 04.04.2012*