UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | ) ) ) | |
| *Plaintiff*, | ) ) | |
| v. | ) ) | Case No. 1:14-cv-00292-SEB-TAB |
| ITT EDUCATIONAL SERVICES, INC., | ) ) ) | |
| *Defendant*. | ) | |

**CONSUMER FINANCIAL PROTECTION BUREAU'S
OPPOSITION TO ITT'S MOTION TO DISMISS THE COMPLAINT**

TABLE OF CONTENTS

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................1

II.  THE MOVANT'S BURDEN..........................................................................................4

III. ARGUMENT .................................................................................................................4

   A. Congress did not violate separation of powers principles in creating the Bureau. ..............4

   B. Congress satisfied the requirements of fair notice when it enacted the CFPA's
      prohibition on unfair and abusive acts. ...............................................................7

   C. ITT is a covered person under the CFPA. .......................................................10

      1.  ITT engaged in offering and providing the SCUC private loans. ...........................10

      2.  ITT engaged in brokering the SCUC private loans to ITT students........................12

      3.  ITT offers and provides financial advisory services to students.............................14

      4.  At a minimum, ITT was a service provider to SCUC and ELFCU......................16

   D. The CFPA's narrow merchant exclusion does not shield ITT...............................17

   E. The Complaint states a claim under the CFPA for unfair and abusive acts and
      practices. ..................................................................................................19

      1.  The Complaint states a claim that ITT engaged in unfair acts and practices...........19

         a.  ITT caused its students substantial injury...............................................19

         b.  The injury was not reasonably avoidable by consumers....................................22

         c.  The injury is not outweighed by countervailing benefits to consumers or
             competition. .....................................................................................25

      2.  The Complaint states a claim that ITT engaged in abusive acts and practices. .......25

         a.  ITT took unreasonable advantage of the students' inability to protect their
             interests. ..........................................................................................26

         b.  ITT took unreasonable advantage of the students' reasonable reliance on
             ITT to act in their interests. ...................................................................29

   F. The Complaint states a timely claim for violations of Regulation Z. ....................32

      1.  No court has applied TILA's private statute of limitations to a government
          action................................................................................................32

      2.  ITT failed to disclose the finance charge on the ITT Installment Loans in
          violation of TILA. ...............................................................................33

   G. The third parties to the ITT Private Loan programs are not necessary parties. ...............34

   H. Leave to amend....................................................................................35

IV. CONCLUSION .............................................................................................35

## TABLE OF AUTHORITIES

### Cases

*AINS, Inc. v. United States,*
    56 Fed. Cl. 522 (Fed. Cl. 2003) ............................................................................... 6

*Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Labor Relations Auth.,*
    388 F.3d 405 (3d Cir. 2004) .................................................................................... 6

*American Fin. Servs. Ass'n v. FTC,*
    767 F.2d 957 (D.C. Cir. 1985) ............................................................................... 22

*Arthur Murray Studio of Washington, Inc. v. FTC,*
    458 F.2d 622 (5th Cir. 1972) ................................................................................. 21

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................................................... 19

*Baggett v. Bullitt,*
    377 U.S. 360 (1964) ............................................................................................... 10

*Bandini Petroleum Co. v. Superior Court of State of Ca. in and for Los Angeles Cty.,*
    284 U.S. 8 (1931) ..................................................................................................... 9

*Barber v. Kimbrell's, Inc.,*
    577 F.2d 216 (4th Cir. 1978) ................................................................................. 32

*Barclays Bank PLC v. Franchise Tax Bd. of Cal.,*
    512 U.S. 298 (1994) ................................................................................................. 9

*Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n,*
    377 F.3d 682 (7th Cir. 2004) ................................................................................. 35

*Boyce Motor Lines, Inc. v. United States,*
    342 U.S. 337 (1952) ................................................................................................. 7

*Cameron v. Johnson,*
    390 U.S. 611 (1968) ................................................................................................. 9

*Cole v. Farm Fresh Poultry, Inc.,*
    824 F.2d 923 (11th Cir. 1987) ............................................................................... 17

*Connally v. Gen. Constr. Co.,*
    269 U.S. 385 (1926) ............................................................................................... 10

*Consumer Fin. Prot. Bureau v. Gordon,*
  No. 12-6147, Dkt. No. 180 (C.D. Cal. June 26, 2013) ............................................... 15

*Consumer Fin. Prot. Bureau v. Morgan Drexen, Inc.,*
  No. 13-1267, Dkt. No. 40 (C.D. Cal. Jan. 10, 2014). ............................................. 4, 7

*Consumer Fin. Prot. Bureau v. Morgan Drexen, Inc.,*
  No. 13-1267, Dkt. No. 58 (C.D. Cal. Jan. 10, 2014). ............................................... 4

*Davis Companies v. Emerald Casino,*
  268 F.3d 477 (7th Cir. 2001) ..................................................................... 35

*Dep't of Legal Affairs v. Rogers,*
  329 So.2d 257 (Fla. 1976) ........................................................................ 8

*Diamond v. One W. Bank,*
  No. CV-09-1593, 2010 WL 1742536 (D. Ariz. Apr. 29, 2010) ...................................... 34

*Engel v. Buchan,*
  710 F.3d 698 (7th Cir. 2013) ..................................................................... 4

*FCC v. Fox Television Stations, Inc.,*
  132 S.Ct. 2307 (2012) ............................................................................ 10

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,*
  130 S. Ct. 3138 (2010) .......................................................................... 5, 6

*FTC v. Am. Nat'l Cellular, Inc.,*
  810 F.2d 1511 (9th Cir. 1987) .................................................................... 5

*FTC v. Amy Travel Serv., Inc.,*
  875 F.2d 564 (7th Cir. 1989) ..................................................................... 29

*FTC v. Direct Mktg. Concepts, Inc.,*
  569 F. Supp.2d 285 (D. Mass. 2008) .............................................................. 20

*FTC v. IFC Credit Corp.,*
  543 F. Supp. 2d 925 (N.D. Ill. 2008) ....................................................... 20, 22, 23, 29

*FTC v. INC21.com Corp.,*
  745 F. Supp.2d 975 (N.D. Cal. 2010) ............................................................. 23

*FTC v. Kuykendall,*
  371 F.3d 745 (10th Cir. 2004) .................................................................... 29

*FTC v. LoanPointe, LLC,*
  525 F. App'x 696 (10th Cir. 2013) ............................................................ 22, 28

*FTC v. Minuteman Press,*
   53 F. Supp. 2d 248 (E.D.N.Y. 1998) ................................................................29

*FTC v. Neovi, Inc.,*
   604 F.3d 1150 (9th Cir. 2010) ..................................................... 21, 23, 24, 25

*FTC v. Sperry & Hutchinson Co.,*
   405 U.S. 233 (1972) ..........................................................................................8

*FTC v. Windward Mktg, Ltd.,*
   No. 1:96-CV-615F, 1997 WL 33642380 (N.D. Ga. Sept. 30, 1997) ...........22, 25

*FTC v. Zamani,*
   No. 09-0977, 2011 WL 2222065 (C.D. Cal. June 6, 2011) ..........................20, 21

*Gates & Fox Co, Inc.. v. OSHRC,*
   790 F.2d 154 (D.C. Cir. 1986) .......................................................................10

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972) ..........................................................................................7

*Gresham v. Peterson,*
   225 F.3d 899 (7th Cir. 2000) ............................................................................8

*Hill v. Priority Fin. Servs., Inc.,*
   No. IP98–1319, 2001 WL 1155152 (S.D. Ind. Sept. 28, 2001) .......................14

*Holder v. Humanitarian Law Project,*
   561 U.S. 1 (2010) ..............................................................................................7

*Humphrey's Executor v. United States,*
   295 U.S. 602 (1935) ..........................................................................................5

*ICC v. Chatsworth Coop. Mktg. Assoc.,*
   347 F.2d 821 (7th Cir. 1965) ............................................................................5

*In re: Oliver,*
   499 B.R. 617 (Bkrtcy. S.D. Ind. 2013) ...........................................................28

*Jackson v. Bank of Am. Corp.,*
   711 F.3d 788 (7th Cir. 2013) ..........................................................................28

*Karlin v. Foust,*
   188 F.3d 446 (7th Cir. 1999) ............................................................................9

*Lara-Ruiz v. INS,*
   241 F.3d 934 (7th Cir. 2001) ..........................................................................26

*Mathioudakis v. Conversational Computing Corp.*,
   No. 1:12-cv-00558, 2012 WL 4052316 (S.D. Ind. Sept. 13, 2012)....................................31

*Mfrs. Life Ins. Co. v. 1 Animation Network, Inc.*,
   No. 04-C-8105, 2005 WL 1950666 (N.D. Ill. Aug. 10, 2005)........................................31

*Miller v. Apropos Technology, Inc.*,
   No. 01 C 8406, 2003 WL 1733558 (N.D. Ill. Mar. 31, 2003) ........................................29

*Morgan v. Markerdowne Corp.*,
   976 F. Supp. 301 (D.N.J. 1997) ..........................................................................14

*Morrison v. Olson*,
   487 U.S. 654 (1988) ....................................................................................5

*Nash v. United States*,
   229 U.S. 373 (1913) ....................................................................................7

*Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of the Fed. Reserve Sys.*,
   773 F. Supp.2d 151 (D.D.C. 2011) ......................................................................31

*Nat'l Broad. Co. v. United States*,
   319 U.S. 190 (1943) ...................................................................................10

*Orkin Exterminating Co., Inc. v. FTC*,
   849 F.2d 1354 (11th Cir. 1988).....................................................................20, 23

*Pinter v. Dahl*,
   486 U.S. 622 (1988) ...................................................................................12

*Pippenger v. McQuik's Oilube, Inc.*,
   854 F. Supp. 1411 (S.D. Ind. 1994) ....................................................................31

*Plymale v. Upright*,
   419 N.E.2d 756 (Ind. App. 1981) ......................................................................31

*Pollice v. Nat'l Tax Funding, L.P.*,
   225 F.3d 379 (3rd Cir. 2000)..........................................................................34

*Reynolds v. CB Sports Bar, Inc.*,
   623 F.3d 1143 (7th Cir. 2010)..........................................................................4

*Sain v. Cedar Rapids Cmty. Sch. Dist.*,
   626 N.W.2d 115 (Iowa 2001) ..........................................................................30

*Scott v. Ass'n. for Childbirth at Home, Intl.*,
   430 N.E.2d 1012 (Ill. 1981) ...........................................................................8

*SEC v. Bilzerian,*
    750 F. Supp. 14 (D.D.C. 1990) ................................................................5

*SEC v. Blinder, Robinson & Co.,*
    855 F.2d 677 (10th Cir. 1988) ...............................................................5

*Simmons Co. v. Cantor,*
    3 F.R.D. 281 (W.D. Pa 1943) ...............................................................19

*Sluys v. Hand,*
    831 F. Supp. 321 (S.D.N.Y. 1993) ........................................................28

*Smiley v. Citibank (S.D.), N.A.,*
    517 U.S. 735 (1996) ................................................................................6

*Spiegel, Inc. v. FTC,*
    540 F.2d 287 (7th Cir. 1976) ......................................................8, 14, 28

*State v. Reader's Digest Ass'n., Inc.,*
    501 P.2d 290 (Wash. 1972) ....................................................................9

*Storie v. Randy's Auto Sales, LLC,*
    No. 07-cv-0022, 2007 WL 4438865 (S.D. Ind. Dec. 17, 2007) .............31

*Todd v. Collecto,*
    731 F.3d 734 (7th Cir. 2013) ...............................................................28

*Touby v. United States,*
    500 U.S. 160 (1991) ..............................................................................10

*United States ex rel. Hall v. Tribal Dev. Corp.,*
    100 F.3d 476 (7th Cir. 1996) .................................................................35

*United States v. Berkowitz,*
    927 F.2d 1376 (7th Cir. 1991) ...........................................................6, 10

*United States v. Graham,*
    305 F.3d 1094 (10th Cir. 2002) .............................................................11

*United States v. Ragen,*
    314 U.S. 513 (1942) ................................................................................9

*United States v. Williams,*
    553 U.S. 285 (2008) ................................................................................7

*Ustrak v. Fairman,*
    781 F.2d 573 (7th Cir. 1986) ...........................................................9, 10

*Vallies v. Sky Bank,*
  591 F.3d 152 (3d Cir. 2009) ...................................................................................32

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
  455 U.S. 489 (1982) ......................................................................................... 7, 8

*Yakus v. United States,*
  321 U.S. 414 (1944) ...........................................................................................10

## Constitutional Provisions

U.S. Const. art. II, § 2, cl. 2 ....................................................................................6

## Statutes

12 U.S.C. § 1026.1(c) .............................................................................................33

12 U.S.C. § 1026.1(c)(1)(iii) ....................................................................................33

12 U.S.C. § 1026.4 ..................................................................................................33

12 U.S.C. § 1818(b) ................................................................................................32

12 U.S.C. §§ 1841 *et seq* .........................................................................................15

12 U.S.C. § 1843(k)(4) ............................................................................................16

12 U.S.C. § 1843(k)(5) ............................................................................................16

12 U.S.C. § 5301(15) ...............................................................................................13

12 U.S.C. §§ 5481 *et seq* ...........................................................................................2

12 U.S.C. § 5481(5) ....................................................................................... 10, 12, 16

12 U.S.C. § 5481(6) ....................................................................................... 10, 12, 16

12 U.S.C. § 5481(6)(A) ............................................................................................10

12 U.S.C. § 5481(15)(A)(i) ........................................................................ 10, 11, 12, 13, 16

12 U.S.C. § 5481(15)(A)(ii) ......................................................................................12

12 U.S.C. § 5481(15)(A)(iii) .....................................................................................12

12 U.S.C. § 5481(15)(A)(iv) .....................................................................................12

12 U.S.C. § 5481(15)(A)(v) ........................................................................................... 12

12 U.S.C. § 5481(15)(A)(vi) .......................................................................................... 12

12 U.S.C. § 5481(15)(A)(vii) ......................................................................................... 12

12 U.S.C. § 5481(15)(A)(viii) ................................................................................... 12, 14

12 U.S.C. § 5481(15)(A)(ix) .......................................................................................... 12

12 U.S.C. § 5481(15)(A)(x) ........................................................................................... 12

12 U.S.C. § 5481(26)(A) ............................................................................................... 16

12 U.S.C. § 5491(c)(3) ................................................................................................... 5

12 U.S.C. § 5492(c)(2) ................................................................................................... 6

12 U.S.C. § 5492(c)(3) ................................................................................................... 6

12 U.S.C. § 5497(a) ....................................................................................................... 6

12 U.S.C. § 5497(a)(2)(C) .............................................................................................. 6

12 U.S.C. § 5512(b)(4)(B) .............................................................................................. 6

12 U.S.C. § 5513(a) ....................................................................................................... 6

12 U.S.C. § 5513(c)(3)(B)(ii) .......................................................................................... 6

12 U.S.C. § 5517(a)(1) ................................................................................................. 17

12 U.S.C. § 5517(a)(2)(A) ............................................................................................ 18

12 U.S.C. § 5517(a)(2)(A)(i) ......................................................................................... 17

12 U.S.C. § 5517(a)(2)(B) ........................................................................................ 18, 19

12 U.S.C. § 5517(a)(2)(B)(iii) ....................................................................................... 17

12 U.S.C. § 5517(a)(2)(C)(i) ..................................................................................... 18, 19

12 U.S.C. § 5517(a)(2)(C)(ii)(II) ................................................................................... 17

12 U.S.C. § 5531 ...................................................................................................... 10, 16

12 U.S.C. § 5531(a) ................................................................................................. 29, 30

12 U.S.C. § 5531(c)(1)............................................................................8, 19

12 U.S.C. § 5531(d)...................................................................................31

12 U.S.C. § 5531(d)(2)..........................................................................9, 25

12 U.S.C. § 5531(d)(2)(B)....................................................................26, 29

12 U.S.C. § 5531(d)(2)(C)........................................................................29

12 U.S.C. § 5536...............................................................................10, 16

12 U.S.C. § 5536(a)(1)(B)........................................................................25

12 U.S.C. § 5564.....................................................................................16

12 U.S.C. § 5565(a)(1)...............................................................................4

15 U.S.C. § 45(n)......................................................................................9

15 U.S.C. § 1602(cc)(2)............................................................................13

15 U.S.C. § 1607(a)..................................................................................32

15 U.S.C. § 1607(a)(6)..............................................................................32

15 U.S.C. § 1640(e)..................................................................................32

15 U.S.C. § 1650(a)(6)..............................................................................14

28 U.S.C. § 1331.......................................................................................4

28 U.S.C. § 1345.......................................................................................4

## Regulations

12 C.F.R. § 225.28(a)..............................................................................16

12 C.F.R. § 225.28(b)(6)(v)........................................................................16

12 C.F.R. Part 226....................................................................................33

12 C.F.R. Part 1026..................................................................................33

12 C.F.R. Part 1026, Supplement I, § 1026.4(b)(9) ......................................33

12 C.F.R. Part 1026, Supplement I, § 1026.20(a) ...........................................................33

12 C.F.R. Part 1026, Supplement I, § 1026.36(a) ...................................................... 13, 14

12 C.F.R. § 1026.1(c) ......................................................................................................33

12 C.F.R. § 1026.1(c)(1)(iii) ...........................................................................................33

12 C.F.R. § 1026.2(a)(17)(i) ............................................................................................33

12 C.F.R. § 1026.4 ..........................................................................................................33

12 C.F.R. § 1026.17 ................................................................................................... 33, 34

12 C.F.R. § 1026.17(a) ....................................................................................................34

12 C.F.R. § 1026.17(b) ....................................................................................................34

12 C.F.R. § 1026.18 ........................................................................................................34

12 C.F.R. § 1026.18(d) .............................................................................................. 33, 34

12 C.F.R. § 1026.20(a) .............................................................................................. 33, 34

12 C.F.R. § 1026.20(a)(4) ...............................................................................................33

12 C.F.R. § 1026.36(a)(1) ...............................................................................................13

12 C.F.R. § 1026.36(a)(2) ...............................................................................................13

34 C.F.R. § 682.200(b) ....................................................................................................14

## Rules

Fed. R. Civ. P. 12(b)(1)...................................................................................................4

Fed. R. Civ. P. 12(b)(6).................................................................................................31

Fed. R. Civ. P. 12(b)(7).................................................................................................35

Fed. R. Civ. P. 15(a).....................................................................................................35

Fed. R. Civ. P. 19 .........................................................................................................34

## Other Authorities

*Black's Law Dictionary* (9th ed. 2009)..........................................................................13

*CFPB Supervision and Examination Manual – Version 2*, Consumer Financial Protection Bureau (Oct. 2012), http://files.consumerfinance.gov/f/ 201210_cfpb _supervision-and-examination-manual-v2.pdf ........................................................................................................................8

Federal Reserve Board Consumer Compliance Handbook (Nov. 2013) ................................................32

Merriam-Webster Dictionary,
    http://www.merriam-webster.com/dictionary/ ............................................................... 11, 26

Office of the Comptroller of the Currency Interpretive Letter,
    October 6, 1977, 1977 WL 23261 ........................................................................................32

S. Rep. No. 111-176 (2010) ..............................................................................................................15

Truth in Lending (Regulation Z), 76 Fed. Reg. 79768 (Dec. 22, 2011)
    (to be codified at 12 C.F.R. Part 1026)..............................................................................33

Webster's New World College Dictionary (3d ed. 1997) ..................................................................11

INDEX OF EXHIBITS

Exhibit 1:     *Consumer Fin. Prot. Bureau v. Morgan Drexen, Inc.,* No. 13-1267, Dkt.
               No. 40 (C.D. Cal. Jan. 10, 2014).

Exhibit 2:     *Consumer Fin. Prot. Bureau v. Morgan Drexen, Inc.,* No. 13-1267, Dkt.
               No. 58 (C.D. Cal. Feb. 24, 2014).

Exhibit 3:     *Consumer Fin. Prot. Bureau v. Gordon*, No. 12-6147, Dkt. No. 180 (C.D.
               Cal. June 26, 2013).

Exhibit 4:     Federal Reserve Board Consumer Compliance Handbook (Nov.
               2013) (excerpt), available in full at http://www.federalreserve.gov/
               boarddocs/supmanual/cch/cch.pdf.

## I.  INTRODUCTION AND SUMMARY OF ARGUMENT

ITT's motion aims to convince this Court that it provided the ITT Private Loans[1] merely to help students finance their education, and suggests that enforcing the law against unfair and abusive practices will prevent students with subprime credit from getting access to funding. Nothing could be further from the truth. This case is not about access to credit. It is about ITT taking advantage of students who thought they were getting a fair bargain, and then ambushing them with a predatory loan they felt they could not refuse. ITT capitalized on its students' financial vulnerabilities and pushed them into the ITT Private Loans—loans that ITT knew the students did not expect, could not afford, and on which they were likely to default—with the goal of boosting the appearance of ITT's financial statements at the cost of the students' financial futures.

ITT students typically earn only about $18,000 per year and have subprime credit scores. Compl. ¶24. Federal financial aid does not cover ITT's tuition for the vast majority of students. *Id.* ¶5. To make up the difference, ITT gave entering students no-interest loans called Temporary Credit, without disclosing that such loans would not, for most students, be available after their initial enrollment. *Id.* ¶¶6, 99, 103, 106, 110. Although the technical due date for these loans was the end of the academic year, very few students had the means to repay the loans in a lump sum at that time. *Id.* ¶¶103, 109.

Instead, ITT had a "plan all along," as it told its investors, for converting these Temporary Credits and subsequent tuition gaps into loans that were ostensibly provided by third parties. Compl. ¶¶10, 11, 98, 133, 136. ITT was the primary force in creating, operating, and maintaining these loan programs, but used several third-party entities in order to push the debt off of its own books and improve the appearance of its financial performance. *Id.* ¶¶98, 110, 114–15, 121–22, 129, 131, 135,

---

[1] Loans to ITT students marketed under the names PEAKS and Student CU Connect CUSO, LLC ("SCUC") are referred to here as the "ITT Private Loans."

137. Students were never informed of this plan. Instead, in or around their second year, after having already borrowed significant sums of money to attend ITT, they were told it was time to "repackage" their financial aid. They were then pushed into taking on the ITT Private Loans. *Id.* ¶¶8, 85, 87, 97, 133. Some students were pulled from class, had their course materials or transcripts withheld, or were threatened with expulsion. *Id.* ¶¶9, 87. Some students, relying on the ITT financial aid staff to handle their aid packages through ITT's automated system, were so rushed through "repackaging" appointments that they did not even know they had been signed up for these expensive loans. *Id.* ¶¶85, 89, 91, 142. The ITT Private Loans carried harsh terms: during the relevant period, those who had the worst credit ratings—about half of the students who received the loans—had interest rates of 16.25% and origination fees of 10%. *Id.* ¶123–24. ITT, knowing full well its students could not afford these loans, expected their default rate to spiral upwards of 60%. *Id.* ¶127.

ITT violated the Consumer Financial Protection Act ("CFPA") of 2010, 12 U.S.C. §§ 5481 *et seq.*, by engaging in this unfair and abusive bait-and-switch scheme that forced students to repay no-interest loans and fund second-year tuition gaps with high-cost loans. Compl. ¶¶156–82. These ambush tactics are exactly the kind of tricks, traps, and surprises in lending that the CFPA was designed to prevent. The Bureau is seeking relief under the CFPA for conduct from July 21, 2011 until the ITT Private Loan programs ran out of funds in December 2011.

When ITT Private Loan funds were not available, including after the loan programs ran out of money in 2011, ITT provided its students with a different credit product: in-house installment loans (the "ITT Installment Loans"). Compl. ¶146–47. From 2009 through the present, ITT has violated the Truth in Lending Act ("TILA") in connection with these installment loans. *Id.* ¶¶183–91. ITT offered these students a discount as an incentive to pay ITT in a lump sum, rather than pay

over time. *Id.* ¶¶144, 147. The law requires that such a discount be disclosed as a finance charge. *Id.* ¶¶186, 189. In violation of TILA, ITT failed to make the required disclosure. *Id.* ¶¶190, 191.

ITT tries to forestall this case by claiming that the Bureau's structure violates the Constitution. Virtually the same argument was recently roundly rejected by another district court. *See* Exs. 1 & 2. ITT also argues that the CFPA's ban on unfair and abusive conduct—the elements of which are defined in the statute—is unconstitutionally vague, even though courts have consistently upheld less clearly-delineated regulations. In particular, other statutes modeled on the Federal Trade Commission Act's ("FTCA") unfairness prohibition have been upheld against similar challenges, even before that act's unfairness prohibition was further clarified by Congress.

ITT's other arguments are similarly unavailing. It argues that it is not a "covered person" or "service provider" under the CFPA, and thus not subject to the unfairness and abusiveness prohibitions, but this is belied by the facts alleged, which show ITT's role as the main force behind the ITT Private Loan programs and the offering of the ITT Private Loans. ITT further protests that it was actually helping students by offering them private loans to pay ITT and, in any event, it was legally entitled to collect the price of its tuition. But the Complaint does not take issue with ITT's high tuition or whether it can collect debts; it takes issue with the unfair and abusive methods ITT used to obtain payment. These students were not "offered" the loans, in a consensual sense; they were forced into them—either knowingly or unknowingly—by a financial aid staff trained to make students think they were acting in their interests, but compensated based on how many of the students were "repackaged" according to ITT's plan.

ITT's arguments to dismiss the TILA claim are similarly baseless: the Bureau's TILA claim is not precluded by a one year statute of limitations, as no such limitation has been placed on TILA enforcement actions by the government, and ITT is not entitled to an end-run around TILA disclosures simply by reframing the ITT Installment Loans as settlements of debt.

In short, ITT's motion to dismiss lacks merit and should be denied in full.

## II.     THE MOVANT'S BURDEN

On a motion to dismiss, the Court must accept that all well-pleaded facts alleged in the Complaint are true, construe those facts in the light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010). If the Complaint contains "sufficient factual allegations to permit the court to draw a reasonable inference that the defendant is liable for the misconduct alleged," then ITT's motion must be denied. *Engel v. Buchan*, 710 F.3d 698, 709 (7th Cir. 2013).[2]

## III.     ARGUMENT

### A.  Congress did not violate separation of powers principles in creating the Bureau.

ITT attempts to dismiss this action by challenging the constitutionality of the Bureau, as established by the CFPA, based on separation-of-powers principles. Br. 8–10. Virtually identical arguments were recently rejected by another court, which concluded that "the [Bureau] complies with the separation of powers principles contained in Articles I, II, and III of the Constitution." *Consumer Fin. Prot. Bureau v. Morgan Drexen, Inc.*, No. 13-1267, Dkt. No. 40, at 2–4 (C.D. Cal. Jan. 10, 2014) (attached as Ex. 1), *appeal dismissed*, No. 14-55333 (9th Cir. Apr. 11, 2014).[3] This Court should reject ITT's arguments for the same reasons. First, Supreme Court precedent forecloses ITT's contention that the CFPA unconstitutionally impedes the President's powers by limiting his ability to remove the Bureau Director except "for inefficiency, neglect of duty, or malfeasance in office."

---

[2] ITT's motion refers to Fed. R. Civ. P. 12(b)(1) (*see* Dkt. No. 15 at 1), but its brief offers no basis for such a motion and indeed never even mentions it. This Court has subject-matter jurisdiction over this case because it concerns federal consumer financial law, 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345. Any motion by ITT under Fed. R. Civ. P. 12(b)(1) must be denied.

[3] That court also concluded that the defendants had not even established "substantial grounds for a difference of opinion as to the constitutionality of the CFPB." *Id.*, Dkt. No. 58 at 3 (Feb. 24, 2014) (attached as Ex. 2).

12 U.S.C. § 5491(c)(3). In *Humphrey's Executor v. United States*, the Supreme Court approved identical for-cause removal protections for FTC commissioners, in light of the functions that the commissioners perform. 295 U.S. 602, 619, 628, 632 (1935). The Bureau Director exercises the same kinds of functions, and *Humphrey's Executor* thus applies with full force here. *See also Morrison v. Olson*, 487 U.S. 654, 692–93 (1988) (approving provision authorizing removal of independent counsel only for "good cause"); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3161 (2010) (concluding that "a single level of good-cause tenure" preserved sufficient presidential oversight).

Contrary to ITT's contention, the Bureau's independent litigating authority is not a ground for invalidating the for-cause removal protection here or otherwise finding the President's powers to be unconstitutionally impeded. Courts, including the Seventh Circuit, have repeatedly concluded that the Constitution permits independent agencies to bring civil enforcement actions, even though the President may remove those agencies' heads only for cause. *ICC v. Chatsworth Coop. Mktg. Assoc.*, 347 F.2d 821, 822–23 (7th Cir. 1965) (rejecting separation-of-powers challenge to independent litigating authority of the Interstate Commerce Commission); *SEC v. Blinder, Robinson & Co.*, 855 F.2d 677, 682 (10th Cir. 1988) (explaining that *Humphrey's Executor* "stands generally for the proposition that Congress can, without violating Article II, authorize an independent agency to bring civil law enforcement actions where the President's removal power was restricted to inefficiency, neglect of duty, or malfeasance in office"); *accord FTC v. Am. Nat'l Cellular, Inc.*, 810 F.2d 1511, 1514 (9th Cir. 1987) (same for the FTC); *SEC v. Bilzerian*, 750 F. Supp. 14, 16–17 (D.D.C. 1990) (citations omitted) ("Congress may, without violating Article II, authorize an independent agency to bring civil law enforcement actions even though the President's removal power is restricted."). Further, the

Director's delegation of authority to others does not affect the constitutional analysis, and ITT offers no support for its assertion to the contrary.[4]

ITT's next objection—that there is "[n]o [c]ongressional [c]ontrol" of the Bureau's funding, Br. 9—is both wrong and wholly unmoored from constitutional principles. Congress established the mechanism for funding the Bureau and retains full power to change it using the ordinary legislative process. *See* 12 U.S.C. § 5497(a). Congress may fund agencies as it chooses, not just through annual appropriations bills. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Labor Relations Auth.*, 388 F.3d 405, 409 (3d Cir. 2004) (explaining that "Congress may . . . decide not to finance a federal entity with appropriations," but rather through some other funding mechanism); *AINS, Inc. v. United States*, 56 Fed. Cl. 522, 539 (Fed. Cl. 2003) (holding that Congress may authorize an agency to obtain and use funds from a specified source "without first appropriating the funds as it does in typical appropriation and supplemental appropriation acts"). And the statutory provision that precludes the House and Senate Appropriations Committees from reviewing the Bureau's primary funding, 12 U.S.C. § 5497(a)(2)(C), does nothing to change the power that *Congress* has to control the Bureau's funding.[5] Accordingly, ITT's attack on the constitutionality of the Bureau must be rejected.

---

[4] ITT's contention that the appointment of the Deputy Director violates the Appointments Clause is likewise unfounded. ITT has not demonstrated why the Deputy Director's appointment has any bearing on this suit, and its "perfunctory and undeveloped" arguments are not sufficient to preserve the issue. *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991). In any event, the Deputy Director's appointment is constitutional because the Director, who appointed him, is the "head[] of [a] department[]" under the Appointments Clause, U.S. Const. art. II, § 2, cl. 2. The Bureau is a "department" because it is "a free-standing, self-contained entity in the Executive Branch" with its own "separate allotment or part of business." *See Free Enter. Fund*, 130 S. Ct. at 3162 (internal quotations omitted). Contrary to ITT's suggestion, the Bureau's establishment in the Federal Reserve System is irrelevant: the Federal Reserve *System* is not itself an agency, and the Federal Reserve *Board of Governors*, another Federal agency within the Federal Reserve System, exercises no control over the Bureau. *See* 12 U.S.C. §§ 5492(c)(2), (3).

[5] ITT's contention that the CFPA "limits judicial oversight in ways that are relevant to separation of powers analysis," Br. 10 n.7, is also meritless. Two of the three provisions that it cites, 12 U.S.C. §§ 5513(a) and 5513(c)(3)(B)(ii), have nothing to do with judicial review. And the third provision simply indicates that courts should defer to Bureau interpretations of the laws it administers when other agencies share authority over those laws. 12 U.S.C. § 5512(b)(4)(B). This is consistent with separation-of-powers principles. *See Smiley v.*

**B.  Congress satisfied the requirements of fair notice when it enacted the CFPA's prohibition on unfair and abusive acts.**

ITT claims that the CFPA's prohibitions on unfair and abusive acts and practices are unconstitutionally vague.[6] Not so. Although a law may be unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited" or "is so standardless that it authorizes or encourages seriously discriminatory enforcement," *United States v. Williams*, 553 U.S. 285, 304 (2008), "we can never expect mathematical certainty from our language." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). Indeed,

> [M]ost statutes deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions. Consequently, no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.

*Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340 (1952); *see also Nash v. United States*, 229 U.S. 373, 377 (1913) ("[T]he law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree.").

In addition, "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Hoffman Estates*, 455 U.S. at 498. Thus, "economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of

---

*Citibank (S.D.), N.A.*, 517 U.S. 735, 740–41 (1996); Ex. 1, *Morgan Drexen*, No. 13-1267, at 11–13.

[6] ITT purports to bring both a facial and as-applied vagueness challenge, Br. 10, but the Court must consider only "whether [the CFPA] is vague as applied to the particular facts at issue, for '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)).

action." *Id.* Likewise, "laws imposing civil rather than criminal penalties do not demand the same high level of clarity." *Gresham v. Peterson*, 225 F.3d 899, 908 (7th Cir. 2000) (citing *Hoffman Estates*, 455 U.S. at 498–99). "Finally, perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." *Hoffman Estates*, 455 U.S. at 499.

The CFPA's prohibitions on unfair and abusive acts or practices—economic regulations that do not impose criminal penalties or impinge on constitutionally protected rights—afforded ITT sufficiently "fair warning of what is proscribed." *Id.* at 503. An act or practice is unfair under the CFPA if it "[1] causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers; and [3] such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c)(1). This is "the same three-part test as the [standard for unfairness in the FTCA]."[7] As the Illinois Supreme Court observed in rejecting a similar vagueness challenge to a state statute modeled on the FTCA, the term "'unfair' as in the phrase[] . . . 'unfair . . . acts or practices' . . . has a venerable history of interpretation and definition by the Federal courts, and now can be said to have a well-settled meaning in Federal trade-regulation law." *Scott v. Ass'n. for Childbirth at Home, Intl.*, 430 N.E.2d 1012, 1018 (Ill. 1981) (citing *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972); *Spiegel, Inc. v. FTC*, 540 F.2d 287 (7th Cir. 1976)). Accordingly, although "inherently insusceptible of precise definition," the phrase "'unfair acts or practices' ha[s] a sufficiently definite and well-established meaning to overcome the charges of vagueness." *Scott*, 430 N.E.2d at 1018; *see also Dep't of Legal Affairs v. Rogers*, 329 So.2d 257, 267 (Fla. 1976) (rejecting vagueness and non-delegation challenges to state statute prohibiting "unfair" acts or practices); *accord State v. Reader's Digest Ass'n., Inc.*, 501 P.2d 290, 301 (Wash. 1972) (same). It is notable that these cases

---

[7] *CFPB Supervision and Examination Manual – Version 2*, Consumer Financial Protection Bureau, UDAAP 2 n.4 (Oct. 2012), http://files.consumerfinance.gov/f/ 201210_cfpb _supervision-and-examination-manual-v2.pdf.

were decided even prior to Congress's 1994 amendment of § 5 of the FTCA, which further clarified the scope of the FTC's unfairness authority. *See* 15 U.S.C. § 45(n).

The CFPA's prohibition on "abusive" acts or practices also easily meets the Due Process Clause's requirements for fair notice. As relevant here, an "abusive" act or practice is one that "takes unreasonable advantage of . . . the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service, or . . . the reasonable reliance by the consumer on a covered person to act in the interests of the consumer." 12 U.S.C. § 5531(d)(2). ITT quotes Bureau Director Cordray as observing that application of this test will generally turn on the "facts and circumstances" of each particular matter. Br. 12. But the truism that a law prohibiting a person from taking "unreasonable advantage" of vulnerable consumers will depend on the particular facts and circumstances presented is not a ground to question its constitutional validity. As the Supreme Court has observed, "'reasonableness' is a guide admitting effective judicial review in myriad settings," *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 315–16 (1994), and "[t]he mere fact that [even] a penal statute is so framed as to require a jury upon occasion to determine a question of reasonableness is not sufficient to make it too vague to afford a practical guide to permissible conduct." *United States v. Ragen*, 314 U.S. 513, 523 (1942) (citation omitted).[8]

ITT's reliance on one case's description of the term "abusive" as "vague" is misplaced and misleading. Br. 11 (citing *Ustrak v. Fairman*, 781 F.2d 573, 580 (7th Cir. 1986)). That case not only involved constitutionally protected rights, which are subject to a different standard, but the Seventh Circuit found that the rule was *not* unconstitutionally vague. *Ustrak*, 781 F.2d at 580–81. The other

---

[8] *See also Cameron v. Johnson*, 390 U.S. 611, 616 (1968) (the word "'unreasonably' . . . is a widely used and well understood word"); *Bandini Petroleum Co. v. Superior Court of State of Ca. in and for Los Angeles Cty.*, 284 U.S. 8, 18 (1931) (rejecting vagueness challenge to a statute prohibiting an "unreasonable waste" of gas on the ground that what is unreasonable "may be ascertained to a fair degree of certainty in each individual case"); *Karlin v. Foust*, 188 F.3d 446, 465–67 (7th Cir. 1999) (making medical emergency exemption to abortion informed consent statute depend on exercise of "reasonable medical judgment" is not unconstitutionally vague).

cases ITT cites are similarly inapposite. *Connally v. Gen. Constr. Co.*, 269 U.S. 385 (1926), involves a criminal statute; *FCC v. Fox Television Stations, Inc.*, 132 S.Ct. 2307 (2012), addresses the FCC's "abrupt" change in its regulation of "'sensitive areas of basic First Amendment freedoms,'" *id.* at 2318 (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964)); and *Gates & Fox Co, Inc. v. OSHRC*, 790 F.2d 154 (D.C. Cir. 1986), concerns the Occupational Safety and Health's Administration attempt to apply a regulation in a factual situation clearly outside the scope of its text. As discussed below, *see infra* Part E.2, ITT's alleged conduct clearly falls within the scope of the CFPA's abusive prohibition. Thus, ITT's vagueness challenge should be rejected.[9]

## C.   ITT is a covered person under the CFPA.

The CFPA prohibits "covered persons" from engaging in unfair, deceptive, or abusive acts or practices, and empowers the Bureau to bring enforcement actions against those who do. 12 U.S.C. §§ 5531, 5536. A company is a covered person if it "engages in offering or providing a consumer financial product or service." *Id.* § 5481(6).

### 1.   ITT engaged in offering and providing the SCUC private loans.

ITT is a covered person under the CFPA because it engaged in offering and providing the SCUC private loans to ITT students.[10] Those loans are undisputedly extensions of credit to consumers, and therefore "consumer financial products" under the CFPA, 12 U.S.C. §§ 5481(5), (15)(A)(i); thus, the only question is whether ITT "engage[d] in offering or providing" those loans.

___

[9] ITT's "perfunctory and undeveloped" argument, *Berkowitz,* 927 F.2d at 1384, that the CFPA's unfairness and abusiveness prohibitions fail to provide an "intelligible principle" to guide the Bureau's discretion, Br. 12 n.9, is similarly meritless. The Supreme Court has approved far-less-detailed principles in the past, including instructions for agencies to fix "fair and equitable" commodities prices, *Yakus v. United States*, 321 U.S. 414, 426–27 (1944); to regulate broadcast licensing as "public interest, convenience, or necessity" requires, *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 225–26 (1943) (internal quotation marks omitted); and to take action to "avoid an imminent hazard to the public safety," *Touby v. United States*, 500 U.S. 160, 165–67 (1991).

[10] It appears that no PEAKS loans were originated after July 21, 2011, the time period relevant to the CFPA claims. *See* Compl. ¶132; Br. 3. Thus, unless discovery reveals otherwise, the Bureau assumes that the affected students were recipients of SCUC loans alone. PEAKS remains relevant to understanding the SCUC loan program and ITT's role therein.

*Id.* § 5481(6)(A). "The term 'engage' is commonly defined as to 'to occupy or involve oneself, take

part; be active.'" *United States v. Graham*, 305 F.3d 1094, 1102 (10th Cir. 2002) (quoting Webster's

New World College Dictionary 450 (3d ed. 1997)). To "offer" includes "to make (something)

available" and "to provide or supply (something);" similarly, to "provide" includes "to make

(something) available" and "to supply."[11] ITT did just that. As detailed in the Complaint, ITT:

- Designed and created the SCUC program, setting up an entity to serve as the ostensible lender for loans made exclusively to ITT students. Compl. ¶¶11, 114–28, 133–37.

- Set the credit criteria for the SCUC private loans and made the credit determinations for most of the loans in house, without consulting with SCUC or any other loan program participants. *Id.* ¶¶11, 100–01, 116–18, 121.

- Provided a credit facility to fund the SCUC loan program, such that ITT was actually funding a portion of the lending itself, though the loans did not bear ITT's name. *Id.* ¶121.

- Guaranteed the SCUC loans in case of default above 35%, thus taking much of the risk of the loans that would typically accrue to the lender. *Id.* ¶11, 110, 121.[12]

- Solicited students to apply for the private loans. *Id.* ¶¶8, 9, 85–87, 97, 138–42.

- Controlled the students' application process for the loans, paid the students' membership fees for the Eli Lilly Federal Credit Union ("ELFCU"), one of the participants in the SCUC loan program, prepared the students' ELFCU membership forms, and submitted all paperwork to ELFCU on the students' behalf. *Id.* ¶¶69, 85, 89–92, 121.

These activities show that ITT "engaged in offering or providing" the SCUC private loans, including

providing those loans to approximately 8,600 ITT students after July 21, 2011.

Despite ITT's protestations, the test for a covered person is not whether the student loan

contracts bore ITT's name. Br. 14. The CFPA covers diverse entities that engage in "offering or

providing" consumer financial products or services, like solicitors, advisors, and brokers, that do not

---

[11] *See* Offer, Merriam-Webster, http://www.merriam-webster.com/dictionary/offer (last visited June 12, 2014); Provide, Merriam-Webster, http://www.merriam-webster.com/dictionary/provide (last visited June 12, 2014).

[12] Given even ITT's expected default rate for the SCUC program *before* July 21, 2011, ITT knew even then it would have to reimburse SCUC for nearly the full 65% it guaranteed. *See* Compl. ¶127.

have loan contracts with consumers. *See* 12 U.S.C. §§ 5481(15)(A)(i)–(x). ITT's description of the "hallmarks" of lending activity—the bargain and the contract—has no bearing on the CFPA's broad definition of "covered persons," which is not limited to parties in privity of contract with consumers. *Id.* § 5481(6); *cf. Pinter v. Dahl*, 486 U.S. 622, 642–43 (1988) ("In common parlance, a person may offer or sell property without necessarily being the person who transfers title to, or other interest in, that property.").

Instead, the issue is whether ITT was engaged in offering or providing the SCUC loans: in other words, whether it was involved in, occupied itself with, took part in, or was otherwise active in making available or supplying those loans. The facts alleged here go well beyond that; indeed, ITT was the driving force behind the ITT Private Loan programs. Without ITT, no SCUC loans would have existed or been extended to ITT students. *See* Compl. ¶¶11, 114–22. ITT's central role in offering and providing these loans renders it a covered person under the CFPA.

**2. ITT engaged in brokering the SCUC private loans to ITT students.**

An entity that engages in offering or providing brokering services to consumers or in connection with a consumer loan is also a "covered person" under the CFPA. 12 U.S.C. §§ 5481(5), (6), (15)(A)(i). Thus, even disregarding ITT's role as the central player engaged in offering or providing the SCUC loans, ITT remains a "covered person" because it offered or provided brokering services in connection with those loans for SCUC and other loan program participants. *Id.* ITT engaged in all of the activities involved in brokering private student loans to students. Specifically, ITT:

- Served as the sole conduit through which a student could obtain a SCUC loan. Compl. ¶122.

- Made available the SCUC loans to students to cover students' tuition gaps and outstanding Temporary Credits, thereby benefiting ITT. *Id.* ¶¶8, 9, 85–87, 97, 110, 122, 138–40.

- Filled out and submitted the loan applications on behalf of students using ITT's proprietary SmartForms system. *Id.* ¶¶19, 69, 89–92, 122.

12

- Made the credit assessment that determined most students' eligibility for the SCUC loans. *Id.* ¶¶11, 100, 101, 116–18, 121.

- Acted as the source for students about the amount and terms of their new SCUC loans, and how the funds would be disbursed (in this case, directly to ITT). *Id.* ¶¶122–24.[13]

ITT's citation to the definition of the term "broker" in 12 U.S.C. § 5301(15) is inapposite. Br. 14–15. That section makes clear that its definitions apply "except as the context otherwise requires." *Id.* § 5301. The concept of "broker" to which ITT refers is specifically defined under the heading "Securities terms," and is therefore plainly not intended to cover the term "brokering" in section 5481(15)(A)(i). Guidance for that term, which is not defined in the CFPA, should be derived from the proper context, which is consumer credit, not securities. For instance, Black's Law Dictionary defines "broker" as an "agent who acts as an intermediary or negotiator, esp. between prospective buyers and sellers; a person employed to make bargains and contracts between other persons in matters of trade, commerce, or navigation." *Black's Law Dictionary* 219 (9th ed. 2009). Likewise, under TILA, mortgage originators, which include mortgage brokers, *see* 12 C.F.R. § 1026.36(a)(1), (a)(2), are defined expansively as persons "who, for direct or indirect compensation or gain, or in expectation" of such compensation or gain "take[] a residential mortgage application" or "assist[] a consumer in obtaining or applying to obtain a residential mortgage loan," in addition to those who "offer[] or negotiate[] terms of a residential mortgage loan." 15 U.S.C. § 1602(cc)(2); *see also* 12 C.F.R. § 1026.36(a)(1) (including as a loan originator a person who "takes an application, offers, arranges, assists a consumer in obtaining or applying to obtain, negotiates, or otherwise obtains or makes an extension of consumer credit for another person . . . ."); 12 C.F.R. Part 1026, Supplement I, § 1026.36(a) (origination and brokering activities include referring consumers to

---

[13] Some students report that ITT did not adequately inform them about the terms and conditions of the loans when they signed up for them in ITT's financial aid offices. Compl. ¶¶64, 69, 97, 142. But the failure to make adequate disclosures is no defense to being a covered person under the CFPA.

lenders and introducing consumers to the terms of offered credit). ITT engaged in just such activities in the course of signing up students for ITT Private Loans. Compl. ¶¶85–96, 121–22, 138–42.

Contrary to ITT's assertion otherwise, Br. 15, other federal laws contemplate situations, like this one, in which an educational institution acts a loan solicitor or originator—essentially engaging in brokering activities—for a third-party lender. For instance, in the context of federal student loan programs, a school is considered a loan originator if the lender delegates "substantial functions or responsibilities" to the school. 34 C.F.R. § 682.200(b); *see, e.g.*, *Morgan v. Markerdowne Corp.*, 976 F. Supp. 301, 312, 315 (D.N.J. 1997). And TILA defines a "private education lender" as any "person engaged in the business of *soliciting, making, or extending* private education loans." 15 U.S.C. § 1650(a)(6) (emphasis added); *cf. Hill v. Priority Fin. Servs., Inc.*, No. IP98–1319, 2001 WL 1155152, at *5 (S.D. Ind. Sept. 28, 2001) (Barker, J.) (analyzing what it means to be engaged in the business of soliciting debts). Here, ITT performed equivalent brokering activities, and more. Compl. ¶¶8, 11, 69, 89–92, 100–01, 116–18, 121, 139.

Finally, ITT argues that its activities cannot be considered "brokering" under the CFPA because they are regulated by the Department of Education. Br. 15. The Bureau's authority to address unfair or abusive practices, however, is not diminished by the fact that the Department of Education may also have relevant regulatory authority. *Cf. Spiegel*, 540 F.2d at 292 (conduct may be unfair despite compliance with other laws).

### 3. ITT offers and provides financial advisory services to students.

An entity that engages in providing or offering "financial advisory services" for use by consumers is also a "covered person" under the CFPA. 12 U.S.C. § 5481(15)(A)(viii). Some or all of the following services constitute financial advisory services: consumer loan counseling, advice on financial matters, and assistance with managing debt and modifying the terms of credit. *Id.*; *see also*

14

*Consumer Fin. Prot. Bureau v. Gordon*, No. 12-6147, Dkt. No. 180, at 3 (C.D. Cal. June 26, 2013)

(attached as Ex. 3) (law firm offering mortgage relief services is providing "financial advisory

services"). ITT's financial aid staff provided financial advisory services to its students. For instance,

ITT's financial aid staff:

- Acted as intermediaries between lenders and students and arranged loans for students. Compl. ¶¶18, 87–92, 122, 139.

- Offered advice and assistance regarding loans and other means to finance tuition. *Id.* ¶¶19, 63–84, 88–92.

- Filled out students' loan applications through an automated system and submitted them to ITT's nominal loan originator, ELFCU, on students' behalf. *Id.* ¶¶91–92, 122, 139.

- Advised students about how to manage their existing debt to ITT—their Temporary Credit—and how to extinguish it through a new debt, a private loan or an ITT Installment Loan. *Id.* ¶¶110, 138–51.

ITT attempts to erase the word "financial" from the role of its financial aid staff, suggesting

that financial advisory services are limited essentially to banking activities. Relying on legislative

history, ITT asserts that the phrase "financial advisory services" means financial activities

contemplated in the Bank Holding Company Act ("BHCA"), 12 U.S.C. §§ 1841 *et seq.*, and is

therefore limited to non-banking services "so closely related to banking . . . as to be a proper

incident thereto." *Id.* Br. 16. But Congress did not intend for the BHCA and its implementing

regulations to set the outer limits of the definition of financial product or service. The cited

legislative history explains that the term "financial product or service" (which includes financial

advisory services) was "*modeled* on the activities that are permissible for a bank or a bank holding

company, *such as* under [the BHCA] and implementing regulations." S. Rep. No. 111-176, at 160

(2010) (emphasis added). The BHCA merely served as a prototype, and is therefore not controlling.

Even if the BHCA and its regulations were controlling, ITT's financial advisory services

would qualify as activities "permissible for a bank." The BHCA recognizes a broad range of

"activities that are financial in nature or incidental to such financial activity," including lending,

arranging, facilitating, and advising activities. 12 U.S.C. §§ 1843(k)(4), (5). The implementing rule

defines such activities, which it specified are "so closely related to banking . . . as to be a proper

incident thereto," to include "[a]cting as investment or financial advisor to any person." 12 C.F.R. §

225.28(a). Examples demonstrating the breadth of this term include "[p]roviding educational

courses, and instructional materials to consumers on individual financial management matters." 12

C.F.R. § 225.28(b)(6)(v). ITT's financial advisory services would fall under this expansive umbrella,

even if it applied here.

### 4.  At a minimum, ITT was a service provider to SCUC and ELFCU.

The CFPA also prohibits unfair and abusive acts and practices committed by "service

providers." 12 U.S.C. §§ 5531, 5536, 5564. A "service provider" is a person who "provides a

material service to a covered person in connection with the offering or provision by such covered

person of a consumer financial product or service," including one who "participates in designing,

operating, or maintaining the consumer financial product or service." *Id.* § 5481(26)(A). Thus, even

if ITT's central role in offering SCUC loans, brokering those loans, and providing financial advisory

services were not sufficient to bring ITT under the Bureau's ambit, ITT was a "service provider" to

both SCUC and ELFCU throughout the relevant period.[14] Compl. ¶¶20–21, 116–18, 121. ITT's

intimate involvement in the SCUC loan program, described above, shows ITT's continuing

participation in "designing, operating, or maintaining" the program. *Id.* ¶¶114–26.

ITT argues that it provided no "material" service to SCUC or ELFCU in connection with

the SCUC loan program. Br. 17–18. But given ITT's soup-to-nuts role, this is not credible. Similarly

unavailing is ITT's citation to one Bureau Bulletin's description of service providers as those

---

[14] Those entities are indisputably "covered persons" because of their role in originating and disbursing the
SCUC loans, which are "consumer financial products." 12 U.S.C. §§ 5481(5), (6), (15)(A)(i).

providing "outsource[d]" functions. Br. 18 n.11. This is but one illustrative example in a Bulletin, which does not replace or interpret the statutory text. *Cole v. Farm Fresh Poultry, Inc.*, 824 F.2d 923, 927–28 (11th Cir. 1987) (agency bulletin that provides general guidance and examples—none closely analogous to the case at bar—does not provide a defense to compliance with the statute). Finally, ITT attempts to deny that it could be a service provider because it "designed" the loans before the Bureau existed. Br. 17. But ITT cannot hide from its many roles in the SCUC program beyond its initial design, including helping to further "design," "maintain," and "operate" the program straight through its termination. Thus, ITT's arguments should be rejected.

**D.  The CFPA's narrow merchant exclusion does not shield ITT.**

ITT argues that it is exempt from the CFPA pursuant to 12 U.S.C. § 5517(a)(2)(A)(i). Br. 18. But ITT's reading of the statute is wrong. Because ITT is not a small business, this provision would only limit the Bureau's authority to bring claims for unfairness and abusiveness for conduct not at issue here. *Id.* § 5517(a)(2)(B)(iii). And in any event, the merchant exclusion has no bearing on the Bureau's ability to enforce TILA violations. *Id.* § 5517(a)(1), (a)(2)(C)(ii)(II).

Section 5517(a)(2)(A)(i) is part of a four-step test that excludes a limited class of conduct from the Bureau's authority to enforce the CFPA's prohibition on unfair, deceptive and abusive acts and practices. Step one asks whether the person is "engaged in offering or providing any consumer financial product or service." *Id.* § 5517(a)(1). If not, the person is excluded; if so, the test proceeds to step two. *Id.* Step two asks whether the person is engaged in any of three specific activities (the "step-two activities"): extending credit directly to a consumer to purchase a nonfinancial good or service directly from the merchant; collecting debt arising from such credit; or selling such credit when it is delinquent or in default. *Id.* § 5517(a)(2)(A). If the person is *not* engaged in any step-two activities, then no exclusion applies: the analysis is complete and does not proceed to step three. If the person is *only* engaged in offering or providing consumer financial products or services that

constitute step-two activities, then the analysis continues to step three to determine whether those activities are excluded. And if the person is engaged in a combination of activities that constitute offering or providing consumer financial products or services and only some of them are step-two activities, then the analysis continues to step three for the specified activities, but ends for the others, which remain subject to the Bureau's authority. *Id.*

Like step two, step three asks whether the person is engaged in three specific activities (the "step-three activities"): (a) selling the type of credit described above when it was not delinquent or in default; (b) attempting to evade or circumvent the CFPA; or (c) regularly extending credit that is subject to a finance charge. *Id.* § 5517(a)(2)(B). If the person is engaged in any combination of (a), (b), and (c), then no exclusion applies: the analysis is complete and does not proceed to step four. If the person is *only* engaged in (c), then the analysis continues to step four to determine whether the activity is covered. *Id.* Finally, the fourth step asks whether the person is "engaged significantly" in offering or providing consumer financial products or services. *Id.* § 5517(a)(2)(C)(i). If the person *is* so engaged, then that person is subject to the Bureau's authority to enforce the CFPA's prohibition on unfair, deceptive and abusive acts and practices; if not, that person's step-two activities are excluded from the Bureau's authority in that regard. *Id.*

ITT errs twice. First, it ignores two activities that constitute "offering or providing consumer financial products or services": brokering the ITT Private Loans and providing financial advisory services. Because those activities are *not* step-two activities, they are not covered by the exclusion. *Id.*

Second, for the one activity that is arguably a step-two activity, ITT aborts the analysis prematurely. Assuming that ITT "extends [the ITT Private Loans] directly to a consumer" to pay ITT's tuition, making them a step-two activity, the analysis continues to determine whether ITT is engaged in any of the step-three activities: (a) selling the ITT Private Loans while in repayment; (b) attempting to evade the statute; or (c) regularly extending credit that is subject to a finance charge.

*Id.* §§ 5517(a)(2)(B), (C)(i). There is no dispute that the ITT Private Loans were regularly extended and were subject to a finance charge, so (c) is satisfied. Likewise, there is no dispute that ITT was "engaged significantly" in offering this product, as it extended about $60 million in loans to about 8,600 students from July 21, 2011 through December 2011. *Id.* § 5517(a)(2)(C)(i). Thus, the act of directly extending the ITT Private Loans to students—in addition to ITT's brokering and financial advisory services—are subject to the Bureau's authority under the CFPA.

**E.  The Complaint states a claim under the CFPA for unfair and abusive acts and practices.**

On a motion to dismiss, the court must take note of the claim's necessary elements, identify all related factual allegations, and accept those facts as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 675–79 (2009). If the well-pled facts plausibly state a claim for relief, then the motion to dismiss must be denied. *Id.* As discussed below, the Bureau's Complaint easily meets this standard.[15]

**1.  The Complaint states a claim that ITT engaged in unfair acts and practices.**

Count One of the Complaint sets forth the Bureau's claim that ITT engaged in unfair acts and practices under the CFPA. An unfair act or practice is defined as one which "causes or is likely to cause substantial injury to consumers," where such substantial injury "is not reasonably avoidable by consumers" and "is not outweighed by countervailing benefits to consumers or competition." 12 U.S.C. § 5531(c)(1). The Bureau's allegations satisfy each one of these elements.

**a.  ITT caused its students substantial injury.**

ITT argues that the Complaint fails to allege that ITT caused or was likely to cause substantial injury. Br. 20. This argument is meritless. "In most cases, substantial injury involves

---

[15] Sprinkled through its brief, ITT suggests that the Bureau's inclusion of allegations outside the timeframe of July 21, 2011 through December 2011 is somehow problematic to the pleading. *See, e.g.*, Br. 20, 26. The Complaint makes clear, however, that the actionable conduct took place during that time period. Compl. ¶¶160–65, 170–73, 178–82. The discussion of ITT's activities before July 2011 provides important context and evidentiary support, however. *See, e.g.*, *Simmons Co. v. Cantor*, 3 F.R.D. 281, 282 (W.D. Pa. 1943) (appropriate to provide details beyond what Rule 8 requires where they will be used as evidence in case).

monetary harm." *FTC v. Direct Mktg. Concepts, Inc.*, 569 F. Supp.2d 285, 299 (D. Mass. 2008) (citations omitted). While "a substantial injury is not one that is trivial or speculative," *FTC v. IFC Credit Corp.*, 543 F. Supp.2d 925, 945 (N.D. Ill. 2008), even where "the actual injury to individual customers may be small on an annual basis, this does not mean that such injury is not substantial." *Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354, 1365 (11th Cir. 1988).

In this case, the injury caused by ITT was substantial. The affected consumers are specifically identified in the Complaint as the approximately 8,600 ITT students who were put into ITT Private Loans from July 21, 2011 through December 2011. Compl. ¶¶120, 162. The ITT Private Loans carried interest rates as high as 16.5% and origination fees as high as 10%, which translates to thousands of dollars for each consumer over the life of the loan, and millions of dollars across the group. *Id.* ¶124. Moreover, ITT itself has projected a 64% default rate for the ITT Private Loan programs. *Id.* ¶154. Such defaults result in damage to the students' credit records, which, according to ITT, were fragile in the first place, with the average ITT student's FICO score below 600. *Id.* ¶24. By any measure, millions of dollars in monetary harm and damaged credit to thousands of consumers constitutes "substantial injury." *See, e.g., Orkin*, 849 F.2d at 1365 (finding of substantial injury affirmed where individual injuries were small but total amount of injury to all consumers was $7 million); *FTC v. Zamani*, No. 09-0977, 2011 WL 2222065, at *9 (C.D. Cal. June 6, 2011) ("substantial injury" satisfied by $995 up-front fee in loan modification scam).

ITT's argument that the injury in this case was not substantial is based solely on its disagreement with the Complaint's characterization of these loans as unaffordable to those students, Br. 20, which, given the high numbers of defaults, seems evident. Even if this were not the case, however, the millions of dollars in origination fees and interest, combined with any repercussions from default, are hardly "trivial" and easily clear the bar of substantial injury.

Further, despite ITT's argument to the contrary, Br. 21–23, the Complaint clearly alleges that ITT caused the injury in this case. Indeed, "businesses can cause direct consumer harm . . . in a variety of ways" in connection with an unfair act or practice; causation can be shown even where the defendant merely facilitated or contributed to the practice so long as "the injury was a predictable consequence of those actions." *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1156 (9th Cir. 2010). The Bureau's allegations more than satisfy this standard. As the provider of and exclusive broker for the ITT Private Loans, ITT was the sole conduit through which the students obtained the loans. Compl. ¶¶18, 122. ITT, using its financial aid staff, pushed students into these loans to repay Temporary Credit amounts and other tuition gaps, using pressure, coercive tactics, and simply its control over the financial aid process. *Id.* ¶¶87, 89–92, 97, 119, 139–42. This involvement is more than enough to establish causation. *See, e.g.*, *Neovi*, 604 F.3d at 1156–57 (causation satisfied even where FTC showed that company offered platform to create electronic checks that was vulnerable to fraud that led to losses); *see also Zamani*, 2011 WL 2222065 at *9 (causation satisfied where defendant used false success rates to convince consumers, despite written disclosures warning that there was no guarantee of success).

ITT argues that the Bureau cannot establish causation because the Complaint alleges only that ITT was encouraging, not coercing, the students to repay an amount due.[16] Br. 22. First, "coercion" is not an element of unfairness. More important, however, ITT's argument is not accurate. The Bureau clearly alleges that ITT used coercive leverage—such as withholding necessary

---

[16] ITT also mischaracterizes the Bureau's allegations about ITT's misleading representations about the value of an ITT education, including placement rates or potential future earnings. ITT argues that such allegations cannot support an unfairness claim, and should properly be the subject of deception claim. Br. 22–23. Unfairness, however, may rest on deceptive and misleading tactics. *See Arthur Murray Studio of Washington, Inc. v. FTC*, 458 F.2d 622, 623, 625–26 (5th Cir. 1972) (use of deceptive and misleading statements along with cajolery and coercive sales tactics deprived consumers of free choice and therefore represented unfair practices). Such allegations, like many of the allegations relating to mystery shopper experiences, show how ITT makes a practice of depriving its students of free choice through misinformation.

course materials, transcripts and diplomas, and threatening expulsion—to get the students to take

out the SCUC loans to repay the Temporary Credit loans. *Id.* ¶¶8, 9, 87, 97, 139–40. The method by

which a debt is collected may be unfair regardless of whether the amount is properly owed. *See FTC*

*v. LoanPointe, LLC*, 525 F. App'x 696, 701 (10th Cir. 2013) (even where consumers expressly agreed

in contract to wage garnishment for payday loan collection, practice of using wage garnishment was

unfair); *American Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 963–965, 975 (D.C. Cir. 1985) (approving

Credit Practices Rule, which prohibits unfair methods to collect debts).

ITT further argues that holding a party to the terms of a contract cannot be unfair. Br. 24.

This is wrong as a matter of law. Even though there is a "duty on contracting parties to understand

the obligations they are assuming," such "contract principles . . . are not conclusive" in an action

alleging unfair acts or practices. *IFC Credit*, 543 F. Supp.2d at 948, 953 (citations omitted) (denying

motion to dismiss unfairness claim, holding "this is not an action at common law for simple breach

of contract…. [I]t is an action that charges 'unfairness,' legality and unfairness are not

necessarily congruent."). This case is about ITT ambushing students into high-interest, high-fee

loans by preventing those students from making a free, informed choice about the debts they

incurred, not whether the students were required to adhere to the terms of the Temporary Credit

contract.

### b.  The injury was not reasonably avoidable by consumers.

ITT students could not reasonably avoid their injuries, despite ITT's claim to the contrary.

Br. 23–24. In addressing the avoidability issue, courts consider "whether consumers had a free and

informed choice that would have enabled them to avoid the unfair practice." *FTC v. Windward Mktg,*

*Ltd.*, No. 1:96-CV-615F, 1997 WL 33642380, at *11 (N.D. Ga. Sept. 30, 1997), citing *American Fin.*

*Servs. Ass'n*, 767 F.2d at 976; *see also IFC Credit*, 543 F. Supp.2d at 946 (examining whether the

defendant "takes advantage of an obstacle to the free exercise of consumer decisionmaking")

(citations omitted). Injury is reasonably avoidable only where those harmed "have reason to anticipate the impending harm and the means to avoid it, or they may seek to mitigate the damage afterward if they are aware of potential avenues toward that end." *Orkin*, 849 F.2d at 1365 (citations omitted). Finally, injuries that may only be avoided by expenditure of significant effort may not be considered "reasonably" avoidable. *See, e.g., Neovi*, 604 F.3d at 1158 (citations omitted) (injury not reasonably avoidable where "reimbursement required a substantial investment of time, trouble, aggravation, and money"); *FTC v. INC21.com Corp.*, 745 F. Supp.2d 975, 1004 (N.D. Cal. 2010) (unauthorized charges that could have been avoided only by scrutiny of telephone bills not "reasonably avoidable").

Here, the harmed students had no reason to anticipate that ITT would pressure them into refinancing their zero-interest Temporary Credit loans into the expensive ITT Private Loans midway through their ITT education. The only written disclosure regarding Temporary Credit *did not* indicate that ITT would push students into repaying the balance with high-interest, high fee loans. Compl. ¶¶103, 119. Rather, that disclosure contains references to "New Temporary Credit" and "Renewal of Carryforward Temporary Credit," which could lead consumers to believe that each year they would be given another interest free loan. *Id.* ¶¶103, 106. In fact, ITT led some students to believe that Temporary Credit would be available for their entire educational program, due only after graduation. *Id.* ¶105. ITT staff downplayed the fact that the Temporary Credit was a loan that would have to be repaid; indeed, some students were not even aware they had a loan. *Id.* ¶¶104, 107, 108.

Further, ITT students could not make a free and informed choice when faced with imposition of the ITT Private Loans. With no expectation to the contrary, students who had already invested substantial time and money at ITT were coerced and pressured into taking out the ITT Private Loans. *Id.* ¶¶8, 9, 87, 97, 138–142. ITT knew that few students would be able to repay their Temporary Credit in a lump sum, and thus students were left with virtually no choice but to take the

ITT Private Loans or give up the investment they had already made toward an ITT degree. *Id.* ¶¶97, 109. Using an automated system while rushing and controlling the appointments, the ITT financial aid staff made a practice of encouraging students to rely on ITT to take care of financial aid matters for them. *Id.* ¶¶88–92. Indeed, as a result, there were some students who did not even know they had taken out ITT Private Loans. *Id.* ¶142. Students who did not understand that they had taken out the ITT Private Loans, did not understand the harsh terms of the loans, or believed they had no choice but to take out the loans, could hardly have reasonably avoided them.

ITT's arguments that the injury was reasonably avoidable are unconvincing. Br. 24. ITT first argues that students could have transferred to another institution once they learned of the ITT Private Loans—"[l]imited transferability is not non-transferability." It is at best a question of fact whether this was the case; also, because ITT withheld transcripts as "leverage," students would not have been able to transfer credits, even if theoretically transferrable. *See* Compl. ¶87. Further, to the extent ITT suggests that students should have attended "part-time" or worked "between academic terms" to repay the balance, it is doubtful whether students could have done this without a "substantial investment of time, trouble, aggravation, and money." *Neovi*, 604 F.3d at 1158. ITT also makes the questionable claim that students had a "reason to anticipate" that they would have to repay the Temporary Credit with the ITT Private Loan because the Temporary Credit's nine-month term was disclosed and there was a buried mention of the ITT Private Loans in the ITT catalog. Br. 24. Many students were *not* aware that these loans would have to be repaid within that timeframe, however, and none knew that they would be pushed into the ITT Private Loans by ITT. Compl. ¶¶104–06, 119, 133. In either case, given the difficulty of transferring, earning the thousands of dollars needed to satisfy this debt, or finding the needle in the haystack of information in ITT's catalog, none of ITT's theories of avoidability is "reasonable." *See Neovi*, 604 F.3d at 1158.

24

c.  **The injury is not outweighed by countervailing benefits to consumers or competition.**

ITT claims that the Bureau fails to allege that the injury to the affected ITT students was not outweighed by countervailing benefits to consumers because the ITT Private Loans allowed students to continue at ITT, which could have increased their earning potential. Br. 25. This argument misses the mark. The unfair practice was not, as ITT tries to suggest, the mere extension of credit, but rather that ITT coerced its students into the credit by preventing them from exercising a free and informed choice. Compl. ¶160. And it was unnecessary. Students were able to continue at ITT with just Temporary Credit, some during the relevant period and many after 2011 when the ITT Private Loans were no longer available. *Id.* ¶¶111, 143, 147. Thus, the only effect of the ITT's improper practices is that students paid more to finance their education. Paying more for something, without getting anything additional, is not a benefit. "[W]hen a practice produces clear adverse consequences for consumers that are not accompanied by an increase in services or benefits to consumers or by benefits to competition, the unfairness of the practice is not outweighed." *Windward Mktg*, 1997 WL 33642380, at *11 (citations omitted).[17]

2.  **The Complaint states a claim that ITT engaged in abusive acts and practices.**

The CFPA prohibits covered persons and service providers from engaging in abusive acts and practices by "taking unreasonable advantage" of consumers. 12 U.S.C. §§ 5331(d)(2), 5536(a)(1)(B). ITT violated two of the abusiveness provisions in the CFPA in connection with the ITT Private Loans.

---

[17] ITT does not even try to argue that its practice in connection with the ITT Private Loans is beneficial to competition, nor could it. The purpose of ITT Private Loans was merely to improve the *appearance* of ITT's financial statements, pushing up ITT's income and free cash flow numbers to impress investors, and to help ITT appear to satisfy its requirement to obtain at least ten percent of its revenue from sources other than the Department of Education. Compl. ¶¶10, 98, 134–37.

### a. ITT took unreasonable advantage of the students' inability to protect their interests.

Under section 5531(d)(2)(B), the Bureau must show that the defendant "took unreasonable advantage of . . . the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service." The phrase "to take advantage," has a readily understood meaning that resonates strongly in this case. *Lara-Ruiz v. INS*, 241 F.3d 934, 940 (7th Cir. 2001) ("In construing a statute, we start by looking to the plain language, giving the words used their ordinary meaning"). According to the Merriam-Webster Dictionary, to "take advantage" means to "use to advantage" or to "profit by" or "impose on."[18] Thus, a company violates section 5531(d)(2)(B) if it unreasonably profits by or imposes on consumers' inability to protect their interests in selecting or using a consumer financial product or service. This claim is amply supported by the allegations in the Complaint.

First, the affected students were unable to protect their interests when ITT pushed them into the ITT Private Loans. As a group, the students had poor credit profiles and low earnings, and few ITT students could afford to pay any amounts over that covered by federal aid or Temporary Credit balances. Compl. ¶¶5, 8, 24, 28, 109, 113. To obtain an initial Temporary Credit, students had to meet only minimal credit criteria, which were often waived. *Id.* ¶100. Later, when they were suddenly faced with "repackaging" their financial aid, the already complicated process was rushed and controlled and students had to rely heavily on ITT's financial aid counselors. *Id.* ¶¶69, 85–92. With the threat of losing their investment in an ITT degree, students felt they had no choice but to take on ITT Private Loans, for which ITT had prequalified them by providing them Temporary

---

[18] *See* Take, Merriam-Webster, http://www.merriam-webster.com/dictionary/take%20advantage (last visited June 12, 2014).

Credit. *Id.* ¶¶50–51, 116, 119, 140. Many of them did not understand the terms of those loans and some did not even know they had signed for them. *Id.* ¶¶97, 142.

Second, the Complaint shows how ITT exploited that vulnerability, imposed the ITT Private Loans on students faced with an apparent lack of options, and unreasonably profited from this arrangement, which benefitted the company at the expense of the students. ITT knew few students were able to pay the Temporary Credit amounts or the tuition gap amounts in a lump sum. Compl. ¶¶5, 8, 24, 28, 109, 113, 140. ITT put the ITT Private Loan Programs in place as a vehicle for students to pay off these amounts. *Id.* ¶¶8, 11, 114, 126, 133–137. Unlike a typical market-based loan program, however, the ITT Private Loans were set up to accept nearly any student with a Temporary Credit, regardless of his or her credit profile, to ensure that ITT could shift the likely-uncollectible debts off of its books and turn them into current cash from an ostensible third-party source. *Id.* ¶¶11, 98, 100–01, 114–18, 134–36.[19] All ITT had to do to execute this plan was get students to sign up for those loans. As alleged in the Complaint, ITT engaged in a host of tactics designed to exploit students' lack of options and lack of understanding in order to push them into taking out the loans. *E.g.*, Compl. ¶¶8, 9, 24, 28, 69, 87–92, 97, 109, 139. Tellingly, while enrolling students were not warned that the added cost of the ITT Private Loans would become part of their educational expense, ITT told its shareholders that it was its "plan all along" to achieve this goal. *Id.* ¶¶136–37.

ITT's arguments against this well-pled claim are unavailing. ITT argues that it could not have violated the law because it was within its rights to withhold credits from students who transferred out. Br. 28–29. It further argues that merely offering an "option[al]" source of funding for a debt it was owed, even if it may be unaffordable to its students, is not abusive. Br. 27, 29. ITT also argues

---

[19] Though ITT argues that it did not take an "advantage" because it received no interest or fee income from the loans, Br. 26, the financial benefits to ITT are clearly laid out in these paragraphs of the Complaint.

27

that it was helping students fund their educations, and that, by the Bureau's lights, loans with high default rates would be *per se* abusive. Br. 29. Those arguments mischaracterize the claims and ignore the facts alleged. This case is not about ITT's right to be repaid, as it was in *In re: Oliver*, 499 B.R. 617 (Bkrtcy. S.D. Ind. 2013) and *Todd v. Collecto*, 731 F.3d 734 (7th Cir. 2013), cited by ITT.[20] Nor is it about unconscionability under state contract law, as it was in ITT's cited authority, *Jackson v. Bank of Am. Corp.*, 711 F.3d 788, 793 (7th Cir. 2013). This case is not about deeming a given credit product, on its own, "abusive," and the case is certainly not about consumers who were given a choice. Rather, the abusive conduct here was ITT's imposition of the ITT Private Loans, through unreasonable tactics, on a vulnerable population of consumers who were unable to protect themselves from this unwanted financial product, only so that ITT could present a more appealing financial appearance to its shareholders. *Cf. Sluys v. Hand*, 831 F. Supp. 321, 323, 327 (S.D.N.Y. 1993) (creditors are not permitted to use unfair tactics); *Spiegel*, 540 F.2d at 292–93 (ostensibly legal practice to collect on a valid debt can be unfair); *LoanPointe*, 525 F. App'x at 701 (the fact that an act was done to further a legal right does not excuse the "harm that can flow from the act" when it is done unlawfully).

ITT further argues that it provided information to students about the terms of the Temporary Credit and the consequences of a failure to repay, and therefore students cannot have been taken advantage of. Br. 27. This argument flies in the face of the law and the facts alleged. The Complaint makes clear that students were not aware of or were misled about the terms of the Temporary Credit, Compl. ¶¶104–06, 108, and in any event, the abusive claim centers on ITT's exploitation of the students' inability to repay the lump sum, which ITT knew, and the fact that the

---

[20] Neither case deals with an abusiveness claim, and neither discusses a situation like this one, where the context and scheme, as a whole, make the institution's conduct unlawful.

students would have the Hobson's choice of taking the ITT Private Loans or being forced to forgo their investment of time and money already made.

ITT also argues that it cannot be liable under this prong of abusiveness because the Complaint does not allege that ITT did anything to prevent the students from protecting their interests. Br. 28. Although the Bureau does allege that the financial aid staff engaged in conduct that had this effect, ITT's argument is irrelevant because the statute imposes no such requirement. *See, e.g., Miller v. Apropos Technology, Inc.*, No. 01 C 8406, 2003 WL 1733558, at * 8 (N.D. Ill. Mar. 31, 2003) (defendants cannot rely on the absence of a fact which is not an element of the claim). Section 5531(d)(2)(B) makes it illegal for ITT to *take* unreasonable advantage of the consumer's inability to protect his own interests, whether or not ITT was responsible for the circumstances that led to the consumer's vulnerability.[21]

### b. ITT took unreasonable advantage of the students' reasonable reliance on ITT to act in their interests.

To state a claim under 12 U.S.C. § 5531(d)(2)(C), the Bureau must show that ITT took unreasonable advantage of "the reasonable reliance by the consumer on [ITT] to act in the interests of the consumer." The allegations in the Complaint more than meet the elements of this claim.

Reasonable reliance exists where the relationship between the defendant and consumers is of a kind that would lead reasonable and prudent persons to rely on the defendant to act in their interests.[22] *Cf. FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989) (citations omitted)

---

[21] The claims that the Bureau is attempting to regulate interest rates, or that any interest-bearing loan to a consumer without other options is abusive under the Bureau's theory, are more distractions. Br. 29. The Bureau makes no such claims, only that ITT's coercive tactics in pushing the ITT Private Loans led to consumer harm. The Bureau's action in this case does not preclude other creditors, loan brokers, and financial advisors from providing lawful products and services. *Cf. IFC Credit*, 543 F. Supp. at 940 ("If the FTC were to prevail at trial, all that would be 'chilled' would be unfair and deceptive practices . . . .").

[22] The Bureau need not show proof of individual reliance by every consumer, which would thwart the government's ability to fulfil its statutory purpose and frustrate the public goals of a CFPA action. *Cf. FTC v. Kuykendall*, 371 F.3d 745, 765–66 (10th Cir. 2004); *FTC v. Minuteman Press*, 53 F. Supp. 2d 248, 262–63

(explaining that an individual defendant can be held liable for deceptive corporate practices under the FTCA if, among other things, the FTC proves "misrepresentations or omissions of a kind usually relied on by reasonably prudent persons"); *see also Sain v. Cedar Rapids Cmty. Sch. Dist.*, 626 N.W.2d 115, 126 (Iowa 2001) (school counselor "clearly assumes an advisory role, is aware of the use for the information, and knows the student is relying upon the information provided," and therefore invites reliance).

ITT, and its financial aid staff, had just such a relationship with its students. The affected students relied heavily on ITT for advice and guidance with the financial aid process; indeed, ITT encouraged them to do so. Moreover, ITT unreasonably profited off of that reliance by pressing the ITT Private Loans on its students under the guise of acting in their interests. ITT represented to students that it would work in their interests to help them get better jobs and higher salaries. Compl. ¶¶30–32, 34–36, 38–45. It instructed its financial aid staff to gain students' trust and to appear to work in their interests. *Id.* ¶¶88–94, 141. It encouraged students to rely on the financial aid staff from the enrollment stage onward and fed that reliance through the repacking stage. *Id.* ¶¶63–66, 85–92, 122. And it used a variety of tactics to influence both new and continuing students, such as controlling their aid applications and rushing them through the borrowing process. *Id.* ¶¶69, 78, 85–92, 97–98, 122, 138–42. The affected students demonstrated their reliance by signing up for the ITT Private Loans. *Id.* ¶162. The students were not aware that ITT trained and compensated the financial aid staff more like salespeople than like counselors. *Id.* ¶¶95–96.

ITT argues that the Complaint is inconsistent, asserting that consumers could not have reasonably relied on ITT to act in their interests while ITT was pushing them into predatory loans. Br. 29–31. But the statute contemplates both a predatory act ("takes unreasonable advantage") and a

---

(E.D.N.Y. 1998). The CFPA creates no private right of action; it is exclusively enforced by government agencies. 12 U.S.C. § 5531(a).

credulous victim ("reasonable reliance by the consumer"). Unfortunately, there can be no doubt that consumers often rely on people offering consumer financial products, and view them as "trusted advisors," even as those people push the consumers into toxic products. *Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of the Fed. Reserve Sys.*, 773 F. Supp.2d 151, 172 (D.D.C. 2011). ITT's case law is inapposite, as none of it bears on the Rule 12(b)(6) standard, the pleading of "reasonable reliance" in a public enforcement action, or the operation of consumer protection statutes. Moreover, because reasonable reliance is a question of fact, the Bureau need not allege more to state a plausible claim for relief. "Generally speaking . . . the questions of reasonable diligence and reasonable reliance are questions of fact for the jury to decide." *Pippenger v. McQuik's Oilube, Inc.*, 854 F. Supp. 1411, 1427 (S.D. Ind. 1994) (Barker, J.) (citing *Plymale v. Upright*, 419 N.E.2d 756, 763 (Ind. App. 1981)); *see also Mathioudakis v. Conversational Computing Corp.*, No. 1:12-cv-00558-JMS-DKL, 2012 WL 4052316, at *5–6 (S.D. Ind. Sept. 13, 2012); *Storie v. Randy's Auto Sales, LLC*, No. 07-cv-0022-SEB-JPG, 2007 WL 4438865, at *3 (S.D. Ind. Dec. 17, 2007); *Mfrs. Life Ins. Co. v. 1 Animation Network, Inc.*, No. 04-C-8105, 2005 WL 1950666, at *2 (N.D. Ill. Aug. 10, 2005).

To no avail, ITT further argues that the Bureau fails to allege that ITT gave students false information about the ITT Private Loans. Br. 31–32. But an abusiveness claim does not require proof of misrepresentations. 12 U.S.C. § 5531(d). Finally, ITT argues—ironically, given its position that students' reliance was unreasonable—that it did in fact act in students' interests. Br. 33. But the facts show otherwise. First, ITT may claim that by offering classes and degree programs it was acting in the interests of its customers, but the high levels of default by its former students on their loans reflect a different result. Moreover, the way ITT pushed the ITT Private Loans on its students was not in their interests. After luring financially vulnerable students by baiting them with interest free loans in the form of Temporary Credit, knowing that those students would not be able to repay those loans in a lump sum, ITT pushed them into high-interest, high-fee loans from an ostensible

31

third-party lending program that it organized for this very purpose, to shift those debts off its own books and record them as income. Compl. ¶¶2–12. Left with expensive loans on which most of them would default, students' interests were not served by ITT's conduct.

## F.  The Complaint states a timely claim for violations of Regulation Z.

### 1.  No court has applied TILA's private statute of limitations to a government action.

ITT argues, incorrectly, that the Bureau's claims under TILA are time-barred under 15 U.S.C. § 1640(e). Br. 33–34. But section 1640(e) does not apply here; it applies only to private suits under TILA, not to government enforcement actions. The Bureau's authority to bring a TILA action is set out in a separate section of TILA, 15 U.S.C. § 1607(a)(6). To our knowledge, no court has ever applied the statute of limitations in 15 U.S.C. § 1640(e) to a public enforcement action.

In addition to authorizing enforcement actions by the Bureau, section 1607(a) also authorizes other federal regulators to enforce TILA. Those agencies have consistently taken the position—and courts have consistently agreed—that section 1607 authorizes government actions and section 1640 authorizes private suits. *See, e.g.*, *Vallies v. Sky Bank*, 591 F.3d 152, 156 (3d Cir. 2009); *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 222 (4th Cir. 1978). The unanimous interpretation is that the one-year limitations period for private suits does not apply to public enforcement actions. *See, e.g.*, Federal Reserve Board Consumer Compliance Handbook, Regulation Z at 57 (November 2013) ("Regulatory administrative enforcement actions also are not subject to the one-year statute of limitations.") (excerpt attached as Ex. 4); Office of the Comptroller of the Currency Interpretive Letter, October 6, 1977, 1977 WL 23261 ("[A]lthough individual borrowers are restricted in bringing suit under Section 130 by a one-year statute of limitations the Comptroller is not restricted by any statute of limitations under either the Truth in Lending Act or 12 U.S.C. § 1818(b)."). Thus ITT's statute of limitations argument is without support.

**2. ITT failed to disclose the finance charge on the ITT Installment Loans in violation of TILA.**

TILA's implementing rule, Regulation Z, requires disclosure of finance charges, in writing, before consummation of the transaction. 12 C.F.R. §§ 1026.17, 18(d).[23] That rule applies to any regularly-extended, closed-end consumer credit that is payable in more than four installments or subject to a finance charge. *Id.* § 1026.1(c). A "finance charge" includes any discount to induce a consumer to pay by means other than credit. *Id.* § 1026.4; 12 C.F.R. Part 1026, Supplement I, § 1026.4(b)(9).

ITT's argues that the ITT Installment Loans are excluded from Regulation Z under 12 C.F.R. § 1026.20(a)(4). But ITT cannot claim the 20(a)(4) exception because it only applies to loans that are technically "refinancings" under section 20(a), which itself only applies to obligations that replace previous obligations that were subject to Subpart C of Regulation Z. *Id.* § 1026.20(a) ("A refinancing occurs when an existing obligation *that was subject to this subpart* is satisfied and replaced . . . .") (emphasis added); 12 C.F.R. Part 1026, Supplement I, § 1026.20(a) ("A transaction is subject to section 226.20(a) only if it meets the general definition of a refinancing."). Here, the ITT Installment Loans were typically used to repay one or more Temporary Credits, which were not subject to Subpart C because they were neither subject to a finance charge nor payable in more than four installments. *Id.* §§ 1026.1(c)(1)(iii), 2(a)(17)(i).

ITT's affirmative obligation to disclose the terms of the ITT Installment Loans arose because—in contrast to the Temporary Credit—the ITT Installment Loans were both subject to a finance charge and payable in more than four installments. 12 C.F.R. § 1026.2(a)(17)(i). Therefore,

---

[23] The Bureau's citations to Regulation Z are to 12 C.F.R. Part 1026, which was published by the Bureau in relevant part on December 22, 2011 (76 Fed. Reg. 79768), after the CFPA transferred rulemaking authority to the Bureau. ITT's citations are to 12 C.F.R. Part 226, which is the version of Regulation Z administered by the Federal Reserve Board. For the purposes of this case, Parts 226 and 1026 are substantively identical.

under TILA, ITT was required to disclose the terms of the credit obligation, including any applicable finance charges, before consummation of the transaction. *Id.* §§ 1026.17, 1026.18(d). The fact that the ITT Installment Loans were given to satisfy a previous obligation not subject to TILA does not exempt the ITT Installment Loans from the disclosures required by Regulation Z. *See, e.g.*, *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 411–14 (3rd Cir. 2000) (requiring TILA disclosures when installment arrangements were entered into to pay debts arising from delinquent water bills). In failing to provide the disclosures required by Regulation Z prior to consummating the ITT Installment Loans, ITT violated TILA and Regulation Z. 12 C.F.R. §§ 1026.17(a), (b), 1026.18.

ITT cites just one case, *Diamond v. One W. Bank*, No. CV-09-1593, 2010 WL 1742536 (D. Ariz. Apr. 29, 2010), which does not support its argument. Unlike the original mortgages that were modified in *Diamond*, ITT's Temporary Credit was not subject to Subpart C and was therefore not eligible for "refinancing" under section 1026.20(a). ITT also inexplicably cites to the Fair Debt Collection Practices Act, which is irrelevant to TILA. Similarly, ITT's argument that the obligation to disclose a discount as a finance charge only operates when the discount is an incentive to pay before receiving services does not comport with TILA. The Bureau alleges that ITT offered the discount at origination (Compl. ¶¶144–48), and so should have disclosed it as a finance charge.[24]

## G. The third parties to the ITT Private Loan programs are not necessary parties.

Without even addressing the standards for required joinder under Fed. R. Civ. P. 19, ITT half-heartedly argues that SCUC and other loan program participants are necessary and indispensable parties because the Complaint seeks monetary damages. Br. 14. ITT falls far short of

---

[24] The falsity of ITT's debt settlement argument is further illustrated by the broad effect it would have on enforcement of the Regulation Z disclosure requirements. Under ITT's argument, any creditor could avoid providing TILA disclosures by following ITT's example: first, issue credit that does not subject the lender to the TILA requirements and second, replace that credit with one that would otherwise subject the lender to TILA, but which is now allegedly exempt as a "change in the payment schedule." The result would be an end-run around TILA disclosures.

showing that the other lenders and investors are necessary or indispensable. *E.g.*, *Davis Companies v. Emerald Casino*, 268 F.3d 477, 481–85 (7th Cir. 2001) (under multi-step analysis, investor was not a necessary party). The Bureau has brought no claims against those entities, nor does the action seek to set aside contracts with unnamed (and sovereign) parties, as it did in ITT's cited case, *United States ex rel. Hall v. Tribal Dev. Corp.*, 100 F.3d 476, 479–81 (7th Cir. 1996). The Bureau has sued ITT for its own unfair and abusive conduct and it seeks appropriate monetary damages for the consumers injured thereby. No joinder is required here, and ITT's motion to dismiss under Fed. R. Civ. P. 12(b)(7) must be denied.

## H.  Leave to amend

If the Court finds the Complaint deficient in some respect, the Bureau requests leave to amend. Such leave should be freely granted. *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004); Fed. R. Civ. P. 15(a).

## IV.   CONCLUSION

ITT's motion to dismiss should be denied.


Respectfully submitted,


s/Cynthia Gooen Lesser
Cynthia Gooen Lesser (NY Bar #2578045)
Ethan Haim Levisohn (DC Bar #982702)
Nicholas F. B. Smyth (PA Bar #307972)
Maureen Elin McOwen (DC Bar #976749)
Office of Enforcement
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: (202) 435-9594
Facsimile: (202) 435-7722
e-mail: Cynthia.Lesser@cfpb.gov


*Attorneys for the Consumer Financial Protection Bureau*

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2014, a copy of the foregoing document, the Consumer Financial Protection Bureau's Opposition to ITT's Motion to Dismiss the Complaint, and the exhibits thereto, were filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Date:   June 12, 2014                      <u>s/ Cynthia Gooen Lesser</u>
                                           Cynthia Gooen Lesser (NY Bar #2578045)
                                           Enforcement Attorney
                                           Consumer Financial Protection Bureau
                                           1700 G Street, NW
                                           Washington, DC 20552
                                           Telephone: (202) 435-9594
                                           Facsimile: (202) 435-7722
                                           e-mail: Cynthia.Lesser@cfpb.gov

                                           *Attorney for the Consumer Financial Protection Bureau*