**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| **CONSUMER FINANCIAL PROTECTION BUREAU,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ITT EDUCATIONAL SERVICES, INC.,**<br><br>**Defendant.** | **Case No. 1:14-cv-00292-SEB-TAB** |

**DEFENDANT ITT EDUCATIONAL SERVICES, INC.'S**
**REPLY IN SUPPORT OF ITS MOTION TO STAY DISCOVERY**
**PENDING A RULING ON ITS MOTION TO DISMISS**

## INTRODUCTION

The Bureau admits that ITT's motion to dismiss presents threshold constitutional and legal issues, that this is a complex case involving questions of first impression, and that stays of discovery are granted with substantial frequency in cases like this to spare defendants the costs of discovery into meritless claims. The Bureau also admits that ITT already has produced a "significant page count" during the Bureau's investigation, and that those productions are only a small fraction of what the Bureau will seek through a campaign of discovery at ITT's 140 campuses if given the opportunity. And the Bureau does not dispute that it has already collected voluminous discovery—in addition to that produced by ITT—from third parties and other regulators. These factors are textbook grounds for staying further burdensome discovery pending the outcome of ITT's well-founded motion to dismiss.

## ARGUMENT

### A. The Bureau Admits That ITT's Motion To Dismiss Raises Threshold Legal Issues In A Complex Case Involving Questions Of First Impression

Contrary to the Bureau's contention, ITT's argument in support of a stay is not "simply" that it has filed a motion to dismiss. Opp. 4.[1] Rather, ITT's motion to dismiss raises dispositive threshold constitutional and statutory challenges, and a stay of discovery generally is appropriate "when a party raises a potentially dispositive threshold issue." *Tamburo v. Dworkin*, 2010 WL 4867346, at *1 (N.D. Ill. Nov. 17, 2010); Opp. 4. The Bureau concedes both points. The "complexity" of the case, the Bureau admits, derives from "the fact that many issues in this case will be issues of first impression" requiring the interpretation of the "fairly new" Consumer Financial Protection Act. Opp. 6. The Bureau also recognizes that this Court frequently grants stays of discovery pending motions to dismiss in the wake of "'the Supreme Court's recent adoption of a more rigorous pleading standard to spare defendants the costs of discovery into meritless claims.'" *Id.* (quoting *Dillinger, LLC v. Elec. Arts, Inc.*, 2010 WL 1945739, at *1 (S.D. Ind. May 11, 2010)). Those concessions strongly support a stay.

In response, the Bureau offers the self-serving assurance that its allegations "more than meet the standard" set in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and thus discovery should proceed. Opp. 6. That argument is unpersuasive. If a motion to stay discovery turned on a plaintiff's assurances that it had met the pleading standard, no defendant would be spared the burden of discovery into meritless claims.

In any event, the Bureau's claims are clearly vulnerable to dismissal. All four are unprecedented. The only claim alleged to cover more than six months rests on the implausible

[1] Citations to "Opp. __" refer to the Bureau's Opposition To Defendant's Motion To Stay Discovery (D.E. 31). Citations to "Mot. __" refer to ITT's Motion To Stay Discovery Pending A Ruling On Its Motion To Dismiss (D.E. 24).

theory that fully-disclosed discounts on overdue debts are undisclosed "finance charges." The Bureau's remaining claims are premised on the assertion that private loans issued, owned, and serviced by third parties are somehow "ITT Loans"—an assertion that is untenable on the face of the pleadings. Tellingly, the Bureau admits that it filed this action—the "primary purpose of" which is to "enjoin and deter unlawful conduct"—without knowing "what conduct should be enjoined." CFPB's Mot. Relief Court's Order To Make Settlement Demand (D.E. 26) at 2, 3.[2]

**B. The Bureau Admits That Its Contemplated Discovery Will Be Overwhelming**

The Bureau is emphatic that the "significant" production it has already received from ITT represents "only a fraction" of the documents the Bureau seeks. Opp. 2. The Bureau also makes clear that it will seek metadata and other electronic information, *id.*, thereby multiplying the expenses of discovery and increasing the need for "more intensive judicial involvement than required by conventional discovery." Barbara J. Rothstein, Ronald J. Hedges, and Elizabeth C. Wiggins, *Managing Discovery of Electronic Information: A Pocket Guide for Judges* 2 (2007). The Bureau plans to seek discovery from ITT's headquarters and potentially each of its more than 140 campuses nationwide, Mot. 4, even as to loans that are irrelevant to the claims, CFPB Opp. to Mot. Dismiss (D.E. 25) at 10 n.10.

The Bureau's reasons for insisting that discovery "would not be burdensome" to ITT are not credible. Opp. 8. The Bureau quibbles over whether ITT is a small company—apparently assuming that because ITT is a public company with a number of physical locations, it must therefore be "quite capable of collecting and producing" the information that the Bureau vows to

[2] The Bureau asserts that a "sister court" has rejected a claim "virtually identical to ITT's first constitutional argument in this case." Opp. 5 (citing *CFPB v. Morgan Drexen, Inc.*, No. 13-1267 (C.D. Cal. Jan. 10, 2014)). That decision is not binding here, and *Morgan Drexen* did not consider identical constitutional arguments and did not concern a challenge to the Bureau's jurisdiction over educational institutions like ITT. Thus, *Morgan Drexen* cannot resolve the threshold challenges posed by ITT's motion to dismiss.

seek. *Id.* In fact, ITT is among the smaller corporations on the New York Stock Exchange, with a market capitalization of about $390 million.[3] The average NYSE-listed company, in contrast, has a market capitalization of about $8.9 billion. Moreover, ITT's limited resources and its employees are dedicated to providing educational services to students—not responding to complex requests for historical information—and the Bureau's contemplated discovery threatens significantly to drain those resources. For example, as ITT has explained to the Bureau, data created prior to 2012 is housed on backup tapes that are not reasonably accessible. The volume of this information is potentially enormous and would be difficult to identify and retrieve. Campuses easily may be overwhelmed by discovery requests on their staff. The question is not whether ITT is *capable* of responding to the Bureau's discovery requests, but whether doing so at this time—before the motion to dismiss is decided—would present burdens that outweigh the benefit. *Tamburo*, 2010 WL 4867346, at *3. It clearly would.

The Bureau also suggests, incorrectly, that ITT will produce "much of the information" the Bureau will seek in two "state matters that implicate some of the same subjects as this enforcement action"—specifically, *King v. ITT Educational Services, Inc.*, 1:14-cv-00321 (D.N.M. Apr. 4, 2014), and civil investigative demands (CIDs) served in 2014 by a group of state Attorneys General. Opp. 2, 8. The Bureau ignores, however, the constitutional limitation that states may regulate conduct only within their own borders. *E.g.*, *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 582-83 (1986). The state-level CIDs focus on activities within a specific set of states; the Bureau is seeking discovery from all of ITT's campuses *nationwide*.

---

[3] http://finance.yahoo.com/q?s=ESI (accessed July 2, 2014).

In any event, in *King*, the parties are still litigating whether the case belongs in state or federal court, and discovery has not begun; and discovery in the CID matters does not cover a fraction of the information the Bureau seeks in this case. ITT could not fulfill the Bureau's discovery demands—in whole or even in substantial part—with information produced in those proceedings, and unsurprisingly, the Bureau has never hinted that it would accept relevant portions of such productions as satisfaction of its much broader requests. Thus, discovery in these separate state matters cannot be used to justify burdensome discovery here.

The Bureau is also incorrect that the burden of collecting and producing information related to approximately 8,600 individual students is a "red herring." Opp. 8. Information contained in specific student files implicates federally-protected privacy concerns under the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g. If none of the FERPA exceptions applies, before ITT can produce any student files, it must obtain written consents from each student or laboriously redact all personally identifying information from their files. *Id.* § 1232g(b). Although FERPA permits ITT to disclose personally identifiable student information if compelled by a "judicial order," even in that case the statute requires ITT to make reasonable efforts to notify each student of such an order in advance of disclosure so that the student may seek protective action. 34 C.F.R. § 99.31(a)(9). The Department of Education itself has recognized that where a court has ordered the disclosure of student information, "it would be difficult in many cases for the agency or institution to comply with [FERPA's] statutory requirement" of notifying students in advance of compliance. 53 Fed. Reg. 11,942, 11,955 (Apr. 11, 1988); *see also* 65 Fed. Reg. 41,852, 41,858 (July 6, 2000) (acknowledging that the notice requirement "is overly burdensome" in the litigation context, and eliminating it in litigation between a student and a school).

The Bureau suggests that ITT can "easily" access current contact information for these approximately 8,600 students through the servicer of the students' loans, Opp. 9, but this assurance rests on a number of unfounded assumptions, including: that the servicer will willingly provide such information to ITT; that there is a single servicer for all 8,600 students from which to obtain this information; that all 8,600 students continue to register their current physical and electronic addresses with the servicer; and that the student information is in a format that is easily accessible. The reality will be far more complicated, costly, and burdensome than the Bureau suggests.

### C. The Burdens Of Discovery Before A Decision On ITT's Motion To Dismiss Far Outweigh Any Benefits

A district court should "'limit discovery if it determines that the burden of the discovery outweighs its benefit.'" *Tamburo*, 2010 WL 4867346, at *3 (citation omitted). Given the threshold, dispositive issues raised in ITT's motion to dismiss, the burden and expense of the Bureau's contemplated discovery, and the lack of any overriding prejudice to the Bureau, there is ample justification to stay discovery until ITT's preliminary legal challenges have been decided.

The Bureau invokes the purpose of the Federal Rules "to secure the just, speedy, and inexpensive determination" of cases, Opp. 3, 7, and these considerations apply in greater force to support ITT. ITT, too, has a strong interest in a "just" and "speedy" resolution of this case—the prompt dismissal of the Bureau's meritless claims. And, unlike the Bureau, ITT has a compelling interest in securing an "inexpensive" outcome—which is precisely why ITT should not be forced to pay tens of millions of dollars to provide the Bureau with additional discovery for claims that may well be dismissed. *See Hughes v. CUNA Mut. Grp.*, 257 F.R.D. 176, 179 (S.D. Ind. 2009) ("Avoiding needless discovery is important in any lawsuit," citing Fed. R. Civ. P. 1); *see also* Fed. R. Civ. P. 26(b)(2)(C)(iii).

The Bureau argues unpersuasively that its case could be prejudiced by delaying discovery while this Court decides ITT's motion to dismiss. Opp. 9. But any delay very likely would be far shorter than the Bureau's own delay caused by refusing to work cooperatively with ITT during its investigation or to contact ITT for more than a year in 2012 and 2013. *See infra* Part D. Furthermore, any effects of a limited stay are likely to be mooted entirely if this Court dismisses some or all of the Bureau's claims. Even if one or more claims proceed, the Bureau offers no reason to conclude that a brief stay of discovery will have any meaningful impact in a case that the Bureau itself predicts will not be ready for trial until 2016.

The Bureau's other ostensible reasons for opposing a stay wither under scrutiny. Assuming, *arguendo*, that there may be "defaults, finance charges, fees, and adverse credit reporting," Opp. 9, the Bureau fails to explain why it could not seek restitution for those injuries if it prevails on its theories. Moreover, the Bureau does not dispute that the third-party loan program at issue *ended in 2011* and, thus, could not conceivably result in new loans of the sort disputed in all three of the Bureau's core claims. Mot. 8-9. Any risk that "relevant information . . . will not be preserved for trial," Opp. at 9, is slight—both parties have litigation holds in place—and the remote possibility of witness unavailability would be present even under the Bureau's proposed trial date of 2016. These concerns are inherent in *all* complex litigation, and the Bureau admits that district courts frequently stay discovery pending a decision on motions to dismiss in "complex cases." Opp. 5-6. That practice reflects courts' understanding that the burdens of discovery in complex cases such as this typically override any asserted need for immediate discovery into claims that later may be dismissed.

**D. The Length Of The Bureau's Investigation Is Attributable To The Bureau**

Perhaps to distract from the clear grounds for staying discovery, the Bureau resorts to accusing ITT of prolonging its investigation. ITT did not "slow-walk[]" the Bureau's

investigation. Opp. 2. The Court need not delve into this history, but given the Bureau's misstatements, ITT believes it necessary to correct the record.

The Bureau issued its first CID to ITT on May 18, 2012. Mot. 2. That CID was issued under Richard Cordray acting as Director of the Bureau based on an unlawful recess appointment. *See NLRB v. Noel Canning*, 573 U.S. ___, 2014 WL 2882090, at *5 (June 26, 2014). ITT nonetheless endeavored to comply with the Bureau's CID in the spirit of cooperation. Although the CID included hundreds requests for interrogatory responses, documents, and written reports, the Bureau initially required a complete response to every request within 30 days. Mot., Ex. 1, at 2. Following a meet-and-confer session, the Bureau agreed to allow additional time for ITT to produce certain responsive documents or to file a petition to set aside or modify the CID. ITT worked diligently to produce documents, but the Bureau persisted in making unachievable demands about the scope and speed of ITT's production—such as insisting that ITT turn over documents without sufficient time for counsel to review them beforehand.[4]

When it proved impossible to satisfy the Bureau's demands, ITT filed—as the Bureau's regulations contemplate—a petition to set aside the CID on August 6, 2012. 12 U.S.C. § 5562(f)(3) (authorizing petitions to set aside a CID for violation of any "constitutional or other legal right or privilege").[5] ITT argued that the Bureau lacked authority to issue a CID because Mr. Cordray had been unconstitutionally appointed. Petn. 5-8. The Bureau mocks this argument as "frivolous" (Opp. 3), but the Supreme Court has unanimously held that the President's attempt to use the Recess Appointments Clause to install Executive officers while the Senate is in a

[4] See July 31, 2012 Letter from J. Mendro to Messrs. Lisa and Brown, a copy of which is attached as Exhibit 1 hereto.

[5] Excerpts from ITT's Petition To Set Aside The Civil Investigative Demand are attached as Exhibit 2 hereto. Citations to "Petn. __" refer to ITT's petition.

three-day intra-session adjournment is indeed unconstitutional. *Noel Canning*, 2014 WL 2882090, at *5.[6] ITT also argued, among other things, that the Bureau's structure violates the Constitution's separation of powers. Petn. 9-15. That issue, which is presented in ITT's motion to dismiss, has not yet been decided by the Supreme Court.

When ITT filed its petition, the ball was in the Bureau's court. The Bureau's regulations expressly provide that a party who petitions to set aside a CID is under no obligation to respond to that CID while the petition is pending. 12 C.F.R. § 1080.6(f). The Bureau could have maintained a dialogue with ITT or timely decided ITT's petition, but instead the Bureau delayed for more than a year—making no further contact with ITT—until after the Senate confirmed Mr. Cordray as Director in 2013. Thereafter, the Bureau withdrew its first CID and issued a second CID. The Bureau never ruled on ITT's petition to set aside the first CID.

After receiving the second CID, ITT again met and conferred with the Bureau in good faith and entered into a tolling agreement to enable the Bureau conduct its investigation unencumbered by limitations deadlines. Mot. 2. As a result, the Bureau twice modified its second CID and granted ITT an indefinite extension of its deadline to challenge the CID "[i]n consideration of ITT's commitment to cooperate with the Bureau's investigation and produce documents."[7] Although the Bureau reserved the right to reinstate ITT's deadline, the Bureau never did so and never stated that any of ITT's prompt productions in response to that CID were deficient. Nor did the Bureau ever seek to compel compliance with either of its CIDs due to any

---

[6] The President's purported recess appointment of Mr. Cordray was on the same day as the appointments at issue in *Noel Canning*. *See* http://www.whitehouse.gov/the-press-office/2012/01/04/president-obama-announces-recess-appointments-key-administration-posts (last visited July 2, 2014).

[7] See October 7, 2013 Letter from O. Lev, Consumer Financial Protection Bureau, to J. Mendro, at 5, a copy of which is attached as Exhibit 3 hereto.

purported failure to cooperate, though it has done so in other cases. *See* 12 U.S.C. § 5562(e); 12 C.F.R. § 1080.10.

The Bureau's contention that ITT chose to "drag its feet" during its "nearly two-year investigation" is thus contrary to the record. Opp. 2, 3. While the Bureau admits that ITT has produced a "significant page count" of documents, *id*. at 2, this production did not trickle in over two years, and ITT was never offered an extended production schedule, as the Bureau implies. Rather, the Bureau rushed ITT to produce numerous documents in two, rapid-fire bursts between May 18 and August 6, 2012, and between September 13 and December 9, 2013. In the first of those short periods, ITT produced nearly 80,000 pages of documents and hundreds of additional files in native format. In the second, ITT produced about 44,000 additional pages, including substantial ESI, and written reports. Altogether, ITT produced more than 123,000 pages of documents over periods that spanned a total of less than six months. The Bureau's charge that "ITT never agreed to provide a witness" for deposition, Opp. 3, is equally unfair: The Bureau requested only one deposition, which it indefinitely "suspend[ed]" and never rescheduled. Ex. 3, at 5. The Bureau's accusations of delay tactics in the face of its own failure to contact ITT *for more than a year* during its investigation are factually incorrect.

**CONCLUSION**

ITT's and the Court's interest in a just, speedy, and inexpensive resolution of this case outweighs any concerns raised by the Bureau and militates in favor of staying all further discovery until ITT's motion to dismiss has been decided. ITT respectfully requests the Court stay discovery, including disclosures, pending resolution of ITT's motion to dismiss.

Dated: July 2, 2014

Respectfully submitted,

ICE MILLER, LLP

By: /s/ *Philip A. Whistler*
Philip A. Whistler (#1205-49)

Thomas E. Mixdorf (#16812-49)
One American Square, Suite 2900
Indianapolis, IN 46282-0200
Telephone: (317) 236-2100
Facsimile: (317) 236-2219
Philip.Whistler@icemiller.com
Thomas.Mixdorf@icemiller.com

GIBSON, DUNN & CRUTCHER LLP
Timothy J. Hatch (*pro hac vice*)
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
THatch@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
Douglas R. Cox (*pro hac vice*)
Jason J. Mendro (*pro hac vice*)
Lucas C. Townsend (*pro hac vice*)
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: (202) 955-8500
Facsimile: (202) 467-0539
DCox@gibsondunn.com
JMendro@gibsondunn.com
LTownsend@gibsondunn.com

*Attorneys for Defendant*
*ITT Educational Services, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 2, 2014, a copy of the foregoing Defendant ITT Educational Services, Inc.'s Reply In Support Of Its Motion To Stay Discovery Pending A Ruling On Its Motion To Dismiss, and supporting exhibits, was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ *Philip A. Whistler*
Philip A. Whistler