**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| **CONSUMER FINANCIAL PROTECTION BUREAU,** | ) )  ) |
| **Plaintiff,** | ) ) |
| **v.** | )  **Civil Action No. 1:14-cv-00292-SEB-TAB** ) |
| **ITT EDUCATIONAL SERVICES, INC.,** | ) ) |
| **Defendant.** | ) ) |

**REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

ICE MILLER, LLP
Philip A. Whistler (#1205-49)
Thomas E. Mixdorf (#16812-49)
One American Square, Suite 2900
Indianapolis, IN 46282-0200
Telephone: (317) 236-2100
Facsimile: (317) 236-2219
Philip.Whistler@icemiller.com
Thomas.Mixdorf@icemiller.com

GIBSON, DUNN & CRUTCHER LLP
Timothy J. Hatch (*pro hac vice*)
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
THatch@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
Douglas R. Cox (*pro hac vice*)
Jason J. Mendro (*pro hac vice*)
Lucas C. Townsend (*pro hac vice*)
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: (202) 955-8500
Facsimile: (202) 467-0539
DCox@gibsondunn.com
JMendro@gibsondunn.com
LTownsend@gibsondunn.com

July 22, 2014

*Attorneys for Defendant*
*ITT Educational Services, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................ 2

    I.      THE BUREAU'S STRUCTURE IS UNCONSTITUTIONAL ........................... 2

    II.     THE COMPLAINT VIOLATES DUE PROCESS ................................................ 4

    III.    THE BUREAU LACKS JURISDICTION OVER ITT ......................................... 6

          A.     This Case Falls Within The Merchant Exclusion. ..................................... 6

          B.     The Bureau Lacks Jurisdiction In Any Event. ........................................... 8

    IV.    THE CFPA CLAIMS FAIL ON THEIR OWN TERMS ................................... 12

          A.     The New "Bait-And-Switch" Theory Is Incoherent And Fails. ............................................................................................................. 12

          B.     Count 1:  The Complaint Fails To Allege "Unfair" Conduct. ....................................................................................................... 13

          C.     Counts 2 & 3:  The Complaint Fails To Allege "Abusive" Conduct. ....................................................................................................... 16

    V.     COUNT 4:  THE BUREAU'S REGULATION Z ARGUMENTS ARE MERITLESS ...................................................................................................... 19

CONCLUSION ............................................................................................................ 20

# **TABLE OF AUTHORITIES**

Page(s)

## **Cases**

*Adams v. City of Indianapolis,*
  742 F.3d 720 (7th Cir. 2014) ........................................................................... 16

*Aetna Life Ins. Co. v. Lavoie,*
  475 U.S. 813 (1986) ............................................................................................ 2

*Am. Booksellers Ass'n v. Hudnut,*
  598 F. Supp. 1316 (S.D. Ind. 1984) .................................................................. 5

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) .......................................................................................... 12

*Atkins v. Chicago,*
  631 F.3d 823 (7th Cir. 2011) ........................................................................... 12

*Baker v. Capital One Bank (USA), N.A.,*
  No. 1:12-cv-971-SEB-DKL, 2012 WL 5930094 (S.D. Ind. Nov. 26, 2012) ...... 13

*Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.,*
  291 F.3d 1000 (7th Cir. 2002) ......................................................................... 16

*Bordenkircher v. Hayes,*
  434 U.S. 357 (1978) .......................................................................................... 11

*Bullock v. BankChampaign, N.A.,*
  133 S. Ct. 1754 (2013) ...................................................................................... 10

*Career Coll. Ass'n v. Dep't of Educ.,*
  No. 92-cv-1345-LFO, 1992 WL 233837 (D.D.C. Aug. 31, 1992) ....................... 5

*CFPB v. Morgan Drexen, Inc.,*
  No. 13-1267 (C.D. Cal. Jan. 10, 2014) .............................................................. 2

*Christopher v. SmithKline Beecham Corp.,*
  132 S. Ct. 2156 (2012) ...................................................................................... 12

*Citizens State Bank v. FDIC,*
  751 F.2d 209 (8th Cir. 1984) ........................................................................... 19

*Cohen v. Am. Sec. Ins. Co.,*
  735 F.3d 601 (7th Cir. 2013) ........................................................................... 14

*Consol. Bank, N.A. v. U.S. Dep't of Treasury,*
  118 F.3d 1461 (11th Cir. 1997) ....................................................................... 19

*Cont'l Training Servs., Inc. v. Cavazos,*
  893 F.2d 877 (7th Cir. 1990) ......................................................................... 4-5

*Dasgupta v. Univ. of Wis. Bd. of Regents,*
  121 F.3d 1138 (7th Cir. 1997) ......................................................................... 12

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Davis Cos. v. Emerald Casino, Inc.*,
268 F.3d 477 (7th Cir. 2001) ................................................................. 9

*Davis v. HSBC Bank Nev., N.A.*,
691 F.3d 1152 (9th Cir. 2012) ............................................................. 15

*Dep't of Legal Affairs v. Rogers*,
329 So. 2d 257 (Fla. 1976) ................................................................... 5

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) ............................................................................. 14

*Elec. Power Supply Ass'n v. FERC*,
Nos. 11-1489, et al., --- F.3d ---, 2014 WL 2142113 (D.C. Cir. May 23, 2014) ................... 8

*FCC v. Fox Television Stations, Inc.*,
132 S. Ct. 2307 (2012) ......................................................................... 4

*Free Enter. Fund v. PCAOB*,
130 S. Ct. 3138 (2010) ......................................................................... 5

*FTC v. IFC Credit Corp.*,
543 F. Supp. 2d 925 (N.D. Ill. 2008) ................................................... 14

*FTC v. INC21.com Corp.*,
745 F. Supp. 2d 975 (N.D. Cal. 2010) ................................................. 15

*FTC v. Neovi, Inc.*,
604 F.3d 1150 (9th Cir. 2010) ....................................................... 14, 15

*FTC v. Sperry & Hutchinson Co.*,
405 U.S. 233 (1972) ............................................................................. 5

*FTC v. Windward Mktg., Inc.*,
No. 1:96-cv-615F, 1997 WL 33642380 (N.D. Ga. Sept. 30, 1997) ..................................... 15

*FTC v. Zamani*,
No. SACV 09-0977-DOC(MLGx), 2011 WL 2222065 (C.D. Cal. June 6, 2011) ............... 14

*Gabelli v. SEC*,
133 S. Ct. 1216 (2013) ......................................................................... 19

*Gates & Fox Co. v. OSHRC*,
790 F.2d 154 (D.C. Cir. 1986) .............................................................. 6

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ................................................................................. 5

*Kolender v. Lawson*,
461 U.S. 352 (1983) ............................................................................. 6

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    134 S. Ct. 1377 (2014) ...................................................................... 14

*Loving v. IRS*,
    742 F.3d 1013 (D.C. Cir. 2014) .................................................... 8, 11

*NLRB v. Noel Canning*,
    134 S. Ct. 2550 (2014) .................................................................. 2, 5

*Odier v. Hoffman Sch. of Martial Arts, Inc.*,
    619 F. Supp. 2d 571 (N.D. Ind. 2008) ............................................ 19

*Orkin Exterminating Co. v. FTC*,
    849 F.2d 1354 (11th Cir. 1988) ................................................ 14, 15

*Papachristou v. City of Jacksonville*,
    405 U.S. 156 (1972) .......................................................................... 4

*Peck v. Ford Motor Co.*,
    603 F.2d 1240 (7th Cir. 1979) ........................................................ 14

*Pierce v. Atchison, Topeka & Santa Fe Ry. Co.*,
    65 F.3d 562 (7th Cir. 1995) ............................................................ 18

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*,
    631 F.3d 436 (7th Cir. 2011) .......................................................... 19

*Pollice v. Nat'l Tax Funding, L.P.*,
    225 F.3d 379 (3d Cir. 2000) ...................................................... 19, 20

*Scott v. Ass'n for Childbirth at Home, Int'l*,
    430 N.E.2d 1012 (Ill. 1981) .............................................................. 5

*Sorrell v. IMS Health Inc.*,
    131 S. Ct. 2653 (2011) ...................................................................... 5

*Spiegel, Inc. v. FTC*,
    540 F.2d 287 (7th Cir. 1976) ...................................................... 5, 10

*State v. Reader's Digest Ass'n*,
    501 P.2d 290 (Wash. 1972) ................................................................ 5

*Susan B. Anthony List v. Driehaus*,
    134 S. Ct. 2334 (2014) ...................................................................... 3

*Todd v. Collecto, Inc.*,
    731 F.3d 734 (7th Cir. 2013) ...................................................... 14, 18

*TXO Prod. Corp. v. Alliance Res. Corp.*,
    509 U.S. 443 (1993) ........................................................................ 11

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*United States ex rel. Hall v. Tribal Dev. Corp.*,
    100 F.3d 476 (7th Cir. 1996) ............................................................... 9

*United States v. Graham*,
    305 F.3d 1094 (10th Cir. 2002) ........................................................... 8

*United States v. Poindexter*,
    951 F.2d 369 (D.C. Cir. 1991) ............................................................. 6

*Ustrak v. Fairman*,
    781 F.2d 573 (7th Cir. 1986) ............................................................... 6

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) ............................................................................. 5

*Virachack v. Univ. Ford*,
    410 F.3d 579 (9th Cir. 2005) ............................................................. 19

*Yeftich v. Navistar, Inc.*,
    722 F.3d 911 (7th Cir. 2013) ............................................................. 16

**Statutes**

12 U.S.C. § 5301(15) ........................................................................... 10

12 U.S.C. § 5393(b)(1)(B) ...................................................................... 8

12 U.S.C. § 5481(1) ............................................................................... 9

12 U.S.C. § 5481(6) ............................................................................... 8

12 U.S.C. § 5481(6)(B) .......................................................................... 9

12 U.S.C. § 5481(15)(A)(i) .................................................................. 10

12 U.S.C. § 5481(15)(A)(ii) ................................................................. 10

12 U.S.C. § 5481(15)(A)(iii) ................................................................ 10

12 U.S.C. § 5481(15)(A)(iv) ................................................................ 10

12 U.S.C. § 5481(15)(A)(vi) ................................................................ 10

12 U.S.C. § 5481(15)(A)(vii) ............................................................... 10

12 U.S.C. § 5481(15)(A)(viii) .............................................................. 11

12 U.S.C. § 5491 .................................................................................... 2

12 U.S.C. § 5491(a) ............................................................................... 3

12 U.S.C. § 5491(b)(1) .......................................................................... 3

12 U.S.C. § 5491(b)(5) .......................................................................... 3

## TABLE OF AUTHORITIES
### (continued)

Page(s)

12 U.S.C. § 5491(c)(3) .................................................................................................... 3

12 U.S.C. § 5492(b) ........................................................................................................ 3

12 U.S.C. § 5497(a)(2)(C) .............................................................................................. 3

12 U.S.C. § 5512(b)(4)(B) .............................................................................................. 3

12 U.S.C. § 5513(a) ........................................................................................................ 3

12 U.S.C. § 5513(c)(3)(B)(ii) ......................................................................................... 3

12 U.S.C. § 5513(c)(8) ................................................................................................... 3

12 U.S.C. § 5517(a)(2)(A)(i) .......................................................................................... 7

12 U.S.C. § 5517(a)(2)(B)(iii) ........................................................................................ 7

12 U.S.C. § 5517(a)(2)(C)(i) .......................................................................................... 7

12 U.S.C. § 5517(o) ...................................................................................................... 13

12 U.S.C. § 5531(c)(1)(A) ............................................................................................ 13

12 U.S.C. § 5531(c)(1)(B) ............................................................................................ 15

12 U.S.C. § 5564(b) ........................................................................................................ 3

12 U.S.C. § 5565(c)(1) .................................................................................................... 8

12 U.S.C. § 5565(c)(2) .................................................................................................... 5

12 U.S.C. § 5565(c)(2)(B) .............................................................................................. 8

15 U.S.C. § 78c ............................................................................................................. 10

15 U.S.C. § 1607(a) ........................................................................................................ 7

15 U.S.C. § 1640(e) ...................................................................................................... 19

20 U.S.C. § 1019a ......................................................................................................... 11

44 U.S.C. § 3502(5) ........................................................................................................ 3

### Regulations

12 C.F.R. § 225.28(a) ................................................................................................... 11

12 C.F.R. pt. 226, supp. I, at 624 (2013) ..................................................................... 20

12 C.F.R. § 1026.1(c) ................................................................................................... 20

12 C.F.R. § 1026.1(c)(2) ............................................................................................... 20

12 C.F.R. § 1026.4(b)(1) ............................................................................................... 20

12 C.F.R. § 1026.4(b)(2) ............................................................................................... 20

## TABLE OF AUTHORITIES
**(continued)**

Page(s)

12 C.F.R. § 1026.4(b)(3) ................................................................................. 20

12 C.F.R. § 1026.4(c)(2) ................................................................................. 20

12 C.F.R. § 1090.106(b) ................................................................................... 7

28 C.F.R. § 58.12(b)(12) ................................................................................. 11

78 Fed. Reg. 73,383 (Dec. 6, 2013) ................................................................. 7

### Rules

Fed. R. Civ. P. 9(b) ........................................................................................ 15

Fed. R. Civ. P. 12(b)(1) .................................................................................... 3

Fed. R. Civ. P. 12(b)(7) .................................................................................... 9

### Other Authorities

Bd. of Governors of the Fed. Reserve Sys. and FDIC, *Unfair or Deceptive Acts or Practices by State-Chartered Banks* (Mar. 11, 2004) ................................. 18

C. Boyden Gray & Jim R. Purcell, *Why Dodd-Frank Is Unconstitutional*, Wall St. J., June 21, 2012 ........................................................................................... 3

CFPB Bulletin 2012-03 .................................................................................. 12

Eric Pearson, *A Brief Essay on the Constitutionality of the Consumer Financial Protection Bureau*, 47 Creighton L. Rev. 99 (2013) ...................................... 3

H.R. Rep. No. 111-367 (2009) .......................................................................... 9

H.R. Rep. No. 112-559 (2012) ........................................................................ 11

*How Will the CFPB Function Under Richard Cordray: Hearing Before the Subcomm. on TARP, Financial Services and Bailouts of Public and Private Programs*, 112th Cong. 112-107, at 70 (2012) ........................................................................ 6

Inst. of Educ. Scis., Nat'l Ctr. for Educ. Statistics, *Digest of Education Statistics*, http://nces.ed.gov/ programs/digest/d13/tables/dt13_503.20.asp (last visited July 21, 2014) ................................................................................................... 17

Kent Barnett, *The Consumer Financial Protection Bureau's Appointment With Trouble*, 60 Am. U.L. Rev. 1459 (2011) ......................................................... 3

S. Rep. No. 111-176 (2010) ............................................................................ 11

Webster's Third New Int'l Dictionary 751 (1976) ............................................. 8

## <u>INDEX OF EXHIBITS</u>
### *(lettering continued from exhibits in opening brief)*

F.  Excerpts from ITT's Catalog and Handbook (Indianapolis, IN 2011).

G.  United States Department of Education, Cohort Default Rates (Nov. 7, 2011).

## INTRODUCTION

ITT's opening brief demonstrated that this case should be dismissed with prejudice; the Bureau's opposition confirms that conclusion. The Bureau's theory that ITT provided CUSO loans to students, Opp. 10, fails twice over: it is factually false, as the complaint discloses; and in any event ITT falls within the statute's "merchant exclusion."[1] On that basis alone, all of the Counts fail. The Bureau also illogically claims that ITT violated Regulation Z by failing to disclose that zero-interest, zero-fee installment payments bear a "finance charge." But the "charge" is fictitious: On the Bureau's theory, the cost of attending ITT and the cost of repaying outstanding balances in installments are distinct transactions; but neither varies in price depending on whether it is financed, as is necessary on the Bureau's theory of "finance charge."

The opposition makes significant concessions. The Bureau admits that ITT earned no interest or fees from loans issued to students by "several third-party entities" over which the Bureau "indisputably" has jurisdiction. Opp. 1, 16 n.14, 27 n.19. *Those* are the entities properly subject to the Bureau's theories, and their absence compels dismissal. Mot. 14. The Bureau also admits that this case involves only CUSO loans, not PEAKS loans, Opp. 10 n.10, so any claims regarding PEAKS are forfeited. The Bureau does not dispute that Temporary Credit or CUSO loans were independently lawful. *See id.* at 25 (students could have continued at ITT "with just Temporary Credit"); *id.* at 28 (case is not about "a given credit product"). Indeed, it concedes that withholding services from students in default on their debt is lawful, and that "[t]his case is not about ITT's right to be repaid" or whether students "were required to adhere to the terms" of Temporary Credit. *Id.* at 28, 22. The "mystery shopper" allegations that pervade the complaint are all but abandoned, *id.* at 21 n.16, and properly so, as they, too, are irrelevant.

---

[1] "Opp. __" refers to the Bureau's Opposition To ITT's Motion To Dismiss The Complaint (D.E. 25). "Mot. __" refers to ITT's Motion To Dismiss The Complaint (D.E. 23). References to "¶ __" refer to the complaint (D.E. 1).

The Bureau also resorts to recharacterizing its claims and asserting new allegations, but it cannot amend its complaint through its opposition.  This case should be dismissed.

## ARGUMENT

## I.    THE BUREAU'S STRUCTURE IS UNCONSTITUTIONAL

Separation of powers principles "safeguard individual liberty," and the "longstanding 'practice of the government'" informs the separation-of-powers inquiry.  *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559-60 (2014).  The Bureau's structure is a gross departure from "longstanding practice":  Never has a federal agency purported to wield core Executive and Legislative powers at the discretion of a single Director while shielded from meaningful checks by the President or Congress.  The Bureau does not deny that its structure is unprecedented, but defends its constitutionality principally on *CFPB v. Morgan Drexen, Inc.*, No. 13-1267, slip op. 2-4 (C.D. Cal. Jan. 10, 2014).  That opinion is not binding and likely will be subject to future appeal. Moreover, *Morgan* does not implicate all of the constitutional arguments presented by ITT, including that the Deputy Director's appointment itself violates the Appointments Clause. Significantly, the Bureau does not deny that the Deputy Director has been involved in the Bureau's investigation, and his participation taints the Bureau's decisions.  *See Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825 (1986); *see also* 12 U.S.C. § 5491 (providing for Presidential removal of Director but not Deputy Director).[2]

*Morgan* involves a debt relief company, not the Bureau's attempt to expand its jurisdiction beyond the limits set by Congress to cover educational institutions that did not issue loans or otherwise provide consumer financial products.  Indeed, the constitutional violation is made more acute by the Bureau's insistence that its jurisdiction is "broad," "defined

---

[2]   Citing an irrelevant case discussing appellate briefing, the Bureau invites the Court to ignore ITT's argument that the Deputy Director's appointment violates the Appointments Clause.  Opp. 6 n.4.  But that separate invasion of the appointment power is another reason why the Bureau violates the Constitution's structural limits.

expansively," and an "expansive umbrella."  Opp. 12, 13, 16.  Restrictions on Article II removal power are upheld only where an agency's organic statute tightly circumscribes the agency's authority.  Mot. 9.  Consequently, what may be acceptable in the limited context of *Morgan* is unconstitutional here.[3]

The Bureau argues, oddly, that because Congress can amend the Bureau's organic statute to correct its unconstitutional features, the Bureau is subject to Congress's oversight.  Opp. 6.  Congress *always* can amend unconstitutional statutes through the "ordinary legislative process," *id.*, a truism that cannot save the Bureau from scrutiny by the courts.  Recourse to this bizarre argument is a concession that the Bureau is *not* subject to Congress's regular oversight.

No federal entity combines the Bureau's panoply of problematic features, including: [1] strict limitations on the Director's removal, 12 U.S.C. § 5491(c)(3); [2] the Director's lengthy tenure, *id.* § 5491(c)(3); [3] a single Director, rather than Commission or Board, *id.* § 5491(b)(1); [4] an unconstitutionally appointed Deputy Director not removable by the President, *id.* § 5491(b)(5); [5] the Director's ability to delegate all powers to subordinates, *id.* § 5492(b); [6] status as an independent agency within an independent agency, *id.* § 5491(a); 44 U.S.C. § 3502(5); [7] independent litigating power, 12 U.S.C. § 5564(b); [8] immunity from the Congressional appropriations process, *id.* § 5497(a)(2)(C); and [9] unprecedented restrictions on judicial review, *id.* §§ 5512(b)(4)(B), 5513(a) & (c)(3)(B)(ii), (c)(8).  The Bureau intrudes on the prerogatives of the President, Congress, and the courts and upsets the constitutional balance.[4]

---

[3]  Contrary to the suggestion, Opp. 4 n.3, there *are* substantial grounds for doubting the Bureau's constitutionality. *See, e.g.*, Mot. 8-10; Eric Pearson, *A Brief Essay on the Constitutionality of the Consumer Financial Protection Bureau*, 47 Creighton L. Rev. 99 (2013); Kent Barnett, *The Consumer Financial Protection Bureau's Appointment With Trouble*, 60 Am. U.L. Rev. 1459 (2011); C. Boyden Gray & Jim R. Purcell, *Why Dodd-Frank Is Unconstitutional*, Wall St. J., June 21, 2012, at A17.

[4]  Because the Bureau's structure violates the separation of powers, there is no justiciable case or controversy.  Under "[t]he law of Article III standing, which is built on separation-of-powers principles," the Director may not use "the judicial process . . . to usurp the powers of the political branches."  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 12(b)(1).

## II.      THE COMPLAINT VIOLATES DUE PROCESS

Counts 1 through 3 violate Due Process as applied to ITT because the CFPA's prohibitions on "unfair" and "abusive" conduct lack sufficient "precision and guidance" and fail to give educational institutions fair notice of "what is required of them."  *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012).  The Bureau cites no statute, regulation, or decision alerting ITT that its practices—which are heavily regulated by the United States Department of Education, among others—might suddenly be deemed "unfair" or "abusive."

**A.**  Ironically, the Bureau urges the Court to tolerate a greater degree of vagueness for economic regulation "'because its subject matter is often more narrow.'"  Opp. 7 (citation omitted).  While courts sometimes allow "greater leeway" for business regulation, such leeway is only given "where the acts limited are in a narrow category."  *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972).  But here, the Bureau *itself* argues that it regulates an "expansive" category of activities covering "diverse" entities, Opp. 16, 11, refuting any claim of "narrow" application.  The Bureau also suggests that businesses "'can be expected to consult relevant legislation in advance.'"  Opp. 7 (citation omitted).  But ITT *has* consulted the relevant authorities—for example, Department of Education regulations specifying the disclosures schools must make to students, how financial aid staff may be compensated, and how student debt is treated.  *See* Mot. 15, 20, 23, 32 n.22.  If, as the Bureau insists, these specific requirements must yield to vague standards of "unfairness" and "abusiveness," then the Bureau must adopt regulations defining these standards as they may apply to colleges and universities. That the Bureau has not done so deprives ITT of fair notice.

Nor is the Bureau correct that this action does not "impinge on constitutionally protected rights."  Opp. 8.  Colleges have well-recognized, constitutionally protected property interests in participating in federal student loan programs.  *Cont'l Training Servs., Inc. v. Cavazos*, 893 F.2d

877, 893 (7th Cir. 1990); *Career Coll. Ass'n v. Dep't of Educ.*, 1992 WL 233837, at *5 (D.D.C. Aug. 31, 1992). Deeming acts taken in compliance with the terms of federal loan programs to be unlawful directly threatens ITT's property interest. The Bureau also is attempting to impose liability for truthful communications between ITT and students, chilling ITT's First Amendment rights. *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2664 (2011). And ITT has a protected interest in not being subject to an enforcement action by an unconstitutional agency. *Noel Canning*, 134 S. Ct. at 2559; *Free Enter. Fund v. PCAOB*, 130 S. Ct. 3138, 3151 & n.2 (2010).[5]

**B.** The Bureau relies, Opp. 8, on several decisions finding prohibitions on "unfair" acts not unconstitutionally vague as applied to marketing home childbirth literature, *Scott v. Ass'n for Childbirth at Home, Int'l*, 430 N.E.2d 1012 (Ill. 1981), and lotteries, *Dep't of Legal Affairs v. Rogers*, 329 So. 2d 257 (Fla. 1976); *State v. Reader's Digest Ass'n*, 501 P.2d 290 (Wash. 1972). The Due Process inquiry, however, requires that courts "consider whether a statute is vague *as applied to the particular facts at issue*." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010) (emphasis added). None of the Bureau's cases sustained a construction of "unfair" so broad and untethered as the Bureau's theories here require. Neither *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972), nor *Spiegel, Inc. v. FTC*, 540 F.2d 287 (7th Cir. 1976), *see* Opp. 8, considered unconstitutional vagueness. Moreover, financial aid communications with students are prescribed by federal law, and ITT is not alleged to have violated that law. Thus, whether or not "unfair" can be viewed as vague in the abstract, it is vague as applied here to reach the federally-regulated conduct of educational institutions. *See Am. Booksellers Ass'n v. Hudnut*, 598 F. Supp. 1316, 1339 (S.D. Ind. 1984) (Barker, J.) (unconstitutional vagueness where

---

[5]   That the CFPA "do[es] not impose criminal penalties," Opp. 8, is cold comfort given the CFPA's authorization of fines of up to $1 million per day per violation. 12 U.S.C. § 5565(c)(2). Where, as here, a statute has a "prohibitory and stigmatizing effect," it is "'quasi-criminal'" and "may warrant a relatively strict test" under the Due Process Clause. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).

regulated persons "cannot reasonably steer between lawful and unlawful conduct"), *aff'd on other grounds*, 771 F.2d 323 (7th Cir. 1985), *aff'd*, 475 U.S. 1001 (1986).

**C.**   Unable to cite any authority holding that a prohibition on "abusive" acts satisfies Due Process in *any* context, the Bureau invites the Court to substitute a "reasonableness" standard. Opp. 9.  The question "is not, however, whether [the Court] can now rewrite the statute to make it clear, but whether the defendant was fairly on notice of its meaning when he acted." *United States v. Poindexter*, 951 F.2d 369, 380 n.1 (D.C. Cir. 1991).  The Director testified to Congress that the "unreasonable advantage" element of "abusiveness" was "something of a vague term that needs definition."[6]  The Bureau must provide that "need[ed] definition" through rulemaking, not enforcement.

The Bureau misconstrues ITT's authorities.  *See* Opp. 9-10.  In *Ustrak v. Fairman*, 781 F.2d 573, 580 (7th Cir. 1986), the court held that "abusive" was inherently "vague" and could be tolerated only in the context of prison regulations, where "the concept[] of vagueness . . . ha[s] less scope."  The Bureau attempts to distinguish *Gates & Fox Co. v. OSHRC*, 790 F.2d 154 (D.C. Cir. 1986), as involving the unconstitutional application of a regulation "clearly outside the scope of its text," Opp. 10, but that is no distinction at all—the Bureau cannot even invoke a regulation, and is bringing an enforcement action "outside the scope" of the statutory text.[7]

## III.   THE BUREAU LACKS JURISDICTION OVER ITT

### A.   This Case Falls Within The Merchant Exclusion.

Even if the Bureau could otherwise assert jurisdiction to bring these claims—as discussed below, it cannot—the merchant exclusion deprives the Bureau of jurisdiction over ITT.  This is

---

[6]   *How Will the CFPB Function Under Richard Cordray: Hearing Before the Subcomm. on TARP, Financial Services and Bailouts of Public and Private Programs*, 112th Cong. 112-107, at 70 (2012); *see also* Mot. 12.

[7]   In dismissing ITT's fully-supported nondelegation argument, the Bureau cites only cases involving delegations of *regulatory* authority.  Opp. 10 n.9.  But the CFPA delegates power to define unintelligible statutory prohibitions through arbitrary *enforcement*, a violation of the paramount constitutional "'requirement that a legislature establish minimal guidelines to govern law enforcement.'"  *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (citation omitted).

no less true of Count 4: the Bureau's authority to enforce TILA is "[s]ubject to" the CFPA's subtitle B, which contains the merchant exclusion. 15 U.S.C. § 1607(a). *Contra* Opp. 17.

The extension of credit "for the purpose of enabling [students] to purchase [a] nonfinancial good or service"—education—exempts ITT from the Bureau's jurisdiction. 12 U.S.C. § 5517(a)(2)(A)(i). This includes Temporary Credit, which is an essential component of all of the Bureau's claims. Moreover, if, as the Bureau contends, ITT provided CUSO loans to students, then those loans *also* constitute an extension of credit for the purpose of purchasing education, and thus are *also* beyond the Bureau's jurisdiction. The exclusion applies regardless of any supposed brokering or financial advisory services.

The Bureau argues that because ITT did not rule out irrelevant exceptions to the merchant exclusion, there must be "no dispute" that those exceptions apply. Opp. 19. Nonsense: ITT need not burden the Court with inapplicable exceptions, and the only exception the Bureau cites is plainly inapplicable. 12 U.S.C. § 5517(a)(2)(B)(iii). Temporary Credit is interest-free and not "subject to a finance charge"; and the Bureau concedes that ITT, a seller of nonfinancial goods and services, did not receive fees or interest on third-party CUSO loans. Opp. 27 n.19. Although the Bureau argues that CUSO loans "were regularly extended," *id.* at 19, it admits that third parties, not ITT, "regularly extend[ed]" those loans, *see* Opp. 16 n.14. Even if the Bureau had not conceded the irrelevance of this exception, ITT would nonetheless fall within the merchant exclusion because the complaint fails to plead that ITT is "engaged significantly in offering or providing consumer financial products or services." 12 U.S.C. § 5517(a)(2)(C)(i).[8] The case ends here.

---

[8] The Bureau's regulations recognize as "significant" only those student loan servicers handling more than one million accounts. 78 Fed. Reg. 73,383, 73,396 (Dec. 6, 2013); *see also* 12 C.F.R. § 1090.106(b). There is no allegation that this case involves anywhere close to one million loans between July 21, 2011 and December 2011. ¶ 162 (alleging 8,600 third-party loans "since July 21, 2011"); Opp. 11.

**B.      The Bureau Lacks Jurisdiction In Any Event.**

**1.  No "Offering Or Providing" CUSO Loans.**  The Bureau's admission that ITT did

not originate or collect interest or fees from the CUSO loans, Opp. 1, 27 n.19, separately

establishes that ITT is not under the Bureau's jurisdiction.  The Bureau has jurisdiction only over

a person who "engages in *offering or providing* a consumer financial product or service."  12

U.S.C. § 5481(6) (emphasis added).  On the face of the complaint, ITT does neither.  The

Bureau's limited jurisdiction is not a license to police all economic activity that may touch on

finance.  *See Elec. Power Supply Ass'n v. FERC*, --- F.3d ---, 2014 WL 2142113, at *3 (D.C. Cir.

May 23, 2014) (rejecting interpretation of agency's jurisdiction that would have "no limiting

principle" and allow regulation of "any number of areas"); *Loving v. IRS*, 742 F.3d 1013, 1021

(D.C. Cir. 2014) ("[C]ourts should not lightly presume congressional intent to implicitly delegate

decisions of major economic or political significance to agencies").

The Bureau cites *United States v. Graham*, 305 F.3d 1094, 1102 (10th Cir. 2002), which

construed the dissimilar phrase "engaged in the business of . . . dealing in explosive materials."

Opp. 11.  *Graham* makes clear that courts look to the "the language and design of the statute as a

whole" when construing undefined terms.  305 F.3d at 1102 (internal quotation marks omitted).

When used in the CFPA, the phrase "engages in" is interchangeable with the verb or noun it

modifies.  For example, a "person that recklessly engages in a violation," 12 U.S.C.

§ 5565(c)(2)(B), is a "person that violates," *id.* § 5565(c)(1).  Other provisions of Dodd-Frank, of

which the CFPA is a part, confirm that "engaged" requires more than mere participation, as the

Bureau contends.  *E.g.*, 12 U.S.C. § 5393(b)(1)(B) (authorizing agency action where company

executive "engaged *or* participated in any unsafe or unsound practice") (emphasis added).  The

Bureau also ignores the more pertinent definition of "engage" as meaning "to begin and carry on

an enterprise, esp. a business or profession," Webster's Third New Int'l Dictionary 751 (1976)—

8

a definition far more consistent with the CFPA's focus than the overbroad definition the Bureau wrenches from its explosives case.  Read in context, the phrase "engage in offering or providing a consumer financial product or service" means offering or providing such products or services *as a business or profession*—which ITT indisputably did not and does not do.[9]

The Bureau insists that ITT was the "driving force" behind the third-party loans, Opp. 12, but rhetoric cannot transform ITT into a covered person under the statute.  Only an "affiliate" of a person who offers or provides a consumer financial product or service may qualify as a covered person, 12 U.S.C. § 5481(6)(B), yet the Bureau never alleges that ITT was an affiliate of the third-party lenders.  Nor does the Bureau adequately allege "control" necessary to affiliate status. *Id.* § 5481(1); *cf.* ¶ 11 (lone, conclusory assertion that unnamed third-party lenders were "controlled by ITT").  Even if the Bureau had adequately alleged control, the Bureau's failure to join those necessary parties requires that the complaint be dismissed.  Fed. R. Civ. P. 12(b)(7).[10]

The opposition's attempt to reconstruct the complaint does not cure these failings.  Many new assertions go well beyond allegations in the complaint.  *Compare, e.g.*, Opp. 11 (ITT "set[] up an entity to serve as the ostensible lender") *with* ¶ 121 (ITT was "actively involved" in creation of CUSO loans).  None of these contentions shows that ITT offered or provided a consumer financial product or service, and indeed it did not.

The Bureau argues that ITT is like other "diverse entities" covered by the CFPA, Opp. 11, but the argument supports ITT.  Where Congress intended to cover persons who provide

---

[9]   Congress rejected a proposal that would have adopted the broad definition of "covered person" that the Bureau favors.  H.R. Rep. No. 111-367, at 3 (2009) ("any person who engages directly or indirectly in a financial activity, in connection with the provision of a consumer financial product or service").  Congress's refusal to confer jurisdiction over persons who "indirectly" engage in "financial activity" forecloses the Bureau's argument.

[10]   The Bureau disagrees, Opp. 34-35, but does not deny that it seeks "rescission," that the private loans were issued pursuant to contracts between students and third parties, and that "a contracting party is the paradigm of an indispensable party."  *United States ex rel. Hall v. Tribal Dev. Corp.*, 100 F.3d 476, 479 (7th Cir. 1996) (citation omitted).  The Bureau relies on *Davis Cos. v. Emerald Casino, Inc.*, Opp. 35, but the alleged necessary party in *Davis* was not a party to the contract at issue.  268 F.3d 477 (7th Cir. 2001).

products and services other than consumer loans and credit, it did so explicitly.  *E.g.*, 12 U.S.C. § 5481(15)(A)(ii), (iii) (real estate products and services); *id.* § 5481(15)(A)(iv), (vi) (deposit taking and check cashing services);  *id.* § 5481(15)(A)(vii) (providing financial data processing products).  ITT does not fall into any of those express categories.

**2. No "Brokering."**  The Bureau also incorrectly claims jurisdiction over ITT for "brokering" CUSO loans.  Opp. 12.  Under the CFPA, "brokering" constitutes "extending credit and servicing loans."  12 U.S.C. § 5481(15)(A)(i) (defining "financial product or service" as "extending credit and servicing loans, *including* acquiring, purchasing, selling, *brokering*, or *other extensions of credit*") (emphases added).  No allegation suggests that ITT extended or serviced CUSO loans.  *See* Opp. 12-13.  Nor is any alleged activity akin to "acquiring, purchasing, [or] selling" credit, 12 U.S.C. § 5481(15)(A)(i).  *See Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754, 1760 (2013) (construing term in light of its "linguistic neighbor").

The Bureau likens "broker" to "originator," Opp. 13, then haphazardly pulls examples of "originator" from *other* statutes and regulations, without showing that Congress had those terms in view in enacting the CFPA.  Dodd-Frank, however, expressly incorporates the traditional definition of broker as one who engages "in the business of effecting transactions . . . for the account of others."  12 U.S.C. § 5301(15) (cross-referencing 15 U.S.C. § 78c); Mot. 14-15.[11]

There is no support for the Bureau's startling claim that it may sue ITT for activities taken pursuant to Department of Education regulations.  Opp. 14.  Its sole authority, *Spiegel*, held only that a mail-order catalog's practice of suing customers in a distant state forum could be deemed to violate federal law.  540 F.2d at 294.  That is far from punishing ITT for advising

---

[11]   The Bureau argues, not that ITT effects loan transactions for compensation, but that "other federal laws contemplate" that schools may "engag[e] in brokering activities" for lenders.  Opp. 14.  Accepting, *arguendo*, the Bureau's characterization of those laws, they merely show that Congress knows how to speak with clarity when imposing brokering liability on schools.  Congress has not chosen to do so here.

students on loan options and assisting them in securing financial aid—activities that colleges are *required* to undertake.  20 U.S.C. § 1019a.  Punishing a defendant for lawful conduct violates due process.  *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978); *accord TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 454 & n.17 (1993) (plurality).

   **3.  No "Financial Advisory Services."**  The Bureau's conception of its jurisdiction is excessive:  If offering "advice and assistance regarding loans and other means to finance tuition" were a "financial advisory service" under the CFPA, Opp. 15, the Bureau would have jurisdiction over every university, preparatory and parochial school in America.  There is no evidence Congress intended to bring about such a limitless result.  *Loving*, 742 F.3d at 1021.

   Quite the contrary, the legislative history shows that the section is "more narrowly drawn" than the Bank Holding Company Act, which covers only activities "closely related to banking."  S. Rep. No. 111-176, at 160 (2010); Mot. 16; *see also* 12 C.F.R. § 225.28(a).  The BHCA's limits are also consistent with the ordinary meaning of "credit counseling" and "debt management," 12 U.S.C. § 5481(15)(A)(viii), terms which describe formal *analysis* of a consumer's personal finances.  28 C.F.R. § 58.12(b)(12); *see also* H.R. Rep. 112-559, at 261 (2012).  Contrary to the Bureau's suggestion that ITT might nonetheless qualify as an "investment or financial advisor" under BHCA regulations, Opp. 15, the complaint never alleges credit counseling or any activity that would satisfy the "[a]cting as investment or financial advisor" category under the BHCA and its regulations.

   **4.  Not A "Service Provider."**  As a last resort, the Bureau asserts that ITT was a "service provider" to Student CU Connect CUSO, LLC and Eli Lilly Federal Credit Union, two entities not named in the complaint.  Opp. 1 n.1, 11, 16.  Nowhere has the Bureau alleged anything about the legal relationship between ITT and these entities or the nature of the "material

services" ITT supposedly provided them after July 21, 2011.  The Bureau offers only unsupported generalities about ITT's supposed "soup-to-nuts role" in actions by those third-party lenders.  *Id.* at 16; *see also* Mot. 7; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Previously, the Bureau described service providers as performing "outsource . . . functions."  CFPB Bulletin 2012-03, at 1; Mot. 18 n.11.  The Bureau's attempt to denigrate its own official interpretation highlights the shifting sands on which its case is built, and should be rejected.  *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012).  Vague assertions that ITT "help[ed] to further 'design,' 'maintain,' and 'operate'" CUSO loans are conclusory and contribute nothing to satisfying the Bureau's jurisdictional burden.  Opp. 17.

## IV.   THE CFPA CLAIMS FAIL ON THEIR OWN TERMS

### A.   The New "Bait-And-Switch" Theory Is Incoherent And Fails.

The Bureau newly characterizes the conduct at issue as "bait-and-switch," where the "bait" is Temporary Credit and the "switch" are CUSO loans.  Opp. 2.  But no student could have been "baited" with Temporary Credit at enrollment *and* "switched" into a private loan at repackaging during the period at issue (*i.e.*, between July 21, 2011 and December 2011).  Mot. 30-31.  Temporary Credit was available during students' first academic year, whereas CUSO loans were not available until students' second academic year.  ¶¶ 6-8.  The Bureau does not claim that the initial extension of Temporary Credit is unlawful; but in any event it occurred for those who took CUSO loans before the claims period.  Although the Bureau asserts that "students felt they had no choice but to take on [CUSO loans]" when Temporary Credit came due, Opp. 26-27, having to pay is an *effect* of the extension of credit before July 21, 2011.  Claims "cannot be revived by pointing to effects within the limitations period of unlawful acts that occurred earlier."  *Dasgupta v. Univ. of Wis. Bd. of Regents*, 121 F.3d 1138, 1140 (7th Cir. 1997); *see also Atkins v. Chicago*, 631 F.3d 823, 832 (7th Cir. 2011) (plaintiff "can plead himself

12

out of court" with "facts that show that he has no legal claim"); *Baker v. Capital One Bank (USA), N.A.*, 2012 WL 5930094, at *3 (S.D. Ind. Nov. 26, 2012) (Barker, J.) (dismissing with prejudice given facts "already pleaded").

**B.    Count 1:  The Complaint Fails To Allege "Unfair" Conduct.**

**1.  No Substantial Injury Caused by ITT.**  The Bureau claims that students with CUSO loans suffered "substantial injury" from "high" interest rates and origination fees, and because of "projected" default rates of PEAKS and CUSO loans.  Opp. 2, 20.  To the extent the Bureau seeks to impose liability for consequences flowing from "high" interest rates, the Bureau exceeds its jurisdiction.  Opp. 22; 12 U.S.C. § 5517(*o*) (Bureau has no authority "to establish a usury limit applicable to an extension of credit").  Moreover, the interest rates and fees were set, imposed, and collected by third parties, not ITT, precluding causation.  12 U.S.C. § 5531(c)(1)(A); Opp. 27.  The Bureau also cannot deny that all rates and fees were fully disclosed to students before they entered into private loans, and that students were told that Temporary Credit was, indeed, temporary and due at the end of the academic term.  Mot. 24 & Ex. B–C.  The Bureau faults ITT's disclosures for not stating "that ITT would push students into repaying the balance" when it became due, Opp. 23; ITT's statement that balances were due on a specified date, however, clearly meant just that.  The Bureau never alleges that ITT told students it would automatically continue to extend additional Temporary Credit after they were in arrears.

Equally meritless are the Bureau's claims of "presently project[ed]" default rates for CUSO loans.  ¶ 154.  The Bureau lumps together *all* students who took private loans at any time—including during the 2009 financial crisis—without attempting to allege, as it must, injury to CUSO borrowers in late 2011.  *Id.*  Simply asserting that injury to these borrowers "seems evident," Opp. 20, is not sufficient to satisfy pleading standards.  More fundamentally, the Bureau cites no case in which default rates were a "substantial injury" caused by a party that

neither originated nor serviced the loans at issue.  Rather, the Bureau's authorities are consistent with ITT's position.  *See* Opp. 20-21; *FTC v. Neovi, Inc.*, 604 F.3d 1150 (9th Cir. 2010) (substantial injury from unauthorized checks drawn using defendant's accounts); *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354 (11th Cir. 1988) (substantial injury from defendant's collection of unauthorized fees); *FTC v. Zamani*, 2011 WL 2222065 (C.D. Cal. June 6, 2011) (substantial injury from defendant's collection of fees).

Merely asserting ITT's "involvement" in the financial aid process is insufficient to plead causation.  Opp. 21.  As discussed, *see supra* Part III, mere involvement with a financial product or service does not trigger the Bureau's jurisdiction.  Further, the Bureau's view of proximate causation—which must be proved under any federal cause of action, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014)—is far too broad.  By the Bureau's lights, the Department of Education also "caused" injury from defaults because the vast majority of students' financial aid comes from federal programs whose regulators exert "control over the financial aid process."  Opp. 21.  That is not the law of proximate causation; a defendant cannot be liable for "merely creat[ing] a 'condition' by which the subsequent injury was made possible."  *Peck v. Ford Motor Co.*, 603 F.2d 1240, 1245 (7th Cir. 1979); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 343 (2005) (alleging a condition that "will *sometimes* play a role in bringing about a future loss," even if it "may prove to be a necessary condition of any such loss," is "insufficient" to survive a motion to dismiss).[12]

### 2. Any Injury Was "Reasonably Avoidable."  Injury is reasonably avoidable when

---

[12]   The Bureau does not deny that withholding course materials and transcripts from students who are in arrears is a practice that all schools employ.  Although the Bureau suggests that such practices nonetheless were "unfair," Opp. 22, Seventh Circuit law is to the contrary.  *Todd v. Collecto, Inc.*, 731 F.3d 734, 739 (7th Cir. 2013); *see also Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 609 (7th Cir. 2013); Mot. 22, 28.  The Bureau relies on *FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 948 (N.D. Ill. 2008), Opp. 22, but unlike this case, *IFC* involved allegations of a "massive fraudulent scheme" that justified setting aside contract terms.

those allegedly harmed "have reason to anticipate the impending harm and the means to avoid it" or can reasonably mitigate the harm after the fact.  *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168-69 (9th Cir. 2012).  The Bureau does not deny that students were advised of the limited term of Temporary Credit and all potential interest rates and fees on CUSO loans—the asserted "injury"—before enrolling at ITT.  Mot., Ex. A–C.  This distinguishes the Bureau's cases involving flawed disclosures or affirmative misrepresentations.  *Neovi*, 604 F.3d at 1155 (business model "facilitated fraud"); *Orkin*, 849 F.2d at 1365 ("contracts give no indication" of possible fee increase); *FTC v. INC21.com Corp.*, 745 F. Supp. 2d 975, 990-91 (N.D. Cal. 2010) ("misrepresentations to customers"); *FTC v. Windward Mktg., Inc.*, 1997 WL 33642380, at *11-*13 (N.D. Ga. Sept. 30, 1997) (unauthorized bank draft).  The Bureau complains that the disclosures were "buried," Opp. 24, but ITT is *required* to provide numerous, lengthy disclosures under Department of Education regulations.[13]

**3.  Benefits To Students Outweigh Any Injury.**  CUSO loans gave students an option for continuing their education when private student loans were otherwise unavailable.  Mot. 2-3.  The Bureau does not deny the significant benefits of an ITT degree; rather, it speculates that CUSO loans were "unnecessary" because, in the Bureau's judgment, ITT could have given all students Temporary Credit in 2011.  Opp. 25.  Questions of business necessity are well beyond the Bureau's competence and outside the scope of the statute, which mandates a balancing of "substantial injury" against "countervailing benefits."  12 U.S.C. § 5531(c)(1)(B).  The Bureau cites no case in which an alleged injury outweighed the substantial benefits that flow from a college education; the fraudulent telemarketing scheme in *Windward Marketing* did not have "any benefits to consumers or competition."  1997 WL 33642380, at *13; Opp. 25.

---

[13]   The Bureau references unspecified "deceptive and misleading tactics" to create the illusion of unfairness, Opp. 21 n.16, but fails to plead those assertions with particularity, Fed. R. Civ. P. 9(b); Mot. 19 n.12, and pleads no claims for which they are elements.  Those assertions should be disregarded.

**C.      Counts 2 & 3:  The Complaint Fails To Allege "Abusive" Conduct.**

**1. ITT Did Not Take Advantage Of Students' Vulnerability.**  The Bureau aims to

make new law by arguing that "'took unreasonable advantage'" means to "'profit by.'"  Opp. 26.

Merely making a profit is not abusive, and this overbroad construction should be rejected.

The assertion that ITT "unreasonably profited" from third-party loans is conclusory,

vague and implausible.  *See Yeftich v. Navistar, Inc.*, 722 F.3d 911, 917 (7th Cir. 2013).  Again:

ITT received no fees or interest from CUSO loans.  Under any plausible interpretation,

"unreasonable advantage" requires more than rationalizing that ITT "benefitted" indirectly from

third-party loans when other funding sources had "dried up."  Opp. 27; ¶ 99.  If the Bureau's

theory stated a claim, the entire higher education sector would be taking "unreasonable

advantage" of students.  *Cf. Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief &

Dev.*, 291 F.3d 1000, 1021 (7th Cir. 2002) (rejecting interpretation that would impose "almost

unlimited liability").  The Bureau's theory also founders on its own assertions that ITT took

"much of the risk" of CUSO loans supposedly predestined to fail, Opp. 11; ¶ 154.[14]

The Bureau's refrain that ITT "rushed" the repackaging process, Opp. 26, is baseless.

The only paragraphs cited in the complaint either pertain to the initial enrollment stage, not the

later repackaging stage, or are conclusory and untied to the relevant period in 2011.  *See Mot.

15-16, 26; see also Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014) (complex

claims pled "in wholly conclusory terms" fail to state a claim).  Moreover, inability to pay tuition

not covered by federal aid or school credit is not an indication that students could not protect

themselves.  *Cf.* Opp. 26-27; ¶ 109.  It is why private loans exist, and not only for ITT students.

Further, the availability of other sources of funding and options for reducing the annual cost of

---

[14]   To argue that it was ITT's "plan" for students to have access to private loans, the Bureau improperly relies on
out-of-context investor discussions in January 2010—well before the CFPA's enactment—regarding *PEAKS loans*
not at issue.  ¶¶ 133-137.  Those discussions confirm what all students were told:  Temporary Credit is temporary.

education renders it implausible that students somehow would "los[e] their investment" in their degree if they did not take a particular third-party loan.  Opp. 26; ¶ 104; Mot. 28.  Among other options, students could switch to part-time status or borrow from family or friends.  These common scenarios do not cause students to "lose" their investment.[15]

Despite the Bureau's attempts to dismiss the significance of ITT's clear and correct disclosures to students regarding Temporary Credit and the third-party CUSO loans, Opp. 28, ITT provided students with the information necessary, and time, to seek out other sources of funds to meet their financial obligations to ITT.  Indeed, incorporated in the Enrollment Agreement that every new student signed, ITT expressly "encourage[d] student and parent borrowers to . . . shop around to obtain private Loans from Lenders who offer the best combination of Terms for the borrower's particular circumstances."  Ex. F; *see also* Mot. 22, 28.

**2.  ITT Did Not Take Advantage Of Students' Reliance.**  The Bureau fails to allege sufficiently that ITT took unreasonable advantage of students' reasonable reliance.  Citing two cases about *misrepresentations*—no misrepresentations are alleged here—the Bureau invents an overbroad definition of "reasonable reliance" that would apply whenever "reasonable and prudent persons" would rely on a defendant "to act in their interests."  Opp. 29.  It does not follow that efforts to help students "get better jobs and higher salaries" means that it was reasonable for students to rely on ITT for *personal financial counseling*.  *Id.* at 30.  Reasonable reliance under the CFPA must be tied to some affirmative conduct by a covered person pertaining specifically to a "consumer financial product or service"—not to general expressions of helpfulness.  ITT's staff is *not* trained to act as students' personal credit counselors, and the Bureau does not plausibly allege otherwise.  The Bureau's expansive theory of "reasonable

---

[15]  Students often work while attending college—including 40.4% of students attending private four-year colleges in 2012.  Inst. of Educ. Scis., Nat'l Ctr. for Educ. Statistics, *Digest of Education Statistics*, http://nces.ed.gov/programs/digest/d13/tables/dt13_503.20.asp (last visited July 21, 2014).

reliance" would justify an enforcement action anytime a consumer claims dissatisfaction with a business, a result Congress never intended.

Even if the Bureau is not required to prove the reasonable reliance of *all* students, Opp. 29 n.22—a point ITT disputes—the Bureau still must allege facts to demonstrate that *some* students reasonably relied on ITT for a covered product or service. The Bureau notes that reasonable reliance presents fact questions, Opp. 31, but there are frequent instances where purported reliance is "unreasonable as a matter of law." *Pierce v. Atchison, Topeka & Santa Fe Ry. Co.*, 65 F.3d 562, 570 (7th Cir. 1995). This is one of them. Students who received Temporary Credit acknowledged, in writing and with a signature, that it was due at the end of the term and that failure to repay on time would result in default. Mot., Ex. B, at 3. Schools may withhold services when a student is in default on financial obligations. *Todd*, 731 F.3d at 739. There is no allegation that ITT told students that they could expect to receive additional Temporary Credit while in default. Thus, any reliance by students on the continued availability of Temporary Credit would have been unreasonable as a matter of law.

The Bureau has no response to ITT's argument that students have educational and professional interests apart from purely financial concerns. Mot. 33. CUSO loans made higher education possible for many students during the financial crisis—an obvious benefit.[16] "Projected" default rates do not categorically negate these benefits. Opp. 31-32. In 2012, for example, the government estimated that 49% of federal Title IV loans to students who graduated in 2009 from two-year private sector colleges would default at some point over 20 years. Ex. G. The Bureau does not contend that the *government's* loans are "abusive."

---

[16] *See* Bd. of Governors of the Fed. Reserve Sys. and FDIC, *Unfair or Deceptive Acts or Practices by State-Chartered Banks* (Mar. 11, 2004), http://www.fdic.gov/news/news/financial/2004/fil2604a.html (benefits that offset injurious effects of an act or practice "may include lower prices or a wider availability of products and services").

## V.      COUNT 4:  THE BUREAU'S REGULATION Z ARGUMENTS ARE MERITLESS

**A.**  Even if Count 4 were not precluded by the merchant exclusion, it is subject to TILA's one-year statute of limitations.  15 U.S.C. § 1640(e).  Nothing exempts government agencies from its express terms, and the Bureau cites no case holding that the concerns that led Congress to circumscribe TILA liability in § 1640(e) do not apply when the plaintiff is a federal agency.  Government agencies asserting a cause of action are no less bound by the statute of limitations than private parties.  *See Gabelli v. SEC*, 133 S. Ct. 1216, 1223 (2013).[17]

**B.**  The Bureau's theory is that offering a fully-disclosed *discount* on repayment of overdue debt constitutes an undisclosed *finance charge* under Regulation Z.  To force this theory into the Regulation Z framework, the Bureau creates a new financial product that it dubs "ITT Installment Loans," that appears nowhere in the complaint.  *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011).

A discount operates as a finance charge where a business charges a higher price to credit customers than it charges to cash customers for a particular transaction.  *See, e.g., Virachack v. Univ. Ford*, 410 F.3d 579, 582 (9th Cir. 2005); *Odier v. Hoffman Sch. of Martial Arts, Inc.*, 619 F. Supp. 2d 571 (N.D. Ind. 2008).  But there is no allegation that ITT charged a higher price to students who financed their tuition with Temporary Credit compared to those who paid with cash.  Rather, the Bureau argues that the relevant "transaction" occurred when graduating students entered into "ITT Installment Loans" to pay overdue balances.  Opp. 34; *see also Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 409 (3d Cir. 2000) ("'[C]onsumer credit transactions' arose when homeowners entered into payment plans with respect to the . . .

---

[17]   The Bureau is also incorrect that no court has applied TILA's statute of limitations to a public enforcement action.  Opp. 32; *Consol. Bank, N.A. v. U.S. Dep't of Treasury*, 118 F.3d 1461, 1467 (11th Cir. 1997) (construing § 1640(e) as applying to the Office of Comptroller of Currency); *Citizens State Bank v. FDIC*, 751 F.2d 209, 218 (8th Cir. 1984) (applying § 1640 limitations against the FDIC).  Indeed, the same section that provides TILA's statute of limitations contains numerous other provisions applicable to federal agencies.  *E.g.*, 15 U.S.C. § 1640(e) (authorizing federal agency to intervene in and remove action by state).

obligations.").  As to *this* transaction, the Bureau fails to allege that ITT charged a higher price to credit customers than cash customers.  Only students who entered into installment plans were using credit and uniformly paid the full amount of their debt; students who settled their debt with cash at a discount *never entered into the transaction*.  In fact, ITT charged all students the same price for their tuition, and the same price for any "Installment Loans" they opted to take.  *See* 12 C.F.R. pt. 226, supp. I, at 624 (2013) ("Charges imposed uniformly in cash and credit transactions are not finance charges").

The Bureau's reliance on *Pollice* is misplaced.  There, Regulation Z required disclosure because the installment plans carried interest and fees—indisputably finance charges.  225 F.3d at 414; 12 C.F.R. § 1026.4(b)(1)-(3).  Here, in contrast, students who paid over time paid the face value of their outstanding debt, nothing more.  Allowing customers to pay off TILA-exempt debt in installments would not encourage an "end-run around TILA disclosures," Opp. 34 n.24, because interest-free installment payments that cost the same for *all* customers do *not* "otherwise subject the lender to TILA" *id.*; *see also* 12 C.F.R. pt. 226, supp. I, at 624.  Regulation Z does not apply when a creditor and a defaulting debtor work out a repayment schedule to settle the existing debt without imposing interest or fees.  12 C.F.R. §§ 1026.1(c), 1026.4(b)(1), (c)(2).  That is all that happened here.  Count 4 must be dismissed.

## CONCLUSION

The complaint should be dismissed with prejudice.  The Bureau's informal request for leave to amend if the complaint is "deficient," Opp. 35, should be denied on futility grounds; or, at a minimum, it should be tested by a formal motion for leave to amend.

Dated:   July 22, 2014

Respectfully submitted,

ICE MILLER, LLP

By:   /s/ *Philip A. Whistler*
      Philip A. Whistler (#1205-49)

Thomas E. Mixdorf (#16812-49)
One American Square, Suite 2900
Indianapolis, IN  46282-0200
Telephone:  (317) 236-2100
Facsimile: (317) 236-2219
Philip.Whistler@icemiller.com
Thomas.Mixdorf@icemiller.com

GIBSON, DUNN & CRUTCHER LLP
Timothy J. Hatch (*pro hac vice*)
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile:  (213) 229-7520
THatch@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
Douglas R. Cox (*pro hac vice*)
Jason J. Mendro (*pro hac vice*)
Lucas C. Townsend (*pro hac vice*)
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: (202) 955-8500
Facsimile:  (202) 467-0539
DCox@gibsondunn.com
JMendro@gibsondunn.com
LTownsend@gibsondunn.com

*Attorneys for Defendant*
*ITT Educational Services, Inc.*

21

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2014, a copy of the foregoing Reply Brief In Support Of Defendant's Motion To Dismiss, including the accompanying exhibits, was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


_/s/ Philip A. Whistler_
Philip A. Whistler