# ESI SUPPLEMENT TO CASE MANAGEMENT PLAN

To be prepared and submitted as directed pursuant to paragraph III.K. of the Master Case Management Plan or by Court Order.

1. Discovery Scope.  Following a detailed discussion between counsel of a discovery plan for this matter, each party should outline below the categories and types of information that party intends to seek in discovery in this matter. This outline should include, in addition to identification of the various topics on which discovery will be sought and identification of the nature and type of documents to be produced, a list by each party of the potentially relevant custodians of such information and the date ranges relevant to discovery in this matter.

    Plaintiff:

    In addition to third-party discovery, the Bureau plans to seek documents and information from ITT as outlined in the following five categories:

    1. **ITT's role in the ITT Private Loan Programs.** This category includes email communications, presentations, analyses, reports, and other documents and information regarding ITT's relationship with the other parties to the loan programs, ITT's control or influence over the management, design, and operation of the programs, ITT's knowledge of students' outcomes and ability to repay, and ITT's financial risks and benefits from the loan programs.

    2. **The roles and actions of ITT's financial aid staff.** This category includes documents and information regarding training, company policies and procedures, staff compensation and performance evaluation, organizational structure, and complaints and corrective actions relating to the financial aid services provided to ITT students.

    3. **ITT's consumer communications.** This category includes communications between ITT and students and prospective students in connection with: the ITT Private Loan Programs; Temporary Credit; the ITT Installment Loans; transferring credits; admissions testing; and students' outcomes and ability to repay student loans.

    4. **The purpose, operation, and outcomes of the ITT Private Loan Programs, Temporary Credit program, and the ITT Installment Loan program, and the loans made through these programs.** This category includes email communications, presentations, analyses, reports, and other documents and information regarding the loans and loan programs, as well as the default, delinquency, and repayment status of any loans held or serviced by the programs.

5. **ITT's financial aid files.** This category includes the financial aid files for ITT students who were offered or provided an ITT Private Loan after July 21, 2011, as well as ITT students who were offered or provided an ITT Installment Loan from 2009 through the present.

To the extent ITT has already produced documents in response to a Civil Investigative Demand, and done so in accordance with the Bureau's Document Submission Standards, the Bureau will not seek duplicative productions.

**Likely Custodians at ITT:**

1. Financial aid staff and management at the local, regional, and corporate levels.

2. Corporate managers and other personnel involved in financial strategy for ITT, including the development and operation of the ITT Private Loan Programs, Temporary Credits, and the ITT Installment Loans.

3. Corporate and regional managers involved in collecting, compiling, manipulating, disseminating, and reporting data and information on default rates, job placement, and student outcomes.

**Relevant Date Range:**

The Bureau's CFPA claims relate to ITT Private Loans extended after July 21, 2011, and ITT's role in the ITT Private Loan Programs since they were first being planned in 2008. The Bureau's TILA claims relate to ITT Installment Loans extended from January 1, 2009 through the present. The Bureau will tailor the date ranges accordingly for each area of discovery, for efficient management of the case and to minimize the burden on the Defendant.

Defendant:

ITT intends to seek discovery from the Bureau related to its investigation of ITT and the basis for its contentions in its complaint:

1. **Information Collected from Third Parties:** This category includes documents and information that the Bureau collected from third parties, which the Bureau has not shared with ITT.

2. **Information Received from other Governmental Entities Regarding ITT:** This category includes documents and information regarding ITT that the Bureau received from any other agency, state or federal, or other governmental entities.

3. **The Bureau's Investigation and Claims:** This includes discovery addressed to the basis for the Bureau's claims and contentions, and the

>   manner by which it conducted its investigation of ITT and determined to pursue this action, as relevant to ITT's defenses.

   **Relevant Date Range:** ITT would limit its requests to the time period encompassed by the date when the Bureau began consideration of its investigation of ITT to the present.

2. ESI Sources and Volumes. With regard to the discovery outlined in paragraph 1, each party should discuss the types of ESI (*e.g.*, Outlook e-mail, Word documents, Excel spreadsheets, CAD drawings, etc.) implicated by the opposing party's requests (meaning that Defendant should address the categories and types of information identified by the Plaintiff, etc.), any proprietary software involved in the production of such ESI, the location of such ESI (*e.g.,* 14 servers located in 3 states, 57 individual PC hard drives that are not connected to a central server, etc.), and the estimated volume of ESI implicated by such requests (*e.g.*, 20 GB of Outlook .pst files, 500 MB of Excel spreadsheets, etc.).

   Plaintiff:

   The Bureau's document management tool is Relativity, and the Bureau will produce all ESI using Relativity. The Bureau currently holds approximately 135 GB of potentially relevant and discoverable data, some of which is already in ITT's possession.

   Defendant:

   ITT's document management tool is Relativity, and ITT will produce ESI using Relativity to the extent practicable. Some information the Bureau seeks, however, may be maintained on proprietary software that cannot be processed in Relativity.

   The Bureau's requests potentially implicate numerous document types, including electronic communications, Word documents, Excel spreadsheets, presentations, and propriety software.

   Given the time period suggested by the Bureau, ITT expects that most of the information the Bureau intends to request is housed on backup tapes and, thus, not reasonably accessible. At this time, ITT's outside discovery vendor, Navigant, has collected approximately 1,500 backup tapes that might be implicated by the Bureau's requests. These tapes contain information, primarily from ITT's corporate headquarters, dating from December 2008 through July 2012. Navigant estimates that the tapes it has collected to date contain approximately 97,000 GB of data, much of which is redundant. ITT believes that if the Bureau is permitted to take wide-ranging discovery related to its more than 140 regional and local locations across the United States, additional backup tapes also may be implicated. ITT is working with Navigant to determine the potential volume of such additional tapes. The period for which historical information is available varies across ITT campuses. Depending on how many ITT locations and custodians from which the Bureau seeks documents, the volume of this information could be potentially massive and difficult to identify and retrieve. Recent data is housed on a cloud-based system.

3. <u>Accessibility</u>.  Identify any potential sources of ESI in this matter that are "not reasonably accessible" as defined by Fed. R. Civ. P. 26(b)(2)(B).

   <u>Plaintiff</u>:

   The Bureau does not have any sources of relevant and discoverable ESI which are not reasonably accessible.

   As to the burden on ITT in responding to theoretical discovery requests from the Bureau, the Bureau does not have sufficient information to offer an opinion. However, as discussed below, ITT is or will be responding to overlapping requests in other matters, thereby reducing any burden imposed in this matter.

   Since the Bureau served its original Civil Investigative Demand in May 2012, ITT has been on notice of the subject matter of the Bureau's investigation and of ITT's obligation to preserve and retain potentially relevant documents in a reasonably accessible format. In addition, shortly thereafter, ITT was notified of an investigation by the Securities and Exchange Commission (SEC) dealing with similar topics and bearing a similar obligation to preserve ESI. To the extent ITT transferred relevant information to backup tapes after being made aware of these investigations, any difficulty in retrieving that information is self-imposed and should be considered by the Court in determining whether the data is reasonably accessible.

   With respect to ITT's obligations under the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g, ITT incorrectly states that written consent from consumers may be required. The relevant regulation allows for an exception when information is sought pursuant to a court order or a valid subpoena, in which case ITT need only notify students and provide an opportunity for them to "seek protective action." 34 CFR § 99.31(a)(9)(ii). As a court order or subpoena can be obtained in this matter, ITT will not be required to obtain written consent. Id. at § 99.31(a)(9)(i). In addition, though ITT claims that even notification will be a substantial burden, in fact, the servicer for the ITT Private Loans is (or should be) in regular contact with the relevant student population. ITT, as part of their ongoing involvement with the loan program, is in regular contact with the servicer and therefore the contact information for these students is readily accessible to ITT. Notifying those 8,600 students will be a straightforward task.

   <u>Defendant</u>:

   ITT began migrating its data to an Office 365 cloud environment in 2012.  Because the Bureau's requests concern information preceding that migration, ITT expects that virtually all of the information the Bureau seeks will be housed on backup tapes that are not reasonably accessible.  At this time, Navigant has collected approximately 1,500 backup tapes from ITT, and those are generally focused on information generated at ITT's corporate headquarters.  ITT and Navigant are currently working to determine how many additional tapes may contain responsive information if the Bureau is permitted to seek discovery from all of ITT's more than 140 campuses.

The vast majority of the information the Bureau now proposes to seek was stored on backup tapes before the Bureau issued its first CID.  The Bureau's speculation to the contrary is baseless.  Moreover, it is neither practical nor required for companies in receipt of CIDs to construct vast IT infrastructures capable of housing all of their data generated nationwide, over a period of more than six years, in active servers.  In fact, the instructions set forth in the CFPB's CIDs do not require information to be preserved on active servers.  In addition, the CFPB ceased communicating with ITT for more than a year after ITT petitioned the Bureau, consistent with the Bureau's own procedures, to modify or set aside the first CID it issued in May 2012.  And although the Bureau never decided ITT's petition on the merits, the Bureau ultimately withdrew that initial CID altogether.  The second CID the Bureau issued in September 2013 was narrower, and on September 27, 2013 and October 7, 2013, the Bureau formally modified its second CID to limit it further.  That is the only CID that had not been withdrawn before the Bureau filed this action, making it all the less reasonable for the Bureau to suggest that ITT was obligated to maintain a much broader set of data in active servers.

The Bureau also indicates that it will seek student financial aid files for 8,600 or more students.  These requests potentially trigger onerous statutory obligations, subject to limited exceptions, under the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g.  In order to produce these files, ITT may have to seek consent of each individual student whose files are responsive to the Bureau's request.  As noted on page 5 above, responding to this request would require inordinate cost and time, and ITT may be unable to secure consents.  Even if consents were excused by an order of the Court, FERPA would nonetheless impose burdensome notice requirements and other procedures that would increase the costs of discovery in this matter.

4. ESI Management Software.  Describe the software each party intends to use to manage any ESI produced in this matter and identify the Information Technology personnel primarily responsible for assisting counsel with the production and management of ESI in this matter.

   Plaintiff:

   The Bureau intends to use Relativity to manage the review and production of ESI in this matter. Dmitry Chesnokov will be the Information Technology person primarily responsible for assisting counsel with the production and management of ESI in this matter.

   Defendant:

   ITT intends to use Relativity to manage review and production of ESI in this matter, to the extent practicable.  Mark Clews of Navigant, together with a team of consultants, would assist attorneys in managing the restoration, processing, hosting, and production of ESI.  Christopher Sasso of Gibson Dunn would assist in this effort.  Michael Quesada is ITT's VP IT Infrastructure and would also assist as necessary with the collection and management of ESI.

5

5. <u>Metadata</u>. Identify the potential sources of metadata in this matter and each party's anticipated use of metadata in this matter.

   <u>Plaintiff</u>:

   The Bureau's discovery requests will seek production that conforms with the Bureau's Document Submission Standards, which are standard in all of the Bureau's enforcement actions. The Document Submission Standards request the production of a .dat file containing extracted metadata from all ESI. This metadata will be used to load, sort, and search the produced ESI in the Bureau's review tool. Certain metadata fields may also be used as evidence and for admissibility purposes.

   <u>Defendant</u>:

   ITT anticipates that it would be able to produce metadata to the extent it is available.

6. <u>ESI Format</u>. Set forth the format in which each party will produce ESI in this matter.

   <u>Plaintiff</u>:

   The Bureau intends to produce any responsive information in the same format as specified in the Bureau's Document Submission Standards (attached as Ex. 1).

   <u>Defendant</u>:

   ITT intends to produce documents in native format when practicable and cost efficient. ITT may not be able to produce some information, such as that created or stored in proprietary software, in native format.

7. <u>Discovery Sequencing</u>. Have the parties agreed on a plan for the sequencing of discovery in this matter? ☐ ☐ No

   If yes, please describe such agreements:

   If no, please describe the efforts undertaken to reach agreement and identify the issues that remain outstanding:

   <u>Plaintiff's Statement</u>:

   On July 10, 2014, the Court denied ITT's motion to stay discovery, "provided that, pending resolution of Defendant's motion to dismiss, discovery shall be limited to a single set of production requests to be served by Plaintiff." The Bureau intends to serve those requests as soon as practicable. As other discovery of ITT is stayed pending the ruling on the motion to dismiss, the parties have not yet formed a plan for sequencing

6

the remainder of discovery. The Bureau is ready and willing to discuss such sequencing at any time.

Defendant's Statement:

ITT believes that it would be most efficient to sequence discovery based on the accessibility of data and the relevance of the discovery requests to threshold issues, the development of which is most likely to advance the litigation. Inasmuch as the Bureau intends to seek information about thousands of students, ITT also believes that data sampling, such as the parties agreed to in pre-suit discovery, might be an appropriate means of advancing the litigation, while mitigating undue burdens. ITT will meet and confer with the Bureau in good faith after reviewing its document requests.

8. Search Protocol. Have the parties agreed on any protocol for the identification and review of relevant ESI (*e.g.*, search terms, predictive coding, etc.)? ☐ No

If yes, please describe such agreements, including, if applicable, a list of agreed search terms to be used:

If no, please describe the efforts undertaken to reach agreement and identify the issues that remain outstanding:

Plaintiff's Statement:

During the conference on May 13, 2014, the Bureau offered to work with ITT to craft search terms to streamline discovery. ITT took the position that discovery, and any discussions related to crafting discovery efforts, were premature. Therefore the parties did not discuss specific search terms. ITT maintains the position that discussions related to discovery are premature and has filed a motion to stay discovery. The Bureau remains open to working with ITT to craft search terms, as well as to limiting discovery by date and custodian and discussing predictive coding, once ITT is willing to engage in substantive discussions regarding discovery.

Defendant's Statement:

ITT has offered to cooperate with the Bureau in good faith to devise means to streamline discovery if any of the Bureau's claims proceed beyond ITT's motion to dismiss. Having not been provided with the Bureau's specific requests, ITT is not able to propose specific search terms at this time. Moreover, the Bureau has not provided any specific suggestions as to how discovery could be streamlined consistent with its wide-ranging requests. ITT has, however, conferred with the Bureau about some of the ways in which its general categories of discovery topics are overly broad and would impose undue burdens on ITT.

Furthermore, after previously receiving specific document requests in the Bureau's CIDs, ITT conferred with the Bureau about specific search terms that it used to review potentially responsive ESI, and the Bureau did not object to those terms or to ITT's

approach.  For example, as noted in ITT's December 9, 2013 letter transmitting a document production to the Bureau, ITT searched the files of nine different corporate custodians identified by the Bureau, and ITT used the following search terms: ("Temp* credit") AND (refinan* OR refi* OR re-fi* OR finance* OR convert* OR pay* OR pack* OR repack* OR re-pack* OR roll*) AND (PEAKS OR CUSO OR "Student CU" OR SCUC OR ELFCU OR ELIFCU OR "Eli Lilly" OR Liberty OR RSA OR "risk sharing agreement").  If any discovery proceeds in this matter, ITT would be prepared to discuss proposed search terms with the Bureau after reviewing its specific requests.  ITT would also consider in good faith any proposals offered by the Bureau.  ITT has also asked the Bureau if it would consent to the use of predictive coding as a means of reducing discovery costs.

9.  Preservation.  Describe what efforts each party has undertaken to ensure the preservation of ESI potentially relevant to this matter and identify any unresolved issues pertaining to the preservation of ESI in this matter?

    Plaintiff:

    The Bureau has a litigation hold in place to preserve all potentially relevant ESI.

    The Bureau has concerns about ITT's characterization of its ESI as being preserved in a format that is "not reasonably accessible." *See* Sections 2, 3, 10, and 12.

    Defendant:

    ITT has issued appropriate litigation holds, as well as several follow-up holds, to preserve ESI.  ITT also has taken reasonable, good faith efforts to preserve backup tapes that were in existence as of the date of the original Civil Investigative Demand.


10.  Cost of Production.  Each party should analyze the data provided in paragraph 2 and provide an estimate of the costs associated with production of ESI in this matter:

     Plaintiff:

     The Bureau does not expect its costs of production to be significant.

     The expense of attorney and paralegal time in reviewing productions is not properly calculated as a cost of production. Thus, the Bureau does not factor in such costs.

     Though ITT states that it has produced substantial amounts of information to the Bureau, as discussed in the Bureau's Response in Opposition to ITT's Motion to Stay Discovery ("Response to the Motion to Stay Discovery," Dkt. 31, incorporated herein by reference), despite the page count of documents produced, those productions were limited and duplicative, including several large and duplicative versions of campus catalogs. In addition, a substantial amount of the information that ITT produced to the Bureau had been previously produced to the United States Senate Committee on Health,

8

Education, Labor, and Pensions; because that information had already been collected and prepared for production, ITT should not have incurred significant costs in producing a copy to the Bureau.

As discussed above, the Bureau will work with ITT to limit the scope of discovery and will discuss the use of search terms, predictive coding, limited date ranges, and limited custodians. Further, in response to litigation filed by the New Mexico Attorney General, civil investigative demands from State Attorneys General, and subpoenas from the SEC, ITT has produced and will continue to be required to produce many documents relevant to this matter to other entities; despite ITT's protestations, there is significant overlap between these matters and the present litigation. Such overlapping productions should substantially reduce the cost of production which can be accounted to this matter; for instance, many documents that have been placed onto backup tapes have likely been retrieved already or will be retrieved in response to other investigations and litigation, and the cost of producing those documents for this case is only incremental. Any argument that ascribes to this litigation the costs that ITT would otherwise have to bear is flawed.

Finally, as discussed above, to the extent that ITT transferred relevant information to backup tapes after being made aware of the Bureau's investigation in May 2012, the cost of retrieving that information from backup tapes is self-imposed.

<u>Defendant</u>:

To date, ITT already has produced more than 123,000 pages of documents to the Bureau on topics similar or identical to those the Bureau proposes to seek discovery on again. This production has imposed extensive costs on ITT.

At this time, ITT is unable to provide a specific estimate of costs that would result from the Bureau's additional proposed discovery requests because the location, format, and volume of potentially responsive data cannot be determined before the scope the Bureau's discovery requests is clarified. The Bureau's summary of its proposed discovery suggests that the Bureau may seek discovery related not only to ITT's corporate headquarters, but also its more than 140 campuses located throughout the United States. Furthermore, the Bureau suggests that it might seek discovery relating not only to more than 8,600 students, but also to prospective students throughout the country over a range of several years. And the Bureau purports to seek discovery related to at least one loan program that it admits is not relevant to its claims. *See* CFPB Opp. to Mot. Dismiss (D.E. 25) at 10 n.10 ("It appears that no PEAKS loans were originated after July 21, 2011, the time period relevant to the CFPA claims."). ITT believes that these requests are overly broad, and considerable refinement to the scope of discovery that may be permitted, if any, would be necessary to generate a meaningful estimate of costs. Moreover, even the process of identifying all potentially relevant media, as necessary to provide a such an estimate, would impose significant costs on ITT given the expansive nature of the Bureau's proposed requests.

Nonetheless, it is clear that the Bureau's requests would be enormously burdensome. Based on the Bureau's suggested timeframes, ITT expects that the majority of relevant

ESI will be stored on backup tapes. As summarized above, Navigant has collected approximately 1,500 backup tapes from ITT at this time. Those tapes contain data primarily from ITT's headquarters dating from approximately December 2008 through July 2012. Navigant estimates that the tapes it has collected to date contain about **97,000 GB** of ESI. ITT expects that a broad construction of the Bureau's proposed discovery requests would implicate many additional tapes, and it is currently working with Navigant to determine the availability and volume of such tapes.

Navigant has provided the following cost overview regarding the restoration, processing, and hosting of backup tapes:

| Service | Price |
|---|---|
| Tape restoration | $250 per tape |
| Tape Catalog | $30 per tape |
| EDB targeting and export | $150 per EDB |
| Tiff Production | $0.02 per page |
| Data "In" Processing | $ 60 per GB |
| Data "Out" Processing | $ 175 per GB |
| Hosting fees | $10 per GB |
| Relativity user fees | $90 per month |
| Review Support | $275 per hour |
| Tech Time | $150 per hour |
|  |  |

Significantly, these costs do not include attorney or paralegal time, or any other costs associated with reviewing or searching any information recovered. It also does not include any costs associated with retrieving, processing, hosting, or reviewing additional information that might not be housed on backup tapes. The hard costs associated with restoring, hosting, and searching this information could easily amount to several million dollars. ITT expects, however, that the cost of reviewing potentially responsive data will far exceed those hard costs.

The CFPB asserts that the cost of producing the vast volumes of documents it proposes to request would be "incremental" in light of discovery ITT is producing to other parties. That assertion is unfounded and erroneous. Discovery has not commenced at all in the New Mexico proceedings. The other matters to which the Bureau refers do not compare in geographical scope or subject-matter to this case. Accordingly, the Bureau's burdensome requests would not dovetail with ITT's other burdens; it would compound them enormously at a time with the company's legal resources are already being heavily taxed.

11. Cost Allocation/Savings. Describe below the parties' discussions regarding cost-shifting or cost-savings measures in this matter and set forth in detail any agreements reached between the parties in that regard:

Plaintiff's Statement:

During the conference on May 13, 2014, the Bureau offered to work with ITT to reduce the burden of discovery. ITT took the position that it was premature to have such discussions because it intended to move to stay discovery, which it has since done. ITT did, however, ask if the Bureau would agree to pay for some or all of ITT's discovery costs. At this point, the Bureau does not believe there is any basis for such a request, as the presumption in discovery is that the responding party bears the cost of discovery, and the party opposing discovery must apply to the court for relief. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358 (1978). Therefore, although ITT requested that the Bureau pay a portion of its discovery costs, the Bureau refused because there is no basis for such cost-shifting in this case.

Defendant's Statement:

ITT has proposed that the Bureau cover 75% of the cost and that ITT cover 25% of the cost, in light of the fact (among other reasons) that ITT already has produced more than 123,000 pages of documents to the Bureau at ITT's sole expense. There are well-founded grounds for cost-sharing in situations, like this one, where a requesting party seeks extensive discovery of information that is not reasonably accessible. ITT has provided the Bureau authority on this point, but the Bureau has refused to share in any portion of the costs its requests would impose. *See, e.g.*, Fed. R. Civ. P. 26, advisory committee note (2006 amendments); *Spears v. City of Indianapolis*, 74 F.3d 153, 158 (7th Cir.1996); *Autotech Techs. Ltd. P'ship v. Automationdirect.com, Inc.*, 2007 WL 2746646, at *4 (N.D. Ill. 2007); *Wiginton v. CB Richard Ellis, Inc.*, 229 F.R.D. 568, 572 (N.D .Ill. 2004); *Portis v. City of Chicago*, 2004 WL 2812084, at *5 n.10 (N.D. Ill. 2004). ITT thus reserves the right to seek costs associated with responding to the Bureau's discovery requests.

12. Discovery Proportionality. Do the parties agree that the discovery of ESI in this matter satisfies the proportionality standard set forth in Fed. R. Civ. P. 26(b)(2)(C)? ☐ No

If no, identify the nature of the dispute:

Plaintiff's Statement:

The proportionality standard, as relevant to this matter, evaluates whether:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

11

Fed. R. Civ. P. 26(b)(2)(C). In this matter, the Bureau requires substantial information that is in the possession and control of ITT, as detailed above, to prove its claims. This is information that the Bureau does not have, or has only incompletely, as ITT was not cooperative during the investigation of this matter. *See* Response to the Motion to Stay Discovery at 2–3. As noted above, the Bureau will endeavor to limit the burden on ITT and will avoid seeking documents that are unreasonably cumulative, duplicative, or available from another, more convenient source.

Though ITT may bear some costs associated with production in this matter, those costs do not exceed the benefits. As noted above, the information sought by the Bureau will likely overlap significantly with other information ITT has or will produce in other matters, reducing the burden and cost of production associated with this litigation. Moreover, this case is a public enforcement action addressing the conduct of a large corporation, which has impacted the livelihoods of thousands of former ITT students. This enforcement action seeks restitution and other relief, potentially in the tens of millions of dollars, and the possibility of substantial civil money penalties, which should significantly exceed the costs of production that can be attributed to this matter.

Finally, any costs that result from ITT's decision to move information to backup tapes after receiving notice of the Bureau's investigation are self-imposed, and the costs of attorney and paralegal reviews are not properly included as part of the cost of production. *See* Section 2, 3, and 10, above. In addition, as noted above, ITT's argument that it will have to obtain student consent under the Family Educational Rights and Privacy Act is incorrect as a matter of law, and its characterization of the burden is exaggerated. Accordingly, the discovery that the Bureau intends to request in this matter is proportionate and appropriate.

Defendant's Statement:

As discussed above, the Bureau intends to seek an indeterminably large volume of documents and other information, potentially from ITT's more than 140 locations nationwide. ITT believes that the majority of material responsive to the Bureau's proposed requests is housed on backup tapes, which are not reasonably accessible. Restoring, processing, hosting, and reviewing the information on those tapes would be exorbitantly expensive. Moreover, ITT and Navigant are working to identify additional, potentially responsive backup tapes not currently in Navigant's possession. The hard costs alone for restoring, processing, hosting, and searching this information could easily reach several million dollars if the Bureau is permitted to conduct the full range of discovery it appears to request. As explained in Section 3 above, the Bureau's attempt to suggest that ITT imposed these costs on itself is baseless and incorrect. Moreover, the expense of reviewing the voluminous information the Bureau seeks is expected to be much greater.

Furthermore, as noted in Section 3 above, the Bureau has indicated that it plans to seek approximately 8,600 student financial aid files that likely trigger obligations under FERPA, 20 U.S.C. § 1232g to obtain those students' consents prior to production. Even if consents could be excused by court order or some other exception, FERPA will

impose enormous, additional costs in light of the Bureau's proposed requests. These obligations would compound ITT's costs and burdens.

ITT already has produced voluminous documents in response to the Bureau's two civil investigative demands. It is not clear that the Bureau's additional, broad discovery requests would add anything necessary to resolve the issues in this litigation. Moreover, identifying and retrieving additional backup tapes and other information would be complicated and time consuming. Finally, the cost required to respond to the Bureau's proposed requests would vastly exceed the amount in controversy in this case. As discussed in ITT's Motion to Dismiss, the Bureau cannot seek disgorgement or restitution from ITT, as the balance of its claims are based on loans provided by third parties, not by ITT. Further, ITT has suffered a net loss with respect to its Temporary Credit program, and has nothing to disgorge from that program.

As explained in Section 10 above, the Bureau's proposed discovery requests go far beyond any discovery ITT has produced or is producing in other matters. As a result, the Bureau's proposed requests in this matter would only multiply the heavy burdens ITT already faces.

Perhaps to distract from the disproportional burdens its discovery requests would impose, the Bureau resorts to accusing ITT of not cooperating in its investigation. Although this Court need not delve into the history of ITT's interactions with the Bureau, ITT believes it is necessary to correct the record. ITT has made extensive efforts to cooperate with Bureau, under intense time pressure, and at great expense. The Bureau issued two CIDs to ITT, one on May 18, 2012 and the second on September 13, 2013—after the Bureau had ceased any communications with ITT for more than a year. ITT rapidly produced more than 123,000 pages of documents, including substantial ESI, to the Bureau in two short periods. ITT produced documents even when the Bureau lacked a lawfully appointed director. *See NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014). And ITT produced more than 10,000 pages of documents even when the Bureau's regulations expressly excused production due to ITT's timely filing of a petition to set aside the first CID. *See* 12 C.F.R. § 1080.6(f).

Since the Bureau commenced its investigation, ITT met and conferred with the Bureau in good faith on numerous occasions, often in person. As a result of those discussions, the Bureau agreed to issue formal modifications to its second CID on September 27, 2013 and again on October 7, 2013. The Bureau's October 7 letter modifying the CID also granted ITT an indefinite extension of its deadline to challenge the CID "[i]n consideration of the ITT's commitment to cooperate with the Bureau's investigation and produce documents along the lines set forth" in the letter. The Bureau reserved the right to reinstate ITT's deadline to challenge the CID, but ITT produced in accordance with the Bureau's demands, and the Bureau accordingly never elected to reinstate ITT's deadline and never indicated that ITT's productions fell short of the Bureau's expectations. Significantly, although the Bureau is authorized to institute a proceeding "in connection with the failure or refusal of [a CID recipient] to comply with, or to obey, a civil investigative demand in whole or in part," 12 C.F.R. § 1080.10, the Bureau has never instituted such a proceeding against ITT in the more than two years since its

investigation commenced.  Any attempt to justify unreasonable burdens now based on the parties' past interactions is simply unsupportable.

13. Claw Back Agreement.  Have the parties agreed on the following unintentional production "claw back" provision? ☐ Yes ☐

   In the event that a document protected by the attorney-client privilege, the attorney work product doctrine or other applicable privilege or protection is unintentionally produced by any party to this proceeding, the producing party may request that the document be returned. In the event that such a request is made, all parties to the litigation and their counsel shall promptly return all copies of the document in their possession, custody, or control to the producing party and shall not retain or make any copies of the document or any documents derived from such document. The producing party shall promptly identify the returned document on a privilege log. The unintentional disclosure of a privileged or otherwise protected document shall not constitute a waiver of the privilege or protection with respect to that document or any other documents involving the same or similar subject matter.

If no, set forth the alternative provision being proposed?

14. Other.  Identify all outstanding issues or disputes concerning ESI not otherwise addressed herein.

   Plaintiff:

   None at this time.

   Defendant:

   None at this time.