UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 1:14-cv-00292-SEB-TAB |
| vs. | ) | |
| | ) | |
| ITT EDUCATIONAL SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT'S MOTION TO DISMISS**

This cause is before the Court on Defendant ITT Educational Services, Inc.'s Motion to Dismiss [Docket No. 15], filed on April 28, 2014 pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(b)(7). For the reasons set forth below, the Motion is DENIED in part and GRANTED in part.

**Factual and Procedural Background**

Plaintiff Consumer Financial Protection Bureau ("the Bureau"), a United States federal agency, has brought this suit against Defendant, alleging violations of provisions of the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. §§ 5531(a), 5536(a), 5564(a), & 5565, the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq*., and regulations thereunder. Because this cause is before us on a motion to dismiss, we consider the facts as presented by the Bureau's Complaint.

Defendant ITT Educational Services, Inc. ("ITT") is a publicly-traded, for-profit company offering post-secondary courses and degrees to students at more than 100 locations

nationwide.[1] ¶ 2.[2] Many of ITT's students and prospective students have limited financial

means[3], and ITT therefore derives much of its revenue from federal aid, including loans, secured

by the students. ¶¶ 4–5. Some 80% of ITT's revenue, in fact, comes from aid granted under Title

IV of the Higher Education Act of 1965, 20 U.S.C. §§ 1070 *et seq.* ("Title IV Aid"). However, a

large number of students are still unable to afford full tuition to enroll at ITT even with federal

assistance. To enable students to close this "tuition gap," ITT extended to many of them short-

term, no-interest loans called "Temporary Credit." The Temporary Credit packages were offered

to students at the beginning of an academic year, and payment was due nine months later, at the

close of the school year. ¶ 6.

**ITT's aggressive tactics**

The Bureau alleges that ITT employed the Temporary Credit loans as an "entry point" for

"pushing" students into taking out private loans when the Temporary Credit came due and

students were again unable fully to afford tuition for coming school terms. ¶ 7. According to the

Bureau, ITT misled students about the balance of costs and benefits associated with ITT

enrollment—thus guiding them into an unmanageable financial predicament—in a number of

ways.

In the first place, ITT represented to students through oral representations and

advertisements that its programs greatly advanced an enrollee's career prospects and job

placement rates; the Bureau alleges that these representations were exaggerated and were based

on incomplete information. ¶¶ 29–33. The Bureau utilized "mystery shoppers"—young men or

---

[1] ITT is incorporated in Delaware, and maintains its headquarters in Carmel, Indiana, within the Southern District of
Indiana. ¶ 16.
[2] Within this narrative of the facts, citations containing only paragraph numbers refer to the Complaint, found at
Docket No. 1.
[3] The Bureau quotes ITT's chief financial officer as stating that the "average ITT student is earning around $18,000
per year and has a credit score under 600 at the time he or she enrolls." Compl. ¶ 24.

women presenting themselves as prospective students—who reported that ITT staff made exaggerated claims about student success, such as that graduates with associates' degrees "usually make six figures." ¶ 41. In contrast to these claims, ITT's annual disclosures in 2012 indicated that "reported annualized salaries initially following graduation averaged approximately $32,061 for the Employable Graduates in 2011." ¶ 46.[4]

The Bureau alleges that ITT also misleadingly represented to prospective students that its "national accreditation" placed it on par with other major educational institutions. ¶ 54. In fact, while a "national" accreditation sounds authoritative, most non-profit colleges and universities are "regionally" accredited; such institutions accept transfer credits from for-profit schools like ITT only on a case-by-case basis. ¶¶ 50–53. According to the Bureau, ITT not only created an inaccurate overall impression in this respect, but also misled some prospective students in a more specific way: one recruiter claimed that ITT had the same accreditation as "all other schools"; another falsely claimed that "ITT Tech is accredited by the Department of Defense." ¶ 54.

Having given prospective students an inflated notion of the standing of the school and the career benefits derived from the degrees it bestowed, the Bureau alleges that ITT's recruiting staff engaged in heavy-handed methods to convince students to enroll. These methods included frequent phone calls and in-person multimedia presentations that mystery shoppers described as overwhelming in nature. ¶¶ 56, 58–60, 62. Prospective students were encouraged to take an admission test that, in fact, was "virtually impossible to fail," but was used to give them the impression that the school had rigorous admissions standards and that their passing the test augured well for their prospects. ¶ 61. Despite the volubility of the overall sales pitch, the Bureau maintains that ITT recruiters were instructed to be vague and evasive on the question of costs;

---

[4] The Bureau asserts that even these numbers are exaggerated because "annualizing" graduates' salaries hides the effect of part-time jobs. Compl. ¶ 47.

they responded to applicants' questions by stating, "I cannot tell you what your exact cost will be," or by asking, "Do you want a discount education, or a valuable one that will give you a return in the future?" ¶ 57.

Once students agreed to enroll, the Bureau alleges that ITT then switched gears, hurrying them through the enrollment and financial aid processes—so quickly that "many consumers did not know or did not understand what they signed up for." ¶ 64. Specifically, ITT required enrollees to sign an Enrollment Agreement before they could receive any information about their financial aid options or meet with financial aid staff. ¶ 66. Mystery shoppers reported being rushed through e-signatures of documents, including authorizations to request transcripts and credit check approvals without understanding the nature of the forms they were signing. ¶ 67. One mystery shopper recounted that an ITT representative forged her signature on a number of e-documents, explaining that she was "trying to help and it was the only way she could give me the test to help push me through." ¶ 72. The Bureau asserts that financial aid officers then "took control" of the process, rushing enrollees through form signatures and providing them with little detailed information; in the words of a mystery shopper, the process was "a bit overwhelming with how quickly we went through everything, and I wasn't exactly clear on everything the [staff member] was having me sign up for." ¶ 83.

Once students had completed an academic term at ITT, the time came for them to "repackage" their financial aid and loans for the next year. The Bureau alleges that ITT's financial aid staff employed aggressive tactics in seeking to repackage students, including tracking them down on campus, barring or pulling them from class, and enlisting the aid of other ITT staff such as professors. An ITT executive conceded that the school also used the threat of withholding course materials and transcripts as "leverage" to ensure that students would

4

repackage. ¶¶ 85–87. At both the initial and repackaging stages, ITT staff encouraged students to rely on school representatives in seeing them through the process, including the use of forms that automatically populated and required only the students' signatures at the conclusion of the process. An executive stated that ITT was "essentially holding [the students'] hands"; one mystery shopper stated that a financial aid coordinator told him that he would "get more free money that I don't have to pay back if I let them take care of my paperwork."[5] ¶¶ 90–92.

**The "private loans"**

The Bureau's claims against ITT focus on its assertion that, having knowingly cajoled and guided students into a financial predicament in which they were already heavily invested in an ITT degree yet lacked the financial resources to complete it—with the Temporary Credit expiring and financial aid insufficient to fully cover the "tuition gap"—ITT then persuaded continuing students to take out financially irresponsible "private loans" from third-party lenders. In the Bureau's words:

> ITT Financial Aid staff coerced students into taking out loans that they did not want, did not understand, or did not even realize they were getting. . . . ITT sought to have its students pay for the tuition gap with ostensible third-party loans because outside sources of payment could be booked as income to the company, improving its free cash flow and the appearance of its financial statements, and because outside sources of revenue helped ITT meet a requirement by the Department of Education that at least 10% of its revenue be derived from sources outside Title IV loans and grants.

¶¶ 97–98.

One of the sources of the students' predicament was ITT's alleged failure to adequately disclose the nature of the nine-month Temporary Credit to new students. Students who received the Temporary Credit signed a "Cost Summary Payment Addendum" (CSPA), which stated that

---

[5] As ITT has pointed out, the "mystery shoppers," for obvious reasons, were utilized only in reporting on how ITT treated enrollees during the initial stage, rather than the repackaging stage for continuing students. Although the Bureau's allegations regarding mystery shopper reports are placed in its Complaint adjacent to allegations regarding the repackaging stage, it is important to bear this distinction in mind.

the loan was to last for the length of an academic year and carry no interest. According to the Bureau, however, the CSPA's references to "new temporary credit" and "renewal of carryforward temporary credit" could mislead students into believing that renewal of the no-interest loan for future academic years was available. Some students believed that the Temporary Credit would be available until they graduated, ¶ 105, and a mystery shopper reported that she had been led to believe that future years' costs would be "covered under a new temporary credit and that I would owe no money out of pocket." ¶ 107. One director of finance at an ITT location instructed staff to describe the Temporary Credit as "funding" rather than as a loan that would have to be repaid. ¶ 108. ITT was aware that many or most students lacked the ability to repay the Temporary Credit, and it characterized them as "doubtful accounts" on its balance sheets. ¶ 113.

The Bureau alleges that, beginning in 2008, ITT constructed two "private loan" programs as a vehicle for students to discharge the Temporary Credit: continuing students would use the cash they received from the new loans to pay off their debt to ITT and thus remove the "doubtful accounts" from ITT's balance sheets. Of these two programs, only one—the Student CU Connect (SCUC) program—operated during the July–December 2011 time period covered by the Complaint.[6] The Complaint asserts that ITT was heavily involved in the creation of the SCUC program: developing its underwriting criteria, providing a credit facility, paying the credit union membership fees in the lead credit union on behalf of the students taking out the SCUC loans, and providing the SCUC loan originators with a stop-loss guarantee that it would make them whole for losses if defaults on the loans exceeded 35%. ¶ 121. ITT was the "sole intermediary" between SCUC and its students; funds were disbursed through ITT to the student,

---

[6] The other, the PEAKS program, evidently ran out of funds and stopped operating earlier in 2011. ¶¶ 129–132.

and could be used only to pay ITT for tuition and not for any other purpose. Additionally, eligibility criteria for the loans were tailored such that, if students had received Temporary Credit, they were automatically eligible for an ITT private loan.[7] ¶¶ 116, 122.

The loans granted under the SCUC program carried a 10-year term. For students with credit scores below 600, the interest rate after April 2011 was 13% plus prime—or 16.25%—in addition to a 10% origination fee. Nearly half of the students taking SCUC loans fell into this low-credit-score cohort. ¶¶ 123–124. These rates are drastically higher than those available under federal Stafford loans, whose rates since 2009 have ranged from 3.4% for subsidized borrowers to 6.8% for unsubsidized borrowers. ¶ 125. Despite their exacting terms, some 79% of the SCUC loans issued went to continuing ITT students who had previously received Temporary Credit in their first year at ITT. ¶ 126. As of May 2011, ITT's consultant for loan default analysis projected a gross default rate of 61.3% for the existing SCUC loans. ¶ 127.

Crucially, the Bureau alleges that these "private" loans, though nominally originated by third-party lenders, were the brainchild of ITT and that ITT consciously steered economically distressed students, faced with indebtedness upon the expiration of the Temporary Credit, into the SCUC loans. ITT executives, in quarterly earnings calls with investors and analysts, stated that the ITT private loan program was a vehicle for taking the Temporary Credit off of ITT's balance sheets. ¶ 134. In referring to the PEAKS program, which ran from 2009 to 2011 and operated similarly to the SCUC program, ITT's CEO allegedly discussed the interrelatedness of the programs as follows:

> We still anticipate offering internal financing to first-year students . . . . Second year students then would be eligible for financing through the PEAKS program,

---

[7] An exception to this eligibility was made for students who had declared bankruptcy within the previous 24 months. ¶ 116.

to have financing for their forward-looking studies, as well as refinancing any institutional funding provided to them during the first year . . . . But it works that way, second-year students are in the PEAKS program, and first year will continue to be on the balance sheet.

. . .

Basically the way the program is set up, if you think about the balance sheet aspects of this, obviously positive cash flow elements there. And some of that will come from [accounts receivable] that is going to be converted into the PEAKS program, which was our plan all along.

¶¶ 135–136. In a later conference call in 2011, ITT's CEO affirmed that the SCUC program was part of this same "plan," noting that SCUC was "substantially similar for us relative to the PEAKS program so that it's structurally similar and the economics are very, very similar." ¶ 137. According to the Bureau, many students did not migrate from the Temporary Credit to the "private loans" with eyes fully open: some accepted the new loans in reliance upon ITT's acting in their interests, while others did not realize they had incurred a new type of debt because of the "rushed and automated manner" in which ITT financial staff processed the students' paperwork. ¶¶ 141–142.

For those students who had Temporary Credit debt at the close of their first year at ITT but who did not take out "private loans," ITT offered them an incentive to pay off the debt in a lump sum upon graduation—in the form of a 25% discount. ¶ 144. For those students who were unable to pay off the Temporary Credit debt in a lump sum, ITT offered a "temporary credit installment plan" involving monthly payments that ranged, depending on the total amount owed, from six months to more than six years. ¶ 146. According to the Bureau, the paperwork students were given upon enrolling in the installment plan did not disclose this forgone 25% discount as constituting a "finance charge." ¶¶ 148–151.

**Legal Analysis**

8

## Standard of Review

### 1. Standard under Rule 12(b)(1)

The Federal Rules of Civil Procedure command that courts dismiss any suit over which they lack subject matter jurisdiction—whether acting on the motion of a party or *sua sponte. See* Fed. R. Civ. Pro. 12(b)(1). In ruling on a motion to dismiss under Rule 12(b)(1), we "must accept the complaint's well-pleaded factual allegations as true and draw reasonable inferences from those allegations in the plaintiff's favor." *Franzoni v. Hartmax Corp.*, 300 F.3d 767, 771 (7th Cir. 2002); *Transit Express, Inc. v. Ettinger,* 246 F.3d 1018, 1023 (7th Cir. 2001). We may, however, "properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *See Capitol Leasing Co. v. F.D.I.C.*, 999 F.2d 188, 191 (7th Cir. 1993); *Estate of Eiteljorg ex rel. Eiteljorg v. Eiteljorg,* 813 F. Supp. 2d 1069, 1074 (S.D. Ind. 2011).

### 2.  Standard under Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of claims for "failure to state a claim upon which relief may be granted."  Fed. R. Civ. P. 12(b)(6).  In determining the sufficiency of a claim, the court considers all allegations in the complaint to be true and draws such reasonable inferences as required in the plaintiff's favor. *Jacobs v. City of Chi.,* 215 F.3d 758, 765 (7th Cir. 2000). Federal Rule of Civil Procedure 8(a) applies, with several enumerated exceptions, to all civil claims, and it establishes a liberal pleading regime in which a plaintiff must provide only a "short and plain statement of the claim showing that [he] is entitled to relief," Fed. R. Civ. Pro. 8(a)(2); this reflects the modern policy judgment that claims should be "determined on their merits rather than through missteps in pleading." *E.E.O.C. v. Concentra*

*Health Servs., Inc.*, 496 F.3d 773, 779 (7th Cir. 2007) (citing 2 James W. Moore, et al., *Moore's Federal Practice* § 8.04 (3d ed. 2006)). A pleading satisfies the core requirement of fairness to the defendant so long as it provides "enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008).

In its decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the United States Supreme Court introduced a more stringent formulation of the pleading requirements under Rule 8. In addition to providing fair notice to a defendant, the Court clarified that a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Plausibility requires more than labels and conclusions, and a "formulaic recitation of the elements of a cause of action will not do." *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007) (quoting *Twombly,* 550 U.S. at 555).  Instead, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Id.* The plausibility of a complaint depends upon the context in which the allegations are situated, and turns on more than the pleadings' level of factual specificity; the same factually sparse pleading could be fantastic and unrealistic in one setting and entirely plausible in another. *See In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363, 370 (M.D. Pa. 2008).

Although *Twombly* and *Iqbal* represent a new gloss on the standards governing the sufficiency of pleadings, they do not overturn the fundamental principle of liberality embodied in Rule 8. As this Court has noted, "notice pleading is still all that is required, and 'a plaintiff still must provide only enough detail to give the defendant fair notice of what the claim is and the

10

grounds upon which it rests, and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief.'" *United States v. City of Evansville*, 2011 WL 52467, at *1 (S.D. Ind. Jan. 8, 2011) (quoting *Tamayo*, 526 F.3d at 1083). On a motion to dismiss, "the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994).

## Discussion

This suit arises primarily under the Consumer Financial Protection Act (CFPA), the Bureau's organic statute. Congress enacted the CFPA as Title X of the "Dodd-Frank Act" of 2010, with the stated purpose of "ensuring that the federal consumer financial laws are enforced consistently so that consumers may access markets for financial products, and so that these markets are fair, transparent, and competitive." 12 U.S.C. § 5511(a). Counts One through Three of the Complaint allege that ITT engaged in "unfair" and "abusive" acts or practices, in violation of the CFPA's operative provisions, 12 U.S.C. §§ 5531(c)(1), 5531(d)(2)(B) & 5531(d)(2)(C). The Bureau further alleges in Count Four that ITT's nondisclosure of a finance charge violated the Truth in Lending Act (TILA), 15 U.S.C. §§ 1601 *et seq.*, and its implementing Regulation Z, 12 C.F.R. § 1026.17.

ITT seeks dismissal on three broad grounds. First, it contends that the Bureau lacks standing to bring this suit because it is an unconstitutional entity and the CFPA's prohibitions violate the due process clause. Second, ITT urges that the complaint fails to state a claim because ITT is not a covered entity subject to its provisions. Lastly, ITT argues that all four counts fail on their merits. We address these bases of ITT's motion in turn.

## I.    Constitutionality of the CFPA

### A. Removal Power and the "Take Care" Clause

ITT argues that the CFPA violates the constitutional separation of powers by unduly restricting the President's authority to remove the Bureau's Director if he "loses confidence in the intelligence, ability, judgment, or loyalty" of that officer. *See* Def.'s Br. 8 (citing *Myers v. United States,* 272 U.S. 52, 134 (1926)). Because the Bureau is an unconstitutional entity and thus lacks standing, ITT urges that the suit must be dismissed in its entirety for the absence of a judiciable case or controversy. Def.'s Reply 3 n.4; *Susan B. Anthony List v. Driehaus,* 134 S. Ct. 2334, 2341 (2014). To explain ITT's misreading of the constitutional protections afforded the President's power to remove officials like the Director of the Bureau, it is necessary to review the evolution of the doctrine.

### 1.    Evolution of Removal Power Doctrine

The President's power to appoint and remove officers of the Executive Branch broadly derives from his Article II mandate to "take Care that the Laws be faithfully executed." U.S. Const. Art. II, § 3. *See also* U.S. Const. Art. II, § 1, cl. 1 (the "Vesting Clause") ("The executive Power shall be vested in a President of the United States of America."). The Constitution also specifically delineates the scope of the President's appointment power:

> He shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. Art. II, § 2, cl. 2. As to the question of the President's *removal* authority, however, the document is conspicuously silent.

Despite the lack of a clear textual command, the Supreme Court has long recognized that some degree of discretion in removing executive officers is inherent in the President's powers and must be protected from excessive legislative encroachment. The Court first addressed the issue in Chief Justice Taft's voluminous opinion in *United States v. Myers,* 272 U.S. 52 (1926). After examining at length the course of debates in 1789's First Congress, the Court found evidence of an early consensus that, though appointment of principal executive officers was conditioned upon the "advice and consent" of the Senate, the authority to remove lay with the President alone. 272 U.S. at 111–115. The Court found the assumptions of the early Congress to be sound, and explicitly ratified them. The Constitution vested the executive power in the President, the Court reasoned, and the removal power inherent in executive authority—based on traditions inherited from the prerogatives of the British Crown—remained vested in him unless the Constitution specified otherwise.[8] Moreover, on more functional grounds, it would be difficult to imagine the President successfully fulfilling his mandate to "take care that the laws be faithfully executed" if he were unable to command the obedience of the subordinates through which he exercised his powers. *Id.* at 115–135. The *Myers* Court therefore held that Congress was prohibited from unduly limiting the President's "power of removing those for whom he cannot continue to be responsible."  *Id.* at 117.

But the Executive Branch is far larger, and its responsibilities far more diverse, now than in the time of the First Congress or even of William Howard Taft. The rise of the "administrative

---

[8] *See also United States v. Williams,* 504 U.S. 36, 51 (1992) (discussing the interpretive value of British monarchical tradition).

state" during the New Deal and in ensuing decades has spawned a number of independent agencies—formally within the Executive Branch but deriving much of their perceived value from their insulation from party politics and the President's personal fiat. In *Humphrey's Executor v. United States,* 295 U.S. 602 (1935), the Court recognized that with respect to the officers of agencies like the Federal Trade Commission, which are "quasi-legislative and quasi-judicial" rather than "purely executive," the President's authority to remove need not be as absolute as *Myers* had proclaimed. 295 U.S. at 627–629. Because "one who holds his office only during the pleasure of another, cannot be depended upon to maintain an attitude of independence against the latter's will," *id.* at 629, the Court upheld Congress's statutory mandate that the FTC commissioners be removed only for cause—for "inefficiency, neglect of duty, or malfeasance in office." *Id.* at 620 (quoting 15 U.S.C. § 41).

In two more recent landmark cases, the Supreme Court has considered the application of its removal doctrine to "inferior" officers: those who report directly not to the President but to another appointed official within the Executive Branch. In *Morrison v. Olson,* 487 U.S. 654 (1988), the Court determined that the statute[9] authorizing "independent counsels" within the Department of Justice, whom the Attorney General appointed and could remove only for cause, did not unconstitutionally abridge the President's powers. Though the independent counsel was surely an "executive" rather than "quasi-legislative" or "quasi-judicial" officer—his primary function, after all, was criminal investigation and prosecution—Congress's protection of his independence was nonetheless appropriate. This was so in large part because the independent counsel's duties were discrete in scope:

---

[9] The Ethics in Government Act of 1978, 28 U.S.C. §§ 49, 591 *et seq.*

> [T]he independent counsel is an inferior officer under the Appointments Clause, with limited jurisdiction and tenure and lacking policymaking or significant administrative authority. Although the counsel exercises no small amount of discretion and judgment in deciding how to carry out his or her duties under the Act, we simply do not see how the President's need to control the exercise of that discretion is so central to the functioning of the Executive Branch as to require as a matter of constitutional law that the counsel be terminable at will by the President.

*Id.* at 691–692. Moreover, the Court noted, the President did retain the ability to exercise some control over an independent counsel through his at-will appointee, the Attorney General. *Id.* at 692.

In its 2010 decision in *Free Enterprise Fund v. Public Company Accounting Oversight Board,* 561 U.S. 477 (2010), however, the Court drew a bright line limiting the leeway afforded to Congress by the progeny of *Humphrey's Executor* and *Morrison*: Congress could not insulate an inferior officer from presidential oversight with *two* layers of for-cause protection. There, the Court held that the for-cause removal of the commissioners of the Public Company Accounting Oversight Board, an entity created by the Sarbanes-Oxley Act under the aegis of the SEC—whose commissioners themselves may be removed by the President only in limited circumstances—violated the spirit of the "take care" clause. It reasoned as follows:

> A second level of tenure protection changes the nature of the President's review. Now the Commission cannot remove a Board member at will. The President therefore cannot hold the Commission fully accountable for the Board's conduct, to the same extent that he may hold the Commission accountable for everything else that it does. The Commissioners are not responsible for the Board's actions. They are only responsible for their own determination of whether the Act's rigorous good-cause standard is met. And even if the President disagrees with their determination, he is powerless to intervene—unless that determination is so unreasonable as to constitute "inefficiency, neglect of duty, or malfeasance in office." *Humphrey's Executor,* [295 U.S. at 620]. . . . This novel structure does not merely add to the Board's independence, but transforms it.

561 U.S. at 496.

### 2. ITT's Principal Argument

Thus, in the nearly 90 years since *Myers,* the Supreme Court has qualified the doctrine of the President's removal authority it espoused in that decision in at least three respects. Congress may place restrictions on the removal of the officers of "quasi-legislative" or "quasi-judicial" independent regulatory agencies (*Humphrey's Executor*); it may likewise enact tenure protections for an executive inferior officer, if his or her duties are well-defined and discrete in scope (*Morrison*). It may *not,* however, shield an inferior officer behind two layers of tenure protection (*Free Enterprise Fund*). ITT's contentions notwithstanding, we conclude that the structure of the CFPA is permissible when viewed through this doctrinal prism.

ITT first argues that, because "the limitations on removal here are far more restrictive than a 'good cause' provision," the CFPA runs afoul of *Free Enterprise Fund's* dictum that "the President cannot 'take care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them." Def.'s Br. 8 (quoting *Free Enter. Fund,* 561 U.S. at 484). In fact, however, the CFPA specifies precisely the same grounds for removal as the archetypal "for cause" provision approved by the Court in *Humphrey's Executor*: the President may remove the Bureau's director only for "inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3). *Compare with* 15 U.S.C. § 41 ("Any Commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance in office.") (cited in *Humphrey's Executor,* 295 U.S. at 619, 628, 632).

ITT's notion that the degree of insulation from executive oversight afforded the Bureau's Director is explicitly proscribed by precedent therefore lacks merit. The Director is responsible directly to the President, without the additional layer of screening the Court found problematic in

the structure of the Public Company Accounting Oversight Board. *Cf. Free Enterprise Fund,* 561 U.S. at 507 (distinguishing circumstances where "the President has . . . authority to initiate a Board member's removal for cause"). The CFPA's structure is thus unconstitutional only if the authority wielded by the Bureau exceeds the bounds recognized by *Humphrey's Executor* and *Morrison.*

Here, there is no doubt that the Bureau partakes of some of the quasi-legislative and quasi-judicial functions that characterize an independent regulatory agency. It is invested with the authority to engage in rulemaking to further implement Congress's enactments on the subject of consumer financial protection, and its regulatory powers include administrative adjudication. 12 U.S.C. §§ 5511, 5562–5565. *Cf. Humphrey's Executor,* 295 U.S. at 628 (noting that the FTC "is an administrative body created by Congress to carry into effect legislative policies embodied in the statute"); *Buckley v. Valeo*, 424 U.S. 1, 140–141 (1976) (noting that the "administrative" functions performed by the Federal Election Commission are "of kinds usually performed by independent regulatory agencies"). The Bureau also undoubtedly wields paradigmatic "executive" powers—notably the authority to bring suit on behalf of the United States—but we find no basis for concluding that the Director's powers are so great that the inability to remove him or her at whim fatally undermines the President's constitutional prerogatives.

While it is true that the Bureau does not operate only for a fixed time like a Department of Justice independent counsel, *cf. Morrison,* 487 U.S. at 672 ("[T]he office of the independent counsel is 'temporary' in the sense that an independent counsel is appointed essentially to accomplish a single task . . . ."), its enforcement powers are constrained within the subject-matter of its organic statute. ITT objects specifically to CFPA's grant of litigating authority, arguing that the Bureau has "broad jurisdiction and significant power over numerous industries," and that

17

"without meaningful Presidential control over the Director, the Director could initiate suits advancing his—and not the President's—views on the proper construction of federal laws." Def.'s Br. 9. But courts have long and consistently upheld the endowment of regulatory agencies with law enforcement powers against constitutional challenge. *See Bowsher v. Synar,* 478 U.S. 714 (1986) (implicitly affirming the proposition that "officers of the United States" other than the President and Attorney General, such as FTC commissioners, may engage in the enforcement of federal law). This is true of the Securities and Exchange Commission, whose commissioners are subject to removal only for cause and which enjoys broad enforcement powers over publicly traded companies. *See SEC v. Blinder, Robinson, & Co., Inc.*, 855 F.2d 677, 682 (10th Cir. 1988) (upholding the SEC's constitutionality and observing that *Humphrey's Executor* "stands generally for the proposition that Congress can, without violating Article II, authorize an independent agency to bring civil law enforcement actions where the President's removal power was restricted to inefficiency, neglect of duty, or malfeasance in office"); *see also SEC v. Sachdeva,* 2011 WL 933967, at *1 (E.D. Wis. Mar. 16, 2011) (employing the same reasoning). It is true as well of the FTC, which possesses similar power to bring civil suit on the government's behalf and upon whose organic statute a considerable portion of the CFPA's operative language is based. *See FTC v. Am. Nat'l Cellular, Inc.*, 810 F.2d 1511, 1514 (9th Cir. 1987).

We therefore reject ITT's argument that the Supreme Court's established removal power jurisprudence forecloses the for-cause removal protections of the Bureau's Director.

### 3. ITT's Alternate Grounds of Unconstitutionality

In its reply brief, ITT shifts gears. Rather than contending that the Bureau runs afoul of any particular precedent, it asserts that no federal entity has heretofore "combine[d] the Bureau's

panoply of problematic features"—including the length of the Director's tenure, 12 U.S.C. §

5491(c)(3); for-cause removal of the Director, *id.* at § 5491(c)(3); the fact that the Bureau's

authority is concentrated in a single director rather than a multi-member commission[10], *id.* at §

5491(b)(1); its "unconstitutionally appointed" Deputy Director, *id.* at § 5491(b)(5); its

"immunity from the congressional appropriations process," *id.* at § 5497(a)(2)(C); and its

"unprecedented restrictions on judicial review," *id.* at §§ 5512(b)(4)(B), 5513(a),

5513(c)(3)(B)(ii), & 5513(c)(8); among other ostensibly problematic features. Def.'s Reply 3.

There are at least two problems with ITT's "mosaic" theory of the Bureau's

unconstitutionality. First, ITT never offers a convincing basis for the conclusion that many of

these features of the CFPA contribute, even in a piecemeal sense, to the Bureau's

unconstitutionality. Second, its generalized assault on the "unprecedented" nature of the Bureau

proceeds from the mistaken premise that that which is not specifically approved by precedent is

forbidden.

ITT notes, for instance, that the CFPA empowers the Director to delegate any or all of his

powers to any "duly authorized employee, representative, or agent." 12 U.S.C. § 5492(b). Citing

the Supreme Court's decision in *Buckley v. Valeo,* 424 U.S. 1 (1976), it then asserts that this

power to delegate "further undermines the President's control over Executive officials." Def.'s

---

[10] ITT never elaborates on this objection or provides any rationale for the objectionability of concentrating the agency's authority in a Director rather than a commission. American constitutional history, in certain contexts, does undoubtedly betray a certain antipathy to the concentration of power. In the Federalist Papers, James Madison cautioned that "[t]he accumulation of all powers legislative, executive, and judiciary in the same hands . . . may justly be pronounced the very definition of tyranny." The Federalist No. 47, p. 324 (J. Cooke ed. 1961). Justice Stevens later cited this language, in his opinion in *Hamdan v. Rumsfeld,* 548 U.S. 557 (2006), in explaining his opposition to the excessive combination of executive, legislative, and adjudicative authority in military tribunals. *See Consumer Fin. Protection Bureau v. Morgan Drexen, Inc.*, 2014 WL 5785615, at *8 (C.D. Cal. Jan. 10, 2014) (citing *Hamdan,* 548 U.S. at 600–602). But we find no support for the notion that creating a consumer protection agency with a single head rather than a commission structure necessarily runs counter to constitutional principles, and ITT has certainly provided us with no such argument.

Br. 9 (citing *Buckley,* 424 U.S. at 36). The cited portion of *Buckley* merely reviews the body of Supreme Court precedent on the appointment and removal powers of the President, and reaffirms the unremarkable proposition that "members of independent agencies are not independent of the Executive with respect to their appointments." 424 U.S. at 136. We have difficulty extracting from this language any notion that the Constitution is offended by allowing a presidential appointee to delegate some of her own authority to her subordinates; such delegation is a commonplace and unavoidable feature of any large institution. *See, e.g.*, 21 U.S.C. § 871(a) (permitting the Attorney General to "delegate any of his functions [under the Controlled Substances Act] to any officer or employee of the Department of Justice"). *See also Touby v. United States,* 500 U.S. 160, 169 (1991) (implicitly affirming the constitutionality of the delegation authority granted in 21 U.S.C. § 871(a)).

ITT also takes issue with the Director's authority to appoint the Deputy Director. *See* Def.'s Br. 9 n.6 (citing 12 U.S.C. § 5491(b)(5)). The Constitution provides that Congress may vest the heads of Executive Departments with authority to appoint inferior officers. U.S. Const. Art. II, § 2, cl. 2; *Free Enter. Fund,* 561 U.S. at 510–511. ITT insists that the Bureau, as an entity "established in the Federal Reserve system"—itself an independent regulatory agency, *see* 12 U.S.C. § 5491(a); 44 U.S.C. § 3502(5)—is not an Executive Department. The Director, it contends, thus lacks constitutional sanction to appoint his own deputy. We disagree. As the Bureau notes, the CFPB is not in any meaningful sense subordinate to the Federal Reserve Board of Governors, and its Director, as we have seen, is appointed by the President directly. Under the more expansive definition of "department" approved by the Court in *Free Enterprise Fund,* the Bureau likely qualifies as a "separate allotment or part of business; a distinct province, in which a class of duties are allotted to a particular person." *See* 561 U.S. at 511 (concluding that the SEC

is a "'Department' for the purposes of the Appointments Clause").[11] We need not decide the question, however, because ITT has not attempted to demonstrate that the Deputy Director has any relationship to this matter, or that the unconstitutionality of his or her appointment process affects the Bureau's standing to bring suit. *See generally Ayotte v. Planned Parenthood of N. New England,* 546 U.S. 320, 328–329 (2006) (discussing the severability of unconstitutional portions of statutes and affirming that, "[g]enerally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem").

Turning to the Bureau's funding, ITT complains that the "Director may unilaterally claim up to 12% of the Federal Reserve's budget . . . without Congress's approval." Def.'s Br. 9 (citing 12 U.S.C. § 5497(a)). According to ITT, this "immunity from the Congressional appropriations process" further contributes to the Bureau's unconstitutionality. Def.'s Reply 3. ITT overstates the degree of the Bureau's insulation from congressional control; more to the point, it neglects to explain how the Bureau's source of funding implicates constitutional concerns. The CFPA does indeed restrict the House and Senate Appropriations Committees from reviewing the Bureau's primary funding source, *see* 12 U.S.C. § 5497(a)(2)(C), but it does not strip Congress *as a whole* of its power to modify appropriations as it sees fit.[12] As the Bureau has pointed out, the Constitution does not prohibit Congress from enacting funding structures for agencies that differ from the procedures prescribed by the ordinary appropriations process. *See AINS, Inc. v. United States,* 56 Fed. Cl. 522, 539 (Fed. Cl. 2003) (criticizing the "erroneous view that Congress

---

[11] ITT's undeveloped contention that the CFPB is unprecedented and problematic because it is "an independent agency within an independent agency," Def.'s Reply 3 (citing 12 U.S.C. § 5491(a)), is unpersuasive for the same reason.

[12] The statute empowers the Director to draw funds annually from the Federal Reserve in the amount he determines to be "reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law." 12 U.S.C. § 5497(a)(1). It does, however, place a formula-based spending cap on this amount, *id.* at § 5497(a)(2), and it imposes a number of other conditions on the Director's use of the funds so derived.

cannot create special funds and self-financing programs distinct and isolated from the general Treasury funds"). Nor does the Constitution prohibit Congress from creating funding mechanisms that enjoy some degree of insulation from its own year-to-year control. "Congress itself may choose, however, to loosen its own reins on public expenditure. So, for example, although Congress ordinarily requires that appropriations be spent within a single year, it may also authorize appropriations that continue for a longer period of time." *Am. Fed'n of Gov't Emps., AFL-CIO, Local 1647 v. Fed. Labor Relations Auth.*, 388 F.3d 405, 409 (3d Cir. 2004). *See also See Nat'l Ass'n of Reg'l Councils v. Costle,* 564 F.2d 583, 587 & n.10 (D.C. Cir. 1977). ITT"s conclusory assertion that the CFPA's funding structure violates the Origination Clause, U.S. Const. Art. I, § 7, cl. 1, is therefore without merit.

Lastly, ITT argues, in a footnote, that the "CFPA . . . limits judicial oversight in ways that are relevant to separation of powers analysis." Def.'s Br. 10 n.7. ITT cites three statutory provisions in support of this point. Two of them, 12 U.S.C. § 5513(a) and 12 U.S.C. § 5513(c)(3)(B)(ii), have nothing to do with judicial review.[13] The third cited provision does concern judicial review, stating that "the deference that a court affords the Bureau with respect to a determination by the Bureau regarding the meaning of interpretation of any provision of a Federal consumer law shall be applied as if the Bureau were the only agency authorized to apply, enforce, interpret, or administer the provisions of such Federal consumer financial law." 12 U.S.C. § 5512(b)(4)(B). This merely prescribes that the Bureau's constructions of organic law in its subject area are to be given deference, in accordance with the well-established principles first enunciated in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837

---

[13] Both these subsections of the statute concern the authority of the Financial Stability Oversight Council established under subchapter 1 (12 U.S.C. § 5311 *et seq.*) of the legislation. They set for the Council's ability to review, stay, or reverse a regulation promulgated by the Bureau under certain defined circumstances.

(1984). *See Smiley v. Citibank (S.D.), N.A.,* 517 U.S. 735, 740 (1996) ("It is our practice to defer to the reasonable judgments of agencies with regard to the meaning of ambiguous terms in statutes that they are charged with administering."). ITT has not succeeded in identifying anything remotely problematic about the CFPA's provision for judicial review of the Bureau's decisions.

Regardless of the groundlessness of its individualized objections to the Bureau's statutory features, ITT's argument in reply proceeds from a flawed premise. The CFPA is undoubtedly new—and its combination of features thus, in some sense, "unprecedented." Its constitutionality has not yet been subject to authoritative review by the Supreme Court or by any of the Courts of Appeals, and while a number of United States District Courts around the nation have begun to apply the Act, only one so far has addressed a challenge to its constitutionality based on the separation of powers.[14] In that case, *Consumer Financial Protection Bureau v. Morgan Drexen, Inc.*, --- F. Supp. 2d ----, 2014 WL 5785615 (C.D. Cal. Jan. 10, 2014), the Central District of California considered, and rejected, a defendant's claims that the CFPA unlawfully abridged the President's removal power and that the statute endowed the Director with unconstitutional power to delegate his or her authority. 2014 WL 5785615, at *3–4.

---

[14] The Northern District of Illinois recently rejected a defendant's argument that the Bureau is an unconstitutional entity because the operative provisions of the CFPA are impermissibly vague, in violation of the Due Process clause. *See Illinois v. Alta Colleges, Inc.*, 2014 WL 4377579, at *3–4 (N.D. Ill. Sept. 4, 2014). We address this issue below, and we ultimately agree with the conclusion reached by our sister district court.

Apart from two law review articles[15] and an opinion piece in the *Wall Street Journal*[16], ITT cites no authority for its theory that the Bureau's amalgamated features render it unconstitutional. Rather, it appears to argue that, because precedent does not explicitly sanction the Bureau's structure and range of powers—which ITT asserts constitute "a gross departure from longstanding practice"—the CFPA exceeds constitutional bounds. Def.'s Reply 2. This inverts the premise from which we must start in exercising judicial review over Congress: the presumption of constitutionality. *Morrison,* 529 U.S. at 607; *Brown v. Maryland,* 25 U.S. 419, 436 (1827). This principle of prudential judicial deference is a venerable one: Chief Justice Marshall, the Court's first and greatest exponent of judicial review, cautioned that a court should declare legislation unconstitutional only when "[t]he opposition between the constitution and the law [is] such that the judge feels a clear and strong conviction of their incompatibility with each other." *Fletcher v. Peck,* 10 U.S. 87, 128 (1810). Where Congress has acted, a challenge to the constitutionality of its enactments must show not merely that the legislature has taken a path not before explicitly sanctioned by the judicial branch, but that it has affirmatively violated constitutional principles.

---

[15] Of the two articles cited by ITT, one posits that the Bureau's "unique" structure raises questions of constitutionality, while the other more specifically critiques the Director's power to appoint the Deputy Director. *See* Eric Pearson, *A Brief Essay on the Constitutionality of the Consumer Financial Protection Bureau,* 47 Creighton L. Rev. 99, 120–121 (Dec. 2013) (criticizing the "functionalist" approach to the separation of powers analysis); Kent Barnett, *The Consumer Financial Protection Bureau's Appointment with Trouble,* 60 Am. U. L. Rev. 1459, 1488 (June 2011) (arguing that "the Deputy Director's appointment is constitutional is a significant question" deserving of courts' attention). Both articles, while certainly offering legitimate and serious analysis, proceed from a formalist understanding of the separation of powers that we conclude is not supported by the Supreme Court's jurisprudence—including its most recent authoritative discussion of the issue in *Free Enterprise Fund.*

[16] The article to which ITT refers, "Why Dodd-Frank is Unconstitutional," was written by two attorneys in conjunction with a suit they filed in D.C. District Court seeking a declaration that Titles I, II, and X of the Act (including the CFPA) were unconstitutional. C. Boyden Gray & Jim R. Purcell, *Why Dodd-Frank is Unconstitutional,* Wall St. J., June 21, 2012, at A17. That suit was subsequently dismissed for lack of standing. *See State Nat'l Bank of Big Spring v. Lew,* 958 F. Supp. 2d 127 (D.D.C. 2013) (granting the Secretary of the Treasury's motion to dismiss). While the article may be interesting as a sort of executive summary of that ill-fated suit, it hardly qualifies as constitutional analysis in its own right.

ITT thus bears a considerable burden in arguing that, though none of the CFPA's features is itself expressly unconstitutional, the statute as a whole nonetheless runs afoul of the separation of powers. Such a showing is certainly not impossible. *See Ass'n of Am. Railroads v. U.S. Dep't of Transp.*, 721 F.3d 666, 673 (D.C. Cir. 2013) ("Just because two structural features raise no constitutional concerns independently does not mean Congress may combine them in a single statute."). Moreover, while novelty does not create a presumption of unconstitutionality, a court may well find, in certain circumstances, that the lack of historical precedent for an entity raises a red flag. *Nat'l Fed'n of Indep. Bus. v. Sebelius,* 132 S. Ct. 2566, 2586 (2012) (in addressing the constitutionality of the "Obamacare" individual mandate, noting that while "there is a first time for everything," "sometimes the most telling indication of a severe constitutional problem, is the lack of historical precedent") (additional citations omitted). The Bureau, however, is no venture into uncharted waters; it is a variation on a theme—the independent regulatory agency with enforcement power—that has been a recurring feature of the modern administrative state. *See Humphrey's Executor,* 295 U.S. at 629; *SEC v. Blinder, Robinson, & Co.*, 855 F.2d 677, 682 (10th Cir. 1988).

With respect to the removal power doctrine that serves as the core of ITT's claim, the question we must answer, at its simplest level, is a functional one: "whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty." *Morrison,* 487 U.S. at 691. As we have already noted, we believe that the structure and powers of the Bureau are sufficiently analogous to those of the FTC, SEC, and other regulatory agencies that the question of the constitutionality of the CFPA's removal provision is settled by *Humphrey's Executor* and its progeny. *See Humphrey's Executor,* 295 U.S. at 629. *See also Morgan Drexen,* 2014 WL 5785615, at *4 ("It is no more difficult for the

President to assure that the Director of the CFPB is 'competently performing his or her statutory responsibilities' than it was for the President to oversee the leadership of the FTC at the time of *Humphrey's Executor*."). Additionally, ITT has not shown that any of the CFPA's other provisions, whether considered individually or in the aggregate, unconstitutionally infringe on the President's authority to "take care that the laws be faithfully executed"—or otherwise undermine the constitutional separation of powers. We therefore reject ITT's challenge to the constitutionality of the Consumer Financial Protection Act on this basis.

## B. Statutory Vagueness in Violation of Due Process

ITT also asserts that the Bureau's claims against it under the CFPA fail because the statute's prohibitions on "unfair" and "abusive" conduct "fail to give educational institutions fair notice of what is required of them." Def.'s Br. 4 (citing *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012)). This vagueness, it insists, violates the Due Process clause of the Fifth Amendment and renders these portions of the CFPA unenforceable against ITT.[17]

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Fox Television,* 132 S. Ct. at 2315; *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162 (1972) ("Living under a rule of law entails various suppositions, one of which is that all persons are entitled to be informed as to what the State commands or forbids.") (citations omitted). A statute is void for vagueness if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United*

---

[17] The Bureau correctly notes that, at least outside the context of First Amendment overbreadth, it is only appropriate here for ITT to challenge the statute *as applied* rather than facially. *See* Pl.'s Resp. 7 n.6 (citing *Holder v. Humanitarian Law Project,* 561 U.S. 1, 18 (2010)). *See also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494–495 (1982) ("A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.").

*States v. Williams,* 553 U.S. 285, 304 (2008); *Hill v. Colorado,* 530 U.S. 703, 732 (2000); *Fuller ex rel. Fuller v. Decatur Pub. Sch. Bd. of Educ. Sch. Dist. 61,* 251 F.3d 662, 666 (7th Cir. 2001). This doctrine is not implicated merely because "it may at times be difficult to prove an incriminating fact." *Fox Television,* 132 S. Ct. at 2315. Nor can a court declare a law unconstitutionally vague based on "the mere fact that close cases can be envisioned" under its provisions. *Williams,* 553 U.S. at 305–306. Rather, we refuse to apply a statutory standard only where it is so amorphous that reasonable observers have no choice but to "guess at its meaning[,] and differ as to its application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). *See also Fox Television,* 132 S. Ct. at 2315.

The CFPA provides: "It shall be unlawful for . . . any covered person or service provider . . . to engage in any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B). Count One of the Complaint alleges that ITT violated the Act by engaging in "unfair" conduct, while Counts Two and Three allege "abusive" conduct. ITT argues that the unconstitutional vagueness of Section 5536, as applied here, mandates the dismissal of all three counts. Before addressing, in turn, the purported vagueness of the terms "unfair" and "abusive," we pause to resolve the parties' dispute regarding the level of judicial scrutiny warranted by the economic regulation in question.

### 1. Level of Scrutiny

Not all laws are created equal with respect to vagueness doctrine. "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). One important distinguishing factor is whether a statute imposes criminal, or merely civil, penalties; less clarity is demanded of laws or

27

regulations that are enforced through civil action rather than prosecution. *Id.* at 498–499 ("The Court has . . . expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."); *Gresham v. Peterson,* 225 F.3d 899, 908 (7th Cir. 2000) (observing that "laws imposing civil rather than criminal penalties do not demand the same high level of clarity").[18]

Regardless of whether a statute is civil or criminal in nature, courts also demand considerably greater clarity from laws impacting "the exercise of constitutionally protected rights"—particularly the expression rights guaranteed in the First Amendment. *Hoffman Estates,* 455 U.S. at 499. If the enforcement of a law threatens to chill protected speech or the exercise of another fundamental right, we apply more stringent scrutiny to its clarity and the fairness of its notice. *See Fox Television,* 132 S. Ct. at 2318 (discussing the heightened stringency of the vagueness inquiry for regulations that "touch upon sensitive areas of basic First Amendment freedoms") (quoting *Baggett v. Bullitt,* 377 U.S. 360, 372 (1964)). *See also Reno v. Am. Civil Liberties Union,* 521 U.S. 844, 870–871 (1997) ("The vagueness of [a content-based regulation of speech] raises special First Amendment concerns because of its obvious chilling effect"). We review economic regulations, however, with less severe scrutiny. This is because their "subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed,

---

[18] In a footnote to its reply brief, ITT argues that, under *Hoffman Estates,* the CFPA merits stricter review because its penalties, though civil in nature, are "quasi-criminal," with a "prohibitory and stigmatizing effect." Def.'s Reply 5 n.5 (citing *Hoffman Estates,* 455 U.S. at 499). Though ITT is correct that the CFPA does authorize the imposition of heavy fines, 12 U.S.C. § 5565(c)(2), it forbids exemplary or punitive damages. And although it has sought rescission, restitution, disgorgement or compensation for unjust enrichment, and civil money penalties, its Complaint does not seek "public notification regarding the violation" or "limits on the activities or functions of the [defendant]." Compl. 33–34. *Cf.* 12 U.S.C. § 5565(a)(2). The possibility of steep fines, by itself, does not render a statute "quasi-criminal." *See Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 508 (5th Cir. 2001). *Cf. Karlin v. Foust,* 188 F.3d 446, 465 (7th Cir. 1999) (statute is quasi-criminal in that it "imposes professional discipline" and levies forfeiture penalties upon physicians who make unreasonable emergency medical determinations).

the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." *Hoffman Estates,* 455 U.S. at 498.

Here, ITT asserts that, despite the concededly economic nature of the CFPA's prohibitions, a stricter vagueness standard should nonetheless apply, for two reasons. First, it contends that economic regulations receive lax scrutiny only if their subject area is "narrow"; since the FCPA, by contrast, is "broad," a reviewing court should demand more clarity. This misconstrues the case law. ITT cites *Papachristou v. City of Jacksonville,* 405 U.S. 156 (1972), in which the Court stated that "[i]n the field of regulatory statutes governing business activities, where the acts are in a narrow category, greater leeway is allowed." 405 U.S. at 162. In both *Papachristou* and the landmark *Hoffman Estates* decision that followed it, the Supreme Court reasoned that economic regulations deserve looser scrutiny not *if* their subject matter is narrow, but *because* the subject matter of such regulations is inherently more likely to be narrow. *Id.,* *Hoffman Estates,* 455 U.S. at 498. *See also Sweet Home Chapter of Communities for a Great Oregon v. Babbitt,* 1 F.3d 1, 4 (D.C. Cir. 1993) (noting that "modern vagueness cases have *invariably* afforded less protection" to regulations of economic activity) (emphasis added). Like other federal regulatory statutes, the FCPA is indeed "narrower" than a criminal statute, in that it applies only to certain covered entities and to a particular class of economic activity. *See* 12 U.S.C. § 5536(a)(1).

Second, ITT insists that the CFPA warrants greater scrutiny because it does, in fact, impinge on its constitutionally protected rights. ITT urges that it has a "constitutionally protected property interest[]" in participating in federal student loan programs, and the regulation of its

communications to its students chills its First Amendment speech rights.[19] Def.'s Reply 4–5. ITT proves too much by this contention: such a broad conception of a statute's impact on constitutional rights would render the distinction between economic and non-economic regulations nugatory. Almost by definition, an economic regulation impacts the "property" interests of the regulated party; short of contending that the CFPA constitutes a "taking" without due process of its property interest in participating in the federal student loan programs under the Fifth Amendment—a claim ITT never makes—ITT cannot invoke the aura of fundamental constitutional rights simply because the law impacts the disposition of its property. *See, e.g., Betancourt v. Bloomberg,* 448 F.3d 547 (2d Cir. 2006) (city ordinance forbidding property from being left in public areas, as applied to a homeless man's cardboard shelter, did not encroach on any constitutionally protected rights).

ITT's invocation of its free speech rights is similarly overstated. In support of the notion that "the Bureau . . . is attempting to impose liability for truthful communications between ITT and students, chilling ITT's First Amendment rights," ITT cites *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653, 2664 (2011). Unlike the law at issue in *Sorrell,* however, the CFPA does not target commercial *speech*; still less does it constitute content discrimination. *Cf.* 131 S. Ct. at 2665 ("But [the statute] imposes more than an incidental burden on protected expression. Both on its face and in its practical operation, Vermont's law imposes a burden based on the content of speech and the identity of the speaker."). Commercial activity inevitably involves "communications" between buyers and sellers; it does not follow, however, that economic

---

[19] ITT also urges that it "has a protected interest in not being subject to an enforcement action by an unconstitutional agency." Def.'s Reply 5 (citing *Nat'l Labor Relations Bd. v. Noel Canning* 134 S. Ct. 2550, 2559 (2014); *Free Enter. Fund,* 561 U.S. at 491 & n.2). We have already entertained, and rejected, ITT's argument that the Bureau's structure is unconstitutional. Alternatively, if ITT is attempting to argue that the operative language of the CFPA is unconstitutionally vague because the CFPA is unconstitutional, ITT is arguing in circles.

regulations targeting economic behavior violate the First Amendment simply because they might impact speech in this broadest sense. *Id.* at 2664 ("[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech."). A great deal of the body of national antitrust and consumer protection law—of which the CFPA is the latest exemplar—depends for its well-established legality on the recognition that "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *See Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949).

We therefore conclude that, as a statute imposing only civil liability and governing economic activity rather than protected constitutional interest like free expression, the CFPA's language is not subject to heightened scrutiny for vagueness. *See Illinois v. Alta Colleges, Inc.*, 2014 WL 4377579, at *3–4 (N.D. Ill. Sept. 4, 2014) (finding that "the CFPA is an economic regulation . . . subject to a lenient vagueness test"). We proceed to consider the two statutory terms at issue with that understanding in mind.

### 2. "Unfair" Act or Practice

ITT argues that the CFPA's prohibition on "any unfair . . . act or practice," 12 U.S.C. § 5536(a)(1)(B), is utterly "standardless" and thus unacceptably vague. Because the prohibition on "unfair" practices taps into a well-developed and long-established definition of the term, we disagree.

It is a fundamental canon of construction that when Congress employs a term with a specialized meaning relevant to the matter at hand, that meaning governs. *See Moskal v. United*

*States,* 498 U.S. 103, 121 (1990) (Scalia, J., dissenting). If Congress has "borrowed" a term of art from its own existing body of legislation, we therefore presume that it did so advisedly. *See Morissette v. United States,* 342 U.S. 246, 263 (1952). In the words of Justice Frankfurter, "if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings its soil with it." Felix Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Colum. L. Rev. 527, 537 (1947).

Here, the statute's prohibition on "any unfair [or] deceptive act or practice" closely mirrors the language employed by Section 5 of the Federal Trade Commission Act, which proscribes "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). The Bureau's own Supervision and Examination Manual confirms what the near-identical language of the two statutes suggests: that longstanding interpretations of the FTCA should inform interpretation of the CFPA as well. *See* CFPB Supervision and Examination Manual at 174 n.2 (2d ed. 2012).[20]

The FTCA is now more than a century old, and the meaning of its terminology—such as "unfair or deceptive acts or practices" (or "UDAPs")—has been given concrete shape by successive generations of interpretation and refinement. Indeed, the definition has grown more precise over time. "A practice is 'unfair,'" as the Seventh Circuit observed in 1976 according to the FTC's older, broader standard, when it "offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Spiegel, Inc. v. FTC,* 540 F.2d 287, 293 (7th Cir. 1976). From the earliest days of the statute, courts had turned aside challenges to the language on the basis of vagueness. "The phrase is no

---

[20] Accessed at http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf (February 19, 2015).

more indefinite than 'due process of law.' . . . If the expression 'unfair methods of competition' is too uncertain for use, then under the same condemnation would fall the innumerable statutes which predicate rights and prohibitions upon 'unsound mind,' 'undue influence,' . . . 'unfair use,' . . . and the like." *Sears, Roebuck & Co. v. Fed. Trade Comm'n,* 258 F. 307, 311 (7th Cir. 1919).[21] A 1980 FTC policy statement, followed by a 1994 congressional amendment to the statutory language itself, provided more robust—and quantitative—guidance on the meaning of the term. Conduct may only qualify as an unfair act or practice (UDAP) if it: (1) causes or is likely to cause substantial injury to consumers; (2) which is not reasonably avoidable by consumers themselves, and (3) is not outweighed by countervailing benefits to consumers or competition. *See* 15 U.S.C. § 45(n), added by P.L. 103-312, § 9 (Aug. 26, 1994).

ITT's contention that the term "unfair . . . act or practice" is unconstitutionally vague falters in the face of a century's worth of legislative and judicial guidance establishing and refining the term's meaning. We recognize, of course, that the language *itself* may be "inherently insusceptible of precise definition." *See Scott v. Ass'n for Childbirth at Home, Int'l,* 430 N.E.2d 1012, 1018 (Ill. 1981).[22] But Congress's charter for an agency could not, and should not, use descriptions so precise that they foreclose any interpretive uncertainty. "[F]ew words possess the precision of mathematical symbols; most statutes must deal with untold and unforeseen

---

[21] Although the statute was never overturned as vague and was repeatedly held to be enforceable by the courts, it must be noted in the interests of historical accuracy that the 1980 FTC guidance and subsequent 1994 statutory amendment were prompted, at least in part, by criticism that the existing construction of the language rendered it too indefinite. *See, e.g.,* Nelson, *The Politicization of FTC Rulemaking*, 8 Conn. L. Rev. 413, 414 (1976); The Washington Post, Sec. A, p. 22 (Mar. 1, 1978) (cited in "Modern Refinement of F.T.C. Standards," 1 Consumer Law Sales Practices and Credit Regulation § 120 (updated Sept. 2014)).

[22] ITT also cites *Beler v. Blatt, Hasenmiller, Liebsker & Moore,* 480 F.3d 470, 474 (7th Cir. 2007), a Seventh Circuit decision which observes that, in the context of the FDCPA, "the phrase 'unfair or unconscionable' is as vague as they come." 480 F.3d at 474. The court noted that the statute authorized the FTC to issue advisory opinions "giving shape to these and other vague terms"; the problem was that there, unlike here, no such agency guidance had been forthcoming. *Id.* Regardless, the court in *Beler* addressed a different question than that presented here: whether "federal judges ought . . . use this ambulatory language to displace decisions consciously made by state legislatures and courts about how judgment creditors collect judgments entered under state law." *Id.* at 475.

variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions." *Grayned v. City of Rockford,* 408 U.S. 104, 110 (1972). The CFPA, like the FTCA before it, has empowered the agency itself to fill in the broad outlines of its authority with specific regulations and interpretations. The agency and the courts have done so in fleshing out the term "unfair . . . act or practice," and Congress has tapped into that existing body of law in framing the CFPA with identical terminology. We thus have no difficulty in rejecting ITT's suggestion that a reasonable business entity would be forced to guess at the term's meaning, or would be subject to agency's standardless discretion in its enforcement. *Cf. Papachristou,* 405 U.S. at 391.[23]

### 3.  "Abusive" Act or Practice

ITT likewise argues that the CFPA's prohibition on "abusive" acts or practices, upon which Counts Two and Three of the Complaint are predicated, is unconstitutionally vague.

The one respect in which the CFPA's definition of covered misconduct differs from that of the FTCA is the addition of the term "abusive." *Compare* 12 U.S.C. § 5536(a)(1)(B) *with* 15 U.S.C. § 45(a). The legislative history of the CFPA suggests that the term was added, in part, to enable the Bureau to reach forms of misconduct not embraced by the more rigid, cost-benefit standard that had grown up around the terms "unfair" and "deceptive." Sheila Bair, then the chairwoman of the FDIC, advocated adding the term to consumer finance legislation in a 2007 hearing, stating: "'Abusive' is a more flexible standard [than "unfair" or "deceptive"] to address some of the practices that make us all uncomfortable." *Improving Fed. Consumer Protection in*

---

[23] ITT's argument that the statute is vague and standardless is somewhat compromised by its ease in applying the very same supposedly nonexistent standards, later in its brief, to insist that the Bureau has failed to state a claim for unfair acts or practices.

*Fin. Servs., Hearing Before the H. Comm. on Fin. Servs.*, 110th Cong. 37–41 (2007). The new

"abusive" standard is one of the chief salient features of the CFPA, and has been widely

recognized as such. *See* Tiffany S. Lee, *No More Abuse: The Dodd-Frank and Consumer Fin.*

*Protection Act's "Abusive" Standard,* 14 J. Consumer & Com. L. 118, 119–121 (2011)

(collecting academic and industry commentary).

Contextual evidence thus suggests that "abusive" conduct is defined according to a more

flexible, expansive standard than had heretofore been present in federal consumer protection law.

*See Improving Fed. Consumer Protection, supra,* at 40. We need not read the tea leaves of

legislative history, however, to apprehend a standard according to which abusive conduct may be

measured. In fact, the statute itself provides significant guidance:

> The Bureau shall have no authority under this section to declare an act or practice
> abusive in connection with the provision of a consumer financial product or
> service, unless the act or practice—
>
> (1) Materially interferes with the ability of a consumer to understand a term or
>     condition of a consumer financial product or service; or
> (2) Takes unreasonable advantage of—
>     (A) a lack of understanding on the part of the consumer of the material
>         risks, costs, or conditions of the product or service;
>     (B) the inability of the consumer to protect the interests of the consumer in
>         selecting or using a consumer financial product or service; or
>     (C) the reasonable reliance by the consumer on a covered person to act in
>         the interests of the consumer.

12 U.S.C. § 5531(d).[24]

---

[24] ITT contends that this provision's reference to "unreasonable advantage" and "reasonable reliance" is *itself* vague.
ITT's Br. 12. In support, it quotes Justice Scalia's concurrence in *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993), in
which he opined that "'[a]busive' . . . does not seem to me a very clear standard—and I do not think clarity is at all
increased by adding the adverb 'objectively' or by appealing to a 'reasonable person['s]' notion of what the vague
word means." 510 U.S. at 24 (Scalia, J., concurring). While Justice Scalia complained about the indefinite nature of
the standards guiding judicial construction of a criminal statute's prohibition of "abusive" conduct—and further
observe that the "reasonable man" test did not meaningfully clarify matters—he did not actually assert that the
statute in question was void for vagueness. And as the Bureau has noted, the use of "reasonableness" as a proxy for
objectivity is hardly an alien feature in the law. *See Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298,
315–316 (1994) ("We note, initially, that 'reasonableness' is a guide admitting effective judicial review in myriad
settings, from encounters between the police and citizenry . . . to the more closely analogous federal income tax

ITT observes, correctly, that "abusive" is a novel term in the context of the statute. To emphasize what they characterize as the fatal indefiniteness of the language, they quote the 2012 hearing testimony of inaugural Bureau Director Richard Cordray:

> [The Bureau] ha[s] been looking at it, trying to understand it, and we have determined that that is going to have to be a fact and circumstances issue . . . . Probably not useful to try to define a term like that in the abstract; we are going to have to see what kind of situations may arise where that would seem to fit the bill under the prongs.

*How Will the CFPB Function Under Richard Cordray: Hearing Before the Subcomm. on TARP, Fin. Servs. & Bailouts of Pub. & Private Programs,* 112th Cong. 112-107, at 69 (2012). While the term's meaning may be less well-established in the field of consumer protection that that of "unfair," however, the CFPA hardly marks the first time Congress has employed it. The Fair Debt Collections Practices Act (FDCPA), first enacted in 1977, specifically declared as its aim to redress "the use of abusive, deceptive, and unfair debt collection practices by many debt collectors." 15 U.S.C. § 1692(a). The statute prohibits "any conduct the natural consequence of which is to harass, oppress, or *abuse* any person," and it proceeds to enumerate a non-exhaustive list of six types of offending conduct. 15 U.S.C. § 1692d. The FTC has brought over 60 enforcement actions pursuant to this provision since it became effective in 1978, enabling the growth of an appreciable corpus of judicial commentary explicating the meaning of abusive treatment of consumers. *See* Amanda L. Wait, *The New Bureau of Consumer Fin. Protection – An Overview,* at 1 (Am. Bar Ass'n 2010). In a similar vein, the Federal Telemarketing Sales Rule ("FTSR"), promulgated under the Telemarketing and Consumer Fraud and Abuse Prevention

---

context.") (citations omitted); *United States v. Ragen,* 314 U.S. 513, 522 (1942) (noting that determinations "by reference to a standard of 'reasonableness' are not unusual under federal income tax laws").

Act, 15 U.S.C. § 6102, forbids "abusive telemarketing acts or practices." 16 C.F.R. § 310.4. Like the FDCPA, the Rule provides an illustrative list of conduct qualifying as "abusive." *Id.*

ITT also cites judicial decisions in which judges expressed frustration with the amorphous nature of the term "abusive." In *Ustrak v. Fairman,* 781 F.2d 573 (7th Cir. 1986), the Seventh Circuit decried a prison regulation forbidding "disrespectful" and "abusive" prisoner conduct for its vagueness. The court declined to find the regulation unconstitutional, however, reasoning that First Amendment vagueness doctrine is less strictly applied in the context of prisons. 781 F.3d at 580. In *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993), Justice Scalia— concurring separately—discussed Title VII's prohibition on "hostile or abusive work environments." He mused that "'[a]busive' (or 'hostile,' which in this context I take to mean the same thing) does not seem to be a very clear standard." 510 U.S. at 24 (Scalia, J., concurring). Despite his misgivings about the statute's language, however, he acquiesced in the test the Court had adopted to give shape to the "inherently vague statutory language." *Id.* at 25.

As ITT itself acknowledges, however, the issue before us is not whether the word "abusive" can be vague in *any* context, but whether the statutory language incorporating that term gives ITT fair notice of conduct forbidden and permitted in *this* context. Def.'s Reply 5 (citing *Holder,* 561 U.S. at 18). Because the CFPA itself elaborates the conditions under which a business's conduct may be found abusive—and because agencies and courts have successfully applied the term as used in closely related consumer protection statutes and regulations—we conclude that the language in question provides at least the minimal level of clarity that the due process clause demands of non-criminal economic regulation. *See Alta Colleges, Inc.*, 2014 WL 4377579, at *3–4. *Cf. Gates & Fox Co., Inc. v. Occupational Safety & Health Review Comm'n,* 790 F.2d 154, 156 (D.C. Cir. 1986) (invalidating OSHA's interpretation of a regulation as

applied to a defendant, but expressing no opinion on "whether, in a non-penal context, the Commission's interpretation . . . might be permissible").[25]

## II.     Whether ITT is a "Covered Entity"

ITT argues that Counts One, Two, and Three of the Complaint fail to state a claim because ITT is not a covered entity subject to suit under the CFPA. Def.'s Br. 13–19. We conclude that, taking the Bureau's factual allegations as true, the pleadings place ITT within the statute's purview.

The operative provisions under which the Bureau has sued ITT apply only to a "covered person" or "service provider." 12 U.S.C. § 5536(a)(1). The Act defines a "covered person," in turn, as "any person that engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6)(A). A "product or service," as the phrase implies, is more than simply the direct extension of a loan to a consumer: it may include "brokering" or servicing loans, 12 U.S.C. § 5481(15)(A)(i), as well as "providing financial advisory services . . . to consumers on individual financial matters." *Id.* at § 5481(15)(A)(viii). The CFPA defines a "service provider," on the other hand, as one who "provides a material service to a covered

---

[25] In a footnote to its brief, ITT argues that these statutory provisions are unconstitutional, alternatively, because they constitute impermissible delegation of legislative power to the Executive Branch. Def.'s Br. 12 n.9. Congress cannot grant an executive agency rulemaking powers so broad that it has empowered the agency to engage in *de facto* legislating itself—in other words, Congress's mandate must lay down "an intelligible principle to which the [agency] is directed to conform." *Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 472 (2001). The Supreme Court has invalidated Acts of Congress on this basis on less than a handful of occasions; most famously, in *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495 (1935), the Court struck down a portion of the National Industrial Recovery Act, a centerpiece of the New Deal, because it granted the President the authority to regulate the economy by promulgating "codes of fair competition." 295 U.S. at 531. While the Supreme Court's relatively recent decision in *Whitman* may have dispelled the impression that the "non-delegation" doctrine was a dormant relic of pre- (or anti-) New Deal conservatism, there is no doubt here that Congress has supplied an "intelligible principle" to the Bureau. As the Bureau points out, the degree of specificity provided in the CFPA compares quite favorably to other organic statutes that have withstood constitutional challenge. *See, e.g., Yakus v. United States,* 321 U.S. 414, 420, 426–427 (1944) (mandate to the Office of Price Administration to fix "fair and equitable" commodity prices laid down an intelligible principle); *Touby v. United States,* 500 U.S. 160, 165–167 (1991) (provision of Controlled Substances Act empowering Attorney General to classify a drug on a temporary basis where "necessary to avoid an imminent hazard to the public safety" laid down an intelligible principle).

person in connection with" the covered person's offering of a "consumer financial product." *Id.* at § 5481(26)(A). Such material service may include participating in "designing, operating, or maintaining the consumer financial product or service," or processing "transactions relating to the consumer financial product or service." *Id.*

ITT may thus qualify as a "covered person" in three ways germane to the conduct alleged: (1) as a direct provider of consumer financial products—loans—to its students; (2) as a "broker" of those loans or other credit instruments; or (3) by providing "financial advisory services" to students. Alternatively, it may qualify as a "service provider" if it provided a material service to another covered entity—here, the originator of the third-party loans—as defined under the statute.

## A. Whether ITT is a "Covered Person"

### 1. "Engages In"

As an antecedent matter, ITT insists that it is not a "covered person" because it has not "engaged in" any of the statutory activities. According to ITT, an entity "engages" in the provision of consumer financial products or services only if it does so as a business or profession. Since it is primarily an educational institution and only tangentially, if at all, involved in consumer financial products and services, ITT maintains that its business falls outside the CFPA's scope. Def.'s Reply 8–9.

ITT notes, correctly, that we should "look to the language and design of the statute as a whole" in construing the meaning of a particular statutory provision. Def.'s Reply 8 (citing *United States v. Graham,* 305 F.3d 1094, 1102 (10th Cir. 2002)). It then points to 12 U.S.C. § 5393(b)(1)(B), a provision which extends the coverage of a different portion of the consumer

protection law to executives and senior officers of companies who "engaged or participated in any unsafe or unsound practice." 12 U.S.C. § 5393(b)(1)(B). The use of the disjunctive "or," ITT contends, signals that to "engage" must denote a greater degree of involvement than mere "participation." Def.'s Reply 9. ITT also appeals to Webster's Dictionary, one of whose definitions of "engage" is "to begin and carry on an enterprise, especially a business or profession." *Id.* at 8 (citing Webster's Third New Int'l Dictionary 751 (1976)).

We are not persuaded that the CFPA uses "engage" here in anything other than its ordinary sense. "When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States,* 508 U.S. 223, 228 (1993). "In ascertaining the plain meaning of [a] statute," in turn, "[we] must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K-Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). The plainest meaning of the term "engage" is "to occupy or involve oneself; take part; be active." *See United States v. Graham,* 305 U.S. 1084, 1102 (10th Cir. 2002) (citing Webster's New World College Dictionary at 450 (3rd ed.1997)). Congress's use of the term elsewhere in the Dodd-Frank Act comports with this broad, common-sense reading. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."). For instance, the Act defines the term "person regulated by a State insurance regulator" as "any person that is *engaged in the business of* insurance." 12 U.S.C. § 5481(22) (emphasis added). If "engaging" in an activity were synonymous with "being in the business of" that activity, this definition would be redundant. *Cf. In re Total Realty Management, LLC,* 706 F.3d 245, 251 (4th Cir. 2013) ("Principles of statutory construction require 'a court to construe all parts to have meaning' and,

accordingly, avoid constructions that would reduce some terms to mere surplussage.") (quoting

*PSINet, Inc. v. Chapman,* 362 F.3d 227, 232 (4th Cir. 2004)).[26]

## 2. "Financial Advisory Services"

ITT may thus qualify as a "covered person" under the CFPA so long as it involved itself

in any of the statutorily-governed conduct, regardless of whether doing so was its primary

business focus. Here, the Bureau has not pleaded that ITT itself offered to students the "third-

party loans" that are the subject of its claims—at least in the sense that ITT, rather than the third-

party creditors, was the titular lender. *See* Compl. ¶¶ 11, 18, 98, 110, 130. *See also* Compl. ¶ 17

(alleging that ITT engaged in "offering or providing loans, *through certain private loan*

*programs*, to its students") (emphasis added).[27] Nor has the Bureau satisfactorily pleaded that

ITT served as a "broker," as the statute defines that term. The Dodd-Frank Act expressly

incorporates the definition of "broker" contained in the Securities Exchange Act of 1934. 12

U.S.C. § 5301(15). A broker is therefore "any person engaged in the business of effecting

---

[26] We find that ITT's citation to another portion of the statute, 12 U.S.C. § 5393(b)(1)(B), which refers to a company that "engaged *or* participated" in qualifying activities, is less persuasive. As we have noted, ITT insists that the disjunctive "or" should signal that to *engage* is to be involved in greater depth in an activity than to merely *participate.* But the fact that the statute uses those two words tells us nothing about which of the two has the "deeper" meaning, if either. In our view, this passage is most naturally read as an instance of what Justice Scalia called the "iteration to which lawyers, alas, are particularly addicted—such as 'give, grant, bargain, sell, and convey,' . . . or 'right, title, and interest.'" *Moskal v. United States,* 498 U.S. 103, 120 (Scalia, J., dissenting) (citing B. Garner, *A Dictionary of Modern Legal Usage,* at 197–200 (1987)). Webster's Dictionary, for instance, recognizes that the two words may be used interchangeably. Webster's Third New Int'l Dictionary 751 (3d ed. 1993).

[27] The CFPA's "merchant exclusion," 12 U.S.C. § 5517(a), does not apply. The Act states that the Bureau may not generally exercise authority "with respect to a person who is a merchant, retailer, or seller of any nonfinancial good or service and is engaged in the sale or brokerage of such nonfinancial good or service." *Id.* at § 5517(a)(1). The exclusion only applies, however, insofar as the merchant in question "extends credit directly to a consumer . . . for the purpose of enabling that consumer to purchase" non-financial goods from that merchant—or engages in two other types of conduct not material here. *Id.* at § 5517(a)(2)(i)–(iii).With respect to the private loans, the Bureau has not successfully pleaded that ITT "directly extended" credit; therefore, any statutory exclusion that would bar this route to liability is irrelevant. With respect to the Temporary Credit, the Bureau has pleaded that ITT charged students a "finance charge." *See* Compl. ¶¶ 185–187 (citing 12 C.F.R. § 1026.4(b)(9)). Under another limitation to the statutory exemption, ITT's conduct in "regularly" extending credit that bears a finance charge is also unshielded by the "merchant exclusion." *See* 12 U.S.C. § 5517(a)(2)(B)(iii).

transactions . . . for the account of others."[28] 15 U.S.C. § 78c(a)(4)(A). While the Bureau protests that we should apply this definition only "except as the context otherwise requires," 12 U.S.C. § 5301, it has pointed to no indication that the context of Title X actually does dictate a different usage. In fact, the CFPA's own definitions section makes reference to "broker[s] or dealer[s] that [are] required to be registered under the Securities Exchange Act"—a context clue that, if anything, further suggests that the specialized, imported meaning applies. 12 U.S.C. § 5481(21)(A). Because the Bureau has not alleged that ITT was engaged in the "business" of effecting loan transactions on behalf of its students, its conduct as an educational institution does not qualify it as a broker under 12 U.S.C. § 5481(15)(A)(i).

The Bureau has, however, sufficiently stated a claim that ITT engaged in conduct qualifying as the provision of "financial advisory services." The Act specifies that such advisory services include, without limitation, "providing credit counseling to any consumer" and "providing services to assist a consumer with debt management or debt settlement, modifying the terms of any extension of credit, or avoiding foreclosure." 12 U.S.C. § 5481(15)(A)(viii). The Complaint includes allegations that ITT advised students on how to manage their debt to the school after having taken out Temporary Credit; this advice often channeled the students into the private loan programs. Compl. at ¶¶ 110, 138–151. According to the Bureau, ITT completed nearly every step in the process of acquiring CUSO loans on the students' behalf, including filling out the requisite forms (save signatures) and forwarding them to the lending credit union. *Id.* at ¶¶ 91–92, 122, 139. At a minimum, we conclude that such conduct, if proven, would fall within the realm of "credit counseling" and "assist[ing] a consumer with debt management."

---

[28] The Securities Exchange Act definition further specifies that the "transactions" in question must be "in securities." 15 U.S.C. § 78c(a)(4)(A). We assume that Congress intended to import the definition without that limitation; including the limitation would render the definition inapposite for the context of consumer financial protection.

ITT retorts that, despite the fact that the statute itself defines "financial advisory services" only by a non-exclusive list of qualifying conduct, we should apply a more specialized, restrictive definition: those services "so closely related to banking . . . as to be a proper incident thereto." Def.'s Br. 16 (citing 12 C.F.R. § 225.28(a)). It bases this definition on the CFPA's legislative history—specifically, the report of the Committee on Banking, Housing, and Urban Affairs to the full Senate recommending the measure's passage. S. Rep. No. 111-176, at 160 (2010). That report, officially authored by Senator Dodd, notes that the term "financial product or service," as used in the CFPA, was "modeled on the activities that are permissible for a bank or a bank holding company, such as under section 4(k) of the Bank Holding Company Act [BHCA] and implementing regulations." *Id.* The BHCA, which as its title suggests regulates bank holding companies, provides in relevant part that, in addition to banking itself, the regulated entities are permitted to engage in activities that are "financial in nature or incidental to such financial activity" or are "complementary to a financial activity." 12 U.S.C. § 1843(k). Both that statute and its implementing "Regulation Y" go on to provide lists of such permissible activities. *Id.* at § 1843(k)(4); 12 C.F.R. § 225.28(b).

We approach the use of legislative history as an aid to statutory interpretation with serious reservations. The myriad legislative materials accompanying any statute, none of which have been subject to bicameralism and presentment, lend themselves easily to manipulation. In the Supreme Court's words, "judicial investigation of legislative history has a tendency to become . . . an exercise in 'looking over a crowd and picking out your friends.'" *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2004) (citations omitted). Committee reports merit particular skepticism, for they "may give unrepresentative committee members—or, worse yet, unelected staffers and lobbyists—both the power and the incentive to attempt strategic

43

manipulations of legislative history to secure results they were unable to achieve through the statutory text." *Id. See also Milner v. Dep't of the Navy,* 131 S. Ct. 1259, 1267 (2011).

Those reservations notwithstanding, ITT's reasoning is unconvincing. While the reference to activities "so closely related to banking . . . as to be a proper incident thereto" may seem on its face as if it would exclude any activities conducted by an educational entity, the definition proffered by the BHCA and its regulations is permissive in nature—and is accompanied by a broad list of non-banking activities that qualify. The BHCA provides that "[p]roviding financial, investment, or economic advisory services" qualifies as an activity that is "financial in nature." 12 U.S.C. § 1843(k)(4)(C). Its implementing regulation affirms that "[f]inancial and investment advisory activities" are permissible for the bank holding companies subject to the statute. 12 C.F.R. § 225.28(b)(6). Even if Congress did intend the statute to track the BHCA's definition, in other words, the BHCA does not state that "activities so closely related to banking . . . as to be incident thereto" excludes advisory services. And as to what the term "advisory services" *itself* means, the BHCA is no more enlightening than the CFPA. Where legislative history has interpretive value, that value lies in clarifying statutory ambiguity. *See Milner,* 131 S. Ct. at 1267 ("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it."). The Senate Report serves no such purpose here. While the statute itself may not define "financial advisory services" in pellucid terms, the legislative history cited by ITT offers no significant support for ITT's preferred restrictive definition.

ITT offers another, related argument against interpreting the CFPA's "financial advisory services" to include its interactions with its students. "Congress," it reminds us, does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Including an educational institution like ITT within the ambit of entities liable under the statute for

providing financial advisory services is such a significant step, ITT insists, that Congress could hardly have taken it without more explicitly saying so. In *American Bar Association v. F.T.C.,* 430 F.3d 457 (D.C. Cir. 2005), which ITT cites in support of its argument, the D.C. Circuit rejected the FTC's attempt to regulate a law firm as a "financial institution." There, the FTC had supported its expansive reading by pointing to the statute's broad definition of a financial institution as "any institution the business of which is engaging in financial activities," and by noting the same lengthy list of permissible non-banking activities for "financial institutions" that we have already discussed above. 430 F.3d at 467. The court ruled that the statutory framework governing financial institutions, including Congress's definition of the term, contained insufficient ambiguity to warrant deference to the agency's attempt to cram a "rather large elephant in a rather obscure mousehole." *Id.* at 469.

While we do not question the wisdom of the D.C. Circuit's decision in *American Bar Association,* we find it distinguishable. The Consumer Financial Protection Act is aptly named: Congress stated that its purpose is to ensure "that markets for consumer financial products and services are fair, transparent, and competitive." 12 U.S.C. § 5511. As we have already discussed, the statute does *not* restrict its regulatory reach to "financial institutions." *See* 12 U.S.C. §§ 5536, 5481. In the absence of any indication that holding educational institutions—or law firms, for that matter—liable for unfairness to consumers is contrary to the statute's goals, we see no reason to circumscribe what Congress has spoken broadly. *See* Pl.'s Ex. 3 (*Consumer Fin. Prot. Bureau v. Gordon* (C.D. Cal. June 26, 2013)).[29] While it may be an unacceptably dramatic

---

[29] The CFPA expressly restricts the authority of the Bureau over the "practice of law." 12 U.S.C. § 5517(e). However, this limitation applies only to products or services "offered or provided as part of, or incidental to, the practice of law, occurring exclusively within the scope of the attorney-client relationship." *Id.* at § 5517(e)(2)(A). Thus, the CFPA could bring suit against a law firm engaged in the provision of financial products or services not

conceptual leap to label a law firm as a "financial institution," it is hardly a leap at all to say that a school offers "financial advisory services" to its students—particularly on the facts alleged here.

## B. "Service Provider"

ITT also qualifies as a "service provider" under the CFPA. As we have previously noted, the statute extends its reach to any entity that "provides a material service to a covered person in connection with" the covered person's offering of a "consumer financial product." A "material service" may include participating in the "designing, operating, or maintaining" of the consumer financial product or service in question. *See* 12 U.S.C. § 5481(26)(A)(i).

ITT does not dispute that the third-party originators of the SCUC "private loans" were "covered persons" based on the Bureau's allegations. *See* 12 U.S.C. §§ 5481(5), 5481(6). As for ITT's accessory role, the school cannot be held to account for its role in "designing" the loan programs in 2008 and 2009, since the CFPA did not take effect until July 2011. Def.'s Br. 17 (citing *Molosky v. Wash. Mut., Inc.*, 664 F.3d 109, 113 n.1 (6th Cir. 2011) (provisions of the Dodd-Frank Act are not retroactive)). *See also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (discussing principles of statutory retroactivity). The Bureau has also pleaded, however, that ITT was heavily involved in operating and maintaining the loan program. The Complaint alleges that ITT used Temporary Credit as a tool to pre-qualify students for the private loans, that ITT developed the loans' underwriting criteria, that it paid the credit union membership fees in the lead credit union on behalf of the students who took out the loans, and

---

incident to its legal representation of its clients. Notably, the statute contains no such exclusion concerning educational institutions. *See* 12 U.S.C. § 5517.

that it provided a stop-loss guarantee to the programs' lenders—covering any losses from defaults exceeding 35% of participating students. Compl. ¶¶ 116–117, 121–122. These allegations are more than "unsupported generalities"—as ITT calls them—and they suffice to meet the Bureau's burden at this stage of the litigation. *Cf. Iqbal,* 556 U.S. at 678.

The only piece of evidence ITT offers in favor of a reading of "operating" and "maintaining" that excludes the alleged conduct is a quotation from the 2012 CFPB bulletin. According to ITT, "the Bureau . . . has stated that 'service providers' are entities to whom covered persons have 'outsource[d]' functions that would otherwise fall within the Bureau's jurisdiction." Def.'s Br. 18 n.11 (citing CFPB Bulletin 2012-03, at 1). An examination of the Bureau's full statement in the 2012 Bulletin, however, is inconsistent with the impression ITT seeks to convey. The Bulletin states as follows:

> The CFPB recognizes that the use of service providers is often an appropriate business decision for supervised banks and nonbanks. Supervised banks and nonbanks may outsource certain functions to service providers due to resource constraints, use service providers to develop and market additional products or services, or rely on expertise from service providers that would not otherwise be available without significant investment.

CFPB Bulletin 2012-03, at 1. Thus, whether or not we view "outsourced" functions as distinctive from those allegedly performed by ITT, ITT's cited source does not actually assert that an entity is a service provider only if it performs such functions. We see no reason to read "operating" and "maintaining" as bearing anything other than their ordinary meaning; seen in this light, the Bureau has stated a claim that ITT falls into the covered category of "service provider."

## III.   Adequacy of the Bureau's Pleadings under the CFPA

We now turn, lastly, to the Bureau's allegations themselves. ITT argues that each of Counts One, Two, and Three fails to state a claim. Because the guiding standard for each count is different, we consider them separately.

## A. Count One: Unfair Acts or Practices

Count One of the Complaint alleges that, "[f]rom July 21, 2011 through December 2011, ITT subjected consumers to undue influence or coerced them into taking out ITT Private Loans through a variety of unfair acts and practices designed to interfere with the consumers' ability to make informed, uncoerced choices." Compl. ¶ 160. The Bureau alleges that this conduct constituted an "unfair . . . act or practice" under the CFPA. 12 U.S.C. § 5536(a)(1)(B).

In order to state a claim for an unfair act or practice under the Act, a plaintiff must establish that: "[1] the act or practice causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers; and [3] such substantial injury is not outweighed by countervailing benefits to consumers or competition." 12 U.S.C. § 5531(c)(1). The parties dispute the sufficiency of the Complaint with respect to each of these three elements.

### 1.  Substantial Injury

Under the standard for unfair practices that the statute has borrowed from the FTCA, a "substantial" injury in the context of consumer protection is most often a financial one. *See F.T.C. v. Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d 285, 299 (D. Mass. 2008) (citing Letter from Federal Trade Comm'n to Senators Ford and Danforth (Dec. 17, 1980)); *Am. Fin. Servs. Ass'n v. F.T.C.,* 767 F.2d 957, 972 (D.C. Cir. 1985). Although the harm involved need not be massive on an annual basis to count as substantial, *cf. Orkin Exterminating Co., Inc v. FTC,* 849

F.2d 1354, 1365 (11th Cir. 1988), a "trivial or speculative" harm will not suffice. *See FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 945 (N.D. Ill. 2008).

Here, the Bureau has alleged that approximately 8,600 ITT students suffered financial harm when they were directed by ITT into the "private loans" between July and December 2011. Compl. ¶¶ 120, 162. The private loans into which ITT channeled its students carried interest rates as high as 16.25% and origination fees as high as 10%, which "translates to thousands of dollars for each customer over the life of the loan, and millions of dollars across the group." Pl.'s Resp. 20 (citing Compl. ¶ 124). According to the Bureau, the students who took out these loans were predominantly in fragile financial health, and, according to ITT's own projections, some 64% of them defaulted, exacerbating their debt and financial distress. Compl. ¶¶ 124, 154. These allegations adequately describe a substantial financial injury to the students.[30]

Rather than engage directly with these accusations, ITT contends that the Court necessarily lacks a metric by which to judge whether the students were harmed by the loans. According to ITT, there is no "discernible standard" by which the Court could determine that a loan was "unaffordable"; ITT points out that while there is a lengthy regulation defining the scope of affordability for *mortgages,* no analogous authoritative guidance exists for these loans. Def.'s Br. 20–21 (citing 12 C.F.R. § 1026.43(c)). Further, ITT cites 12 U.S.C. § 5517(o), which prohibits the Bureau from establishing a "usury limit applicable to an extension of credit"—with the implication that if the Bureau cannot impose usury caps, then it cannot object to loans on the basis of their unaffordability. *Id.* at 21. ITT's thrusts here are misdirected. The Bureau is not

---

[30] ITT takes issue with the Bureau's "conclusory assertions" regarding what students "wanted, understood, or knew" when they took out the ITT private loans. Def.'s Br. 20 (citing *Adams v. City of Indianapolis,* 742 F.3d 720, 728 (7th Cir. 2014)) (discussing the *Twombly*/*Iqbal* pleading standards requiring a plaintiff to "state a claim to relief that is plausible on its face"). This objection is misguided. Regardless of whether the Bureau's allegations regarding the students' state of mind are plausible, that question has no bearing on whether the students suffered substantial harm.

required to plead here that the private loans crossed any sort of discrete "affordability" threshold, nor does the ultimate success of the claim hinge on whether the rates charged in the loans are *per se* unreasonable or usurious. Rather, the Bureau must plead that ITT's conduct harmed the students' welfare, and the facts it has plausibly pled could support such an inference if proven.

More to the point, ITT objects that the Complaint has not stated a claim that the misconduct caused the harm of which the Bureau complains. The essence of ITT's argument is that the Bureau has not shown that ITT *forced* any students to take out the private loans—and that without coercion it is impossible to show that ITT's actions were the proximate cause of any subsequent financial harm. Def.'s Br. 21–23. ITT relies on *Cohen v. American Security Insurance Co.*, 735 F.3d 601 (7th Cir. 2013). In that decision, the Seventh Circuit addressed a homeowner's claim against a mortgage lender that, pursuant to its contract with the homeowner, had procured hazard insurance on the homeowner's behalf after the homeowner allowed previous coverage to lapse. 735 F.3d at 603–606. The homeowner brought a claim under Illinois's analogue to the FTCA, alleging that the lender had engaged in unfair practices by "coercing" her into paying for high-cost insurance coverage. The court rejected the plaintiff's theory, reasoning that the coverage requirement was common in such contracts, and "if it was not coercive to demand that [she] maintain insurance coverage on the property (and it certainly was not), it cannot have been coercive for [the lender] to threaten to invoke the contractual remedies available for breach of that duty." *Id.* at 610. In other words, the plaintiff had not demonstrated that either the circumstances of the signing of the contract, or its enforcement by the lender in signing up the plaintiff for expensive coverage, had unduly impeded the plaintiff's freedom of choice.

*Cohen* affirms that "insisting that a contract partner fulfill his contractual duties . . . is not coercion," 735 F.3d at 609, but it does not speak meaningfully to the separate question of when the circumstances of a contract's formation may be coercive. Rather, the Seventh Circuit there found that the plaintiff's allegations of unfairness in the contracts' origins lacked plausibility: the lender disclosed the insurance requirement "clearly and fully" throughout the process, and the plaintiff's allegation that the lender was providing a "kickback" to its insurance affiliate was conclusory. *Id.* at 609–610. In short, there was "a total absence of the type of oppressiveness and lack of meaningful choice necessary to establish unfairness." *Id.* at 610 (quoting *Robinson v. v. Toyota Motor Credit Co.*, 775 N.E.2d 951, 962 (Ill. 2002)).

While relevant, formal contract principles are thus "not conclusive" in an unfair practices claim, for this "is an action that charges 'unfairness,' and legality and unfairness are not necessarily congruent." *FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 948, 953 (N.D. Ill. 2008) (citing *F.T.C. v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972)). Here, the Bureau alleges that ITT's tactics were effectively "coercive" for two principal reasons. First, the "repackaging" process was "rushed and controlled" by the ITT financial aid staff, and staff members employed intrusive and overbearing tactics in ensuring that students rolled over their Temporary Credit into private loans, Compl. ¶¶ 85, 87; some students, according to the Bureau, "did not even realize they took out the ITT Private Loans because of the rushed and automated manner in which ITT Financial Aid staff processed ITT students' paperwork." *Id.* at ¶ 142. Second, ITT used the withholding of course materials, transcripts, and transfer credits as leverage to convince impecunious students who had already invested greatly in an ITT education to take out the loans to enable them to keep their heads above water. *Id.* at ¶¶ 160(a)–(c). *See also* ¶¶ 8, 9, 87, 97, 139–140. The Complaint states that "[s]ome students objected to the ITT Private Loans, but they

were told that if they refused to use them, they either had to pay any outstanding Temporary Credit and the next year's tuition gap—which most could not do—or leave the school in the middle of their program and forfeit the investment they had made so far." *Id.* at ¶ 140. Courts have found that both types of tactic can satisfy the causation element of an unfair practices claim. *See F.T.C. v. Zamani,* 2011 WL 2222065, at *9 (C.D. Cal. June 6, 2011) (purveyors of mortgage refinance service committed unfair practices by signing up customers by misrepresenting the "success rate" of the modification program, the recoverability of an up-front fee, and the rates and terms available). In particular, we agree with the Bureau that the threat of withholding vital educational assets like transcripts and class credit is not only likely but appears calculated to produce considerable leverage over ITT students, and that under certain circumstances the deployment of such leverage could fairly be termed "coercive." *Am. Fin. Servs. Ass'n,* 767 F.2d at 973 ("The injury resulting from 'threats' or 'suggestions' of seizure [of household furnishings pursuant to a credit agreement] is not limited to psychological harm. Consumers threatened with the loss of their most basic possessions become desperate and peculiarly vulnerable to any suggested 'ways out.'").

The Bureau has alleged that ITT rushed students through the loan "repackaging" process, left them ill-informed about the nature of the contracts they were signing, and exploited the students' vulnerable financial positions to steer them into loans that provided a temporary solution to the students' problems (and benefited ITT's balance sheets) but deepened their long-term distress.[31] Without abandoning the common law's presumption that parties should be held

---

[31] ITT objects that the bulk of the Bureau's allegations regarding misinformation to "mystery shoppers" fall outside the statute's effective date, and that the Bureau has not specifically alleged that misconduct occurred during the "repackaging" stage for continuing students. Def.'s Br. 21–22. To the contrary, although many of the "mystery shopper" allegations are not directly relevant here, the Complaint also contains a number of allegations that specifically concern the process in question. *See* Compl. ¶¶ 85–87, 97–98, 138–142. Even if we view the allegations

to the terms of contracts to which they freely agreed, our inquiry into "unfair" practices under the statute requires us to look past form and into substance. *See IFC Credit,* 543 F. Supp. 2d at 948 ("[T]his is not an action at common law for simple breach of contract or for fraud. Rather it is an action under a federal statute that makes unlawful conduct causing substantial, unavoidable injury . . . ."). These allegations, if substantiated, would satisfy the Bureau's burden of proof on the question of substantial injury and causation.

### 2. "Reasonably Avoidable"

Our inquiry into whether consumers' injury was "reasonably avoidable" focuses on "whether the consumers had a free and informed choice," and it thus overlaps significantly with the previous discussion of coercion. *See Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012); *Am. Fin. Servs.*, 767 F.2d at 976. "An injury is reasonably avoidable if consumers 'have reason to anticipate the impending harm and the means to avoid it,' or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact." *Id.* (quoting *Orkin,* 849 F.2d at 1365–1366 (11th Cir. 1988)).

Here, ITT contends that any injury sustained by the students as a result of the private loan debt was reasonably avoidable because the students always remained formally free to fill their "tuition gaps" by any means they chose; indeed, as the Complaint concedes, some students opted not to take out the private loans and managed to satisfy their debts by other means. *See* Compl. ¶¶ 25–26, 143. Moreover, ITT notes that the contracts signed by students did disclose the nature

---

concerning ITT's conduct towards prospective students as mere table-setting and immaterial to the CFPA claims, the Complaint contains more than enough relevant allegations to state a claim.

of both the Temporary Credit and the private loans, and it further insists that the school disclosed the effect of outstanding debt on the transferability of credit. Def.'s Br. 24.

In response, the Bureau urges that its pleadings demonstrate that, regardless of whether the injury was formally avoidable, students lacked a free choice as a practical matter. First, the Bureau has alleged that the choice students made was not a meaningfully "informed" one, since ITT staff engaged in so much "hand-holding" that the students' role was often reduced to signing forms already completed for them.[32] Compl. ¶¶ 85–87, 91, 141–142. Since the public policy in favor of holding contracting parties to their agreements depends in part on their having a "full opportunity to read" the contracts in question, these allegations at least raise a question regarding whether the students were adequately informed. *Cf. Cromeens, Holloman, Sibert, Inc. v. AB Volvo,* 349 F. 3d 376, 394 (7th Cir. 2003). *See also Paterson v. Wells Fargo Bank, N.A.,* 2012 WL 4483525, at *5 (N.D. Ill. Sept. 27, 2012) (allowing claim under the Illinois analogue to the FTCA to proceed even where written terms of the contract conflicted with alleged misrepresentations). Second, the Complaint states that the "choice" enjoyed by students, even assuming they fully understood its nature, was an illusory one. As the FTC has explained in fleshing out its parallel "unfairness" standard, an injury may not be reasonably avoidable where a defendant "exercise[s] undue influence over highly susceptible classes of purchasers." *See IFC Credit Corp.,* 543 F. Supp. 2d at 946 (quoting H.R. Rep. No. 156, Pt. 1, 98th Cong., 1st Sess. 37 (1983)). The Bureau's allegations that ITT leveraged the threat of withholding transcripts and

---

[32] The Bureau additionally alleges that the students were victims of a larger "bait-and-switch" pattern, since they were rushed through the earlier Temporary Credit applications and ill-informed of the nature of that debt—which in turn rendered them more vulnerable when it came time to "repackage." Compl. ¶¶ 103–108. We agree with ITT, however, that we must focus on ITT's conduct that fell within the July–December 2011 period in which the CFPA was enforceable; since the allegations center on the private loans and no student's initial and "repackaging" stages could both have taken place in that six-month window, we do not directly consider the allegations of antecedent misconduct. *See* Def.'s Reply 12–13.

denying transferability of credits, or expelling students outright if they failed to make up their "tuition gap," describe a scenario in which students were boxed into a corner. *See* Compl. ¶¶ 87, 160(a)–(b), 163. *See also Wendorf v. Landers,* 755 F. Supp. 2d 972, 979 (N.D. Ill. 2010) (noting that a plaintiff states a claim under Illinois's analogue to the FTCA where "the defendant's conduct gave plaintiff no reasonable alternative" to suffering the injury in question).[33]

We agree with the Bureau. Regardless of any difficulty it may face in proving its allegations that ITT guided its students into a precarious position and exploited that vulnerability to channel them into unwise and damaging debt obligations, its Complaint satisfactorily states its claim at this stage. We "give the plaintiff the benefit of imagination, so long as the hypothesis are consistent with the complaint." *Bissessur v. Ind. Univ. Bd. of Trustees,* 581 F.3d 599, 603 (7th Cir. 2009) (quoting *Sanjuan,* 40 F.3d at 251).

### 3.  Whether Harm Outweighed Benefit to Consumers

The harm-benefit balance associated with ITT's conduct is a particularly fact-dependent issue. *See Am. Fin. Servs.,* 767 F.2d at 986–988. Perhaps realizing as much, neither party devotes much discussion to it. ITT argues, in effect, that the lifelong benefits flowing from a post-secondary degree must outweigh the economic harm allegedly inflicted by the loans: "Many graduates from various types of post-secondary educational institutions advance in their careers following the 'entry-level' positions obtained upon graduation . . . . [A]bsent private loans, students with Temporary Credit balances or otherwise in need of funds to cover an additional

---

[33] ITT points to *Todd v. Collecto, Inc.*, 731 F.3d 734 (7th Cir. 2013), an FDCPA decision in which the Seventh Circuit observed that it was not "unfair," in the context of the FDCPA, "for a college to withhold a student's transcript until he has settled her debt to the school." 731 F.3d at 739. As the court in *Todd* itself noted, however, the three-part standard for unfairness under the FTCA (and now the CFPA) does not fit perfectly with the "unfairness" described in Section 1692f of the FDCPA. *Id.* Regardless, the question of whether it is unfair to *collect* a pre-existing debt by withholding transcripts is a different question than whether it is unfair to goad students into *incurring* debt by use of such a threat.

year of tuition would almost certainly have been worse off." Def.'s Br. 25. This argument misses

the central thrust of the Bureau's accusations: that ITT's unfair practices lay in creating a stark

choice between the private loans and dropping out of college. *See* Pl.'s Resp. 25. The finder of

fact will thus need to frame the question more precisely, inquiring whether the harm of the

situation created by ITT's conduct outweighed any benefit such conduct conveyed upon

students.

The Bureau has alleged in its Complaint that "[t]he injury to the ITT students who took

out ITT Private Loans was not outweighed by countervailing benefits to consumers or to

competition." Compl. ¶ 164. Standing on its own, such an allegation might be inadequate and

conclusory. Read in conjunction with the Complaint's other, more detailed, allegations

concerning the nature of the harm suffered, however, we conclude that it is sufficient to state a

claim that the third element of the "unfairness" test has been satisfied. *See* Compl. ¶¶ 46–49, 85–

87, 97–98, 138–142.

**B. Counts Two and Three: Abusive Practices**

The Bureau brings two counts alleging that "abusive" acts or practices in violation of 12

U.S.C. § 5531: Count Two alleges that ITT took unreasonable advantage of the inability of

consumers to protect their own interests in selecting or using a consumer financial product,

Compl. ¶¶ 166–173; and Count Three alleges that ITT took unreasonable advantage of the

reasonable reliance by consumers on ITT to act in the consumers' interests. Compl. ¶¶ 174–182.

**1.  "Unreasonable Advantage"**

As a threshold matter, ITT objects that the Bureau has not stated a claim that it took

"unreasonable advantage" of its students—a necessary element of both of its claims regarding

"abusive" acts or practices. Def.'s Br. 25–27 (citing 12 U.S.C. § 5531(d)(2)). In ITT's words: "There is no allegation that ITT received any fees or interest from any private loan. To the contrary, the complaint alleges that ITT 'guaranteed' the very same private loans for which it supposedly predicted a 60% default rate . . . which undermines the Bureau's unlikely claim of 'advantage.'" Def.'s Br. 26 (citing *Bissessur,* 581 F.3d at 603–604).

But the Bureau has, in fact, alleged that ITT derived an advantage from its conduct. In the absence of evidence indicating that we should do otherwise, we construe the language of a statute according to its "plain language, giving the words used their ordinary meaning." *Lara Ruiz v. I.N.S.*, 241 F.3d 934, 940 (7th Cir. 2001) (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs., Ltd. P'ship,* 507 U.S. 380, 388 (1993)). The ordinary meaning of "to take advantage of" is "to make use of for one's own benefit," to "use to advantage," or to "profit by." Webster's Third New Int'l Dictionary 2331 (3d ed. 1993). Here, the Bureau has alleged that signing up students for the private loans enabled ITT to clear the "doubtful assets" represented by the Temporary Credit off its balance sheets, converting it into "immediate income and cash-on-hand." Compl. ¶ 114.[34] In fact, the Bureau's allegations quote senior ITT officials stating that ITT designed the loan programs precisely in order to derive such an economic benefit from them. Compl. ¶¶ 134–137. Given the Bureau's allegations about the unfair nature of the students'

---

[34] ITT argues that since the Bureau has not alleged that the school caused the students' subsequent high default rate on the private loans, the Bureau cannot have stated a claim that the loans were "abusive." While proximate cause is indeed a necessary element of a theory of liability, as ITT points out, *see* Def.'s Br. 27 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014)), the Bureau's claim is not that ITT derived advantage from the fact that the students later defaulted, but from the cash flow generated by their taking out the loans in the first place. Whether or not ITT caused the students later to default—or derived some sort of benefit from that default—is irrelevant.

predicament, the Complaint sufficiently pleads that ITT derived "unreasonable advantage" from its conduct, according to the term's ordinary, broad meaning.[35]

## 2. Count Two: Students' Inability to Protect Their Interests

In defining the scope of "abusive" acts or practices, the CFPA lays out several routes to liability. One means by which a defendant's conduct may be abusive is if the defendant "takes unreasonable advantage of . . . the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service." 12 U.S.C. § 5531(d)(2)(B).

ITT assails the Complaint for "posit[ing] that students were unable to protect their own interests in the repackaging process 'because' they lacked the resources or time to repay any outstanding Temporary Credit or obtain private loans elsewhere." Def.'s Br. 28 (citing Compl. ¶ 171). ITT continues, objecting that "[t]he complaint does not show that ITT limited the amount of time students had to arrange financing from any source, prevented students from paying with family funds, or prevented students from taking a period to work and then resuming their education when they had paid their Temporary Credit balance." *Id.* Contrary to ITT's assertions, the Bureau has in fact alleged that ITT contributed to the students' vulnerability by knowingly waiving its minimal credit criteria to allow students to take out Temporary Credit, and by

---

[35] As to the "unreasonable" nature of the advantage ITT allegedly derived from the transactions, ITT objects that its course of conduct is simply "how financial aid in higher education works." In support, it cites *Jackson v. Bank of America Corp.*, 711 F.3d 788 (7th Cir. 2013), in which the Seventh Circuit dismissed a procedural unconscionability claim regarding a mortgage contract because "[t]here is nothing in the record to indicate that [plaintiffs] did not understand the terms of their loan . . . [or] that the [plaintiffs] did not understand the potential consequences of defaulting on their loan." 711 F.3d at 793. Here, the Bureau has, in fact, alleged such lack of understanding on the part of the students. *See* Compl. ¶ 142. More to the point, ITT's "slippery slope" argument is inapposite. If, once the factual record is developed, it turns out that ITT's practices are fully in line with the practices of colleges and universities nationwide, the Bureau would face a steep (but not necessarily impossible) hill to climb in establishing that such common practices "take unreasonable advantage" of students. But the Bureau has alleged conduct that— we hope—is not simply par for the course; at any rate, the "everyone else is doing it" defense does not support a motion to dismiss absent an argument that the allegations are legally invalid or factually implausible.

engaging in the same aggressive, hand-holding tactics described elsewhere in connection with the later "repackaging" process. Compl. ¶¶ 100, 63–84.

Regardless of who caused the students' vulnerability, the Bureau's burden here is to show that they were, in fact, unable to protect their own interests. As we have discussed before in connection with "coercion" and the lack of a reasonable alternative, ITT's argument relies too heavily on a formalistic reading of the statutory requirement. It is likely true, as ITT asserts, that students never lost the theoretical power to defend their interests, in the sense that they could have walked away from ITT entirely and refused to take out new debt. *See* Def.'s Br. 28. A reasonable reading of the statutory language, however, is that it refers to oppressive circumstances—when a consumer is unable to protect herself not in absolute terms, but *relative to* the excessively stronger position of the defendant. *See, e.g., Ting v. AT&T,* 319 F.3d 1126, 1148–1149 (9th Cir. 2003) (noting that, under doctrine of procedural unconscionability, a literal, physical lack of consumer choice is not necessary to show oppressiveness). *See also* Carey Alexander, *Abusive: Dodd-Frank Section 1031 and the Continuing Struggle to Protect Consumers,* 85 St. John's L. Rev. 1105, 1114–1119 (2011) (discussing the legislative history of the "abusive" standard as consistent with the understanding that it is a statutory codification of the common-law doctrine of unconscionability). As we have already discussed, the Complaint sufficiently alleges that such oppressive circumstances existed here.[36] We therefore conclude that Count Two of the Complaint states a claim for relief.

---

[36] In its brief, ITT again raises the argument that using transfer credits as leverage cannot be a violation of the statute because precedent dictates that "educational institutions may—and do—withhold credits for transferring students with outstanding tuition balances." Def.'s Br. 28 (citing *In re Oliver,* 499 B.R. 617, 620–621 (Bankr. S.D. Ind. 2013)). *In re Oliver,* the new case ITT cites (in addition to *Todd v. Collecto,* which we have already discussed), is a bankruptcy decision concerning whether an unpaid balance on a student account meets the definition of an education loan under the statutory discharge exception for student loan debt. 499 B.R. at 620–621. Like *Todd,* it has nothing to do with the separate question of whether it may be "abusive" for an educational institution to use its authority to withhold transcripts or transfer credits as leverage in persuading students to take out new debt.

### 3.   Count Three: Students' Reasonable Reliance on ITT

Count Three of the Complaint asserts an alternate ground of ITT's liability for "abusive" conduct: that ITT "[took] unreasonable advantage of . . . the reasonable reliance by the consumer on a covered person to act in the interests of the consumer." 12 U.S.C. § 5531(d)(2)(C).

"Reasonable reliance" is a familiar concept in tort law, and it is a question of fact generally not appropriate for resolution on a motion to dismiss, or even summary judgment. *See Pippenger v. McQuik's Oilube, Inc.*, 854 F. Supp. 1411, 1427 (S.D. Ind. 1994) ("[G]enerally speaking, the questions of reasonable diligence and reasonable reliance are questions of fact for the jury to decide."). To withstand a motion to dismiss, a plaintiff's allegations that a group of consumers relied on a defendant's representations need not contain specific allegations as to any particular consumer's individual reliance. *See F.T.C. v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991) ("It would be inconsistent with the statutory purpose [of the FTC] for the court to require proof of subjective reliance by each individual consumer."); *F.T.C. v. Kuykendall,* 371 F.3d 745, 765–766 (10th Cir. 2004).

The Bureau has alleged that, throughout their time at the school, ITT staff represented to students that they would "work in the interests of [their] students to better their lives." Compl. ¶¶ 29–32. This included orally assuring prospective students of large salaries, "usually . . . six figures," upon graduation. *Id.* at ¶¶ 40–42. According to the Complaint, "[s]ome ITT students accepted the ITT Private Loans because they believed ITT Financial Aid staff was acting in their interests in signing them up for such loans, and they believed, based on ITT's representations, that ITT in general was acting in their interest to better their lives." Compl. ¶ 141. Thus, the Bureau has alleged both that ITT students relied upon staff members' representations as to the private loans, and that students act in reasonable reliance on the school's misrepresentations as to

the nature and role of the financial aid staff. *See* Compl. ¶¶ 95–96 ("Despite words and actions to the contrary, ITT staff was not trained, nor was the staff instructed, to safeguard students' financial interests . . . . Most of ITT's metrics for evaluating the performance of Financial Aid staff were related to how many students had completed financial aid packages . . . ."). *See also Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of the Fed. Reserve Sys.*, 773 F. Supp. 2d 151, 172 (D.D.C. 2011) ("Even though mortgage brokers operate on behalf of neither the consumer nor the creditor, reasonable consumers may erroneous believe that loan originators are working on their behalf.") (citations omitted).[37]

ITT argues broadly that the claim fails both because its allegations are inconsistent with the Bureau's theory that students were "coerced" into taking out the private loans, and because the Bureau's allegations are nothing more than "bare assertions." ITT's first argument is groundless: a complaint may advance inconsistent legal theories based on the same set of facts. *See Tamayo v. Blagojevich,* 526 F.3d 1074, 1086 (7th Cir. 2008) ("Although our pleading rules do not tolerate factual inconsistencies in a complaint, they do permit inconsistencies in legal theories.") (citing *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805 (1999)). The Bureau has alleged no facts overtly inconsistent with those upon which it bases its claim in Count Three.

ITT's argument that the Bureau's allegations fail the *Iqbal*/*Twombly* "plausibility" standard spring from a similarly erroneous premise. ITT insists that paragraphs 65 and 92 of the complaint, alleging that students were given insufficient information about the loan process and

---

[37] As we have stated above, we conclude that the absence of overt misrepresentations in the forms the students signed, to the extent that their formal correctness conflicts with the Bureau's allegations of oral misrepresentations, is not fatal to the Bureau's claim. While a common-law fraud action might be frustrated under most conditions by the existence of a written contract without any factual misrepresentations, the standard may be different under a statutory cause of action—particularly one that does not authorize private enforcement. *See FTC v. Minuteman Press,* 53 F. Supp. 2d 248, 262–263 (E.D.N.Y. 1998) ("Thus, . . . a conflict between a specific disclaimer and a contrary oral representation—typically fatal to a reasonable reliance argument in a purely private suit—is . . . actionable by the FTC . . . .").

that ITT employees "did all the work" for them, offer only "bare conclusions." Def.'s Br. 31

(citing Compl. ¶¶ 65, 92). As for the allegations of misconduct more specifically relating to the

"repackaging" process, Compl. ¶¶ 85–87, 138–142, ITT asserts that they are nothing more than

"'threadbare recitals of the elements of a cause of action' devoid of factual content." *Id.* (quoting

*Iqbal,* 556 U.S. at 678).

"A plaintiff must provide only enough detail to give the defendant fair notice of what the

claim is and the grounds upon which it rests, and, through his allegations, show that it is

plausible, rather than merely speculative, that he is entitled to relief." *Reger Dev., LLC v. Nat'l

City Bank,* 592 F.3d 759, 764 (7th Cir. 2010) (quoting *Tamayo,* 526 F.3d at 1083). In other

words, a plaintiff must plead facts that plausibly give rise to a right to relief—but he need not, at

this stage, *prove* those facts. The portions of the Complaint to which ITT refers are not "recitals"

of the elements of a legal claim at all; rather, they are allegations of fact. *See* Compl. ¶¶ 85–87,

138–142. Reading these allegations in the context of the extensive and detailed allegations of the

Complaint as a whole, we find that they contain enough facts to "state a claim to relief that is

plausible on its face." *See Killingsworth,* 507 F.3d at 618–619. The Bureau need not do more at

this stage, and we thus reject ITT's repeated suggestions otherwise.

We thus conclude that Count Three, like Count Two, satisfies the pleading requirements

imposed by the Federal Rules of Civil Procedure and withstands ITT's motion to dismiss.

## V.      Count Four: Violation of the Truth in Lending Act

"Regulation Z," promulgated by the Federal Reserve Board in implementation of the

Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, requires the disclosure of certain "finance

charges," as defined by the Act, in writing before the consummation of the transaction giving

rise to the charges. 12 C.F.R. §§ 1026.17, 18(d).[38] *See also* 15 U.S.C. § 1605(a) (defining "finance charge"). The Bureau alleges that the discount ITT offered students who paid off their Temporary Credit balances in a lump sum constituted a finance charge, and that ITT's failure to disclose the charge violated TILA and Regulation Z. Compl. ¶¶ 184–191. We do not reach the merits of the claim, because we agree with ITT that Count Four is barred by the applicable statute of limitations.

ITT contends that this claim is governed by the section of TILA governing "civil liability," which provides that "any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e); *Basham v. Fin. Am. Corp.*, 583 F.2d 918, 927 (7th Cir. 1978). Because the Complaint was filed on February 26, 2014—well more than one year after the conduct described in the allegations occurred—ITT asserts that this action lies outside the limitations period. Def.'s Br. 34; Def.'s Reply 19.

The Bureau counters that its claim in Count Four is governed not by TILA's civil liability provision, but by 15 U.S.C. § 1607, the section of the statute which grants the Bureau—together with several other federal agencies—power to "enforce[e] compliance with any requirement imposed" by the Act. 15 U.S.C. § 1607(a)(6). Enforcement actions brought under 15 U.S.C. § 1607 are not subject to the one-year statute of limitations imposed by Section 1640. *See* Fed. Reserve Bd. Consumer Compliance Handbook, Regulation Z, at 57. *See also Household Credit Servs., Inc. v. Pfennig,* 541 U.S. 232, 238 (2004) (noting that the Federal Reserve Board and its

---

[38] The CFPA subsequently transferred rulemaking authority pursuant to this regulation from the Federal Reserve to the Bureau. *See* Pl.'s Resp. 33 n.23.

staff have been designated by Congress as the primary source for interpretation and application of TILA).

We disagree with the Bureau's interpretation of the distinction between the two statutory provisions. First, we see no persuasive evidence that 15 U.S.C. § 1640 governs only *private* civil actions. The provision itself does not exclude actions in which a government agency is the plaintiff, and in fact it explicitly recognizes the possibility of intervention by federal agencies in civil suits initiated by private parties. 15 U.S.C. § 1640(e)(1).[39] Second, agency interpretations support the conclusion that the agency enforcement powers contemplated by Section 1607 are *administrative* in nature, and are separate from any authorization to file civil suits. In interpreting its enforcement authority under TILA, the Comptroller of the Currency stated that "[t]he Comptroller's administrative authority to enforce compliance with the Truth in Lending Act and Regulation Z . . . [is] based on Section 108 of the Act [15 U.S.C. § 1607] and 12 U.S.C. § 1818(b) [the Federal Institutions Supervisory Act]. The authority of these sections is separate from and independent of the civil liability provisions of . . . the Truth in Lending Act." OCC Interpretive Letter, Fed. Banking L. Rep. 85,040 (Oct. 6, 1977). Similarly, the Federal Reserve's interpretive manual for Regulation Z states that "*regulatory administrative* enforcement actions . . . are not subject to the one-year statute of limitations." Fed. Reserve Board Consumer Compliance Handbook, Regulation Z at 57 (Nov. 2013) (emphasis added).

In a recent decision, the Supreme Court reaffirmed the principle that "the cases in which a statute of limitation may be suspended by causes not mentioned in the statute itself . . . are very

---

[39] As the Bureau notes, the Third Circuit in *Vallies v. Sky Bank,* 591 F.3d 152 (3d Cir. 2009), did refer to Section 1640 as creating a "private" cause of action. 591 F.3d at 156. That discussion was outside the context of the distinction we examine here, however; we read the court's description as a slightly overbroad paraphrase rather than a considered restriction.

limited in character, and are to be admitted with great caution; otherwise the court would make the law instead of administering it." *Gabelli v. SEC*, 133 S. Ct. 1216, 1224 (2013) (quoting *Amy v. City of Watertown,* 130 U.S. 320, 324 (1889)). Here, Congress demonstrated its "concern that a creditor not face limitless liability in terms of time" by setting a one-year statute of limitations for the filing of civil suits under TILA. *Consol. Bank, N.A., Hialeah, Fla. v. U.S. Dep't of Treasury, Office of Comptroller of Currency,* 118 F.3d 1461, 1467 (11th Cir. 1997). When the government chooses to enforce the Act by filing a civil suit rather than resorting to the administrative actions under its power, we see no reason why the same congressional concerns should not apply—indeed, they may apply with still greater force. *See Gabelli,* 133 S. Ct. at 1223 (noting that government "civil penalty" actions under the SEC, among other things, "label defendants [as] wrongdoers"). This seems to be a case of first impression: ITT can point to no cases in which a court has applied the civil statute of limitations to a suit brought by the Bureau, and the Bureau has pointed to no civil actions brought by the CFPB—or any other agency— pursuant to 15 U.S.C. § 1607. Under such circumstances, guided by the agencies' own interpretive language and the jurisprudential rule-of-thumb recently reaffirmed by the Supreme Court, we decline to read an exception for agency plaintiffs into the one-year statute of limitations imposed by TILA's civil liability provision. We therefore dismiss Count Four as time-barred.

## V.    Failure to Join Necessary Parties

Hidden within ITT's brief is an extraordinarily concise alternative argument for dismissal. "To the extent the Bureau seeks to recover from ITT the payments made by students to third-party lenders pursuant to their lending contracts, the complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(7) for failure to join those third-party lenders as

necessary parties." Def.'s Br. 14 (citing *United States ex rel. Hall v. Tribal Dev. Corp.*, 100 F.3d 476, 479–481 (7th Cir. 1996)). Federal Rule of Civil Procedure 19 prescribes a multi-part inquiry to guide courts and parties in ensuring "the joinder of all materially interested parties to a single lawsuit so as to protect interested parties and avoid waste of judicial resources." *Davis Cos. v. Emerald Casino, Inc.*, 268 F.3d 477, 481–482 (7th Cir. 2001) (quoting *Moore v. Ashland Oil, Inc.*, 901 F.2d 1445, 1447 (7th Cir. 1990)). ITT has not engaged in any analysis under this standard, nor has it provided any argument at all in support of its Rule 12(b)(7) motion other than the single sentence quoted above. We deem this underdeveloped argument to be waived. *See DeBoard v. Comfort Inn,* 2013 WL 5592418, at *3 (S.D. Ind. Oct. 9, 2013) (citing *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012)). *See also United States v. Berkowitz,* 927 F.2d 1376, 1384 (7th Cir. 1991) ("Perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.").

## Conclusion

For the foregoing reasons, ITT's motion to dismiss is DENIED as to Counts One, Two, and Three of the Complaint, and GRANTED as to Count Four of the Complaint.

IT IS SO ORDERED.

03/06/2015

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Cynthia Gooen Lesser
CONSUMER FINANCIAL PROTECTION BUREAU
cynthia.lesser@cfpb.gov

Maureen E. McOwen
CONSUMER FINANCIAL PROTECTION BUREAU
molly.mcowen@cfpb.gov

Nicholas Finnbarr Smyth
CONSUMER FINANCIAL PROTECTION BUREAU
nick.smyth@cfpb.gov

Ethan H. Levisohn
COSNUMER FINANCE PROTECTION BUREAU
ethan.levisohn@cfpb.gov

Lucas C. Townsend
GIBSON DUNN & CRUTCHER LLP
ltownsend@gibsondunn.com

Timothy John Hatch
GIBSON DUNN & CRUTCHER LLP
thatch@gibsondunn.com

Jason J. Mendro
GIBSON DUNN CRUTCHER LLP
jmendro@gibsondunn.com

Douglas R. Cox
GIBSON, DUNN & CRUTCHER, LLP
dcox@gibsondunn.com

Philip A. Whistler
ICE MILLER LLP
philip.whistler@icemiller.com

Thomas Eugene Mixdorf
ICE MILLER LLP
thomas.mixdorf@icemiller.com